FILED
JAMES BONINI
CLERK

09 NOV 27 AM 9: 27

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
EAST. DIV. COLUMBUS

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| **THE LITTLE HOCKING** | : | **CASE NO.:**  **2 : 0 9 cv 1 0 8 1** |
| **WATER ASSOCIATION, INC.,** | : | |
| 3998 St. Rt. 124 | : | |
| P.O. Box 188 | : | **JUDGE SMITH** |
| Little Hocking, OH 45742 | : | |
|  | : | |
| Plaintiff | : | **JUDGE MAGISTRATE JUDGE KING** |
|  | : | |
|  | : | |
|  | : | |
| v. | : | **COMPLAINT AND JURY** |
|  | : | **DEMAND** |
|  | : | |
| **E.I. DU PONT DE NEMOURS** | : | |
| **AND COMPANY,** | : | |
| a Delaware Corporation, | : | |
| 1007 Market Street | : | |
| Wilmington, Delaware 19898 | : | |
|  | : | |
| Statutory Agent: | : | |
| CT Corporation System | | |
| Registered Agent for E.I. DuPont | | |
| De Nemours and Company | | |
| 1300 E. 9th St. | | |
| Cleveland, OH  44114 | | |
|  | | |
| Defendant | | |

**NATURE OF THE ACTION**

1.   The Little Hocking Water Association, Inc. ("Plaintiff" or "Little Hocking"), a non-

profit public water provider, brings this action because E.I. Du Pont De Nemours and

Company ("Defendant" or "DuPont"), has and continues to improperly handle, treat,

store, dispose of, and/or discharge pollutants, including hazardous and solid wastes and mixtures of such wastes (collectively referred to as "Hazardous Waste(s)") in a manner that has resulted in, and will continue to result in the adulteration and Hazardous Waste pollution of Little Hocking's forty-five acres of wellfields, including the aquifer beneath the surface of the wellfields (collectively referred to as the "Wellfields").

2.   DuPont's acts of Hazardous Waste disposal occurred at and about its Washington Works Plant and/or at and about identified and unidentified waste disposal areas (collectively referred to as "the Facilities") as described herein.

3.   At all relevant times, Hazardous Waste has contaminated and still threatens to contaminate Little Hocking's water distribution system, which consists primarily of pipes, pumps, and storage tanks (collectively referred to as the "Distribution System").

4.   The ultimate sources of the Wellfields' and the Distribution System's adulteration and Hazardous Waste contamination (collectively, "Contamination") are the Facilities.

5.   Hazardous Wastes that are or have been handled, treated, stored and/or disposed of at the Facilities include, but are not limited to, perfluorinated compounds (including perfluorinated acids, sulfonates, phosponates, and telomer alcohols), precursors to perfluorinated compounds and/or other toxic and hazardous materials that may be released with these perfluorinated compounds (all collectively referred to herein as "PFCs").

6.     For the purposes of this Complaint, the term "PFCs" includes all PFCs and their derivatives and/or salts that have been or may be detected in or that are threatening the Wellfields or Little Hocking's water users, including *inter alia*, PFOA, PFOS, PFBA, PFBS, PFHxA, PFHxS, PFPeA, PFHpA, PFNA, PFDA, PFDS, PFUnA, PFDoA, and PFTrA (a table listing the chemical name, acronym, fluorocarbon chain length, and molecular formula of these exemplar PFCs is attached as Exhibit 1). The term "PFCs" also includes each perfluorinated chemical known to DuPont that has not yet been identified to Little Hocking.

7.     PFCs are not naturally occurring. Thus, the PFCs released by DuPont and found in the environment or humans are attributable to human activity. For example, PFOA is produced synthetically and is also formed through the degradation or metabolism of other fluorochemical products, such as higher order carbon chain length PFCs (i.e. "precursor" chemicals).

8.     PFCs persist more than 2000 years in the environment and for many years in the bodies of humans and have been associated with significant health consequences for both human and non-human receptors, such as cancer, impaired immune system function, developmental effects, increased cholesterol, and impaired fertility (see ¶¶ 82 through 128).

9.     By its past and ongoing releases of such Hazardous Wastes, DuPont has contributed to the past and present handling, storage, treatment, transportation and/or disposal of solid or hazardous waste at the Facilities which may present an imminent and substantial endangerment to health and/or the environment in violation of the Resource Conservation and Recovery Act ("RCRA") 42 U.S.C. §6972(a)(1)(B).

10.   As described herein, DuPont's conscious and reckless disregard for the rights of Little Hocking (and the threat posed by the Contamination to human health and the environment) and DuPont's intentional, willful, knowing, wanton, negligent, and/or reckless acts and omissions have caused substantial and significant harm to Little Hocking and its property and have a great probability of causing further substantial and significant harm.

11.   As described herein, DuPont's acts and omissions described herein also violate applicable state common law and, in the alternative, federal common law.

12.   As provided under applicable state common law and federal common law, including the Restatement of Torts (Second) §929, DuPont is liable for all direct and consequential damages as described herein (including, *inter alia*, special damages, punitive damages, and damages for discomfort and annoyance) proximately caused by the past, present, and future Contamination of Little Hocking's property.

13.   Little Hocking seeks injunctive relief (as described more fully herein) abating the endangerment to human health and the environment. Such relief sought includes DuPont's funding of a comprehensive cleanup of the Wellfields and investigation, assessment and cleanup or containment of all sources of Contamination.

14.   Little Hocking also seeks additional relief (as described more fully herein) to remedy the economic harm, property damage, and annoyance and discomfort it has suffered, including, *inter alia*, compensatory damages, punitive damages, and attorneys' fees and costs.

## JURISDICTION AND VENUE

### Subject Matter Jurisdiction

15.   This Court has subject matter jurisdiction pursuant to 42 U.S.C. § 6972(a) as a result of the claim made under RCRA.

16.   This Court also has subject matter jurisdiction pursuant to 28 U.S.C. §1331 in that Little Hocking makes claims against DuPont under federal common law.

17.   Subject matter jurisdiction over the state law claims against DuPont is proper pursuant to 28 U.S.C. §1367.

### Venue

18.   Venue is proper in this district pursuant to 42 U.S.C. § 6972(a), in that the endangerment alleged herein is occurring and may continue to occur within this district, including in Ohio's Washington and Athens counties.  Venue is also proper under 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district and/or a substantial part of the property that is the subject of the action is situated in this judicial district.

### Personal Jurisdiction

19.   This Court has jurisdiction of the person over DuPont because DuPont owns and operates facilities in Ohio, has transacted business in Ohio, and has contracted to supply its goods in Ohio.  Additionally, DuPont's acts or omissions, as described herein, have caused tortious injury to Little Hocking in Ohio. Further, DuPont regularly does or solicits business in Ohio, has persistently through its acts or omissions caused contamination in Ohio, derives substantial revenue from goods used or consumed in Ohio, and/or has continuous and systematic contacts with Ohio.

## PARTIES

### Little Hocking

20.  Little Hocking is a non-profit Ohio corporation whose business is supplying potable water to its customers ("water users").  Little Hocking currently supplies water to residences, to schools, to childcare, elderly care and healthcare facilities, and to businesses, in at least eight townships in Washington County, Ohio and two townships in Athens County, Ohio, including approximately 12,000 people. Additionally, from approximately 1975 until 1992, Little Hocking sold bulk water to the Warren Community Water and Sewer Association, whose office is located in Warren Township, Ohio.

21.  Little Hocking owns property, including the Wellfields, located in Washington County, Ohio and the Distribution System, located in Ohio's Washington and Athens counties.

22.  Little Hocking holds legal title to the Wellfields and has a property interest in the groundwater and water system underlying Little Hocking's land.

23.  The Wellfields consist of approximately 45 acres of land and the soil and groundwater beneath the land.  Little Hocking's ownership of said land includes the right to use the groundwater as the source for the water that Little Hocking pumps to its service region of Ohio.

24.  Little Hocking has never granted DuPont permission to place Hazardous Waste on Little Hocking's property.

25.  DuPont possesses no lease hold, title, or any other property interest in the Wellfields.

26.   The Wellfields are located solely in Ohio on the north side of the Ohio River, directly across the river from DuPont's Washington Works Plant.  The Wellfields are within the zone of influence of DuPont's releases of Hazardous Wastes.

