IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


THE LITTLE HOCKING WATER ASSN., INC.,

      Plaintiff,


    vs.                        Civil Action 2:09-cv-1081
                                     Judge Smith
                                     Magistrate Judge King

E.I. DU PONT DE NEMOURS & CO.,

      Defendant.


**OPINION AND ORDER**

Plaintiff, the Little Hocking Water Association, Inc. ("plaintiff" or "Little Hocking"), alleges that the waste disposal practices of defendant E.I. Du Pont De Nemours & Co.'s ("defendant" or "DuPont") have resulted in the migration of perfluorinated compounds into Little Hocking's wellfields.  Little Hocking asserts claims under the Resources Conservation and Recovery Act, 42 U.S.C. § 6972 ("RCRA").  Little Hocking also asserts claims of nuisance, negligence, trespass, abnormally dangerous activity, conversion, unjust enrichment and declaratory judgment for indemnification.  This matter is before the Court on defendant *DuPont's Motion to Compel Documents From Little Hocking's Privilege Log*, Doc. No. 96 ("*DuPont's Motion to Compel*").[1]  For the reasons that follow, the *Defendant's Motion to Compel*, is **GRANTED in part and DENIED in part.**

---

[1] When citing to this document, the Court will refer to DuPont's page numbers at the bottom of each page rather than to the differing CM/ECF number appearing at the top of the page.

I.    **BACKGROUND**

    **A.    Plaintiff's Allegations and Claims**

    Little Hocking is a non-profit Ohio corporation that supplies water to eight townships in Washington County, Ohio, and to two townships in Athens County, Ohio. *First Amended Complaint*, Doc. No. 23, at ¶ 21.  Little Hocking owns wellfields consisting of approximately forty-five (45) acres of land as well as the soil and groundwater beneath the land. *Id*. at ¶ 26.  The wellfields are located in the State of Ohio, directly across the Ohio River from defendant's Washington Works Plant. *Id*. at ¶ 29.  The wellfields include four production wells which Little Hocking alleges "have been and continue to be contaminated by DuPont's release of [h]azardous [w]astes." *Id*. at ¶ 32.  Little Hocking also alleges that the hazardous wastes have contaminated its water distribution system, which consists of pipes, pumps and storage tanks. *Id*. at ¶ 3.

    The alleged hazardous wastes consist of "perfluorinated compounds (including perfluorinated acids, sulfonates, phosponates, and telomer alcohols), precursors to perflourinated compounds and/or other toxic and hazardous materials that may be released with these perfluorinated compounds." *Id*. at ¶ 5.  The foregoing are collectively referred to as "PFCs."  PFCs are synthetic carbon chain compounds that contain fluorine and are used in the manufacture of numerous consumer products. *Id*. at ¶ 42.  According to Little Hocking, DuPont uses at least one PFC, ammonium perfluorooctanoate ("APFO") in connection with its Teflon® related products. *Id*. at ¶ 44.  APFO is the ammonium salt

of "PFOA," the acronym used to identify the chemical Perfluorooctanoic acid commonly referred to as "C8." *Id.* at ¶¶ 45 n.1, 48.  Little Hocking alleges that DuPont has used PFOA at its Washington Works plant from at least 1951 to the present. *Id.* at ¶ 46.

According to Little Hocking, DuPont has known of the "bio-persistence and toxicity of PFOA" for some time. *Id.* at ¶ 52. Although Little Hocking concedes that DuPont is under no obligation to cease the production, purchase or use of PFOA, plaintiff alleges that the release of such "hazardous wastes" endangers the safety, health and welfare of the community – in particular, Little Hocking's water users. *Id.* at ¶¶ 52-53.  Exposure to PFOA has been identified by the United States Environmental Protection Agency ("EPA") as potentially harmful to human health. *Id.* at ¶¶ 91-96.  Little Hocking alleges that DuPont was aware of the harmful effects of exposure to PFOA on its employees as early as 1981 through, *inter alia*, blood sampling data. *Id.* at ¶¶ 60-67.  Little Hocking further alleges that DuPont was aware of contamination of plaintiff's wellfields and distribution system as early as 1984. *Id.* at ¶ 68.  Little Hocking apparently did not become aware of the presence of PFOA in its wellfields, or of the threat to the public at large, until January 2002, during a West Virginia Department of Environmental Protection meeting. *Id.* at ¶ 81.

Little Hocking alleges that recipients of water supplied by plaintiff "have some of the highest non-worker PFOA blood levels of any reported in the United States or Canada to date – ranging from approximately 112 ppb to, at least, 1950 ppb." *Id.* at ¶ 113.  The

3

average level of PFOA blood levels in the United States is 5.6 ppb. *Id*. at ¶ 114.  Little Hocking alleges that the release of hazardous wastes by DuPont also adversely affects the "air, soils, sediments, surface water and groundwater, and biota used by or accessible to Little Hocking, its water users, and/or the surrounding community." *Id*. at ¶ 118.  Little Hocking alleges that the levels of PFOA in its wellfields are "the highest known in any public water supply in the world."  *Id*. at ¶ 119.

Once Little Hocking learned of the presence of PFOA in 2002, its General Manager, Bob Griffin, investigated the scope of the problem "to find short and long-term solutions to the problem, and to advise Little Hocking's water users of what the small organization knew about the scope of the public health threat." *Id*. at ¶ 149.  To this end, Mr. Griffin's professional life "has been consumed since 2002" with this issue as he has  worked with regulatory agencies and participating in government meetings, including EPA meetings.  *Id*. at ¶ 152.  Little Hocking alleges that its efforts to address the contamination has resulted in fees and expenses, including consultant fees.  *Id*. at ¶¶ 164-168.

In 2005, DuPont entered into a Memorandum of Understanding with the EPA in order to assess the past and current release of PFOA from the Washington Works Plant.  *Id*. at ¶ 130.  According to Little Hocking, the Final Report was inconclusive because of the omissions in the data supplied by defendant.  *Id*.

4

In November 2007, DuPont, "in consultation with Little Hocking and its consultants[,]" completed construction of a building ("the Carbon Plant")[2] that attempted to lower PFOA concentrations in the water sent to Little Hocking's water users. *Id.* at ¶ 135. Little Hocking has spent "hundreds of staff and professional hours planning and reviewing plans for the Carbon Plant that now houses Little Hocking's entire water treatment facilities." *Id.* at ¶ 150. According to Little Hocking, the Carbon Plant was rendered necessary by virtue of DuPont's hazardous wastes. *Id.*

Little Hocking also alleges that the release of hazardous wastes by defendant has affected not only human health and the environment, but also the operations of its business, resulting in multiple categories of expenses, including its participation in the review of the Carbon Plant design plans and its testing of the levels of PFOA and other PFCs in the blood of approximately 25 of its water users. *Id.* at ¶¶ 148-180.

**B.   Procedural History**

The parties have engaged in extensive discovery in this litigation.  On August 12, 2011, Little Hocking produced its first privilege log.  *Declaration of Anthony F. Cavanaugh in Support of DuPont's Motion to Compel Production of Documents from Little Hocking's Privilege Log*, ¶ 3, attached to *Defendant's Motion to Compel* ("*Cavanaugh Declaration*").  Over the ensuing nine months, the parties

---

[2] Little Hocking refers to this building as the "Carbon Plant," *see*, *e.g.*, *Amended Complaint*, ¶ 135, while DuPont refers to it as the Granulated Activated Carbon treatment facility (or "GAC"), *DuPont's Motion to Compel*, p. 4.  For ease of reference, the Court will refer to this facility as the Carbon Plant.

5

attempted to resolve their disputes related to this log; during that process, Little Hocking produced two revised logs.  *Id*. at ¶¶ 4-17; *Exhibits 1-5*, attached thereto.  The declaration Little Hocking attorney D. David Altman, *Declaration of D. David Altman*, attached as *Exhibit 5* to *Cavanaugh Declaration* ("the *Altman Declaration*"), accompanied the latest revised privilege log, which was produced on May 25, 2012 (hereafter "privilege log").  *Cavanaugh Declaration*, ¶¶ 14-16; *Exhibits 4-5*, attached thereto.  Despite this production, the parties' dispute continued.  *Cavanaugh Declaration*, ¶ 17.  Unable to resolve their dispute extrajudicially, DuPont filed *DuPont's Motion to Compel*, by which DuPont seeks to compel the production of various documents that Little Hocking alleges are privileged.

## II.    STANDARD

The Federal Rules of Civil Procedure grant parties the right to "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense. . . ."  Fed. R. Civ. P. 26(b)(1).  Relevance for discovery purposes is extremely broad.  *Lewis v. ACB Business Services, Inc.*, 135 F.3d 389, 402 (6th Cir. 1998).  However, "district courts have discretion to limit the scope of discovery where the information sought is overly broad or would prove unduly burdensome to produce."  *Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 305 (6th Cir. 2007) (citing Fed. R. Civ. P. 26(b)(2)).  In determining the proper scope of discovery, a district court balances a party's "right to discovery with the need to prevent

6

'fishing expeditions.'"  *Conti v. Am. Axle & Mfg.*, No. 08-1301, 326
Fed. Appx. 900, at *907 (6th Cir. May 22, 2009) (quoting *Bush v.
Dictaphone Corp.*, 161 F.3d 363, 367 (6th Cir. 1998)).