27.   For example, the Wellfields are immediately adjacent to the Ohio River and have been flooded by that river.

28.   Additionally, the Wellfields are located directly downwind of the Washington Works Plant.

29.   The Wellfields include four production wells ("Wells 1, 2, 3, and 5"), all of which have been and continue to be contaminated by DuPont's releases of Hazardous Wastes.  At relevant times, as a result of the Contamination, Little Hocking only made emergency use of one of these wells (Well 5). Such Contamination threatens to restrict the use of Well 5 and other wells in the future.

30.   Little Hocking has an interest in protecting the environment and the people in the area in which it owns or uses property.  As a public water purveyor, Little Hocking has an interest in protecting the integrity of its Wellfields and its Distribution System to ensure:

    (a)   the health of its water users;

    (b)   the health of other human and non-human receptors that may be impacted by the Contamination; and,

    (c)   the integrity of the Wellfields' environment.

31.   Little Hocking's interests are heightened by the high levels of PFOA in the Wellfields, the high levels of PFOA in the blood of many of Little Hocking's water users, and the actual and potential impact of PFOA on fetuses and the young.

32.   Little Hocking also has an interest in protecting the environment and the people in areas into which the Contamination is migrating and will continue to migrate.

33.   Because DuPont has caused and continues to cause the Contamination and threatens to cause further Contamination, Little Hocking has a recognizable interest in enforcing federal and state law, including *inter alia* the RCRA Imminent and Substantial Endangerment provision.

### DuPont

34.   DuPont is a Delaware corporation authorized to conduct business in the states of Ohio and West Virginia and has a principal place of business at 1007 Market Street, Wilmington, Delaware 19898.

35.   DuPont owns and operates the Washington Works Plant, located at Route 892 South DuPont Road, Washington, Wood County, West Virginia, 26181, and has been the owner and operator of the Washington Works Plant at all times relevant to this Complaint.

36.   As part of its operations, DuPont operates, has operated, and/or has used the Facilities, which upon information and belief, are located on both sides of the Ohio River and include, but are not limited to: landfills; surface impoundments (such as anaerobic digestion ponds); injection wells; waste incinerators; open burning areas; and, other waste disposal areas known to DuPont but that have not been identified to Little Hocking.

## THE CONTAMINATION

### DuPont's use and releases of Hazardous Wastes

37.   PFCs are synthetic carbon chain compounds that contain large amounts of the element fluorine. PFCs are used in the manufacture of numerous consumer products.

38.   By 1951, DuPont was purchasing large quantities of at least one PFC – ammonium perfluorooctanoate (APFO) – manufactured by 3M for use by DuPont at the Washington Works Plant.   The APFO product with CAS No. 3825-26-1 was marketed by the 3M Company under the tradename FC-143.

39.   APFO is a detergent/surfactant that DuPont currently manufactures, processes and/or distributes in the United States in connection with, at least, its Teflon®-related products.

40.   APFO exists in humans, biota, and the environment as PFOA, as defined below.[1]

41.   DuPont has used PFOA at its Washington Works Plant from at least 1951 to the present.

42.   Powdered (dry) PFOA was used by DuPont in its fluoropolymer manufacturing processes at the Washington Works Plant until the late 1980s.   Liquid PFOA has been used by DuPont since then.   PFOA is present in the air emissions, liquid discharges, and solid residues from these processes.

---

[1] APFO is the ammonium salt of PFOA.   PFCs, including APFO and PFOA are sometimes referred to by the number of carbon atoms in their molecular structures.   Thus, both APFO and PFOA – which are eight-carbon compounds – are commonly referred to as "C8" by the press and other third parties.   DuPont has used APFO as a processing aid for over 50 years.   When in contact with water and biologic media, APFO separates (dissociates) to its ammonium cation   (positively charged component) and its PFOA anion (negatively charged component).   When measuring APFO in humans or the environment, scientists generally estimate the level of APFO present by testing for the concentration of the PFOA anion.   Since APFO exists in humans and the environment as PFOA anion and is measured by the presence of its PFOA anion, this Complaint uses "PFOA" to identify the chemical commonly referenced in outside sources as "C8."

43. The PFOA that has been used (and that is currently manufactured) by DuPont is not pure PFOA, which has a carbon chain length of eight (i.e. "C8"). Rather, it is made up of a mixture of PFCs that range in carbon chain length from, for example, six (i.e. "C6") to sixteen (i.e. "C16"), with the majority of that mixture containing PFOA.

44. DuPont's releases of Hazardous Wastes include but are not limited to DuPont's past and ongoing:

    (a) releases of PFCs from one or more of the Facilities;

    (b) venting PFCs into the air;

    (c) treating waste containing PFCs in anaerobic digestion ponds;

    (d) disposing of waste containing PFCs into landfills; and,

    (e) discharges of PFCs into other pathways that connect the Facilities to the Wellfields, including subsurface, water (e.g. the Ohio River), and air pathways.

45. DuPont has represented to regulators and the public that the transport of air emissions from the Washington Works Plant is the most likely transport pathway from the Plant to the Wellfields.

46. In a 2003 PFOA-related West Virginia class action lawsuit against DuPont:

    (a) DuPont represented to the court that there is no way for DuPont to prevent its PFOA emissions from getting into the class members' drinking water;

    (b) DuPont represented to the court that there are no alternatives to using PFOA in any of the Washington Works Plant's manufacturing operations; and,

    (c) the court found that DuPont continues to actively and intentionally release PFOA from the Washington Works Plant into the air and water.

47.   By May 2000, DuPont learned that 3M, a manufacturer of the PFOA DuPont had been using for a period of time, had decided to stop manufacturing and selling PFOA, based upon concerns associated with the bio-persistence and toxicity of PFOA and the threat that the U.S. EPA would ban the material.

48.   Despite knowledge of the same bio-persistence and toxicity concerns known to 3M relating to the use of PFOA and its release into the environment, DuPont has refused to immediately stop using or making PFOA and other PFCs that might degrade into, form, or otherwise result in the presence of PFOA and/or other PFCs in the environment.

49.   In fact, DuPont continues to manufacture PFOA at its own plant in Fayetteville, North Carolina, to send to the Washington Works Plant and elsewhere.

50.   DuPont is under no legal duty to eliminate the production, purchase, or use of PFOA (including its precursors).

51.   However, even if DuPont does, in fact, eliminate the need to make, buy, or use such PFOA, the Hazardous Wastes already released by DuPont will remain in the environment and in the bodies of people far into the future.

52.   Scientists have found that the chemicals proposed by DuPont and other companies as replacements for PFOA are – like PFOA – extraordinarily persistent in the environment, already found in people's blood, and cross the placenta to contaminate babies before birth.

### DuPont's knowledge and failure to inform

53.   For many years, DuPont hid the truth about its polluting activities, the threat of adverse health effects from pollutants like PFOA, and even the fact of the Contamination.

54.   Since the late 1970s, DuPont has arranged and paid for medical monitoring, including periodic blood sampling, of those DuPont employees working at the Washington Works Plant who have been exposed to PFOA during the course of their employment.

55.   In 1981, 3M advised DuPont that PFOA may cause birth defects in laboratory animals.

56.   Also in 1981, DuPont possessed a document describing the results of a blood sampling study DuPont conducted on at least seven of its pregnant or recently pregnant employees employed at the Washington Works Plant.   This document identified the levels of PFOA in the blood of these employees and described the health status of their children.   One purpose of the blood sample study was to evaluate the employees for PFOA exposure, to monitor umbilical cord blood for the presence of PFOA, to test the babies' blood for the presence of PFOA, and to evaluate reproductive outcomes among the tested employees, including birth defects.

57.   By 1981, DuPont was aware of the presence of PFOA in the umbilical cord blood of at least one of the tested employees and in the blood of the baby of another tested employee.   Thus, DuPont knew or should have known from this study that PFOA moved from the mother through the placenta, to the fetus.

- 12 -

58. Additionally, DuPont knew that two of the tested female employees referenced above gave birth to babies with birth defects.

59. DuPont did not disclose the 1981 human blood sampling/birth defect data to the U.S. EPA, even though, in 1982, it reported to U.S. EPA data regarding the transplacental movement of PFOA in rats.

60. Additionally, DuPont – even earlier than 1981 – knew about the potential presence of organic fluorine in human blood; knew that certain PFCs were a potential source of that organic fluorine; initiated steps to evaluate whether its PFC workers also had elevated levels of organic fluorine in their blood; and, discovered an indication of possible effects on the liver and other disorders in those employees.