Rule 37 authorizes a motion to compel a non-responsive party to
comply with discovery if "a party fails to respond that inspection
will be permitted - or fails to permit inspection - as requested under
Rule 34." Fed. R. Civ. P. 37(a)(3)(B)(iv).  In addition, Rule 37(a)
expressly provides that "an evasive or incomplete disclosure, answer,
or response must be treated as a failure to disclose, answer, or
respond." Fed. R. Civ. P. 37(a)(4).

Finally, the party moving to compel discovery must certify that
it "has in good faith conferred or attempted to confer with the person
or party failing to make disclosure or discovery in an effort to
obtain it without court action." Fed. R. Civ. P. 37(a)(1).  *See also*
S.D. Ohio Civ. R. 37.2. This prerequisite has been met in this case.
*Cavanaugh Declaration*, ¶¶ 4-17; *Exhibits 1-5*, attached thereto.

In the case *sub judice*, DuPont identifies and seeks to compel
four categories of documents listed in Little Hocking's privilege log.
*DuPont's Motion to Compel*, p. 6.  The Court shall address each
category in turn.


## III.  NOTES AND INFORMATION COMPILATIONS PREPARED BY LITTLE HOCKING EMPLOYEES OR "LITIGATION CONSULTANTS"

DuPont first seeks to compel hundreds of entries on Little
Hocking's privilege log identified as "notes" authored by Little

7

Hocking employees (primarily by Mr. Griffin, Little Hocking's general manager) or its "litigation consultants." *Id*. at 6-7 (citing *Exhibit 9*, attached thereto, which is an excerpt of the privilege log).[3]  Many, or most, of the documents in this first category of documents are Mr. Griffin's notes taken during PFOA-related meetings, including government meetings such as EPA meetings, which were subsequently forwarded to Little Hocking's counsel.  *See Revised Exhibit 9; Altman Declaration*, ¶¶ 11-13; *Amended Complaint*, ¶ 152.  In many instances, Mr. Griffin's communications to counsel about these meetings contain attachments that are described on the privilege log as "Attachment to preceding email" or "Attachment to preceding letter."  *See Revised Exhibit 9*.  DuPont therefore also seeks production of "compilations of materials sent from Mr. Griffin to counsel." *DuPont's Motion to Compel*, pp. 6-8 (citing *Exhibit 9*, attached thereto, and the *Altman Declaration*, ¶ 11).  Little Hocking resists the production of these notes and materials, arguing that they are protected by the attorney-client privilege and the work product doctrine.  *Plaintiff's Response in Opposition to DuPont's Motion to Compel Documents from Little*

---

[3] DuPont later revised this privilege log as it relates to the notes and compilations.  *See Exhibit A*, pp. 1-45, attached to *DuPont's Reply in Support of Its Motion to Compel Documents from Little Hocking's Privilege Log*, Doc. No. 117 ("*Reply*").  To avoid confusion, the Court will refer to *Exhibit A*, pp. 1-45, as "*Revised Exhibit 9*."

In addition, although neither party has submitted the notes and compilations to the Court for *in camera* inspection, the excerpted privilege log, *Revised Exhibit 9*, suggests that these notes and compilations are voluminous, amounting to thousands of documents.

*Hocking's Privilege Log*, Doc. No. 108, pp. 4-9[4] ("*Memo. in Opp.*"). The Court will separately address these arguments.

**A. Attorney client privilege**

DuPont first contends that the attorney client privilege does not protect these documents because they do not seek or provide legal advice. *DuPont's Motion to Compel*, pp. 7-8. DuPont further argues that simply forwarding this information to Little Hocking's counsel will not convert otherwise unprivileged documents into privileged communications. *Id.* DuPont also argues that the information believed to be contained in these documents is "critical to DuPont's defense" and relevant to, *inter alia*, Little Hocking's claims for damages, particularly Little Hocking's claim for reimbursement for costs associated with attending EPA meetings and hiring consultants. *Id.* at 3-5.

According to Little Hocking, these notes are protected by the attorney client privilege because they "(a) involved the compilation and analysis of information for counsel's use in this litigation; (b) were intended to be used in . . . discussions with counsel regarding this litigation; and/or (c) were the result of discussions and instructions from counsel." *Memo. in Opp.*, p. 4 (citing, *inter alia*, the *Altman Declaration*, ¶ 8, which avers that Attorney Altman's firm has never provided business advice to Little Hocking). *See also id.* at 5 (citing the *Altman Declaration*, ¶¶ 18-19, representing that the notes and related information provided the basis for legal strategy

---

[4] When citing to this brief, the Court will refer to Little Hocking's page numbers at the bottom of each page.

and legal advice and were otherwise used in representing Little Hocking in actual or anticipated PFOA-related litigation). For example, Mr. Griffin's practice was to take notes when attending PFOA-related meetings and to create compilations of data so that counsel could provide legal advice to Little Hocking. *Id.* at 6 (citing *Declaration of Robert L. Griffin*, ¶¶ 6-8, attached thereto ("*Griffin Declaration*")).

### 1. Standard

The attorney client privilege protects "[c]onfidential disclosures by a client to an attorney made in order to obtain legal assistance." *Fisher v. United States*, 425 U.S. 391, 405 (1976). "[T]he privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice." *Upjohn Co. v. United States*, 449 U.S. 383, 390 (1981). "The privilege applies only where necessary to achieve its purpose and protects only those communications necessary to obtain legal advice." *In re Columbia/HCA Healthcare Corp.*, 293 F.3d 289, 294 (6th Cir. 2002) (citations and quotations omitted). Therefore, the privilege does not extend to communications that do not concern legal advice. *See*, *e.g.*, *Morganroth & Morganroth v. DeLorean*, 123 F.3d 374, 383 (6th Cir. 1997) (finding that communications regarding attorney's fees was "a non-privileged, financial discussion that did not involve the seeking or provision of legal advice"); *United States v. Bartone*, 400 F.2d 459, 461 (6th Cir. 1968) (finding that attorney testimony regarding a

10

defendant's financial dealings was not privileged because there was "no indication that any of this testimony concerned legal advice given to [the defendant]"). The privilege protects only communications between a client and the client's attorney; the privilege does not protect relevant facts underlying those communications. *Upjohn*, 449 U.S. at 395-96. In other words, "[a] fact is one thing and a communication concerning that fact is an entirely different thing." *Id.*; *Graff v. Haverhill North Coke Co.*, No. 1:09-cv-670, 2012 U.S. Dist. LEXIS 162013, at *21 (S.D. Ohio Nov. 13, 2012) ("Thus, factual information conveyed by an employee to the attorney in the course of the factual investigation is protected[.]"). However, "'a party cannot conceal a fact merely by revealing it to his [or her] lawyer[.]'" *Upjohn*, 449 U.S. at 396 (quoting *State ex rel. Dudek v. Circuit Court*, 34 Wis. 2d 559, 580, 150 N. W. 2d 387, 399 (1967)). The attorney client privilege is therefore "'narrowly construed because it reduces the amount of information discoverable during the course of a lawsuit.'" *Ross v. City of Memphis*, 423 F.3d 596, 600 (6th Cir. 2005) (quoting *United States v. Collis*, 128 F.3d 313, 320 (6th Cir. 1997)).

In addition, "documents prepared for the purpose of obtaining or rendering legal advice are protected even though the documents also reflect or include business issues." *In re OM Group Sec. Litig.*, 226 F.R.D. 579, 587 (N.D. Ohio Feb. 28, 2005) (citing *Picard Chemical Inc. Profit Sharing Plan v. Perrigo Co.*, 951 F. Supp. 679, 685-86 (W.D. Mich. 1996)). However, documents are not rendered privileged simply

11

because they may reflect both business and legal matters.  *Cf. Cooey v. Strickland*, 269 F.R.D. 643, 650 (S.D. Ohio 2010).  "When communications contain both legal advice and non-legal considerations, a court must consider 'whether the predominant purpose of the communication is to render or solicit legal advice.'"  *Id.* (quoting *Pritchard v. County of Erie (In re County of Erie)*, 473 F.3d 413, 420 (2d. Cir. 2007)).  Therefore, the entire communication, even the non-legal portions, will be protected from disclosure only if seeking or giving legal advice is the predominant purpose of the communication.  *Id.*

The parties agree that the following elements of the privilege outlined by the United States Court of Appeals for the Sixth Circuit govern this dispute:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection is waived.