61. In 1982, DuPont's Director of its Medical Division told DuPont that "there is great potential for current or future exposure of members of the local community from emissions leaving the DuPont Washington Works plant perimeter."

62. By 1983, DuPont had begun evaluating the potential concentrations of PFOA in the Ohio River from its Washington Works Plant and had begun ground level modeling for potential levels of PFOA discharged into the air from its Washington Works Plant.

63. By 1984, DuPont knew that its PFOA releases were contaminating surrounding properties. Specifically, DuPont knew by at least June 1984 that water supplied by Little Hocking contained PFOA at, at least, 0.5 parts per billion ("ppb"). Further, by 1984, DuPont knew that its releases of PFOA onto Little Hocking's property, including the Wellfields, would continue and that levels in the Wellfields and Distribution System would increase because of DuPont's ongoing releases and the

persistence of PFOA in the environment.  Notwithstanding this knowledge, DuPont did not inform Little Hocking of the Contamination.

64.  In fact, by 1986 DuPont had detected PFOA concentrations exceeding 1 ppb in water supplied by the Lubeck Public Service District (then located in West Virginia near DuPont's Washington Works Plant).

65.  Also by 1986, DuPont was "evaluating the possibility of purchasing the public water supply wells owned by the Lubeck Public Service District."

66.  When evaluating whether to purchase the Lubeck Public Service District water supply wells, DuPont considered the value of protecting DuPont's Washington Works Plant from liability from, at least, the possible accusation of contaminated groundwater.

67.  By April of 1991, DuPont had closed on its purchase of the Lubeck Public Service District property that had been located near DuPont's Washington Works Plant.

68.  DuPont has made no offer to purchase Little Hocking's Wellfields and has refused to otherwise provide an alternate water supply for Little Hocking water users.

69.  In 1987, DuPont's Medical Director told DuPont that the Washington Works Plant needed to place the "highest priority" on issues relating to the presence of PFOA outside the Washington Works Plant boundaries.

70.  By 1991, DuPont had established an internal "community exposure guideline" of 1 ppb for PFOA in public drinking water supplies for humans.

71.  DuPont established this "community exposure guideline" unilaterally, without knowledge of or any input from the scientific community at large.

72.  As of 1991, DuPont described its "community exposure guidelines" as guidelines below which no effect to members of the community during continuous 24-hour a day exposure to a chemical or physical agent is expected.

73.  DuPont further described its "community exposure guideline" as being based on the best available information from industrial experience, animal toxicity studies, controlled human exposure studies, and epidemiological findings.

74.  By 1984, DuPont knew of the presence of PFOA in the Wellfields, the hazardous nature of PFOA, and the likelihood of its continued migration outside of the boundaries of the Washington Works Plant.

75.  DuPont did not advise Little Hocking of either the likely presence of PFOA in the Wellfields or PFOA's threat to the public.

76.  Little Hocking learned of the PFOA levels in the Wellfields at a January 2002 West Virginia Department of Environmental Protection meeting.  Samples were taken in the Wellfields in December 2001 only because Little Hocking asked to be included in the sampling performed under a West Virginia administrative order.

77.  The results of the December 2001 sampling showed PFOA concentrations up to 7.69 ppb in the Wellfields – more than seven times DuPont's community exposure guideline.

78.  DuPont's internal community exposure guideline was not revealed until years later in litigation involving water users in the area of the Facilities.

79.  Prior to 2003, only one U.S. commercial lab had the analytical capability to do the special testing needed to detect PFCs.  The terms of the lab's contract with DuPont barred the lab from testing for PFCs for any other entity without DuPont's consent.

In 2002, DuPont specifically refused to give the lab permission to analyze independent samples for Little Hocking. The inability for any water company, including Little Hocking, to detect PFCs through normal testing was fully understood by DuPont.

80.  Thus, over the years, DuPont, knowingly, intentionally, wantonly, willfully, recklessly, and/or negligently concealed from Little Hocking and government authorities the nature and extent of its releases of Hazardous Wastes, the resulting Contamination, and the health and environmental threats posed by such releases and Contamination.

81.  As part of its operations, DuPont has generated, handled, treated, stored, transported and/or disposed of Hazardous Wastes at its Washington Works Plant. At all times relevant herein, DuPont knew of the toxic, hazardous, persistent, and migratory nature of such Hazardous Wastes, including PFCs, and displayed a knowing, wanton, willful, reckless, and/or negligent disregard for the likelihood that its disposal practices had injured and would continue to injure the neighboring people, businesses and surrounding property.

**Threats to human health and the environment**

82.  In its operation of the Washington Works Plant, DuPont has allowed and continues to allow the release of Hazardous Wastes in such a manner or in such amounts as to endanger the safety, health, or welfare of the surrounding community, including: (a) Little Hocking's water users and (b) members of communities into which the Contamination is migrating.

83. DuPont's releases of Hazardous Wastes are also endangering the health of the environment.

84. For example, at least one PFC (i.e. PFOA) is persistent in the environment (lasts more than 2000 years) and persists for many years in the bodies of humans and animals.

85. Scientists have found the half-life of PFOA in humans to be approximately 4 years, but the half-life can vary depending on factors such as PFOA exposure levels, age, and metabolic rate. PFOA is in the blood of the general population in all geographic regions of the United States.

86. The U.S. EPA has identified potential human health concerns from exposure to PFOA.

87. PFOA is hepatotoxic (liver toxin) to animals.

88. PFOA is bioaccumulative in humans.

89. PFOA is associated with developmental effects in animals and humans.

90. DuPont and other researchers have studied PFOA in lab animals. Studies show that there are gender differences in the elimination of PFOA in rats.

91. PFOA, upon dermal contact, has multiple immune system effects, including suppression of the human immune system and the potential increase in the likelihood of developing asthma and allergies.

92. In fact, in May 2008, West Virginia University scientists reported preliminary findings concerning PFOA's negative impact on the immune system. These

preliminary findings were based on data collected as part of the "C8 Health Project"[2] and included findings that:

    (a)  higher levels of PFOA in people correlate with lower levels of a protein that helps the body fight bacteria, viruses, and other pathogens; and,

    (b)  higher PFOA levels in West Virginia and Ohio residents are associated with higher levels of two enzymes that can indicate liver damage, and also with lower levels of a liver protein that is an important part of the body's defense against infection.

93.    West Virginia University scientists also reported preliminary findings suggesting that elevated PFOA levels in children are associated with high cholesterol levels and that thyroid function was clearly affected in PFOA-exposed people, with the effect strongest at moderate levels of exposure, rather than the highest exposures.

94.    At least one DuPont study also links PFOA with high cholesterol levels in humans.

95.    Most recently, a study released in November 2009 shows results consistent with other epidemiologic studies in finding a positive association between PFOS and PFOA and cholesterol.

96.    Other recent (2009) studies demonstrate that PFOA and PFOS negatively impact fertility, including increased "time to pregnancy" and significantly reduced sperm count.

---

[2] The "C8 Health Project" was established as part of a settlement in the West Virginia class action lawsuit, *Leach, et al. v. E.I. DuPont de Nemours and Company*. The purpose of the C8 Health Project is to collect health data from the class action members, including the amount of PFOA in class members' blood to be used to determine whether PFOA exposure is related to disease.

97.   PFOS and PFOA have been found in human and rat umbilical cord blood, demonstrating movement across the placental barrier between mothers exposed to PFOS and PFOA and their fetuses.

98.   In February 2007, Johns Hopkins released a study showing a discernable negative association between birth weight of babies born in Baltimore, Maryland who were part of the study and the concentrations of PFOA in umbilical cord blood.

99.   In September 2002, the U.S. EPA's Director of the Office of Pollution Prevention and Toxics initiated a priority review of PFOA.   U.S. EPA determined from studies that PFOA causes developmental toxicity and other effects in laboratory animals.

100.   PFOA toxicity for most non-cancer endpoints (i.e. reproductive, developmental, or immune system) are generally considered to follow linear rather than non-linear relationships – that is, a little PFOA causes some damage, a little more PFOA causes more damage.

101.   In June 2005, January 2006, and again in May 2006, a Science Advisory Board C8 Review Panel ("SAB Panel") assembled by the U.S. EPA issued scientific reports describing PFOA as a "likely" human carcinogen.