*Reed v. Baxter*, 134 F.3d 351, 355-56 (6th Cir. 1998).  *See also DuPont's Motion to Compel*, p. 5; *Plaintiff's Response in Opposition to DuPont's Motion to Compel Documents from Little Hocking's Privilege Log*, pp. 2-3.

As the party seeking protection, Little Hocking bears the burden of establishing the attorney client privilege.  *See*, *e.g.*, *United States v. Dakota*, 197 F.3d 821, 825 (6th Cir. 1999).  Simply claiming that information is privileged "is insufficient to meet the burden."

*In re Trans-Industries*, No.: 1:10 MC 34, 2011 U.S. Dist. LEXIS 37910, at *10 (N.D. Ohio Mar. 28, 2011).  For example, Rule 26 of the Federal Rules of Civil Procedure provides that, when a party withholds otherwise discoverable information on the basis of privilege, that party must make a claim of privilege and "describe the nature of the documents, communications, or tangible things not produced or disclosed - and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim."  Fed. R. Civ. P. 26(b)(5)(A).  *See also Cooey*, 269 F.R.D. at 649 ("The privilege log must be detailed enough to prove that the communications in question were in fact confidential communications relating to legal advice.") (citing *In re Search Warrant Executed at Law Offices of Stephen Garea*, No. 97-4112, 1999 U.S. App. LEXIS 3861, at *7 (6th Cir. Mar. 5, 1999)).

### 2.    Notes and compilations authored by Robert Griffin[5]

Little Hocking's general manager, Robert Griffin, authored the majority of the disputed notes and compilations.  *See Revised Exhibit 9; Altman Declaration*, ¶ 9.  Although Mr. Griffin and Little Hocking's counsel aver that these notes and compilations were created at the direction of counsel for the purpose of providing legal advice, *see supra*, the record also reflects that Mr. Griffin created these documents for business purposes:

> As a direct and proximate result of the Contamination, the professional life of Mr. Griffin has been consumed since 2002 with Contamination-related activities.  He has worked

---

[5] Although the parties did not separately address notes authored by Mr. Griffin and notes authored by "litigation consultants," the Court concludes that such a distinction is necessary.

> with regulatory agencies and participated in numerous
> government meetings, including many U.S. EPA meetings, *to
> try and understand the scientific and public health issues
> in order to be able to provide informed responses to
> customer concerns*.

*Amended Complaint*, ¶ 152 (emphasis added). Moreover, the evidence
establishes that Mr. Griffin did not send many of his meeting notes to
counsel, undermining the suggestion that all of his notes were used in
formulating litigation strategy. *See*, *e.g.*, *Revised Exhibit 9*, pp. 1
(meeting notes numbered LH00155235 to LH0155237 created on January 20,
2009 with recipient listed as "N/A"), 2 (meeting notes numbered
LH00160948 to LH0160960, LH00160962 to LH0160966, LH00160967 to
LH0160973, LH00160974 to LH0160983, LH00160984 to LH0160992,
LH00160993 to LH0160998, LH00160999 to LH0161016, LH00161308 to
LH0161313, LH00161315 to LH0161322, LH00161324 to LH0161330,
LH00161332 to LH0161335, LH00161337 to LH0161339, LH00161341 to
LH0161343, LH00161345 to LH0161349 created on several dates with
recipients listed as "N/A").

Therefore, the record reflects that Mr. Griffin, who is not an
attorney, took notes about scientific and public health issues while
attending public or non-privileged meetings in order to later address
consumer questions. *Amended Complaint*, ¶ 152; *Griffin Declaration*, ¶
6(a) (identifying a certain document as, *inter alia*, notes from "a
September 2006 *public meeting* regarding PFOA") (emphasis added).
Considering the present record as a whole, the Court therefore
concludes that Mr. Griffin created the notes and compilations
primarily for a non-privileged purpose. This otherwise unprivileged

information regarding scientific and public health issues is not
rendered privileged simply because Mr. Griffin may have later sent
some of his notes to counsel. *See*, *e.g.*, *Upjohn Co. v. United States*,
449 U.S. 383, 396 (1981) ("'[A] party cannot conceal a fact merely by
revealing it to his [or her] lawyer[.]'") (quoting *State ex rel. Dudek
v. Circuit Court*, 34 Wis. 2d 559, 580, 150 N. W. 2d 387, 399 (1967)).
*Cf. Clevenger v. Dillard's Dep't Stores, Inc*., No. 1:02-cv-558, 2006
U.S. Dist. LEXIS 67322, at *9 (N.D. Ohio Sept. 20, 2006) (finding that
attorney notes based on a meeting with a third party were not
privileged even where attorney "may have then later communicated [to
his client] about the notes and given a legal opinion thereon [because
doing so] does not convert the notes themselves into attorney-client
communication").  Moreover, the Court notes that this information is
relevant to the issue of damages because Little Hocking alleges that
it has incurred, and will continue to incur, costs and expenses
associated with the attendance at various meetings and environmental
"investigation." *See*, *e.g.*, *Amended Complaint*, ¶¶ 152, 167, 170.  In
sum, because the Court finds that the predominant purpose of these
relevant documents is business-related, the attorney client privilege
does not protect the notes and compilations authored by Mr. Griffin.
*See Cooey v. Strickland*, 269 F.R.D. 643, 650 (S.D. Ohio 2010).

> **3.   Notes and compilations authored by "litigation
>        consultants"**

Some of the disputed notes and compilations were authored by
individuals whom Little Hocking identifies as "litigation

15

consultants." *Revised Exhibit 9; Altman Declaration*, ¶ 25. Although DuPont challenges the assertion that these consultants were "experts" hired "in anticipation of litigation," *see, e.g.*, *DuPont's Motion to Compel*, pp. 2, 4, Little Hocking offers little information about these consultants. For example, the record does not reflect how many consultants were hired, when they were hired or who hired each consultant. It appears that some consultants were hired to assist Little Hocking in reviewing the Carbon Plant design plans and overseeing collection of samples from the Carbon Plant. *See Amended Complaint*, ¶ 135 (stating that DuPont, "in consultation with Little Hocking and its consultants[,]" completed construction of the Carbon Plant in November 2007), ¶ 167(b) (alleging that Little Hocking incurred substantial costs associated with "extensively participating (through the efforts of Mr. Griffin and Little Hocking's consultants) in the review of the Carbon Plant design plans"); DuPont's fifth supplemental answer to Little Hocking's Interrogatory Number 1 of its first set of interrogatories, p. 3, attached as *Exhibit 7* to *DuPont's Motion to Compel* (representing that a settlement agreement in a class action filed in state court in West Virginia in which Little Hocking was not a party nevertheless required DuPont to offer to design or procure and install water treatment technology or its equivalent in certain public water systems, including LHWA, and therefore "a meeting took place in December 2004 between counsel, DuPont, LHWA and LHWA's consultant, Bennett & Williams. Additionally, in early 2005, DuPont agreed to compensate a consultant selected by LHWA, Dr. Najm, to offer

technical support to understand and evaluate the plans proposed for GAC treatment at LHWA"); *Deposition of Linda Aller*, attached as *Exhibit 8* to *DuPont's Motion to Compel* ("*Aller Deposition*"), p. 243 (stating that "Dr. Najm did provide services looking at some of the design components of the water treatment plant for Little Hocking Water Association" but that it was "my understanding that he was employed as a litigation consultant"), p. 244 (stating that she, Ms. Aller, provided, *inter alia*, "oversight for the collection of the GAC samples that are collected biweekly" and "provided technical comments relating to some of the adjustments that needed to be made to the designing of their operation of the plant").

At least one Little Hocking consultant, Linda Aller, spoke with EPA employees about C8 issues at and after EPA meetings. *Aller Deposition*, pp. 160-61.[6]

Consultants also assisted Little Hocking in business-related matters. *Amended Complaint*, ¶ 164 (alleging that "Little Hocking has also incurred substantial consultant fees and the cost associated with loss of goodwill, reputation and corporate opportunity"); ¶ 167(a) (alleging that Little Hocking has incurred substantial costs associated with "extensively participating (through the efforts of Mr. Griffin and Little Hocking's consultants) in the PFOA-related U.S. EPA Enforceable Consent Agreement ("ECA") process that directly impacts Little Hocking's property and testing of its Wellfields").

---

[6] Ms. Aller answered this question after being advised by Little Hocking's counsel to answer questions about discussions with EPA employees if she had those discussions "not as a litigation consultant[.]" *Id*. at 160.

Little Hocking's counsel represents that one particular "litigation consultant" was hired to assist with litigation strategy, although he does not identify that individual:

> Virtually all of the entries on Little Hocking's log that involve litigation consultants are documents that involved a single, particular litigation consultant.  That litigation consultant was retained to provide scientific and technical support for anticipated and ongoing PFOA-related litigation and to assist counsel in providing legal advice and formulating legal strategy.