102.   California's Safe Drinking Water and Toxic Enforcement Act of 1986 (or "Proposition 65") requires the State to publish (and update at least once a year) a list of chemicals known to cause cancer or birth defects or other reproductive harm.   In October 2009, the science advisory board of the California Environmental Protection Agency's Office of Environmental Health Hazard Assessment included PFOA "and its salts and transformation and degradation precursors" as one of five selected chemicals for review for possible listing under California's Proposition 65.

103.    In a March 2009 U.S. EPA Safe Drinking Water Act Consent Order with DuPont, U.S. EPA determined that PFOA and its salts (including APFO) may present an "imminent and substantial endangerment to human health at concentrations at or above 0.40 ppb in drinking water." The 0.40 ppb "action level" supersedes an earlier action level of 0.50 ppb, set in a November 2006 Safe Drinking Water Act consent order. The levels of PFOA in Little Hocking's aquifer remain above 0.40 ppb.

104.    Both the negotiated 0.50 ppb action level and the newer 0.40 ppb action level are inadequate levels based on *sub-chronic* exposure. Neither level protects Little Hocking's water users, who have been *chronically* exposed. In an effort to account for *chronic lifetime exposure*, independent scientists at the New Jersey Department of Environmental Protection identified a PFOA drinking water guidance value of 0.04 ppb, an order of magnitude (ten times) lower than the "action level" set forth in the March 2009 Safe Drinking Water Act consent order.

105.    Effective December 1, 2006, the Ohio EPA listed "ammonium perfluorooctanoate CAS No. 03825-26-1" as a toxic air contaminant.

106.    It is likely that one or more other PFCs possess similar characteristics and threats of adverse health effects as set forth above.

107.    The U.S. EPA has found that PFOA can remain in the human body for years and that drinking water contaminated with PFOA can produce concentrations of PFOA in blood serum that are higher than the concentrations present in the water itself.

108.    Indeed, individuals whose residential water is supplied by Little Hocking, and who have had their blood tested for PFOA and other PFCs, have some of the highest

non-worker PFOA blood levels of any reported in the United States or Canada to date
– ranging from approximately 112 ppb to, at least, 1950 ppb.

109.    The average level of PFOA in the blood of people in the United States is 5.6 ppb.

110.    Given the high levels of PFOA in the blood of Little Hocking's water users along
with the biopersistent nature of PFOA in all environmental media and humans,
continued PFOA exposure is a relatively greater threat to Little Hocking's water users
than to those with blood levels of PFOA at the national average.

111.    Other PFCs have also been detected in the blood of the individuals who use Little
Hocking water, including, but not limited to, PFHpA, PFNA, PFDA, PFUnA, PFOS,
and, PFHxS.

112.    Upon information and belief, the PFCs with carbon chains longer than that of
PFOA (i.e. longer than eight) are even more dangerous to human health than PFOA
itself.  To date, no known studies and assessments of risks associated with PFCs have
taken into account any additive and synergistic toxic effects of mixtures of these
compounds.

113.    Additionally, the releases of Hazardous Wastes from the Facilities have occurred
and will continue to occur in such a manner as to threaten or adversely affect air, soils,
sediments, surface water and groundwater, and biota used by or accessible to Little
Hocking, its water users, and/or the surrounding community.

114.    To date, the levels of PFOA in the Wellfields are the highest known in any public
water supply in the world.

115.    Sampling results for Little Hocking's individual production wells have shown
levels of PFOA as high has 18.6 ppb (Well 5); 3.90 ppb (Well 3); 9.89 ppb (Well 2);

and, 9.03 ppb (Well 1). The level of PFOA in water just prior to entering the Distribution System has been measured as high as 8.3 ppb. Sample results from 2001 to the present show an overall trend of increasing PFOA levels in the Wellfields.

116.    Samples have also been taken from test wells and test borings in the Wellfields. Sampling results for Little Hocking's test wells have shown levels of PFOA as high as 37.1 ppb (test well number 4). Sampling results for test borings on the Wellfields have shown levels of PFOA as high as 78 ppb.

117.    By contrast, testing results for other water suppliers in the vicinity of DuPont's Washington Works Plant show PFOA levels as high as 0.705 ppb (Village of Pomeroy), 0.248 ppb (City of Belpre), 0.726 ppb (Tuppers Plains-Chester Water District), 0.102 ppb (Mason County PSD), and 2.09 (Lubeck Public Service District).

118.    Additionally, soil in the Wellfields also contains substantial amounts of, at least, PFOA. PFOA has been detected in soil samples taken from the Wellfields at levels greater than 100 ppb.

119.    Based in part on its discussions with DuPont, U.S. EPA projected a PFOA *half-life* in soil of 20 years and recognized that contaminated soil is a major contributor to groundwater contamination. In fact, according to U.S. EPA, such a long soil half-life means that, once the overlying soil is contaminated, the groundwater will be contaminated for decades. EPA also recognized that soil levels of PFOA can be over ten times more than the PFOA levels found in the underlying aquifer.

120.    Other PFCs have also been detected in the Wellfields, including at least PFBA, PFHxA, PFHxS, PFPeA, PFHpA, PFNA, and PFOS.

121.   In addition to the endangerment posed directly to the contaminated soil, groundwater, surface water, and air from DuPont's releases of Hazardous Wastes, non-human receptors exposed to the contaminated environment, including the Wellfields, are at significant risk of harm.  For example, PFOA and PFOS are linked to:

    (a)   immune system impacts on certain sentinel animal species (which are often used as indicators of the overall health of an ecosystem);

    (b)   elevated mortality in *unexposed* progeny of freshwater macro-invertebrates with exposure in the parental generation; and,

    (c)   disruption of the endocrine system in wildlife.

122.   PFOA is also known to be readily taken up by plants (including wild plants as well as crops grown on contaminated soil) and to bioaccumulate in the food chain.

123.   Further, since PFOA is not the only PFC in the environment, including the Wellfields, mixtures of PFCs raise the likelihood of additive and synergistic impacts on non-human receptors.

124.   Non-human receptors are in the pathways of migration of Hazardous Wastes from the Facilities and secondary sources, including the Wellfields.

125.   Pursuant to a 2005 Memorandum of Understanding with the U.S. EPA, DuPont conducted an environmental assessment to characterize past and current PFOA releases associated with the Washington Works Plant.  As required under the Memorandum of Understanding, a peer consultation panel ("Panel") was convened by an independent third-party administrator to evaluate DuPont's work, which included an assessment of PFOA in biota.  In its July 15, 2009 Final Report, the PCP found,

generally, that "significant limitations and omissions" exist in the data sets collected and relied on by DuPont.

126.    The Panel further recommended that "a significantly expanded set of data collection and analyses…be conducted to fill critical gaps."  With respect to biota, the Panel recognized the "need to determine PFOA concentrations in several biological matrixes to accurately assess exposures" but noted particular data gaps in DuPont's assessment.  For example, DuPont presented no data for PFOA in fish from water bodies near landfills associated with the Washington Works Plant.

127.    Thus, DuPont has not collected sufficient data to accurately characterize the impact of its releases of PFOA on the environment and on non-human receptors at and around the Washington Works Plant, including at and around the Wellfields.

128.    Similarly, DuPont has not collected data necessary to accurately characterize the impact of its releases of other PFCs on:

    (a)    Little Hocking water users;

    (b)    other human and non-human receptors at and about the Washington Works Plant, including at and around the Wellfields; and,

    (c)    the environment at and around the Washington Works Plant, including at and about the Wellfields.

### The threats to human health and the environment are ongoing

129.    Little Hocking has historically sought finished drinking water that is non-detect for PFOA and other PFCs.  Finished water is water that enters Little Hocking's distribution system.

130.  In November 2007 – in consultation with Little Hocking and its consultants – DuPont completed construction of a building that contains experimental granular activated carbon "beds." (the "Carbon Plant") The Carbon Plant is located near the Wellfields and is an interim attempt to lower PFOA concentrations in the water pumped into Little Hocking's Distribution System (i.e. the water sent to Little Hocking's water users).

131.  DuPont has refused to agree to fund operation of the Carbon Plant until the threat to the health of those chronically exposed is eliminated, i.e. until PFOA and other PFCs are removed from the Wellfields, or until a PFC-free alternate water supply is entering the Distribution System.