*Altman Declaration*, ¶ 25.  In singling out this particular "litigation consultant," who apparently assisted with the formulation of legal strategy, the *Altman Declaration* implies that other consultants were not retained for that purpose, *i.e.*, other consultants were retained for business reasons, not to assist in litigation.  Indeed, the evidence discussed *supra* establishes that Little Hocking hired more than one consultant to assist it in business-related matters.  Therefore, the Court cannot conclude, based on the record presently before it, that the notes and compilations authored by consultants were created predominantly for litigation purposes.

Little Hocking's privilege log does not identify "litigation consultants" by name, referring to them simply as "LC" or "L/C."  *See*, *e.g.*, *Revised Exhibit 9*, pp. 1-5.  In other words, there is no way to distinguish one consultant from another or to ascertain from Little Hocking's privilege log whether or not the "litigation consultant" appearing in a particular entry was the "particular litigation consultant" purportedly retained to assist in formulating legal strategy.  As the party resisting production, Little Hocking bears the

18

burden of establishing the existence of the attorney client privilege. *See*, *e.g.*, *United States v. Dakota*, 197 F.3d 821, 825 (6th Cir. 1999). For the reasons discussed *supra*, Little Hocking's cryptic privilege log does not provide sufficient information to enable the Court to determine if the consultant notes are privileged. *See*, *e.g.*, *In re Search Warrant Executed at Law Offices of Stephen Garea, Suite 422, City Centre One, 100 Federal Plaza East, Youngstown, Ohio*, No. 97-4112, 1999 U.S. App. LEXIS 3861, at *7; *Cooey v. Strickland*, 269 F.R.D. at 649 ("The privilege log must be detailed enough to prove that the communications in question were in fact confidential communications relating to legal advice.").

Accordingly, viewing this record as a whole, the Court concludes that Little Hocking has not established that the attorney client privilege protects the notes and compilations authored by "litigation consultants."

**B.  Work product doctrine**

The parties also disagree whether the work product doctrine protects the notes and compilations.

**1.  Standard**

The work product doctrine "'is distinct from and broader than the attorney-client privilege.'" *Reg'l Airport Auth. v. LFG, LLC*, 460 F.3d 697, 713 (6th Cir. 2006) (quoting *In re Antitrust Grand Jury*, 805 F.2d 155, 163 (6th Cir. 1986)). This doctrine "protects an attorney's trial preparation materials from discovery to preserve the integrity of the adversarial process." *In re Professionals Direct Ins. Co.*, 578

F.3d 432, 439 (6th Cir. 2009) (citing *Hickman v. Taylor*, 329 U.S. 495, 510-14 (1947)).  The work product doctrine, incorporated into Fed. R. Civ. P. 26(b)(3), specifically protects (1) "documents and tangible things"; (2) "prepared in anticipation of litigation or for trial"; (3) "by or for another party or its representative." *Id.* (quoting Fed. R. Civ. P. 26(b)(3)). *See also Upjohn*, 449 U.S. at 398.  "If the court orders discovery of those materials [documents and tangible things], it must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation." Fed. R. Civ. P. 26(b)(3)(B).  Accordingly, courts distinguish between facts and opinion when determining whether or not the work product doctrine will serve to protect information from disclosure:

> So-called "fact" work product, the "written or oral information transmitted to the attorney and recorded as conveyed by the client" . . . may be obtained upon a showing of substantial need and inability to otherwise obtain without material hardship. . . . However, absent waiver, a party may not obtain the "opinion" work product of his adversary; *i.e.*, "any material reflecting the attorney's mental impressions, opinions, conclusions, judgments, or legal theories."

*Tennessee Laborers Health & Welfare Fund v. Columbia/HCA Healthcare Corp.*, 293 F.3d 289, 294 (6th Cir. 2002) (citations omitted).

In determining whether a document is protected by the work product doctrine because it was "prepared in anticipation of litigation or for trial," a court must ask two questions:  "(1) whether that document was prepared 'because of' a party's subjective anticipation of litigation, as contrasted with ordinary business

purpose; and (2) whether that subjective anticipation was objectively reasonable." *In re Professionals Direct Ins. Co.*, 578 F.3d at 439 (citing *United States v. Roxworthy*, 457 F.3d 590, 594 (6th Cir. 2006)). The party resisting disclosure bears the burden of showing that the material was "prepared in anticipation of litigation or for trial." *See*, *e.g.*, *Toledo Edison Co. & Cleveland Electric Illuminating Co. v. G A Technologies, Inc.*, 847 F.2d 335, 339 (6th Cir. 1988). A party may satisfy this burden "'in any of the traditional ways in which proof is produced in pretrial proceedings such as affidavits made on personal knowledge, depositions, or answers to interrogatories,' and that the showing 'can be opposed or controverted in the same manner.'" *Roxworthy*, 457 F.3d at 597 (quoting *Toledo Edison Co.*, 847 F.2d at 339). "Where an undisputed affidavit . . . is specific and detailed to indicate that the documents were prepared in anticipation of litigation or trial, then the party claiming work product protection has met its burden." *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 381 (6th Cir. 2009) (quoting *Roxworthy*, 457 F.3d at 597). However, courts will reject claims for work product protection "where the only basis for the claim is an affidavit containing conclusory statement[s]." *Id.* (quoting *Roxworthy*, 457 F.3d at 597).

Finally, "[i]f a document is prepared in anticipation of litigation, the fact that it also serves an ordinary business purpose does not deprive it of protection[.]" *In re Professionals Direct Ins. Co.*, 578 F.3d at 439 (citing Roxworthy, 457 F.3d at 595). However,

the party seeking protection bears the burden of showing that "anticipated litigation was the 'driving force behind the preparation of each requested document.'"  *Id.* at 578 F.3d at 439 (quoting *Roxworthy*, 457 F.3d at 595).  *See also Roxworthy*, 457 F.3d at 599 (stating that such documents do not lose protection under the work product doctrine "unless the documents 'would have been created in essentially similar form irrespective of the litigation'") (quoting *United States v. Adlman*, 134 F.3d 1194, 1202 (2nd Cir. 1998)).

      **2.  Notes and compilations authored by Robert Griffin**[7]

        **a.  "Fact" or "opinion"**

DuPont argues that the notes and compilations taken at public meetings by non-attorney Robert Griffin do not contain the mental impressions of counsel and are therefore not entitled to protection under the "opinion" work product.  *DuPont's Motion to Compel*, pp. 9-10; *Reply*, pp. 3-4.  Little Hocking's briefing implies that it, too, believes that the documents are "fact" work product, *cf. Memo. in Opp.*, pp. 6-9 (arguing that these documents were prepared in anticipation of litigation and that DuPont has not shown a substantial need for the documents, *i.e.*, considerations applicable only to "fact" work product).  However, Little Hocking does suggest that Mr. Griffin's notes "*can* reveal D. David Altman's opinion work product on what counsel thought was important enough to justify an instruction to take notes."  *Memo. in Opp.*, p. 9 n.13 (emphasis added).

---

[7]Again, the parties do not separately address the notes authored by Mr. Griffin and those authored by the "litigation consultants."

This Court disagrees. Other than this one unsworn, speculative sentence buried in a footnote, Little Hocking offers nothing to persuade this Court that Mr. Griffin's notes , made during the course of public meetings, reflect Attorney Altman's opinions. Indeed, as DuPont points out, the *Altman Declaration* confirms that Mr. Griffin was simply recording and relaying PFOA and related information to counsel:

> 18. It was also my pattern and practice to instruct Mr. Griffin to take notes and/or create memoranda regarding PFOA-related information. . .
>
> 19. For example, it was common practice for Mr. Griffin to take notes at PFOA-related meetings that he attended. He then communicated the recorded information to our office.

*Altman Declaration*, ¶¶ 18-19. Even if Mr. Griffin's notes and compilations were recorded at the direction of counsel, nothing in the *Altman Declaration* establishes that the documents contain the mental impressions of counsel. Under these circumstances, this Court concludes that notes and compilations authored by Mr. Griffin contain facts that do not reflect counsel's opinions. *See*, *e.g.*, *In re Grand Jury Subpoena*, 510 F.3d 180, 183-84 (2d Cir. 2007) ("To be entitled to protection for opinion work product, the party asserting the privilege must show 'a real, rather than speculative, concern' that the work product will reveal counsel's thought processes 'in relation to pending or anticipated litigation.'") (quoting *In re Grand Jury Subpoenas Dated Mar. 19, 2002 & Aug. 2, 2002*, 318 F.3d 379, 386 (2d Cir. 2003)); *Haworth, Inc. v. Herman Miller, Inc.*, 162 F.R.D. 289, 296 (W.D. Mich. May 30, 1995) ("Opinion work product protection is not

triggered unless 'disclosure creates a real, non-speculative danger of revealing the lawyer's mental impressions' and the attorney had 'a justifiable expectation that the mental impressions revealed by the materials will remain private.'") (quoting *In re San Juan Dupont Plaza Hotel Fire Litigation*, 859 F.2d 1007, 1015-16 (1st Cir. 1988)).