132.  Despite the recognized endangerment to the environment and Little Hockings' water users and the water users' chronic exposure to the Contamination, there is presently no agreement by DuPont to:

　　　(a)　　identify or eliminate the sources of the Contamination;

　　　(b)　　remove the PFOA and other PFCs  in the Wellfields;

　　　(c)　　prevent the further migration of PFOA and other PFCs from the Wellfields identify or eliminate the sources of the Contamination;

　　　(d)　　remove the PFOA and other PFCs  in the Wellfields;

　　　(e)　　prevent the further migration of PFOA and other PFCs from the Wellfields and other Little Hocking property;

　　　(f)　　perform testing to ensure that the Carbon Plant removes PFCs other than PFOA from the water sent to Little Hocking water users (other PFCs can break down in the environment to form PFOA);

  (g)  perform testing to ensure that the Distribution System is free of PFCs, or,

  (h)  secure an alternate water supply for Little Hocking.

133. DuPont is also not preventing further migration of PFOA and other PFCs through Little Hocking's aquifer into the environment, including water supplies of other communities.

134. Similarly, the U.S. EPA's Safe Drinking Water Act consent order with DuPont does nothing to ensure that the Carbon Plant is removing PFCs other than PFOA, including PFOA precursors.  The consent order also does not require DuPont to operate the Carbon Plant as long as PFCs other than PFOA, including PFOA precursors, remain in the Wellfields.

135. Further, scientists have found that continued exposure at the consent order's 0.40 ppb action level is still expected to lead to elevated serum levels.

136. Additionally, drinking water is not the only human exposure pathway associated with DuPont's releases of Hazardous Wastes.  For example, U.S. EPA has recognized that data shows that eating food grown in an area with PFOA soil contamination is correlated with higher human blood levels of PFOA.  Thus, since PFOA is known to bioaccumulate in plants and animals, home-grown produce, farm produce, locally-produced milk and meat, fish from surface waters, game animals, and other biota are pathways of exposure that also present an endangerment to human health.

137. The Contamination caused by DuPont is not contained and continues to spread.

138. If the contaminated soil in the Wellfields is not remediated, such contamination will continue to impact the underlying aquifer far into the future.

139.    Further, the water in the Wellfields that is not captured by Little Hocking's wells continues to migrate from the Wellfields.  Hence, DuPont's disposal practices have rendered the Wellfields a secondary source of contamination.

140.    Little Hocking has a particular concern for these issues in light the fact that the Contamination continues to migrate to other locations in the environment.

141.    DuPont continues to actively and intentionally release Hazardous Wastes from the Facilities.

142.    DuPont's violations of applicable state law and federal law are current and ongoing.  Additional contamination is continuing and will likely continue to occur if proper steps are not taken.

### Impacts on Little Hocking's operations

143.    In addition to the Contamination of its Wellfields and Distribution System and the blood of its water users, DuPont's releases of Hazardous Wastes have and continue to cause substantial economic and other business-related damage, annoyance, and discomfort to Little Hocking.

144.    In 2002, when Little Hocking learned of the preliminary information about the Contamination, Little Hocking's General Manager, Bob Griffin ("Mr. Griffin"), took steps to uncover the true scope of the Contamination problem, to find short and long-term solutions to the problem, and to advise Little Hocking's water users of what the small organization knew about the scope of the public health threat.

145.    In addition to mitigating its damages, Little Hocking entered into no fewer than seven tolling agreements with DuPont, agreed to help administer a bottled water program, and filed all of the documents with the Ohio EPA necessary for DuPont to

construct and partially maintain the Carbon Plant.  In an additional effort to mitigate damages, Little Hocking spent hundreds of staff and professional hours planning and reviewing plans for the Carbon Plant that now houses Little Hocking's entire water treatment facilities.  The Carbon Plant would not be necessary but for the presence of DuPont's Hazardous Wastes in the Wellfields.  In taking these actions, Little Hocking acted in reliance on at least two agreements under which DuPont promised to fund the construction and operation of a Filtration Plant for Little Hocking.

146.    As a direct and proximate result of the Contamination, Mr. Griffin has been diverted from the central purpose for which he was hired by Little Hocking – planning for future system growth and infrastructure improvements.

147.    As a direct and proximate result of the Contamination, the professional life of Mr. Griffin has been consumed since 2002 with Contamination-related activities.  He has worked with regulatory agencies and participated in numerous government meetings, including many U.S. EPA meetings, to try to understand the scientific and public health issues in order to be able to provide informed responses to customer concerns. He has worked with hundreds of water users to meet their Contamination-related needs.  He has worked with consultants and other professionals to help him evaluate scientific, technical, legal, and research issues.

148.    As a direct and proximate result of the Contamination, the work of Little Hocking's Board and other staff has likewise been dominated since 2002 by Contamination-related issues.  In fact, DuPont's past and ongoing conduct has come to disrupt all normal business activity of Little Hocking.

149.    Additionally, since at least August 2004, Little Hocking sought to have bottled water supplied (at DuPont's expense) to Little Hocking's water users.  In August 2005 – after Little Hocking provided PFOA blood level information to DuPont – DuPont agreed to pay for such water and its delivery to persons living within Little Hocking's service area ("Bottled Water Program").

150.    Little Hocking urged DuPont to continue the Bottled Water Program until removal of PFOA in the Distribution System had been verified by several rounds of testing demonstrating that the Distribution System had been purged of PFOA and that no new PFOA was being added to the Distribution System.  DuPont, however, stopped payments for delivery of bottled water to Bottled Water Program Participants on November 30, 2007.

151.    Further, the Contamination threatens or adversely affects Little Hocking's ability to fully utilize its property, including the Wellfields and the Distribution System.  As a result, Little Hocking has suffered and will suffer damages.

152.    For example, due to the levels of PFOA in Little Hocking's Production Well 5, Little Hocking used Well 5 during only one 4-day period from September 2002 until the Filtration Plant was installed in late 2007.

153.    Little Hocking also had long-term plans to double its production capacity and planned on developing another well to further that goal.   Because of the Contamination, Little Hocking has halted plans to develop other wells.

154.    Additionally, in 1985, Little Hocking purchased approximately 20 acres for future wellfield development.  Due to the Contamination, Little Hocking has lost use of the

additional acreage (part of the Wellfields) and the aquifer below.  Little Hocking has, therefore, incurred damages in the lost value of its aquifers.

155.    Up until July 1, 2009, Little Hocking was classified by the Ohio Environmental Protection Agency ("OEPA") as a Class I water system.

156.    As a Class I water system, Little Hocking was required to have a Class I operator at the Carbon Plant for a minimum of 1.5 hours per week.

157.    In 2009, the Ohio Environmental Protection Agency ("OEPA") determined that Little Hocking – as a result of the Contamination and the necessity of the Carbon Plant – would be subject to OEPA regulation as a Class II water system.  As a Class II water system, Little Hocking is now required to have a Class II water operator at the Carbon Plant for a minimum of 20 hours per week.

158.    As a result of Little Hocking's reclassification to a Class II water system, Little Hocking will incur costs associated with ensuring that a Class II water operator is present at the Carbon Plant for the minimum 20 hours per week, thereby increasing operating expenses and diverting personnel from other tasks.

159.    Little Hocking has also incurred substantial consultant fees and the cost associated with loss of goodwill, reputation and corporate opportunity.

160.    Little Hocking has incurred substantial attorneys' fees as a direct result of the Contamination.

161.    Said Contamination has proximately caused Little Hocking to suffer harm to its property and a decline in the value of its property.

162.    The Contamination has also caused Little Hocking to incur substantial costs associated with, by way of example:

(a)    extensively participating (through the efforts of Mr. Griffin and Little Hocking's consultants) in the PFOA-related U.S. EPA Enforceable Consent Agreement ("ECA") process that directly impacts Little Hocking's property and testing of its Wellfields;

(b)    extensively participating (through the efforts of Mr. Griffin and Little Hocking's consultants) in the review of the Carbon Plant design plans;

(c)    issuing at least three notices of contamination and other advisories to its water users in order to keep its water users informed of the threat of adverse health effects associated with drinking water contaminated with PFOA and in order to continue avoiding the use of Well 5;

(d)    testing the levels of PFOA and other PFCs in the blood of approximately 25 of its water users; and,

(e)    administering the Bottled Water Program (for which DuPont agreed to reimburse Little Hocking, but, to date, has not done so).

163.    Due to DuPont's acts and omissions, Little Hocking will also incur substantial future costs associated with, for example:

(a)    operating and maintaining the Carbon Plant to remove PFOA from its water until alternate water is provided;

(b)    locating an alternate water source;

(c)    obtaining rights in an alternate water source; and,

(d)    installing, operating, and maintaining pipelines and other equipment necessary for the ongoing provision of alternate water.