Little Hocking goes on to identify a single document that is purportedly "Mr. Griffin's notes taken during a conference with counsel" that "reveal[s] D. David Altman's opinion regarding Little Hocking's legal options." *Id.* (citing document numbered LH00169202). In other words, Little Hocking now suggests for the first time that some of the disputed notes and compilations authored by Mr. Griffin were taken during a strategy meeting with Little Hocking's counsel rather than at public meetings regarding water quality.

However, this detail is not evident in Little Hocking's privilege log. The information contained in the privilege log "must be sufficient to enable the court to determine whether *each element* of the asserted privilege is satisfied." *Cooey v. Strickland*, 269 F.R.D. at 649 (quoting *In re Universal Services Fund Tel. Billing Practices Litig.*, 232 F.R.D. 669, 673 (D. Kan. 2005)). This Court has previously acknowledged that courts require that privilege logs include the following information:

> 1. A description of the document explaining whether the document is a memorandum, letter, e-mail, etc.;
>
> 2. The date upon which the document was prepared;
>
> 3. The date of the document (if different from # 2);
>
> 4. The identity of the person(s) who prepared the document;

5. The identity of the person(s) for whom the document was prepared, as well as the identities of those to whom the document and copies of the document were directed, "including an evidentiary showing based on competent evidence supporting any assertion that the document was created under the supervision of an attorney;"

6. The purpose of preparing the document, including an evidentiary showing, based on competent evidence, "supporting any assertion that the document was prepared in the course of adversarial litigation or in anticipation of a threat of adversarial litigation that was real and imminent;" a similar evidentiary showing that the subject of communications within the document relates to seeking or giving legal advice; and a showing, again based on competent evidence, "that the documents do not contain or incorporate non-privileged underlying facts;"

7. The number of pages of the document;

8. The party's basis "for withholding discovery of the document (i.e., the specific privilege or protection being asserted); and

9. Any other pertinent information necessary to establish the elements of each asserted privilege."

*Id.* (quoting *In re Universal Services Fund Tel. Billing Practices Litig.*, 232 F.R.D. at 673). In other words, "[t]he privilege log must be detailed enough to prove that the communications in question were in fact confidential communications relating to legal advice." *Id.*

Here, notwithstanding Little Hocking's unsworn representation in the *Memo. in Opp.*, the privilege log does not provide the detail necessary for the Court to conclude that the notes in document numbered LH00169202 actually arose in connection with a meeting with counsel regarding legal strategy. *See Revised Exhibit 9*, p. 4 (asserting protection under the work product doctrine and attorney client privilege and simply describing document numbered LH00169202 as

25

notes taken by Mr. Griffin on August 14, 2006 with a subject matter
listed as "AC notes re: agency actions").  Little Hocking's failure in
this regard is particularly curious considering that it first produced
a privilege log nearly a year and a half ago and thereafter twice
revised the log.  *See*, *e.g.*, *Cavanaugh Declaration*, ¶¶ 3, 5, 14
(stating that Little Hocking produced its first privilege log on
August 12, 2011, which was subsequently revised on September 12, 2011
and again on May 25, 2012).  Nevertheless, the Court concludes that it
will provide Little Hocking one more opportunity to cure the
deficiencies in this regard in its current privilege log.
Accordingly, Little Hocking is **ORDERED** to produce, within fourteen
(14) days of the date of this *Opinion and Order*, a revised privilege
log that is detailed enough in order to meet the above-described
criteria.[8]  Little Hocking is specifically **ADVISED** that its failure to
provide detail sufficient to establish that any of Mr. Griffin's notes
or compilations were taken during conferences with counsel regarding
legal strategy will result in a waiver of otherwise applicable
protections.

### b.    Prepared in anticipation of litigation

        Having concluded that Mr. Griffin's notes and compilations taken
at public meetings are not "opinion" work product, the Court next
considers whether those documents must be produced.  As discussed
*supra*, Little Hocking, as the party seeking protection, bears the

---

[8] For example, the revised privilege log must include enough information to
establish that the document numbered LH00169202 (and, if applicable, any
other additional documents) are Mr. Griffin's notes from a meeting with
counsel providing legal advice rather than from a public meeting.

burden of showing that these notes and compilations were taken in "anticipation of litigation."  In particular, the work product doctrine protects documents prepared in anticipation of litigation, even if they also serve an ordinary business purpose, if the moving party shows that the "anticipated litigation" was the "'driving force behind the preparation of each requested document.'"  *In re Professionals Direct Ins. Co.*, 578 F.3d at 439 (quoting *Roxworthy*, 457 F.3d at 595).

Here, DuPont argues that there is no evidence that litigation was the "driving force" behind these documents, which are business records related to water quality.  *DuPont's Motion to Compel*, pp. 8-9.  More specifically, DuPont contends that Little Hocking, which is in the business of delivering potable water to customers, would have generated these documents, even if this litigation had not been filed, in order to respond to customer concerns about a potential contaminant.  *Id.* (citing, *inter alia*, *Amended Complaint*, ¶ 152 (alleging that Mr. Griffin participated in government meetings "in order to be able to provide informed responses to customer concerns")); *Reply*, pp. 3-4.

Little Hocking, however, takes the position that these documents are protected because they were created during or after January 2002, which is when a subjective and objective anticipation of litigation arose because that is the first time that DuPont advised Little Hocking of C8 contamination.  *Memo. in Opp.*, pp. 6-7.  Asserting that DuPont's focus on the "driving force" of the documents is too limited,

Little Hocking argues that these documents were not created in the ordinary course of business, but rather to aid counsel in litigation. *Id.* at 7-8 (citing *Griffin Declaration*, ¶ 6; *Altman Declaration*, ¶¶ 11-12, 18-19).  Little Hocking further argues that it did not create or maintain any C8-related documents prior to 2002 and represents that the documents that it does create in the ordinary course of business are limited to compounds that must be monitored, and do not include PFOA, which is an unregulated compound.  *Id.* at 8 (providing no citations to the record).

DuPont contends that Little Hocking's position that it is not "in the C8 business" contradicts Little Hocking's representations in the *Amended Complaint*, which detail the amount of time spent and acts taken by Little Hocking representatives and consultants learning about PFOA "all for the stated purpose of the ability to provide informed responses to customer concerns." *DuPont Motion to Compel*, pp. 8-9 (citing *Amended Complaint*, ¶ 152). *See also Reply*, pp. 3-4 (arguing that Little Hocking's contention that Mr. Griffin investigated PFOA only because he intended to sue DuPont is simply an attempt to protect non-privileged notes and compilations).

DuPont's arguments are well-taken.  According to the *Amended Complaint*, Little Hocking is in the "business" of "supplying potable water to its customers[,]" *id.* at ¶ 21, and "has historically sought finished[9] drinking water that is non-detect for PFOA and other PFCs." *Id.* at ¶ 134.  According to Little Hocking, upon learning of PFOA

---

[9] "Finished water is water that enters Little Hocking's distribution system." *Id.* at ¶ 134.

contamination in its water system, Mr. Griffin took action to learn about and address the contamination and to educate its water users. *See id*. at ¶ 149 (stating that Mr. Griffin "took steps to uncover the true scope of the Contamination problem, to find short and long-term solutions to the problem, and to advise Little Hocking's water users of what the small organization knew about the scope of the public health threat"). Specifically, as discussed *supra*, Mr. Griffin "has worked with regulatory agencies and participated in numerous government meetings, including many U.S. EPA meetings, to try and understand the scientific and public health issues in order to be able to provide informed responses to customer concerns." *Id*. at ¶ 152.

Against this backdrop, Little Hocking has not persuaded the Court that Mr. Griffin's notes - taken at public meetings - "are not general water quality records created for a business purpose" or that "it is actually *inconsistent* with Little Hocking's normal business purpose to create documents about a chemical that Little Hocking is not required to monitor[.]" *Memo. in Opp*., p. 8 (emphasis in original). Not only has Little Hocking provided no evidence to support its assertion in this regard, but the record establishes that Little Hocking believes that it was legally required to report, and therefore presumably to monitor, the presence of C8 and related compounds. *See*, *e.g.*, *Exhibit 13*, p. 2, attached to *Dupont's Motion to Compel* (letter dated July 13, 2005 from Little Hocking to the EPA providing a summary of the Little Hocking blood testing data for PFOA and PFOS and other perfluorinated compounds in order to, *inter alia*, "ensure compliance with any legal

29

obligations Little Hocking may have under the reporting requirements of Section 8 of the Toxic Substances Control Act"). Moreover, the *Amended Complaint* establishes that Little Hocking's business is to provide potable water to its customers and that it has a history of seeking drinking water that does not contain PFOA. The *Amended Complaint* also makes clear that Mr. Griffin attended the public meetings regarding water quality and PFOA in order to respond to customer concerns. In other words, Mr. Griffin took notes at public meetings primarily for business, rather than legal, purposes. Therefore, Mr. Griffin's notes taken at public meetings "'would have been created in essentially similar form irrespective of the litigation.'" *See Roxworthy*, 457 F.3d at 599 (quoting *United States v. Adlman*, 134 F.3d 1194, 1202 (2nd Cir. 1998)).