164. In addition, as a result of DuPont's acts and omissions, Little Hocking's ability to borrow money using contaminated land as collateral has been impaired.

165. In short, Little Hocking has been converted into a response center for Contamination-related issues as Little Hocking has struggled to provide its water users with clean, unadulterated drinking water, fought to preserve its reputation and fought to protect the Wellfields, now and in the future.

166. Because of DuPont's acts and omissions, Little Hocking owns contaminated Wellfields and owns a Distribution System that continues to be threatened by the contamination. The presence of the Contamination has exposed Little Hocking to litigation risks related to the contamination of its property. Little Hocking is, therefore, entitled to an appropriate ongoing indemnity for any cost, including attorneys' fees, related to the Contamination.

167. In addition, DuPont unlawfully created a latent condition that renders the Wellfields and Distribution System defective. As a result, Little Hocking has suffered damages equal to the cost of remedying the defect.

168. Further, DuPont's improper appropriation of land and aquifer beneath the surface of the Wellfields amounts to a private taking of property, including the underlying water resources and renders DuPont liable for the value of the unauthorized appropriation and use, from the inception of the appropriation through the removal of the latent defect.

169. The illicit storage of DuPont's PFCs occupies the aquifer beneath the surface of the Wellfields and Little Hocking is entitled to full legal and equitable remedies to regain possession of said subsurface.

170.    Little Hocking is entitled to damages for the rental value associated with DuPont's illicit storage of PFCs in the Wellfields.

171.    DuPont's acts and omissions have and continue to usurp Little Hocking's ability to fulfill its mission to further public health by providing safe, unadulterated drinking water.

172.    DuPont's acts and omissions, including concealing what it knew for years, prevented Little Hocking from taking earlier steps to prevent damages to the Wellfields and otherwise having the opportunity to attempt to mitigate such damage.

173.    Despite subverting the mission of Little Hocking, contaminating the Wellfields and hiding the truth about what it did, DuPont has sought to coerce Little Hocking to give up its constitutional rights to protect its property and the safety of its Wellfields and Distribution System in the future.

174.    As a direct and proximate result of the DuPont's acts and omissions, Little Hocking has and/or will:

(a)    incur costs and expenses for environmental testing and investigation;

(b)    incur costs and expenses associated with preliminary assessment, investigation and cleanup of the Contamination and with containment or cleanup of the sources of the Contamination;

(c)    suffer a reduction in the value of its property, including the Wellfields and Distribution System, and its business enterprise;

(d)    be deprived of the ability to fully use and enjoy its property without risking harm to its water users and others;

- 33 -

(e)　　be deprived of the ability to make full use of its property, including its production wells;

(f)　　incur costs related to the risk of third-party lawsuits and administrative actions;

(g)　　incur costs related to locating an alternate source of drinking water, transporting said water to Little Hocking for any needed treatment and distribution, and operating and maintaining said transportation system;

(h)　　incur loss of corporate opportunities;

(i)　　incur costs related to operating and maintaining the Carbon Plant;.

(j)　　incur costs related to the Bottled Water Program;

(k)　　incur costs related to the reclassification of Little Hocking from a Class I to a Class II water provider;

(l)　　incur costs related to Little Hocking's oversight of the activities noted above;

(m)　　incur attorney fees, expert fees, and litigation expenses.

175.　　As provided under applicable state common law and federal common law, including the Restatement of Torts (Second) §929, DuPont is liable for all direct and consequential damages as described herein (including, *inter alia*, special damages, punitive damages, and damages for discomfort and annoyance) proximately caused by the past, present, and future Contamination of Little Hocking's property.

## CLAIMS FOR RELIEF

### First Claim – RCRA Imminent and Substantial Endangerment

176.   Each of the allegations in the above paragraphs is incorporated by reference as if fully set forth herein.

177.   DuPont is a "person" under 42 U.S.C. §6972(a)(1)(B).

178.   PFOA (and other PFCs), as described herein, are discarded materials and each is a "solid waste" as defined under RCRA, 42 U.S.C. §6903(27) and a "hazardous waste" as defined under RCRA, 42 U.S.C. §6903(5).

179.   As a result of its releases of PFOA and other Hazardous Wastes as described herein, DuPont has contributed to and will continue to contribute to the past and present handling, storage, treatment, transportation and/or disposal of solid or hazardous waste which may present an imminent and substantial endangerment to health and/or the environment in violation of RCRA, 42 U.S.C. § 6972(a)(1)(B).

180.   Conditions at and about the Wellfields as described herein may present an imminent and substantial endangerment to health and/or the environment: via open pathways resulting in routes of exposure, including direct dermal contact, ingestion of water and soils, and inhalation; and, via continued migration of Contamination in groundwater at or near the Wellfields.  Little Hockings' water users, members of the public, and frequenters of surrounding properties are or will be directly exposed to contaminants through all pathways of migration.

181.   By reason of the foregoing acts and omissions of DuPont, Little Hocking is entitled to an order for such relief as may be necessary to remedy the results of DuPont's conduct.   Such relief includes, but is not limited to injunctive relief compelling DuPont to:

    (a)    fund and/or undertake comprehensive environmental investigations, testing, and assessment to fully delineate the nature and the extent of the endangerment;

    (b)    permanently abate the threat caused to health and the environment, including the air, soil, sediments, and groundwater at and about the Wellfields;

    (c)    clean up the Contamination; and,

    (d)    develop and implement strategies to prevent future releases of Hazardous Wastes that threaten harm to health or the environment.  All of said relief should include appropriate oversight by Little Hocking and/or the Court.

182.    Little Hocking is also entitled to recover all costs of litigation including reasonable attorney fees and expert fees, pursuant to 42 U.S.C. § 6972.

183.    More than ninety (90) days before the filing of this 42 U.S.C. §6972 action, Little Hocking gave written notice of the RCRA violations, by letter of July 23, 2009 to DuPont and all other persons required to be notified pursuant to §6972.  This notice was received by DuPont on or before August 3, 2009, and by all other parties required to be notified no later than August 3, 2009.

184.    No government entity is diligently proceeding with any action as defined in 42 U.S.C § 6972(b)(2)(B) and (b)(2)(C), including any removal or remedial actions under RCRA.

185.    No government agency is diligently enforcing any action in any court of the United States or State to require compliance with any permit, standard, regulation, condition, requirement, prohibition or order sought to be enforced in this action under RCRA.

**Second Claim – Public and Private Nuisance**

186. Each of the allegations in the above paragraphs is incorporated by reference as if fully set forth herein.

187. Little Hocking was and is entitled to full use and enjoyment of the Wellfields, the Distribution System, and its other property and the environment surrounding its property.  Little Hocking has been deprived of such use and enjoyment by DuPont's acts and omissions.

188. DuPont caused and threatened to cause, and continues to cause and threaten to cause, the contamination of the environment by allowing the PFCs to continue to escape into the soil, sediments, biota, surface water and/or groundwater and property owned and used by Little Hocking, rendering said water, soil, sediments, biota and property unfit for its historic uses.

189. DuPont's acts and omissions have caused and will continue to cause a substantial and unreasonable interference with:

   (a)   Little Hocking's use and enjoyment of its Wellfields; and,

   (b)   the rights of a substantial but indefinite number of members of the general public (including Little Hockings' water users) to safe, uncontaminated drinking water.  Such interference has resulted in harm to Little Hocking that is of a different kind and degree than that suffered by the general public.

190. By causing the contamination of the soil, surface waters, sediments, biota and/or groundwater in the vicinity of the Wellfields, DuPont's acts and omissions described herein amount to a nuisance, both absolute and qualified, which has proximately damaged the Wellfields, the Distribution System and the quality of the water

distributed by Little Hocking.  Such damage has thereby injured and annoyed Little
Hocking and has endangered the comfort, health, and safety of the public (including
Little Hocking's water users).

191.    Additionally, DuPont's releases of PFCs have continued in the face of data
revealing the PFCs' (particularly PFOA's) threat of adverse human health effects and
harmful impacts on the environment.

192.    DuPont's conscious disregard for the rights of Little Hocking and the safety of the
public (including Little Hocking's water users) and DuPont's intentional, willful,
knowing, wanton and reckless conduct has caused substantial and significant harm to
Little Hocking and its property and has a great probability of causing further
substantial and significant harm.

193.    DuPont's acts and omissions also constitute abnormally dangerous conduct that
has and continues to result in abnormally dangerous conditions in an inappropriate
place (the Wellfields).