In reaching this conclusion, the Court recognizes that Little Hocking offers declarations asserting that Mr. Griffin created these notes in order to prepare for PFOA-related litigation, which Little Hocking has allegedly anticipated since 2002. *See supra*. However, the allegations in the *Amended Complaint* controvert, or at the very least, undermine the representations in those declarations. To accept Little Hocking's current position would require the Court to ignore the *Amended Complaint*, which the Court declines to do. *Cf. Roxworthy*, 457 F.3d at 597 (crediting affidavits, offered in the context of a work product analysis, that were uncontroverted by the record). Therefore, although Mr. Griffin's notes may have also aided Little Hocking in its litigation, the Court cannot find that "anticipated

litigation" was the "'driving force behind" these the generation of
those notes.  *See In re Professionals Direct Ins. Co.*, 578 F.3d at 439
(quoting *Roxworthy*, 457 F.3d at 595).  Accordingly, the Court
concludes that the work product doctrine will not serve to protect Mr.
Griffin's notes and compilations of public meetings from discovery.[10]

### 3.  Notes and compilations authored by "litigation consultants"

Individuals identified as "litigation consultants" also authored
some of the disputed notes and compilations.  *See Revised Exhibit 9*.
As discussed *supra*, however, Little Hocking provides little
information about these consultants in its invocation of the work
product doctrine.  Although Little Hocking states that one particular
"litigation consultant" was hired to assist with litigation strategy,
*see Altman Declaration*, ¶ 25, it does not identify that individual and
the privilege log simply refers to "litigation consultants" as "LC" or
"L/C."  *See*, *e.g.*, *Revised Exhibit 9*, pp. 1-5.  Moreover, the
descriptions of the documents authored by the "litigation consultants"
do not provide information sufficient to establish that the notes
relate at all to litigation.  *See*, *e.g.*, *Revised Exhibit 9*, p. 8
(asserting protection under, *inter alia*, the work product doctrine in
connection with notes numbered LH00195360 to LH00195363; LH00195364 to
LH00195367; LH00195368; LH00195369 that were sent to no one and bear a
subject matter described as "C-8 Community Advisory Meeting").  In

---

[10] Having so concluded, the Court need not and does not determine whether
DuPont has demonstrated a "substantial need" for these documents.  *Cf.*
*Tennessee Laborers Health & Welfare Fund v. Columbia/HCA Healthcare Corp.*,
293 F.3d 289, 294 (6th Cir. 2002) (stating that "fact" work product may be
obtained upon a showing of, *inter alia*, substantial need).

sum, the Court is unable to conclude on this record that the documents purportedly drafted by an unidentified "particular litigation consultant" assisted with strategy "in anticipation of litigation." Little Hocking has therefore failed to meet its burden and has not established that the work product doctrine protects notes authored by its "litigation consultants." *See*, *e.g.*, *Toledo Edison Co. & Cleveland Electric Illuminating Co.,* 847 F.2d at 339; *Biegas,* 573 F.3d at 381 (noting that courts will reject claims for work product protection "where the only basis for the claim is an affidavit containing conclusory statement[s]") (citing *Roxworthy*, 457 F.3d at 597). *Cf. Cooey v. Strickland*, 269 F.R.D. at 649.

Accordingly, as it relates to the notes and compilations authored by Little Hocking employees (primarily Mr. Griffin) and "litigation consultants," *DuPont's Motion to Compel* is **GRANTED in part and DENIED in part**. Specifically, *DuPont's Motion to Compel* is **GRANTED** as to the notes and compilations taken during public meetings by Mr. Griffin and the "litigation consultants" as reflected in *Revised Exhibit 9*. Little Hocking is **ORDERED** to produce such documents within fourteen (14) days of the date of this *Opinion and Order*. The motion is **DENIED** to the extent that the disputed documents are notes or compilations arising from a meeting with counsel reflecting legal strategy. Little Hocking is **ORDERED** to produce, within fourteen (14) days, a revised privilege log that is consistent with the foregoing.[11]

---

[11] The Court notes that the briefing and *Revised Exhibit* refer briefly or generally to a "litigation consultant privilege." However, this issue was not fully developed by the parties and is therefore not addressed by this Court.

**IV.  WATER AND BLOOD SAMPLING DOCUMENTS**

DuPont next seeks to compel information identified as water and blood sampling documents.  *See DuPont Motion to Compel*, pp. 10-13; *Revised Exhibit 10*.[12]  Sampling information apparently includes: (1) underlying data/results from blood and water sampling tests conducted by Little Hocking and/or its representatives as well as (2) charts, graphs and/or spreadsheets created by Little Hocking or its representatives analyzing and/or summarizing Little Hocking's sampling data.  *DuPont's Motion to Compel*, pp. 10-13; *Memo. in Opp.*, pp. 9-13; *Reply*, pp. 5-6; *Griffin Declaration*, ¶ 8; *Altman Declaration*, ¶ 20; *Revised Exhibit 10*.

According to DuPont, "Little Hocking has relied on water and blood sampling results to accuse DuPont of wrongdoing in this case and in correspondence with regulators."  *DuPont's Motion to Compel*, p. 10.  For instance, Little Hocking has tested the blood of certain Little Hocking residents and has forwarded "a summary of blood sampling data" to the EPA with the assertion that DuPont releases and/or disposes of, *inter alia*, C8, at a nearby plant:

> [DuPont] owns and operates the DuPont Washington Works Plant in Parkersburg, West Virginia, across the Ohio River from the Little Hocking well field.  DuPont uses, releases and/or disposes of perfluorinated compounds – including C8 – at its Washington Works Plant.  Little Hocking's wells contain the highest levels of C8 found in any public water supply in the country to date. . . .

---

[12] *Revised Exhibit 10* appears on pages 46-60 of *Exhibit A* attached to DuPont's *Reply*.

> Recognizing the threat to human health (including that of
> Little Hocking members) from C8 and related compounds,
> Little Hocking paid for blood sampling of the 25
> individuals referred to above (the blood samples were
> arranged for, obtained, analyzed, and paid for with no
> assistance from or involvement by DuPont).

*Exhibit 13*, p. 2, attached to *Dupont's Motion to Compel* (letter dated

July 13, 2005 from Little Hocking to the EPA providing "a summary of

the Little Hocking blood data" for inclusion in the EPA administrative

record and "to ensure compliance with any legal obligations Little

Hocking may have under the reporting requirements of Section 8 of the

Toxic Substances Control Act").

DuPont contends that the *Amended Complaint* "relies on these

results" when it alleges that:

> The ultimate sources of the [Little Hocking] Wellfields'
> and the Distribution System's adulteration and Hazardous
> Waste contamination (collectively, "Contamination") are the
> [DuPont] Facilities.
>
> *            *            *            *
>
> To date, the levels of PFOA in the Wellfields are the
> highest known in any public water supply in the world.
>
> *            *            *            *
>
> Because of DuPont's acts and omissions, Little Hocking owns
> contaminated  Wellfields and owns a Distribution System
> that continues to be threatened by contamination.

*Amended Complaint*, ¶¶ 4, 119, 171.

According to DuPont, Little Hocking has withheld documents

(reflected in hundreds of entries in Little Hocking's privilege log)

related to "sampling" on the basis of the attorney client privilege

and the work product doctrine. *DuPont's Motion to Compel*, p. 11.

However, DuPont complains, the privilege log does not indicate whether these documents "relate to sampling that Little Hocking has provided to the EPA or if these documents reflect sampling conducted by Little Hocking that has not been disclosed to the EPA or to DuPont." *Id.* The Court will address each issue in turn.

### A. Underlying Sampling Data

It does not appear that Little Hocking opposes production of underlying sampling data. *See Memo. in Opp.*, pp. 10, 13. Instead, Little Hocking takes the position that DuPont already "has the underlying data[.]" *Id.* at 13 (stating further that it "never intended" blood sampling results sent to the EPA "to be privileged or protected"). *See also id.* at 10 (representing that Little Hocking is not "withholding a slew of unique underlying sampling data" and has already produced "water quality data" and "water sampling data from DuPont"). However, DuPont complains that Little Hocking "refuses to confirm that it has produced all of the water and blood sampling data in its possession" and argues that it impossible to determine from Little Hocking's privilege log whether all of this data has been produced. *Reply*, p. 5.