194.    The acts and omissions of DuPont were and are being conducted in a manner that
constitutes a nuisance under applicable state common law and federal common law.

195.    In addition, because DuPont negligently and carelessly caused the PFCs to
contaminate the groundwater at or about Little Hocking's properties, DuPont created a
potential and unreasonable threat of adverse health effects, which, in due course,
resulted in injury. DuPont's acts and omissions also constitute a qualified nuisance.

196.    DuPont's acts and omissions constitute a nuisance at all times and under any
circumstances.  In addition, DuPont has violated applicable statutory and regulatory

standards.  Thus, DuPont's acts and omissions, including its violations of statutory and regulatory standards give rise to *nuisance per se.*

197.     The acts and omissions of DuPont have decreased the value of Little Hocking's property and services as a purveyor of public water, and/or have caused the humans and animals that consume Little Hocking's water to suffer increased threat of adverse health effects.

198.     As long as DuPont's nuisance continues, Little Hocking's damages caused by DuPont will continue.

199.     DuPont knew or should have known of the PFCs disposed of and being released from the Facilities.  DuPont failed to adequately and timely warn Little Hocking of the presence of and adverse effects of those materials.

200.     As a proximate result of DuPont's intentional, willful, knowing, wanton and reckless and/or negligent creation of a nuisance:

> (a)     the Wellfields and the Distribution System have been significantly harmed and will be significantly harmed;

> (b)     Little Hocking has suffered and will suffer the damages as set forth herein; and,

> (c)     Little Hocking has not been able to fully use and enjoy its property.

201.     As provided under applicable state common law and federal common law, DuPont is liable for all direct and consequential damages as described herein (including, *inter alia*, special damages, punitive damages, and damages for discomfort and annoyance) proximately caused by the past, present, and future Contamination of

Little Hocking's property. DuPont is also liable for such other relief as will abate and remediate the nuisance and its short-term and long-term effects.

## Third Claim – Negligence

202.   Each of the allegations in the above paragraphs is incorporated by reference as if fully set forth herein.

203.   At all times relevant herein, DuPont negligently caused the contamination of the soil, biota, surface water, sediment, and groundwater at and about the Wellfields and failed to timely, fully and adequately warn or notify Little Hocking of the contamination.

204.   The presence of and threats related to PFCs in the environment, including the Wellfields, were known to or obvious to DuPont but were not known to or obvious to Little Hocking or its water users.

205.   At all times relevant herein, DuPont had and continues to have a duty to, *inter alia*:

(a)   take adequate and timely precautions to prevent the PFCs from being released and contaminating the environment and nearby properties, including the soil, surface water, sediments, biota, and groundwater at and about the Wellfields;

(b)   remove the PFCs from the soil, surface water, sediments, biota and groundwater, including the contamination at and about the Wellfields and Distribution System;

(c)   adequately and timely warn federal, state, and local authorities, potentially affected members of the public, and purveyors of public water (including Little

Hocking) of the presence of and danger and threats related to the releases of PFCs into the environment, including the Wellfields; and,

(d)     handle, treat, store, and/or disposal of Hazardous Waste in such a manner as to so as to not create a nuisance or a condition causing an imminent and substantial endangerment to human health and/or the environment.

206.    DuPont breached its duties, including those outlined above.

207.    For example, notwithstanding DuPont's knowledge, DuPont failed to adequately and timely warn the members of the public, including Little Hocking, of the presence of and threats related to the DuPont's releases of PFCs into the Wellfields.

208.    DuPont's breach of its duty to warn – which remains ongoing – is a substantial contributing cause to harm suffered by Little Hocking.

209.    Further, DuPont continues to provide false, incomplete, and/or misleading information as to its releases of PFCs, the presence of those PFCs in the Wellfields, and the threats related to its releases of PFCs.

210.    DuPont's acts and omissions show an utter disregard of prudence, amounting to a complete neglect of the integrity of the Wellfields and the safety of Little Hocking's water users.

211.    DuPont's conscious disregard for the rights of Little Hocking and the safety of its members has caused and is continuing to cause substantial harm to Little Hocking and its property and has a great probability of causing further substantial harm.

212.    As a proximate result of the foregoing negligent and/or wanton and reckless acts or omissions of DuPont:

(a)    Little Hocking's Wellfields and Distribution System have been

contaminated by PFCs;

(b)    Little Hocking has suffered and will suffer damages as described herein.

213.    As provided under applicable state common law and federal common law,
DuPont is liable for all direct and consequential damages as described herein
(including, *inter alia*, special damages, punitive damages, and damages for discomfort
and annoyance).

### Fourth Claim – Trespass

214.    Each of the allegations in the above paragraphs is incorporated by reference as if
fully set forth herein.

215.    DuPont by the foregoing intentional conduct caused and will continue to cause
PFCs to escape and invade and contaminate the groundwater, surface water, soils,
sediments, biota and other property of Little Hocking. Said contamination was or
should have been reasonably foreseeable to DuPont.

216.    Little Hocking, which has never authorized said invasion of its property by these
PFCs, has title to and exclusive possession of the land invaded by the contaminants
and has a property interest in the groundwater and Distribution System underlying that
land.

217.    Further, DuPont took affirmative steps to conceal the trespass by preventing the
only commercial lab in the U.S. that could properly test for PFCs from doing so for
the public or any entity, such as Little Hocking.

218.    The presence of these contaminants on Little Hocking's property, including the
groundwater, constitutes a continuing trespass. DuPont's conscious disregard for the

rights Little Hocking and the safety of its water users has caused substantial harm to Little Hocking and its property and has a great probability of causing further substantial harm.

219.   As a proximate result of DuPont's intentional, knowing, wanton and reckless and/or negligent acts and omissions:

(a)   Little Hocking's properties, including the Wellfields and Distribution System have been harmed and will continue to be harmed;

(b).   Little Hocking has suffered and will suffer the injuries and damages as set forth herein.

220.   As a result of DuPont's intentional misconduct and wanton and reckless acts, DuPont is liable for all direct and consequential damages as described herein (including, *inter alia*, special damages, punitive damages, and damages for discomfort and annoyance) proximately caused by the past, present, and future invasion of Little Hocking's property, as provided under applicable state common and federal common law.

### Fifth Claim –
### Abnormally Dangerous or Ultrahazardous Activity

221.   Each of the allegations in the above paragraphs is incorporated by reference as if fully set forth herein.

222.   Little Hocking's property and its water users have been exposed to the PFCs released from the Washington Works Plant as a proximate result of DuPont's acts and omissions.

223.   The use, disposal, storage, generation and release of the PFCs are abnormally dangerous or ultrahazardous activities in which DuPont is and has been engaged.

224.   By reason of carrying on such activities which proximately and foreseeably caused the contamination of Little Hocking's property and the surrounding environment, DuPont is strictly liable to Little Hocking even if it exercised the utmost care to prevent the harm, which DuPont nonetheless failed to do.  This liability arises pursuant to applicable state common law and federal common law, including the Restatement of Torts (Second) §§ 519 and 520.

225.   DuPont directly and proximately caused the injuries to Little Hocking described herein including, e.g., property damage and loss of use and enjoyment of property.

226.   DuPont's conscious disregard for the rights of Little Hocking and the safety of Little Hocking's water users has caused substantial harm to Little Hocking and its property, including the Wellfields, and has a great probability of causing further substantial harm.  As a direct and proximate result of this contamination, Little Hocking suffered all of the injuries and damages described herein. DuPont is liable under applicable state common law and federal common law for all such damages, including special damages, and for punitive damages as set forth herein.

**Sixth Claim – Conversion**

227.   Each of the allegations in the above paragraphs is incorporated by reference as if fully set forth herein.

228.   At all times relevant to this Complaint, the Little Hocking has had and continues to have actual and constructive possession, and the immediate right to possession, of its property, including the Wellfields and the Distribution System.

229.   By its unauthorized acts and omissions as described herein, including its intentional, willful, knowing, wanton, reckless, and negligent conduct, DuPont has and

- 44 -

continues to exercise dominion or control over Little Hocking's property, including the Wellfields and the Distribution System.

230.    Such dominion and control by DuPont has and continues to wrongfully interfere with Little Hocking's rights of ownership of the Wellfields and the Distribution System, including Little Hocking's use of its groundwater.

231.    DuPont's exercise of dominion and control over the Wellfields and Distribution System and its wrongful interference with Little Hocking's rights of ownership has caused substantial harm to Little Hocking and its property and has a great probability of causing further substantial harm.