In reviewing the record, the Court agrees that there exists some ambiguity as to whether or not all the underlying water and blood sampling data has been produced. *See*, *e.g.*, *Memo. in Opp.*, p. 10 (representing in a brief, rather than in an affidavit or declaration, that Little Hocking has produced water and blood sampling data), p. 13 (stating that it disclosed sample results to the EPA, but withheld the

names of those sampled); *Aller Deposition*, pp. 159-60 (Little Hocking counsel instructing witness not to answer questions regarding her communications with the EPA on grounds of privilege); *Revised Exhibit 10*, pp. 1-2 (describing the subject of several entries as "Sampling results," "Sample Results" or "C8 results"). Therefore, to the extent that there remain any outstanding underlying water or blood sampling data, *DuPont's Motion to Compel* is **GRANTED.** Little Hocking is **ORDERED** to produce such information within fourteen (14) days of the date of this *Opinion and Order*.[13]

In the event that all underlying water and blood sampling data has already been produced, Little Hocking is **ORDERED** to submit, within fourteen (14) days, an affidavit or declaration confirming this production complete.

B.    Charts, Graphs and/or Spreadsheets

DuPont mentions in passing that the Court should compel Little Hocking to produce "all documents listed on Exhibit 10 and any other material relating to [Little Hocking's] sampling efforts[.]" *DuPont's Motion to Compel*, p. 13. However, rather than explaining why the various types of charts, graphs and spreadsheets created by Little Hocking, its representatives or its counsel[14] should be produced, DuPont's arguments focus on compelling production of the underlying

_____

[13] In so ordering, the Court expects Little Hocking to produce complete sampling results, including the names of those individuals whose blood was sampled. Although neither party addresses whether such production implicates the Health Insurance Portability and Accountability Act of 1966 ("HIPAA"), DuPont notes that the protective order in place in this case protects confidential documents. *See Agreed Interim Protective Order*, Doc. No. 54.

[14] Attorney Altman and his office authored several documents listed on *Revised Exhibit 10*. *See*, *e.g.*, *id*. at 1-2, 9-11, 14.

sampling results. *See*, *e.g.*, *id.* at 10 ("Little Hocking has relied on water and blood sampling *results* to accuse DuPont of wrongdoing in this case and in correspondence with regulators" and "Little Hocking relies on these *results* to accuse DuPont of contaminating its wellfield and customers; accusations that mirror allegations in this lawsuit"), at 12 ("Sampling *Results* are Not Protected by Attorney-Client Privilege" and "Sampling *Results* Are Not Protected by the Work Product Doctrine"), at 13 ("Little Hocking has waived any claim of privilege or work product protection over these sampling *results*"); *Reply*, p. 5 (complaining that Little Hocking improperly seeks to withhold "water and blood sampling *results*" and complaining that Little Hocking has withheld the identity of individuals from the sampling data), p. 6 (arguing that Little Hocking "has failed to meet its burden to establish that any underlying water or blood sampling data is protected" and contending that Little Hocking has waived any such protection over the "*underlying sampling data*") (emphasis added). Considering that the Court has already ordered production of all underlying sampling data, *see supra*, and because DuPont offers no justification or interest in other documents, there appears to be nothing else for the Court to compel in this regard. Accordingly, to the extent that it seeks documents other than underlying sampling data appearing in *Revised Exhibit 10*, *DuPont's Motion to Compel* is **DENIED**.[15]

## V.  DOCUMENTS RELATING TO LITTLE HOCKING'S ECONOMIC HARM ALLEGATIONS AND DAMAGES CALCULATIONS

---

[15] Having so concluded, the Court need not, and does not, address the issue of waiver.

DuPont seeks to compel documents that relate to Little Hocking's allegation of economic harm and damages calculations.  *See DuPont's Motion to Compel*, pp. 14-16; *Revised Exhibit 11*.[16]  In opposing DuPont's request, Little Hocking represents that it has already produced "the documents underlying its damages claims," including invoices, receipts and "[i]nformation about the damages-related consultant work[.]" *Memo. in Opp.*, p. 18.  Little Hocking has also provided attorney fee totals on a quarterly basis.  *Id*. at 19.  According to Little Hocking, it has withheld only (1) attorney invoices (2) invoices relating to non-testifying "litigation consultant" work, and (3) charts, spreadsheets and memoranda regarding litigation expenses and damages created for anticipated or pending litigation.  *Id*. at 14-18.  The Court shall address each category in turn.

### A.    Attorney Invoices

Little Hocking argues that the detailed attorney invoices are privileged and protected by the work product doctrine because they reveal legal advice and strategy.  *Id*. at 14-15.  Little Hocking further argues that it has not waived this privilege or protection because the attorney invoices have not been placed at issue.  *Id*. at 19.  According to Little Hocking, the reasonableness of counsel's work is irrelevant "until Little Hocking prevails and gains the statutory right to seek reimbursement for litigation costs." *Id*.  Finally, Little Hocking contends that it has met DuPont's need for attorney fee

---

[16] *Revised Exhibit 11* appears on pages 61-82 of *Exhibit A* attached to DuPont's *Reply*.

information at this stage of the proceedings because it has been providing DuPont with attorney fee totals on a quarterly basis.  *Id.*

DuPont argues that attorney billing records are privileged only if they reveal the client's motive in seeking representation, litigation strategy or "the specific nature of the services provided." *DuPont's Motion to Compel*, p. 14 (quoting *Chaudhry v. Gallerizzo*, 174 F.3d 394, 402 (4th Cir. 1999)).  Here, DuPont contends, the descriptions provided in Little Hocking's privilege log do not indicate that the requested records reveal such privileged information.  *Id.* at 14-15.  Even if the records do reveal such privileged information, Little Hocking should nevertheless produce a redacted version of the non-privileged document.  *Reply*, p. 7. Finally, in response to Little Hocking's argument that it need not produce fee information until it prevails on its claims, DuPont contends that Little Hocking has waived claims of privilege and work product by placing attorney fees at issue in this case.  *Id.* at 8 (citing *Amended Complaint*, ¶¶ 149,[17] 150, alleging business interruption resulting from PFOA investigation); *DuPont's Motion to Compel*, pp. 15-16 (citing *Amended Complaint*, ¶¶ 152, 167(a) and (b), alleging business interruption and economic harm resulting from PFOA investigation).

"Typically, the attorney-client privilege does not extend to billing records and expense reports." *Chaudhry,* 174 F.3d 394 at 402. *See also Penn, LLC v. Prosper Bus. Dev. Corp.*, No. 2:10-cv-993, 2012

---

[17] Based on the description of this paragraph in the *Reply*, the Court assumes that DuPont intended to cite to paragraph 149, not paragraph 147.

U.S. Dist. LEXIS 117067, at *37-38 (S.D. Ohio Aug. 20, 2012) ("In discovery disputes, a blanket assertion of privilege regarding attorney fee bills is typically not appropriate.") (collecting cases); *Saint-Gobain Autover USA, Inc. v. Xinyi Glass N. Am., Inc.*, 707 F. Supp. 2d 737, 764 n.22 (N.D. Ohio April 13, 2010) ("The assertion that descriptions of work in billing records are protected by attorney-client privilege has generally been rejected.") (quoting *Kwik-Sew Pattern Co. v. Gendron*, No. 1:08-CV-309 2008 U.S. Dist. LEXIS 74849, at *2 (W.D. Mich. Sept. 25, 2008)). However, records that reveal the client's motive in seeking representation, litigation strategy or the specific nature of services rendered are privileged. *Chaudhry*, 174 F.3d at 402-03.

This Court is not persuaded that Little Hocking's blanket refusal to produce attorney invoices during discovery is appropriate. *See*, *e.g.*, *Penn, LLC*, 2012 U.S. Dist. LEXIS 117067, at *37-38. *Cf. Evenflo Co. v. Hantec Agents Ltd.*, No. 3-:05-CV-346, 2006 U.S. Dist. LEXIS 74684, at *10-11 (S.D. Ohio Oct. 13, 2006) (finding, *inter alia*, in the context of discovery and a motion to compel, that attorney invoices were privileged where they "reveal the specific nature of the services provided"). Here, Little Hocking's privilege log does not support its assertion of privilege. More specifically, it is impossible to determine from Little Hocking's conclusory descriptions - often simply "Invoice for attorneys' fees," *see*, *e.g.*, *Revised Exhibit 11*, pp. 2-5 - whether the attorney invoices capture privileged

or product protected information.[18]  The Court therefore concludes that Little Hocking has failed to meet its burden in protecting this information.  Under the circumstances presented in this case, the Court agrees with DuPont that production that redacts privileged information is appropriate.  Accordingly, to the extent that it seeks attorney invoices appearing on *Revised Exhibit 11*, *DuPont's Motion to Compel* is **GRANTED**, subject to the following limitations.  Little Hocking is **ORDERED** to produce, within fourteen (14) days of the date of this *Opinion and Order*, attorney invoices, redacting only information that reveals Little Hocking's motive in seeking representation, litigation strategy, the specific nature of services rendered and/or counsel's mental impressions.[19]  To the extent that Little Hocking contends that it is unable to redact portions of a document and continues to withhold any attorney invoices on the basis of privilege or work product, Little Hocking is **FURTHER ORDERED** to produce, within fourteen (14) days of the date of this *Opinion and Order*, a revised privilege log that is sufficiently detailed to establish that these documents are entitled to such protection.