232.    As a direct and proximate result of DuPont's exercise of dominion and control over the Wellfields and Distribution System, Little Hocking suffered all of the injuries and damages described herein. DuPont is liable under applicable state common law and federal common law for all such damage and punitive damages as set forth herein.

## Seventh Claim – Unjust Enrichment

233.    Each of the allegations in the above paragraphs is incorporated by reference as if fully set forth herein.

234.    Little Hocking's property has been contaminated by and its water users have been exposed to the PFCs released from the Facilities as a proximate result of DuPont's acts and omissions as described herein including its intentional, willful, knowing, wanton, negligent, and reckless conduct.

235.    Little Hocking has expended significant financial resources directly resulting from DuPont's contamination of Little Hocking's property.

236.   DuPont has also used the Wellfields as a repository for DuPont's Hazardous Waste, when DuPont should have been spending its own financial resources to properly control and/or eliminate those releases.

237.   Little Hocking's expenditure of financial resources and DuPont's use of the Wellfields as a repository resulting from DuPont's Hazardous Waste releases have conferred a financial benefit upon DuPont.

238.   DuPont has been and is aware of said benefits to DuPont.

239.   Retention of the foregoing benefit under the circumstances described in this Complaint would be unjust unless DuPont pays Little Hocking in the amount of the foregoing benefit.

240.   DuPont is liable under applicable state common law and federal common law for all such damages and for punitive damages as set forth herein.

241.   Little Hocking is entitled to all legal and equitable relief necessary to remedy DuPont's unjust enrichment, including restitution.

**Eighth Claim – Common-law Indemnity**

242.   Each of the allegations in the above paragraphs is incorporated by reference as if fully set forth herein.

243.   The Contamination has caused the public to be exposed to hazardous PFCs and therefore has created an implied contract between Little Hocking and DuPont, which requires DuPont to cease contaminating, and to remediate the Contamination.

244.   Because DuPont has refused to remediate the Contamination, Little Hocking has been forced and will be forced to spend significant financial resources to, *inter alia,*

limit the public's exposure, remediate the contaminated Wellfields and Distribution System, and locate alternative sources of drinking water for the public.

245.   Little Hocking was not responsible for the use, manufacture, and release of PFCs. Little Hocking was not responsible for contaminating its own Wellfields, its Distribution System, and placing its users and its own property in danger. Instead, DuPont's actions and omissions as described herein, including its intentional, willful, knowing, wanton and reckless conduct, are primarily responsible for the potential and actual exposure of users of Little Hocking's water to the PFCs.

246.   Little Hocking has had to spend and will have to spend significant financial resources to take mitigative and remedial actions that DuPont should have taken. Little Hocking will continue to be forced to undertake such actions in the future, because DuPont refuses to do so. Further, DuPont refuses to do so in a manner that can be verified as to its effectiveness.

247.   As a result of the foregoing implied contract of indemnity, Little Hocking is entitled (under applicable state common law and federal common law) to recoup from DuPont all financial expenditures Little Hocking has incurred arising from DuPont's pollution of the Wellfields and is entitled to a declaratory judgment as to such costs that will be incurred by Little Hocking in the future.

### RELIEF REQUESTED

WHEREFORE, Little Hocking prays that this Court:

A.   Issue an order declaring that DuPont's conduct violated RCRA and requiring compliance with RCRA.

B.   Issue an order declaring that DuPont's Washington Works Plant has caused or contributed to an imminent and substantial endangerment to health or the environment and granting injunctive relief or other relief compelling DuPont (pursuant to a court-ordered plan and with participation of Little Hocking) to fund a complete assessment and remediation of all source areas and other areas – including the Wellfields – affected by releases (past and ongoing) from the Facilities and from secondary sources. At minimum, this should include the identification and removal of elevated levels of soil contamination.    Little Hocking seeks additional relief that is necessary to serve the public interest, including, e.g., DuPont's funding of an independent, comprehensive, scientific study to:

>    (1) fully delineate the nature and extent of the Contamination and the resulting endangerment;

>    (2) identify all sources of the Contamination;

>    (2) identify all the pathways and speed of migration of the Contamination in the aquifer;

>    (3) determine the full extent of Hazardous Wastes in the Ohio River and its sediments; and,

>    (4) determine the impact of the Hazardous Wastes on impacted flora and fauna and other non-human receptors.

Little Hocking also seeks an order requiring DuPont to stop the threat of future migration or release of Hazardous Wastes, including from secondary sources such as the Wellfields.  In the interim, Little Hocking seeks an agreement or a judicially-enforceable assurance that DuPont will locate and provide an alternate water supply

that is from another source free of PFOA and other for as long as PFOA and other PFCs are detected in the Wellfields. In the alternative and in the event there is a long-term demonstration that the Carbon Plant reliably removes all PFOA and other PFCs from the Little Hocking water supply, Little Hocking seeks a judicially-enforceable assurance that DuPont will provide for the full cost of the operation of the Carbon Plant, including ongoing monitoring of the performance of that plant, as long as PFOA and other PFCs are detected in the Wellfields.

C.    Issue an order:

(1) providing Little Hocking an oversight role in ensuring that –

(a) an alternate water supply as described above is found and connected to the Little Hocking system (or, in the alternative that the Carbon Plant operates as set forth above) and,

(b) assessment and clean-up activities are properly conducted;

(2) requiring any other action that the parties jointly agree to or that a Court may deem appropriate; and,

(3) awarding Little Hocking litigation fees and costs and the other relief set forth herein.

D.    Issue a judgment in favor of Little Hocking against DuPont, awarding compensatory damages (including special damages) in an amount to be determined in excess of $25,000 and awarding punitive damages in an amount to be determined.

E.    Issue an Order requiring DuPont to fully indemnify Little Hocking for any and all costs and expenses (including attorneys' fees and/or cleanup costs) associated with

any lawsuits, arbitration, or administrative actions related in any way to the Contamination;

F.   Award Little Hocking an indemnity in an amount that is just and appropriate and issue a declaratory judgment for any future costs or expenses (including attorneys' fees and/or cleanup costs) incurred by Little Hocking that are related in any way to the Contamination;

G.   Award Little Hocking reasonable litigation costs, including attorney fees and expert witness fees;

H.   Issue an Order granting Little Hocking the right and the funding to have expert oversight over all relief granted by the Court;

I.   Award such other relief as may be necessary, just or appropriate under the circumstances.

Respectfully Submitted,

_____
D. David Altman (0021457)
Amy J. Leonard (0040611)
Amy M. Hartford (0074836)
Justin D. Newman (0080968)
Brett A. Kravitz (0069101)
D. DAVID ALTMAN CO., L.P.A.
15 East 8th Street, Suite 200W
Cincinnati, Ohio 45202
(513) 721-2180
(513) 721-2299 (fax)

Trial Attorney for Little Hocking

# Exhibit 1

# EXHIBIT 1

| Compound | Acronym | Fluorocarbon chain length | Molecular Formula |
|---|---|---|---|
| Perfluorobutanoate | PFBA | C4 | $C_3F_7COO^-$ |
| Perfluorobutanesulfonate | PFBS | C4 | $C_4F_9SO_3^-$ |
| Perfluoropentanoate | PFPeA | C5 | $C_4F_9COO^-$ |
| Perfluorohexanoate | PFHxA | C6 | $C_5F_{11}COO^-$ |
| Perfluorohexanesulfonate | PFHxS | C6 | $C_6F_{13}SO_3^-$ |
| Perfluoroheptanoate | PFHpA | C7 | $C_6F_{13}COO^-$ |
| Perfluorooctanoate | PFOA | C8 | $C_7F_{15}COO^-$ |
| Perfluorooctanesulfonate | PFOS | C8 | $C_8F_{17}SO_3^-$ |
| Perfluorononanoate | PFNA | C9 | $C_8F_{17}COO^-$ |
| Perfluorodecanoate | PFDA | C10 | $C_9F_{19}COO^-$ |
| Perfluorodecane sulfonate | PFDS | C10 | $C_{10}F_{19}SO_3^-$ |
| Perfluoroundecanoate | PFUnA | C11 | $C_{10}F_{21}COO^-$ |
| Perfluorododecanoate | PFDoA | C12 | $C_{11}F_{23}COO^-$ |
| Perfluorotetradecanoate | PFTrA | C14 | $C_{13}F_{27}COO^-$ |