    **B.    Non-Testifying "Litigation Consultant" Invoices**

---

[18] Having so concluded, the Court need not, and does not, address the parties' arguments regarding waiver.

[19] In other words, the Court will not permit the redaction of non-privileged information.  *See*, *e.g.*, *Chaudhry*, 174 F.3d at 402 ("[T]he amount of the fee, the identification of payment by case file name and the general purpose of the work performed are usually not protected by the attorney-client privilege."); *Humphreys, Hutcheson & Moseley v. Donovan*, 755 F.2d 1211, 1219 (6th Cir. Feb. 20, 1985) ("In general, the fact of legal consultation or employment, clients' identities, attorney's fees, and the scope and nature of employment are not deemed privileged. . . . [T]he amount of money paid or owed by a client to his attorney is not privileged except in exceptional circumstances not present in the instant case.").

DuPont also seeks production of invoices from Little Hocking's "litigation consultants." Little Hocking contends that "absent exceptional circumstances, no discovery regarding non-testifying litigation consultants, including the consultant's name, is permitted." *Memo. in Opp*., p. 15 (citing two cases for the proposition that a party cannot obtain discovery regarding a "consulting expert" or discovery from a non-testifying "expert who is retained or specially employed in anticipation of litigation"). According to Little Hocking, DuPont has not even attempted to establish exceptional circumstances. *Id*.

Little Hocking apparently relies on Rule 26(b)(4)(D) of the Federal Rules of Civil Procedure, which prohibits discovery of "facts known or opinions held by an expert who has been retained or specially employed. . . in anticipation of litigation or to prepare for trial and who is not expected to be called as a witness at trial." However, as discussed *supra*, DuPont challenges the assertion that these consultants were "experts" hired "in anticipation of litigation" and Little Hocking offers little information about these consultants. Little Hocking asserts that it has already produced damages-related consultant work, distinguishing between the types of consulting work performed for Little Hocking. *See*, *e.g.*, *Memo. in Opp*., p. 18. However, nothing in the record supports this assertion, *i.e.*, that there was discreet litigation consulting work performed. For example, the only information before the Court suggests that the consulting work performed for Little Hocking was business related and related to

42

the allegations raised in the *Amended Complaint*, which Little Hocking describes as damages-related work.  *See supra; Memo. in Opp.*, p. 18. Moreover, Little Hocking's privilege log offers no details in support of a claim that Rule 26(b)(4)(D), the attorney-client privilege or the work product doctrine protects the invoices at issue here.  *See*, *e.g.*, *Revised Exhibit 11*, p. 7 (documents identified numbered LH00155306 to LH0155307 authored by "LC" described as "Invoice for consulting services" with no recipients), p. 9 (same, with different document numbers), pp. 12-13 (multiple entries with author listed as "L/C" and subject matter simply "Invoice").  Based on this record, the Court concludes that these documents must be produced.  Accordingly, to the extent that it seeks production of the "litigation consultant" invoices appearing in *Revised Exhibit 11*, *DuPont's Motion to Compel* is **GRANTED** subject to the following limitations.  Little Hocking is **ORDERED** to produce, within fourteen (14) days of the date of this *Opinion and Order*, "litigation consultant" invoices, redacting only privileged and protected information.  To the extent that Little Hocking withholds any "litigation consultant" invoice, Little Hocking is **FURTHER ORDERED** to produce, within fourteen (14) days of the date of this *Opinion and Order*, a revised privilege log that is sufficiently detailed to establish that these documents are entitled to such protection.

### C.   Charts, Spreadsheets and Memoranda

Little Hocking has also withheld charts, spreadsheets and memoranda regarding litigation expenses and economic damages.  *Memo.*

43

*in Opp.*, pp. 16-18; *Revised Exhibit 11.* In support of its position, Little Hocking provides evidence, which is uncontroverted by DuPont, that these documents were prepared in anticipation of litigation. *Griffin Declaration*, ¶ 9. Indeed, DuPont appears to abandon its request for the production of these documents, focusing instead on underlying invoices. *See*, *e.g.*, *Reply*, pp. 7-8. However, as discussed supra, the Court has already determined that these underlying invoices must be produced subject to certain redactions. To the extent that the motion seeks production of Little Hocking's charts, spreadsheets and memoranda regarding litigation expenses and economic damages, *DuPont's Motion to Compel* is **DENIED.**

## VI. DOCUMENTS SENT TO THIRD PARTIES

Finally, DuPont seeks an order compelling production of seven documents that Little Hocking sent to a third party, Robert Bilott. *See DuPont's Motion to Compel*, pp. 17-18. Mr. Bilott is an attorney representing individual plaintiffs in two actions for damages allegedly caused by PFOA contamination resulting from DuPont's facilities. *See DuPont's Motion to Compel*, pp. 17-18 (citing "*Leach v. DuPont*" and "*Rhodes v. DuPont*"); *Altman Declaration*, ¶¶ 26-27 (citing *Leach v. E.I. du Pont de Nemours & Co.*, Case No. 01-C-608 (Cir. Ct. W. Va.)); *Exhibit 12*, attached to *DuPont's Motion to Compel*. DuPont first argues that the scant descriptions in the privilege log prevent DuPont from determining whether the documents are either privileged or entitled to protection. *DuPont's Motion to Compel*, p.

44

17. Even if these documents are entitled to some protection, DePont argues, Little Hocking waived that protection by disclosing the documents to Attorney Bilott because Little Hocking is not a party in *Leach* or *Rhodes* and has apparently never entered into a joint representation agreement with the plaintiffs in those actions. *Id.* at 17-18.

Little Hocking, however, takes the position that the work product doctrine protects the seven documents sent to Attorney Bilott because the documents were created after Little Hocking subjectively and reasonably anticipated litigation. *Memo. in Opp.*, p. 19 (citing *Exhibit 5*, attached thereto). Little Hocking further argues that it and its counsel communicated with Attorney Bilott only "in order to further Little Hocking's efforts toward anticipated or ongoing litigation against DuPont." *Id.* at 19-20 (citing *Altman Declaration*, ¶¶ 27-28). Little Hocking also contends that the protection afforded by the work product doctrine is waived only through disclosure to an adversary, explaining that Attorney Bilott is an ally. *Id.* at 20 (citing *In re Columbia/HCA Healthcare Corporation Billing Practices Litigation*, 293 F.3d at 306). DuPont, however, replies that Little Hocking has offered no evidence of a joint agreement between Little Hocking and Attorney Bilott. *DuPont's Motion to Compel*, pp. 17-18

As an initial matter, the Court agrees that it cannot determine, based on the descriptions in the privilege log, whether the work product doctrine protects the seven documents sent to Attorney Bilott. *See Exhibit 12.* For example, the documents generally appear to

45

contain only discoverable facts and do not appear to constitute work product. *See id*. (describing document numbered LH00159049 as "Class Action information"; document numbered LH00246496 as "Blood Sampling"; document numbered LH00287400 as "TSCA notice re C8"; document numbered LH00289112 as "Meeting"; document numbered LH00289113 as "Sampling data"; document numbered LH00289873 as "Sampling results"; document numbered LH00289981 as "Letter to EPA").

Assuming that these documents are protected, the record does not support a finding of waiver through production to Attorney Bilott. As the parties note, the common-interest doctrine, which protects communications disclosed to third parties under certain circumstances, extends to "two or more parties" sharing a "common interest" who are not parties to the same litigation. *Cooey*, 269 F.R.D. at 652. This doctrine "applies only when all attorneys and clients have agreed to take a joint approach in the matter at issue" and such agreement need not be in writing. *Id*. In addition, the doctrine protects only "communications regarding the common interest and intended to further that interest." *Id*.

Here, Little Hocking has offered uncontroverted evidence that plaintiffs and their counsel in *Leach*, *Rhodes* and this case had an agreement to convey information and that the communications at issue here were in furtherance of their common legal interests. *Altman Declaration*, ¶¶ 26-28. Accordingly, to the extent that it seeks the production of documents disclosed to Attorney Bilott, *DuPont's Motion to Compel* is **DENIED without prejudice.** Little Hocking is **ORDERED** to

46

produce, within fourteen (14) days of the date of this *Opinion and Order*, a revised privilege log that is sufficiently detailed to establish that the work product doctrine protects the seven documents identified in *Exhibit 12*, attached to *DuPont's Motion to Compel*.

      **WHEREUPON**, defendant *DuPont's Motion to Compel Documents From Little Hocking's Privilege Log*, Doc. No. 96, is **GRANTED in part and DENIED in part** consistent with the foregoing.


February 19, 2013                    *s/Norah McCann King*
                                       Norah M<sup>c</sup>Cann King
                                  United States Magistrate Judge

47