IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

THE LITTLE HOCKING WATER ASSN., INC.,

      Plaintiff,

    vs.                     Civil Action 2:09-cv-1081
                                    Judge Smith
                                    Magistrate Judge King

E.I. DU PONT DE NEMOURS & CO.,

      Defendant.

OPINION AND ORDER

      This matter is before the Court on *Plaintiff Little Hocking Water Association's Amended Motion to Compel Defendant DuPont to Comply With Its Discovery Obligations*, Doc. No. 105 ("*Little Hocking's Motion to Compel*"). For the reasons that follow, *Little Hocking's Motion to Compel* is **GRANTED in part and DENIED in part**.

I.    BACKGROUND

      A.    Allegations and Claims

      This Court has previously set forth in detail the allegations and claims in this litigation. *See*, *e.g.*, *Opinion and Order*, Doc. No. 34. More briefly, plaintiff, the Little Hocking Water Association, Inc. ("Little Hocking"), supplies water to townships in Washington County, Ohio and in Athens County, Ohio. *First Amended Complaint*, Doc. No. 23, at ¶ 21 ("*Amended Complaint*"). Little Hocking owns wellfields that are located in the State of Ohio, directly across the Ohio River from defendant E.I. Du Pont de Nemours & Co.'s ("DuPont") Washington

1

Works plant. *Id.* at ¶¶ 26, 29. Little Hocking alleges that DuPont's waste disposal practices have resulted in the migration of hazardous perfluorinated compounds (collectively, "PFCs") into Little Hocking's wellfields. *Id.* at ¶¶ 3, 5. According to Little Hocking, DuPont uses at least one PFC, ammonium perfluorooctanoate ("APFO") in connection with its Teflon® related products. *Id.* at ¶ 44. APFO is the ammonium salt of "PFOA," the acronym used to identify the chemical Perfluorooctanoic acid commonly referred to as "C8." *Id.* at ¶¶ 45 n.1, 48. Little Hocking alleges that DuPont has used PFOA at its Washington Works plant from at least 1951 to the present. *Id.* at ¶ 46. Little Hocking alleges that DuPont has known of the "bio-persistence and toxicity of PFOA" for some time. *Id.* at ¶ 52.

Little Hocking also alleges that DuPont's release of hazardous wastes has affected not only human health and the environment, but also the operations of its business, resulting in expense to it, including participating in review of the Carbon Plant design plans and testing the levels of PFOA and other PFCs in the blood of approximately 25 of its water users. *Id.* at ¶¶ 148-180.

Little Hocking asserts endangerment claims under the Resources Conservation and Recovery Act, 42 U.S.C. § 6972 ("RCRA"). *Id.* at ¶¶ 181-190. Little Hocking also asserts claims of nuisance, negligence, trespass, abnormally dangerous activity, conversion, unjust enrichment and declaratory judgment for indemnification. *Id.* at ¶¶ 191-251.

**B.   Procedural History**

Little Hocking served its *First Request for Production of Documents* and *First Set of Interrogatories* on July 8, 2010.

*Declaration of Justin D. Newman*, ¶¶ 4, 23, attached as *Exhibit 1* to *Little Hocking's Motion to Compel* ("*Newman Declaration*"). After DuPont initially responded and supplemented its answers, a dispute arose regarding the adequacy of the answers. *See*, *e.g.*, *id.* at ¶¶ 5-7, 24-26. Unable to resolve their dispute extrajudicially, *Little Hocking's Motion to Compel* was filed. DuPont opposes this motion, *Defendant's Memorandum in Opposition to Plaintiff's Amended Motion to Compel*, Doc. No. 113 ("*Memo. in Opp.*"), and Little Hocking has filed a reply memorandum, *Plaintiff's Reply in Support of Its Motion to Compel*, Doc. No. 120 ("*Reply*").

## II. STANDARD

The Federal Rules of Civil Procedure grant parties the right to "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense. . . ." Fed. R. Civ. P. 26(b)(1). Relevance for discovery purposes is extremely broad. *Lewis v. ACB Business Services, Inc.*, 135 F.3d 389, 402 (6th Cir. 1998). However, "district courts have discretion to limit the scope of discovery where the information sought is overly broad or would prove unduly burdensome to produce." *Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 305 (6th Cir. 2007) (citing Fed. R. Civ. P. 26(b)(2)). In determining the proper scope of discovery, a district court balances a party's "right to discovery with the need to prevent 'fishing expeditions.'" *Conti v. Am. Axle & Mfg.*, No. 08-1301, 326 Fed. Appx. 900, at *907 (6th Cir. May 22, 2009) (quoting *Bush v. Dictaphone Corp.*, 161 F.3d 363, 367 (6th Cir. 1998)).

Rule 37 authorizes a motion to compel discovery if "a party fails to respond that inspection will be permitted – or fails to permit inspection – as requested under Rule 34." Fed. R. Civ. P. 37(a)(3)(B)(iv). In addition, Rule 37(a) expressly provides that "an evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer, or respond." Fed. R. Civ. P. 37(a)(4).

Finally, the party moving to compel discovery must certify that it "has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action." Fed. R. Civ. P. 37(a)(1). *See also* S.D. Ohio Civ. R. 37.2. This prerequisite has been met in this case. *See Newman Declaration*, ¶ 27, and attachments thereto.

In the case *sub judice*, Little Hocking seeks an order compelling DuPont to, *inter alia*, revise and expand its search for documents and electronically stored information ("ESI"), produce multiple categories of documents and provide more detailed responses to interrogatories. The Court shall address each issue in turn.

## III. DUPONT'S DOCUMENT SEARCH

As an initial matter, Little Hocking globally complains that DuPont's search for responsive documents in this case is deficient because DuPont (1) relied, "in large part," on its document production from prior PFOA-related litigation and (2) refuses "to bring up-to-date its search of the majority of the sources consulted in prior litigation[,]" and even its updated searches of approximately 25

custodians remain inadequate.  *Little Hocking's Motion to Compel*, pp. 18-19, 41-43; *Reply*, pp. 7, 12-14.

**A.  DuPont's Reliance on Document Production From Prior PFOA-Related Litigation**

Little Hocking argues that DuPont's search for documents responsive to Little Hocking's requests does not satisfy the Rules of Civil Procedure because, *inter alia*, DuPont has relied on document productions in earlier filed PFOA-related litigation, which, in some instances, has not been updated for 7 or 8 years.  *See*, *e.g.*, *Little Hocking's Motion to Compel*, pp. 17-19.  DuPont, however, takes the position that it has conducted a thorough and appropriately narrowed search when responding to Little Hocking's document requests in this case.  *Memo. in Opp.*, pp. 6-12.[1]  For the reasons that follow, this Court agrees with DuPont.

Little Hocking seeks documents dating back several decades, including documents previously produced in other DuPont PFOA-related litigation.  *See*, *e.g.*, *DuPont's Responses and Objections to LHWA's First Set of Requests for Production of Documents*, attached as *Exhibit 2 to Little Hocking's Motion to Compel* ("*DuPont's Responses*").  This prior PFOA-related litigation includes (1) *Leach v. E.I. du Pont de Nemours and Company*, No. 01-6-608, Cir. Ct. Wood County W. Va.; (2) *Rhodes v. E.I. du Pont de Nemours and Company*; (3) *Rowe v. E.I. du Pont de Nemours and Company*.  *Declaration of Anthony F. Cavanaugh*, ¶¶ 3, 14, attached to *Memo. in Opp.* ("*Cavanaugh Declaration*").[2]

---

[1] The Court will refer to the page numbers at the bottom of this brief.

[2] Attorney Cavanaugh, who represents DuPont in the instant litigation, has represented DuPont since September 2002 in other PFOA-related litigation, including *Leach*, *Rhodes* and *Rowe*.  *Id.* at ¶¶ 1, 3.  Throughout this

### 1.  *Leach* litigation

The *Leach* plaintiffs, who include many of Little Hocking's customers, filed a class action in August 2001 alleging common law tort claims and a claim for medical monitoring.  *Id.* at ¶ 13.  The *Leach* plaintiffs' document requests, *see Exhibit 19*, attached thereto, were "so broad, seeking essentially all documents referring or relating to PFOA, that they subsume all documents responsive to Little Hocking's Document Requests served in this case."  *Id.* at ¶¶ 14, 17; *Exhibit 19*, attached thereto.  For example, the document requests propounded in *Leach* included:

> 6.  All documents relating or referring to any claim, assertion, or allegation by any person who has alleged that he or she has ingested or otherwise been exposed to C-8.

> \*              \*              \*              \*

> 16.  All documents relating or referring to any release, discharge, disposal, or emission in any manner of any Material [C-8/PFOA, Triton, and FS-62 "and each such material's manufacturing and degradation byproducts and compounds"] by any Defendant into water, including but not limited to, the Ohio River, groundwater, and surface water, including but not limited to, all documents relating or referring to any analysis or evaluation of the nature of or effect(s) of such release, discharge, disposal, or emission.

> 17.  All documents relating or referring to any communications between any Defendant and any Federal, State, or local governmental authorities concerning any Material or any contamination or potential contamination of drinking water.

> \*              \*              \*              \*

representation, Attorney Cavanaugh has become familiar with DuPont's document processing and production systems and capabilities.  *Id.* at ¶ 4.  He has overseen DuPont's discovery in this case as well as in the *Rhodes* and *Rowe* cases, personally interviewing individuals who are conducting each step of the process required to process and produce ESI.  *Id.* at ¶¶ 4-6.

28.  All documents relating or referring to any monitoring, sampling, or other investigation of water quality, including surface, groundwater, and drinking water, at any of Defendants' properties in Wood County, West Virginia or at any property impacted or allegedly impacted by any of Defendants' acts or omissions in Wood County, West Virginia or by a Material.

\*                 \*                 \*                 \*

31.  All documents relating or referring to any environmental audit, investigation, or other internal inquiry into environmental conditions at any of Defendants' current or former properties in Wood County, West Virginia or at any property owned or operated by any Defendant in which a Material is present in drinking water.

32.  All documents relating or referring to each and every action taken by and/or on behalf of any Defendant to study, analyze, and/or investigate the effects and/or potential effects on humans of any Material or any other substance that has been known to be present in the LPSD [Lubeck Public Service District] drinking water or in any other source of drinking water within a five-mile radius of DuPont's Washington Works Plant.

33.  All documents referring or relating to any assessment, investigation, monitoring or other inquiry into the health status of any individuals residing within Wood County, West Virginia, including but not limited to all epidemiological reports and/or investigations of any kind or form performed by or on behalf of any of the Defendants or any other person, including all such epidemiological reports and/or investigations performed by or on behalf of Dupont relating or referring to employees of DuPont's Washington Works Plant[.]

34.  All documents relating or referring to any medical monitoring performed or considered by any Defendant at anytime for any Material or for any substance present or allegedly present in any human drinking water.

*Exhibit 19*, pp. 5-7, 9-10, attached to *Cavanaugh Declaration*.


In responding to the *Leach* plaintiffs' document requests, DuPont's counsel interviewed and collected documents from 254 custodians located throughout various facilities, including Washington

Works; corporate headquarters in Wilmington, Delaware; and "a number
of other DuPont global facilities, including those in Japan and the
Netherlands." *Cavanaugh Declaration*, ¶¶ 14-16. In gathering this
information, counsel did not use electronic search terms to retrieve
potentially responsive material; instead, counsel reviewed all
collected material for responsiveness. *Id.* at ¶ 15. In addition, the
*Leach* document collection was not restricted by date. *Id.* at ¶ 18.
"DuPont collected all potentially responsive documents from
custodians' files through its last document collection which occurred
in August 2004." *Id.* Because the sweep was so broad, DuPont
collected many non-responsive documents. *Id.* at ¶ 19. DuPont's
attorneys spent years completing the review and production in *Leach*.
*Id.* DuPont has produced to Little Hocking the responsive documents
previously produced in the *Leach* litigation. *Id.* at ¶¶ 18-19.

### 2. *Rhodes* and *Rowe* litigation

In 2006, plaintiffs in *Rhodes* and *Rowe*, represented by the *Leach*
counsel, filed additional class actions. *Id.* at ¶¶ 20-22. The *Rhodes*
plaintiffs alleged "causes of action virtually identical to those
brought by the *Leach* class, except that the allegations involved PFOA
and other PFCs." *Id.* at ¶ 20. The *Rowe* plaintiffs, residing near the
DuPont Chambers Works facility in Deepwater, New Jersey, asserted
"common law tort and medical monitoring claims similar to those raised
in *Leach* and *Rhodes* based on allegations of exposure to PFOA and other
PFC's in the vicinity of the New Jersey facility." *Id.* at ¶ 21.

The *Rhodes* and *Rowe* plaintiffs served broad discovery requests,
"seeking essentially all information relating to PFOA and PFCs[.]"

8

*Id*. at ¶ 39.  *See also Exhibit 20*, attached thereto (*Rhodes* discovery requests).  After negotiating with counsel in *Rhodes* and *Rowe*, DuPont identified 119 custodians.  *Id*. at ¶ 24.  According to DuPont, a number of factors resulted in the narrowing of the scope of custodians from the *Leach* matter:

> (1) not every *Leach* custodian had much responsive information; (2) significant duplication across custodian files existed in *Leach*; (3) DuPont's responsive time period was more limited in scope; (4) custodian job functions and titles change over time resulting in their elimination from a list of persons likely to have any new information; (5) many of the *Leach* custodians were employees who even by the time of *Leach* had retired or left job functions with nexus to PFOA-related issues.

*Id*. at ¶ 25.

DuPont's counsel interviewed each of the 119 custodians identified in *Rhodes* and *Rowe* to determine if they possessed responsive documents and, if so, where the documents were stored, *i.e.*, whether in personal files or on shared server spaces or in databases.  *Id*. at ¶ 26.  DuPont's counsel collected the following information from each custodian:  (1) potentially responsive hard copies;[3] (2) potentially responsive ESI stored on the custodian's local hard drive or located in any databases or shared server spaces; (3) personal hard drive, "which is a network drive where a particular custodian can save documents or other electronic materials"; and (4) the entire email account.  *Id*. at ¶¶ 27-28.  The last full collection

---

[3] For the custodians who had also been custodians in the *Leach* litigation, DuPont collected potentially responsive hard copies dated from that custodian's last collection in *Leach*.  *Id*. at ¶ 30.  For custodians who had not been custodians in the *Leach* matter, DuPont collected all potentially responsive hard copies.  *Id*.

and review of documents in the *Rhodes* and *Rowe* matters occurred
between September 1 and December 31, 2007.  *Id*. at ¶ 31.

DuPont loaded all of the ESI collected in *Rhodes* onto a
litigation server, which was searched using a 35-page list of search
terms.  *Id*. at ¶ 32.  DuPont uploaded responsive documents to a
document review database.  *Id*. at ¶ 33.  The hard copy documents were
also scanned and loaded onto the same review database.  *Id*.  Under the
supervision of Attorney Cavanaugh and another individual, a team of
attorneys reviewed these documents for responsiveness to the document
requests in *Rhodes* and *Rowe*.  *Id*. at ¶ 34.  This team reviewed over
650,000 documents from the 119 custodian.  *Id*. at ¶ 35.  This review
required more than a year to complete "and cost approximately
$3,600,000 in discovery services[4] or approximately $30,000 per
custodian."  *Id*. at ¶ 36.  The $3.6 million figure does not include
(1) legal fees for outside counsel who participated in custodian
interviews, supervised the discovery process, drafted privilege logs
and performed other discovery-related tasks, nor does it include (2)
costs "associated with the interview of each custodian, which include
attorney time, custodian time spent away from his or her non-legal
work or the cost for attorney travel."  *Id*. at ¶ 38.

From the files of the 119 custodians identified in *Rhodes* and
*Rowe*, DuPont produced files of 84 custodians in *Rhodes* and the files
of 35 custodians in *Rowe*.  *Id*. at ¶ 24.  DuPont has produced these

_____

[4] These services "include only costs for electronic data storage for the
documents, electronic processing of materials (scanning, searching and
processing the documents for production), review database costs and the costs
for the time spent by the team of attorneys reviewing the documents."  *Id*. at
¶ 37.

documents to Little Hocking.  *Id.* at ¶ 40.  Because the document requests in *Rhodes* and *Rowe* were so broad, "any documents deemed 'non-responsive' in those matters would be likewise non-responsive to Little Hocking's request."  *Id.* at 39.

### 3.  The instant litigation

In order to collect information responsive to Little Hocking's document requests, DuPont's counsel identified 26 custodians "who would either possess or know the location of potentially responsive documents."  *Id.* at ¶ 40.  DuPont's counsel interviewed each of these custodians, reviewing (with the custodian) the custodian's workspace, local computer files and server computer files in order to identify and collect potentially responsive hard copy and electronic documents.  *Id.* at ¶ 42.  DuPont's counsel limited collection efforts to the period after the documents from each from which the custodian were last collected for *Leach*, *Rhodes* or *Rowe*.  *Id.* at ¶ 43.  However, DuPont's counsel collected all of the custodian's potentially responsive files if documents from that custodian had not been previously collected in connection with prior litigation.  *Id.* at ¶ 44.  DuPont's counsel gathered the following information from each custodian:  (1) relevant hard copy documents; (2) relevant ESI stored on the custodian's local hard drives; (3) relevant documents that each custodian accessed or maintained through shared resources (servers, shared files and/or databases); (4) entire personal data drive; and (5) the entire email account.  *Id.* at ¶¶ 45-48.[5]

---

[5] For example, to illustrate through a particular custodian how the document collection works in this case, DuPont points to the collection from custodian Andrew Hartten, who has been involved in PFOA-related matters since

DuPont loaded all of the ESI collected in this case onto a litigation server. *Id*. at ¶ 49. A search of this information yielded 300,428 potentially responsive documents, or approximately 7,700 documents per custodian. *Id*. at ¶ 50. DuPont loaded these documents to a review database. *Id*. at ¶ 51. A team of 20 lawyers, supervised by Attorney Cavanaugh and another individual, reviewed the documents for responsiveness to Little Hocking's document requests. *Id*. This review required approximately 3,000 attorney hours over a 3-month period. *Id*. at ¶ 52. The cost of the discovery services, which, as discussed *supra*, excludes attorney counsel's legal fees for certain discovery tasks, was approximately $250,000, or approximately $9,600 per custodian. *Id*.

Although, as noted, relevance for discovery purposes is extremely broad, *Lewis v. ACB Business Services, Inc.*, 135 F.3d at 402, district courts "must limit the frequency or extent of discovery otherwise allowed by these rules" if the discovery sought is "unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive" or if "the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues."

---

approximately 1997. *Id*. at ¶ 53. In *Leach*, DuPont collected and reviewed Mr. Hartten's files through August 10, 2004. *Id*. In *Rhodes* and *Rowe,* DuPont collected, reviewed and produced his files from August 10, 2004 through September 26, 2007. *Id*. During this process, DuPont reviewed for a second time Mr. Hartten's ESI. *Id*. For this litigation, DuPont's counsel interviewed Mr. Hartten and collected documents from September 27, 2007 through the present. *Id*.

Rule 26(b)(2)(C)(i)-(iii).  Here, considering the temporal scope of
information sought by Little Hocking, it would unreasonable expense
and burden to require DuPont to begin anew its searches in sources
previously searched in other PFOA-related litigation.  In other words,
it was not unreasonable and was less burdensome for DuPont to rely on
its prior searches and documents previously produced in related
litigation when responding to discovery requests in this case.

       To the extent that Little Hocking now criticizes DuPont's
reliance on discovery conducted in earlier litigation, Little Hocking
has failed to persuade the Court that this reliance was inconsistent
with DuPont's obligations under the Federal Rules of Civil Procedure.
For example, Little Hocking complains that DuPont did not search "all
document sources likely to contain documents responsive to *Little
Hocking's* requests[,]" *Little Hocking's Motion to Compel*, p. 18
(emphasis in original), apparently taking the position that the facts
and legal interests raised in this litigation are inconsistent with
those in *Leach*, *Rhodes* and *Rowe*.  *See also* Letter dated September 22,
2011 from Little Hocking's counsel to DuPont's counsel, attached as
*Attachment A* to *Newman Declaration* ("DuPont's admitted desire to
'capitalize' on its production in the other PFOA cases - cases that,
as DuPont knows, involved different claims, facts, and issues - has
resulted in a production consisting almost exclusively of documents
originally collected specifically in response to discovery requests
made in prior litigation that did not involve Little Hocking.").
However, the allegations in the *Amended Complaint* and Little Hocking's
counsel's own declaration belie these claimed distinctions.  *See*,

13

*e.g.*, *Amended Complaint*, ¶¶ 25-34 (alleging that DuPont's Washington
Works plant contaminated Little Hocking's wellfields, and the blood of
Little Hocking's water users, with PFOA); *Declaration of D. David
Altman*, ¶¶ 26-27, attached as *Exhibit 1* to *Plaintiff's Response in
Opposition to DuPont's Motion to Compel Documents from Little
Hocking's Privilege Log*, Doc. No. 108 (declaring that the *Leach* action
involved "injuries caused by PFOA contamination from DuPont's
Washington Works facility" and declaring that Little Hocking's counsel
spoke with *Leach* counsel "to further the common legal interests of
Little Hocking and the *Leach* plaintiffs by conveying information that
could aid in formulating strategies for litigation against DuPont").

The parties agree that DuPont must be "careful and thorough,"
"diligent" and "comprehensive." *Little Hocking's Motion to Compel*, p.
17 (citing *Lava Trading, Inc. v. Hartford Fire Ins. Co.*, No. 03 Civ.
7037, 2005 U.S. Dist. LEXIS 2866, at *28 (S.D. N.Y. Feb. 24, 2005)
(stating that a responding party has "an obligation to ensure that
document searches, when initially made, were careful and thorough"));
*Memo. in Opp.*, p. 5 (citing *Treppel v. Biovail*, 233 F.R.D. 363, 374
(S.D. N.Y. 2006) (stating that, *inter alia*, the responding party "must
conduct a diligent search, which involves developing a reasonably
comprehensive search strategy")). Here, as set forth in detail above,
DuPont cast a wide, thorough net when first responding to the broad
discovery requests in *Leach*, which was appropriately narrowed in
*Rhodes* and *Rowe*, and carefully tailored its search when responding to
Little Hocking's particular requests. The Court finds that these
steps taken by DuPont were sufficiently comprehensive and careful to

14

satisfy DuPont's discovery obligations.  Based on the present record,
Little Hocking has not persuaded the Court that DuPont evaded its Rule
34 obligations when relying on discovery previously produced in prior
litigation.

**B.    Updating Searches**

Little Hocking seeks an order compelling DuPont to update its
searches and document production "for all custodians identified on
DuPont's various custodian lists." *Little Hocking's Motion to Compel*,
pp. 41-42 (citing *Exhibit 37*, attached thereto).[6]  Little Hocking
specifically complains that DuPont refuses to update its production
from approximately 90% of its custodians, instead attempting to update
its production from only approximately 25 custodians.  *Id*.  Little
Hocking also apparently contends that even the updated search of the
files from a particular custodian remains deficient.  *Id*. at 42
(citing *Exhibit 36*, attached thereto) (asserting, *inter alia*, that
DuPont has produced no documents after 2009 from the files of Andrew
Hartten, Principal Project Leader for DuPont Corporate Remediation
Group).  Little Hocking insists that it is entitled to a complete and
current production.  *Id*.

DuPont, however, contends that Little Hocking's request for a
wholesale update of all files of all custodians whose files have been
collected in prior litigation (totaling over 280 custodians) is
unwarranted and burdensome.  *Memo. in Opp.*, pp. 13-15.  For example,
some custodians who previously worked on PFOA-related matters no

---

[6] To the extent that Little Hocking seeks an order compelling DuPont to search
certain electronic sources and internal DuPont entities and compelling DuPont
to use particular search terms, those issues are addressed *infra*.

longer have the same responsibilities, have left DuPont or have died.
*Id*. at 13 (citing *Exhibit 22*, attached thereto (listing over such 90
custodians)).  According to DuPont, broad searches in earlier
litigation yielded significant amounts of non-responsive material and
duplication exists over multiple custodian files.  *Id*.  DuPont
contends that a global update of existing custodians' files would
therefore be labor intensive and costly and unlikely to yield any new
responsive documents.  *Id*. at 14-15.  For example, DuPont explains
that the review of even the limited number of custodians for purposes
of this litigation required more than four months and a team of 20
lawyers.  *Id*. (citing *Cavanaugh Declaration*, ¶¶ 42-51).  To complete a
wholesale document collection and review in connection with more than
280 custodians would cost millions.  *Id*. at 15 (citing *Cavanaugh
Declaration*, ¶¶ 64-65).  Briefly, DuPont argues that compelling it to
run a global search and review would be unreasonably burdensome.  *Id*.

Little Hocking disputes this assertion.  *Reply*, pp. 13-14.
Specifically, Little Hocking complains that DuPont's list of prior
litigation custodians, *Exhibit 22*, attached to the *Memo. in Opp.*, is
deficient on a number of counts.  *Reply*, p. 13.  First, Little Hocking
notes that *Exhibit 22* reflects the status of only approximately 90
(rather than 310) custodians; there is no information about the nearly
200 custodians whose files were not searched for this case.  *Id*.
Second, *Exhibit 22* reflects the status only as of 2011.  *Id*.  Finally,
*Exhibit 22* provides no information as to the exact date that these
custodians died, retired or left the company, which prevents Little
Hocking and the Court from assessing whether DuPont collected

16

documents from these individuals up through the time the custodians left DuPont. *Id*. Little Hocking also disputes DuPont's representation that updating the custodian search would be too costly and yield duplicative results, which is "grossly inflated" and speculative. *Id*. at 13-14.

Little Hocking's criticism is not well-taken. To date, DuPont has produced more than 625,000 documents, comprising over 4.5 million pages of material, to Little Hocking. *Cavanaugh Declaration*, ¶ 54. In responding to Little Hocking's document requests, DuPont, "using its experience litigating PFOA-related cases and working with DuPont in-house counsel," identified 26 key custodians (of the 310 custodians whose files were previously collected in other litigation) who had or knew of potentially responsive information. *Id.* at ¶¶ 41, 54. These custodians' files were updated and produced. *Id.* DuPont explains that, of the other 284 custodians whose files were not updated in this litigation, many (approximately 90) have left DuPont's employ, have retired or died. *Id.* at ¶ 58; *Exhibit 22*, attached thereto. Of the custodians remaining in DuPont's employ, DuPont has not collected documents from many of them since the last collection in *Leach*, approximately 8 years ago, and the files from other custodians have not been collected since *Rhodes* and *Rowe*, approximately 5 years ago. *Cavanaugh Declaration*, ¶ 59. As discussed *supra*, the narrowing of the scope of custodians since *Leach* stemmed from a variety of reasons. These reasons include, *inter alia*, significant duplication of custodian files and changes in custodian job functions over the years,

17

resulting in a custodian's elimination from a list of persons likely to possess new information. *Id.* at ¶¶ 25, 41.

In calculating the time and expense associated with a wholesale update the files of 284 custodians, DuPont relies on its experience in prior PFOA litigation. *See*, *e.g.*, *Cavanaugh*, ¶¶ 63-66. Specifically, DuPont estimates that each custodian's files would yield approximately 5,462 to 7,700 documents for review at a cost of $9,600 to $30,000 per custodian. *Id.* at ¶ 64. "Assuming that all of the 284 custodians for which Little Hocking seeks an update have files available for update," and relying on the volumes collected in prior cases, DuPont estimates that its counsel would have to review approximately 1,551,208 to 2,186,800 documents at a total cost of approximately $3,726,400 to $8,520,000." *Id.* at ¶ 65.

Little Hocking nevertheless insists that DuPont's method of calculating the time and expense necessary for the update of files in this case is based on "rank speculation[.]" *Reply*, p. 13 (citing to *Cavanaugh Declaration*, ¶ 65). Little Hocking specifically complains that Attorney Cavanaugh "has not talked to the 284 custodians whose files have not been searched for this case (or otherwise reviewed their files)." *Id.* at 13-14.

However, the record establishes that DuPont's estimates are based on more than "rank speculation." As set forth in detail above, in narrowing the list of custodians to interview in this case, DuPont reasonably relied on its experience and searches in broader PFOA-related litigation. *See*, *e.g.*, *Cavanaugh*, ¶¶ 25, 41-48, 54, 58; *Exhibit 22*, attached thereto. For example, the record reflects that

18

there would be little or no value in attempting to interview or search the files of custodians who are dead, who have left DuPont or whose job functions and titles have changed over time. *Id*. Although Little Hocking complains that DuPont should have provided more detailed information about these and other custodians, *Reply*, p. 13, DuPont has established that it, as the producing party, is in the best position to identify, and has already identified, potentially responsive information. DuPont has made a sufficient factual showing demonstrating the adequacy of its search methods and the burden imposed in updating its search. *Cf. Steede v. Gen. Motors, LLC*, No. 11-2351, 2012 U.S. Dist. LEXIS 79467, at *9-10 (E.D. Tenn. June 8, 2012) (concluding, *inter alia*, that it was not contrary to law or clearly erroneous for the magistrate judge to accept a party's factual showing without further evidentiary support when denying a motion to compel).

In addition, although Little Hocking is frustrated that DuPont has not again interviewed and searched the files of the 284 custodians, Little Hocking has not provided any evidence that DuPont's narrowed search is defective or otherwise inconsistent with the Federal Rules of Civil Procedure. Instead, Little Hocking simply offers its opinion on how DuPont should have conducted its search, *Reply*, pp. 13-14, an opinion apparently based on Little Hocking's suspicion that additional responsive documents that DuPont carelessly or purposefully overlooked may yet exist within the files of these 284 custodians. *Id*. However, Little Hocking's speculation, standing alone, is not a sufficient basis for granting a motion to compel.

*See*, *e.g.*, *Harris v. Koenig*, 271 F.R.D. 356, 370 (D.D.C. 2010) ("I cannot compel what does not exist. If plaintiffs are speculating that documents responsive to these requests do exist, there must be a reasonable deduction that that is true, and not a mere hunch."); *Ford Motor Co. v. Edgewood Props.*, 257 F.R.D. 418, 428 (D. N.J. 2009) (stating that a party's conclusory suspicion "premised on [the] nefarious speculation" that it has not received all of the documents to which it is entitled is not a sufficient basis for granting "burdensome discovery requests late in the game"); *U.S. v. O'Keefe*, 537 F. Supp. 2d 14, 22 (D.D.C. 2008) ("Defendants protest that there are inexplicable deficiencies in the government's production of electronically stored information, but . . . vague notions that there should have been more than what was produced are speculative and are an insufficient premise for judicial action.").

Finally, Little Hocking complains that even DuPont's "updated" searches of certain key custodians are incomplete. *See*, *e.g.*, *Little Hocking's Motion to Compel*, pp. 19, 41-42; *Exhibit 36*, attached thereto. For example, Little Hocking contends that DuPont has produced no documents from the files of Andrew Hartten, Principal Project Leader for DuPont Corporate Remediation Group who has knowledge of certain "critical issues," "after 2009 (e.g. nothing for 2010 or 2011)." *Exhibit 36*, p. 1, attached to *Little Hocking's Motion to Compel*. In response, however, DuPont offers evidence that it collected documents from Mr. Hartten through April 2011. *Exhibit 23*, p. 1, attached to *Cavanaugh Declaration* (citing to document numbered 008-2007-0003332, *i.e.,* an email dated April 11, 2011). DuPont offers

similar evidence that it has collected documents from certain other key custodians identified by Little Hocking beyond the earlier dates cited by Little Hocking. *See Exhibit 36*, attached to *Little Hocking's Motion to Compel; Exhibit 23*, attached to *Cavanaugh Declaration.* Other key custodians identified by Little Hocking have retired or have assumed different job functions since the last document collection. *Memo. in Opp.*, p. 14; *Exhibit 22*, attached to *Cavanaugh Declaration.* In light of this evidence, the Court cannot conclude that DuPont's updated searches of certain key custodians were defective or otherwise incompatible with DuPont's discovery obligations.[7]

In sum, taking the record as a whole, the burden of spending thousands of attorney hours and millions of dollars to search the files of hundreds of custodians far outweighs Little Hocking's speculation that additional responsive documents may yet reside somewhere in the files of 284 custodians. *See*, *e.g.*, Fed. R. Civ. P. 26(b)(2)(C)(iii); *Surles v. Greyhound Lines, Inc.*, 474 F.3d 288, 305 (6th Cir. 2007); *United States ex rel. McNulty v. Reddy Ice Holdings, Inc.*, 835 F. Supp. 2d 341, (E.D. Mich. 2011). Accordingly, to the extent that it seeks an order compelling DuPont to update custodian files, *Little Hocking's Motion to Compel* is **DENIED**. *Id.; Peavey v. University of Louisville*, No. 3:09-CV-00484-R, 2011 U.S. Dist. LEXIS 30369, at *6 (W.D.Ky. Mar. 23, 2011) (stating that a party's failure to "show[] that a producing party is in fact in possession of [certain information] is grounds to deny a motion to compel") (internal quotation marks omitted).

---

[7] To the extent that updating custodian files includes broader ESI searches using new search terms, that issue is addressed *infra*.

**IV.  SEARCHING ELECTRONIC SOURCES AND INTERNAL DUPONT ENTITIES**

In addition to the alleged global deficiencies regarding DuPont's search for responsive information, Little Hocking also complains that DuPont has not properly searched certain electronic sources and documents in the possession of certain internal DuPont entities. *Little Hocking's Motion to Compel*, pp. 20-33; *Reply*, pp. 15-33.  **A.**

**Electronic Sources**

**1.  DuPont Intranet(s) and Issues Database**

Little Hocking contends that it "has served an interrogatory inquiring into the DuPont intranet(s) that contain PFOA-related information[,]" but that DuPont refuses "to admit to the existence of DuPont's 'intranet' or to an intranet that contains PFC-related materials." *Little Hocking's Motion to Compel*, p. 20. Little Hocking also argues that DuPont has not completely searched shared file storage areas such as the "issues database." *Id.* at 21-22. In support of its request for an order compelling DuPont to search these sources for responsive documents,[8] Little Hocking cites to documents that Little Hocking believes establish that these sources exist. *Id.* at 20-22 (citing *Exhibit 10* (reporting that PFOA-related materials "have been placed in the IMNET data base on the 'PFOA' dashboard"), *11* (referencing the existence of an "Intranet" and "Internet") and *12* (advising of changes to the "Issues Database" and noting that "PFOA information will be located under" one of the categories on that database), attached thereto).

---

[8] Little Hocking's request for an order compelling DuPont to provide a Rule 30(b)(6) witness to testify regarding DuPont's search efforts is addressed *infra*.

DuPont explains, however, that the "issues database" and intranet have been searched and responsive documents have been produced, and that the intranet and "IMNET" database refer to "the same thing":

a.   The "Issues" database referred to by Little Hocking was only in use until 2005, when all of the PFOA related data was migrated to the "Issues Management Network" or "IMNET" database.  The IMNET database was collected in the *Rhodes* litigation, and the 674 documents produced from this database are located at bates numbers beginning with 129.

b.   The "Intranet" referred to by Little Hocking and "IMNET" refer to the same thing, a shared storage area where DuPont's public affairs group saves publicly available articles and standby statements regarding a number of issues, including PFOA.

c.   DuPont has confirmed that documents added to IMNET since 2007 are duplicative of the documents that exist in the files of the public affairs custodians produced in this case, including Clif Webb, Daniel Turner, and Janet Smith.

*Declaration of Libretta P. Stennes in Support of DuPont's Memorandum in Opposition to Little Hocking Water Association's Amended Motion to Compel Defendant DuPont to Comply With Its Discovery Obligations*, Doc. No. 115, ¶ 9 ("*Stennes Declaration*").[9]  DuPont goes on to argue that after it objected to Little Hocking's Interrogatory No. 3 as overly broad[10] and explained to Little Hocking that DuPont does not maintain a

---

[9] Attorney Stennes, who also represents DuPont in the instant litigation, has represented DuPont since 2002 in other PFOA-related litigation, including *Leach*, *Rhodes* and *Rowe*.  *Id*. at ¶¶ 1, 3.  In that capacity, Attorney Stennes has become familiar with DuPont's document processing and production systems and capabilities.  *Id*. at ¶ 4.  She has overseen DuPont's discovery in this case as well as in the *Rhodes* and *Rowe* cases, personally interviewing individuals who are conducting each step of the process required to process and produce ESI.  *Id*. at ¶¶ 4-6.  During the course of this litigation, Attorney Stennes conducted or directed interviews of DuPont personnel.  *Id*. at ¶¶ 7-9.

[10] In their discussions of Little Hocking's request on this issue, the parties do not refer the Court to a specific exhibit containing Interrogatory No. 3. Indeed, Little Hocking does not even refer to the specific interrogatory number at issue.  *See Little Hocking's Motion to Compel*, p. 20 (stating that "Little Hocking has served *an interrogatory* inquiring into the DuPont intranet(s) that contain PFOA-related information") (emphasis added); *Reply*,

"PFC-related" intranet, Little Hocking never mentioned IMNET "so that DuPont could follow up and determine whether additional search and/or supplemental response was warranted." *Id.* at ¶ 10.  Nevertheless, "DuPont has now followed up and represents to this Court that no further production is necessary." *Memo. in Opp.*, p. 22.

In reply, Little Hocking apparently accepts DuPont's representation as to the "Issues" database. *See Reply*, pp. 17-19 (refraining from disputing DuPont's representation that the "Issues" database was only in use until 2005 when all of the PFOA-related data was migrated to the IMNET database).  However, Little Hocking points to additional documents that it believes establish that DuPont's "intranet" is not the same thing as the "IMNET" database. *Reply*, p. 17 (citing to *Exhibits 4* (asking that a document be saved on the "IMNET, intranet and dupont.com"); *5*, p. 2 (advising employees to consult the "Intranet, Internet, or IMNET" for PFOA-related information); *6*, p. 1 (stating that documents "have been placed in the IMNET data base on the 'PFOA' dashboard" and that "[t]he dashboard also includes links to the PFOA pages on the Internet and Intranet which contain other resource materials"); and 7, p. 1 (stating that documents "have been posted on IMNET, as well as the intranet and dupont.com")).[11]  Rejecting DuPont's attempt to blame it for failing to

---

pp. 17-18.  However, after searching the record, the Court finds that Interrogatory No. 3 asks DuPont to "[d]escribe each internal computer network (i.e. intranet) maintained by DuPont, including a description of each PFC-related intranet site." *Exhibit 42*, p. 9, attached to *Little Hocking's Motion to Compel*.

[11] Although *Exhibits 5*, *6*, 7 are attached to the *Reply*, *Exhibit 4*, initially marked confidential by DuPont, is not attached.  *See Reply*, p. 4 n.1 (explaining that several exhibits marked confidential may later be filed on the public record or, if granted leave, under seal).  Instead, *Exhibit 4* was

24

refer to the IMNET before filing the motion to compel, Little Hocking asks for, *inter alia*, an order "requiring DuPont to provide a list of all databases and other shared areas that contain PFC-related information (including all databases that are part of DuPont's intranet)[.]"  *Reply*, p. 18.

Although the *Stennes Declaration* avers that the "Intranet" and IMNET refer to the "same thing," the Court is troubled by documents cited by Little Hocking suggesting that these are actually two different sources.  *See*, *e.g.*, *Exhibit 4*, Doc. No. 123-4, and *Exhibit 5*, attached to *Reply*.  Notwithstanding DuPont's representation in the *Reply* that it has apparently "followed up" on searching IMNET and that "no further production is necessary[,]" *Reply*, p. 22, the Court concludes that additional clarification is needed in light of the ambiguity in the present record.  Accordingly, based on the facts in this particular case and its procedural posture, to the extent that Little Hocking seeks responsive information about and from DuPont's intranet and IMNET, *Little Hocking's Motion to Compel* is **GRANTED in part**.  DuPont is **ORDERED** to produce, within fourteen (14) days of the date of this *Opinion and Order*, an affidavit or declaration with the following information:

(1)  Explanating why or how DuPont's "Intranet" and "IMNET" refer to "the same thing" in light of the exhibits cited above by Little Hocking;

(2)  Confirmating that DuPont has searched IMNET (or, if DuPont later finds that the "Intranet" refers to a source different than

---

filed later after DuPont withdrew its confidential designation.  *See* Doc. No. 123-4.

IMNET, both IMNET and the "Intranet") for responsive documents and either produce such documents or confirm that no responsive, non-duplicative documents exist in the source(s); and

(3)  Providing a list of all databases or other shared areas that contain PFC-related related information[12] and whether or not DuPont has searched these sources for information responsive to Little Hocking's discovery requests.  If DuPont concludes that providing such a list is unduly burdensome, it shall explain, in detail, that conclusion.

### 2.  The "legacy" server

According to Little Hocking, DuPont explained in May 2012 that DuPont had previously created a document repository, the "legacy" server, which contained the raw material collected for the *Leach* litigation.  *Little Hocking's Motion to Compel*, p. 23 (citing *Newman Declaration*, ¶ 13(a)).  DuPont also advised that it had allowed its "license" on the legacy server to lapse and that DuPont did not intend to search that server for information responsive in this case.  *Id.* (citing *Newman Declaration*, ¶ 13(a)).  Little Hocking therefore seeks an order compelling DuPont to renew its license to the legacy server and to search and produce information responsive to Little Hocking's requests in this case.  *Id.*

DuPont, however, contends that Little Hocking is mistaken about the legacy server, which is simply a "[f]igment of Little Hocking's

---

[12] In so ordering, the Court notes that this list is more narrow than the description Little Hocking sought in Interrogatory No. 3, which, as DuPont appropriately notes, broadly seeks descriptions of every internal computer network maintained by DuPont without any apparent limitation.  *See Exhibit 42*, p. 9, attached to *Little Hocking's Motion to Compel*.  The parties' briefing of this issue has sufficiently narrowed the request at issue.

[i]magination[.]" *Memo. in Opp.*, pp. 19-20.  DuPont explains that it loaded the documents collected for review in *Leach* to a database platform and reviewed that data using the software VirtualPartner®. *Cavanaugh Declaration*, ¶ 73.  DuPont has produced the responsive documents collected in *Leach*, which total 231,496 documents.  *Id.* DuPont further explains that it "changed and upgraded software, moving away from the VirtualPartner® platform." *Id.* at ¶ 74.  DuPont has archived "the data preserved in VirtualPartner® to avoid the license fees, hosting charges, and other costs associated with keeping the database in an actively searchable format." *Id.*  DuPont argues that the Court should deny Little Hocking's present request, *i.e.*, its third request, for an order compelling DuPont to search and review the raw material from VirtualPartner®.  *Memo. in Opp.*, p. 20.

As detailed *supra*, DuPont first searched the material for documents responsive in *Leach*, which involved document requests "much broader" than Little Hocking's requests.  *Id.*  DuPont again searched the raw *Leach* ESI in *Rhodes* and *Rowe*, applying search terms that included terms related to other PFCs.  *Id.*  DuPont contends that Little Hocking's speculation that these two prior reviews missed responsive information is unfounded and does not justify imposing on it the burden of requiring yet a third search of ESI that is not readily accessible.  *Id.*

In reply, Little Hocking argues that DuPont admits that (1) it used VirtualPartner® for reviewing documents in *Leach*; (2) it archived data preserved in VirtualPartner® to avoid licensing fees; (3) the raw data gathered in *Leach* is no longer "readily accessible"; and (4) the

27

archived material "has never been searched for this case." *Reply*, p. 16. Little Hocking again disagrees with DuPont's position that responsive documents in *Leach* are necessarily responsive to Little Hocking's requests. *Id*. Little Hocking contends that DuPont's position is unsupported by facts, arguing that "there are large categories of documents that were requested by Little Hocking but not produced in *Leach*, including" documents from internal DuPont entities (such as the Power & Services group), drain information and production well data. *Id*. Little Hocking therefore asks the Court for an order compelling DuPont "to restore the archived material to a searchable format and search the legacy server for" responsive documents. *Id*. at 17.

Little Hocking's arguments are not well-taken. As an initial matter, there is no evidence, other than Little Hocking's apparent misunderstanding, that a legacy server even exists. In addition, for the reasons stated *supra*, Little Hocking has failed to persuade the Court that DuPont's reliance on the production in *Leach* (and *Rhodes* and *Rowe*) is in error or otherwise contrary to DuPont's obligations in responding to Little Hocking's requests in this action. Although Little Hocking hypothesizes the existence of large quantities of unproduced material, it has offered nothing, other than its own speculation, that otherwise unproduced documents reside in the *Leach* raw data, which is not readily accessible.[13] As discussed *supra*, however, this Court will not grant a motion to compel based on the

_____
[13] Following the format in *Little Hocking's Motion to Compel*, pp. 24-33, the Court will separately address, *infra*, Little Hocking's requests for an order compelling DuPont to search the files of internal DuPont entities such as the Power & Services group.

mere suspicion that the producing party possesses additional information that it has not disclosed. *See*, *e.g.*, *In re Porsche Cars N. Am., Inc.*, No. 2:11-md-2233, 2012 U.S. Dist. LEXIS 136954, at *32 (S.D. Ohio Sept. 25, 2012) ("Plaintiffs' speculation that additional emails must exist, that the lack of privileged documents is a sign that Defendants' production must be inadequate, and that [a defendant] is a technologically advanced company that surely maintains all of its documents in electronic form will be insufficient to compel judicial involvement unless Plaintiffs provide evidence that Defendants are improperly withholding documents."). *See also Harris v. Koenig*, 271 F.R.D. at 370; *Ford Motor Co. v. Edgewood Props.*, 257 F.R.D. at 428. In sum, Little Hocking has not shown that the likely benefit of searching (for a third time) and retrieving the raw data in *Leach* (that is not readily accessible) outweighs the burden of this proposed discovery. *See* Fed. R. Civ. P. 26(b)(2)(C)(i)-(iii). Accordingly, to the extent that Little Hocking seeks an order compelling DuPont to restore the archived material in *Leach* to a searchable format and to search the "legacy" server for documents responsive to Little Hocking's requests, *Little Hocking's Motion to Compel* is **DENIED**.

### B.    Internal DuPont Entities

Little Hocking contends that DuPont regularly creates "teams" and "groups" to work on important issues and that the "lack of documents" from several of these internal DuPont entities demonstrates that DuPont's search and production are "woefully deficient." *Little Hocking's Motion to Compel*, p. 24. Little Hocking therefore seeks an order compelling DuPont to search and produce responsive documents

from the files of 14 different internal DuPont entities. *Id.* at 24-33. The Court shall address each entity in turn.[14]

### 1. The PFOA Core Team

Little Hocking contends that DuPont's PFOA Core Team "is integral to DuPont's public relations effort" and that this team examines plant and operational review documents, health effects and industrial hygiene documents. *Id.* (providing no citation to the record). Little Hocking complains that DuPont's production in this case "reflects the importance of the PFOA Core Team's work, but contains little of the actual work of" this team. *Id.* at 24-25. According to Little Hocking, DuPont explained that "it produced documents from a couple members of one version of the PFOA Core Team (from a certain unspecified point in time)." *Id.* at 25. Little Hocking argues that, "given the fact that members of the Core Team played special roles in reviewing documents[,]" DuPont's failure to produce documents "from all team members for all periods of time at issue" is unjustified. *Id.*

In response, DuPont first explains that, even if responsive PFOA-related materials exist, "[g]enerally materials relating to a DuPont 'team' or 'group' do not reside in some set of discretely prepared and assembled file specific to each group." *Cavanaugh Declaration*, ¶ 75.

---

[14] Little Hocking has not identified a specific document request with each entity from which it seeks documents. At best, Little Hocking generally refers to document request numbers as to a specific entity. *See*, *e.g.*, *Reply*, p. 21 (asserting that documents from the P&S group are responsive to document request numbers 11 and 29). In light of these sparse references and the specific circumstances of this case, including that there is no opposition from DuPont on a failure to identify specific document requests, the Court will presume that the requested documents from each internal entity must be purportedly responsive to Little Hocking's document requests.

DuPont's counsel interviewed members of the internal entities from which Little Hocking seeks production, collecting "any documents accessed or maintained by the custodians in any shared server space or database. DuPont attributed those to a custodian when electronic, and the file path metadata would map where the electronic material resides." *Id.* at ¶ 76. As to the PFOA Core Team specifically, DuPont "has produced files from every Core Team leader since the Team's inception in 2003. DuPont has also produced the files of additional Core Team members." *Id.* at ¶ 90. In responding to *Little Hocking's Motion to Compel*, Attorney Cavanaugh "conducted or directed interviews of DuPont personnel. . . . [who] reported that the Core Team includes a multi-disciplinary team, some of whom, beyond the documents shared by the team, are not reasonably likely to possess" information responsive to Little Hocking's requests. *Id.* at ¶ 91. Therefore, DuPont argues, it "reasonably identified only those Core Team members with the broadest set of potentially responsive information, collected their files, reviewed them, and produced the responsive documents to Little Hocking." *Memo. in Opp.*, p. 30.

In reply, Little Hocking contends that DuPont's response concedes that it has failed to search all of the PFOA Core Team files and that it has failed to update all files that were initially searched. *Reply*, p. 24. Little Hocking insists that a search of the files of all former and current Core Team members is necessary because the team "was/is responsible for reviewing and approving DuPont's communications with third parties regarding C-8 issues" and because certain Core Team members were responsible for reviewing documents on

certain specialized subject areas. *Id.* (stating that certain members reviewed documents on, *e.g.*, operational issues while other members reviewed C-8 related documents on health effects or health-related issues and citing *Exhibit 23*, Doc. No. 123-10). Little Hocking therefore characterizes DuPont's production as incomplete "since Little Hocking has very little documentation regarding the PFOA Core Team's review process" and argues that this Court should compel a search of all PFOA Core Team files in light of this Team's important rule and the "glaring deficiencies in DuPont's production[.]" *Id.* at 24-25.

Little Hocking's arguments are not well-taken. DuPont has produced files from every Core Team leader since the Team was formed in 2003 and has produced the files of other Core Team members. *Cavanaugh*, ¶ 90. Moreover, in producing responsive information after conducting interviews, DuPont identified those individuals with the broadest set of potentially responsive information and those individuals not likely to possess responsive information beyond the documents shared by the team. *Id.* at ¶ 91. Little Hocking's reliance on the fact that it has received "very little documentation" is, standing alone, insufficient to warrant judicial intervention. *See*, *e.g.*, *In re Porsche Cars N. Am., Inc.*, 2012 U.S. Dist. LEXIS 136954, at *32. Accordingly, as it relates to the PFOA Core Team files, *Little Hocking's Motion to Compel* is **DENIED.**

## 2. The Washington Works Facility's "Power and Services" Unit

Little Hocking represents that the Power and Services unit at DuPont's Washington Works facility ("P&S" unit or group) "tracks the

water supply from the groundwater production wells for" that facility,
"controls the wastewater treatment facility, and oversees waste
storage and disposal areas (e.g., the 'biopond,' drum storage areas,
and landfills associated with the Washington Works facility)[; and]
collects and coordinates outfall sampling and participates in
investigations of outfall-related problems." *Little Hocking's Motion
to Compel*, pp. 25-26 (citing *Exhibits 13*, *14*, *15* and *22*, attached
thereto).  According to Little Hocking, there is no dispute that
"outfalls carried PFOA-related waste to the Ohio River, which lies
between the Washington Works facility and Little Hocking's
Wellfields." *Id*.  Little Hocking therefore seeks an order compelling
DuPont "to produce responsive information, including source area and
pathway information, found in the files of the Power & Services unit."
*Id*. at 26.

DuPont represents that, although the P&S group had some
responsibility for outfall sampling and waste disposal, *Memo. in Opp.*,
p. 25, it is "not responsible for environmental issues[.]" *Cavanaugh
Declaration*, ¶ 82(a).  Instead, the P&S group is "responsible for
operation and maintenance of Washington Works facility areas that
[are] not connected to a manufacturing process." *Id*. at ¶ 80(b).  For
instance, the P&S group maintains the facility's roadways, walkways
and open spaces, but "is not responsible for the fluoropolymers
manufacturing area where PFOA is used." *Id*.  To the extent that the
P&S group was involved in sampling or work related to waste
information, "that information was shared with and retained by the
environmental group and/or the fluropolymers manufacturing unit." *Id*.

33

at ¶ 82(a).  The fluoropolymers manufacturing unit maintains files relating to its unit's operations and the unit's emissions or disposal.  *Id*. at ¶ 80(c).  The environmental group, which is headed by David Altman,[15] "is responsible for all environmental protection activities for all chemicals, processes, and business units at Washington Works."  *Id*. at ¶ 78.  The environmental group is "responsible for collecting samples and monitoring disposal practices."  *Id*.  As such, that group "collects and provides sampling results for chemicals used at Washington Works and reports those results to state and federal regulators under the facility's regulatory permits."  *Id*.  The environmental group also is responsible for an environmental audit.  *See Exhibit 14*, attached to *Little Hocking's Motion to Compel*.

Therefore, according to DuPont, "[i]nformation relating to sampling and disposal practices does not reside primarily in the Power and Service Group files.  Rather, it resides in the files of Washington Works' environmental group and its fluoropolymers manufacturing group."  *Id*. at ¶ 80(a).  DuPont has collected and produced to Little Hocking the responsive files from both of these groups.  *Id*. at ¶ 80(a).  More specifically, in order to obtain documents relating to the emission or disposal of PFOA, DuPont collected and produced documents from past and current custodians in the fluoropolymers manufacturing unit, including 11 different custodians.  *Id*. at ¶ 81.  DuPont also collected and produced

---

[15] "David F. Altman is a DuPont employee at Washington Works.  He is not the D. David Altman who is Trial Counsel [for Little Hocking] in this case."  *Memo. in Opp.*, p. 24 n.8.

documents from custodians in the Washington Works environmental group, including 11 different custodians.  *Id*. at ¶ 83.

DuPont further represents that DuPont's Corporate Remediation Group ("CRG") also has information from the P&S group's files relating to sampling, emissions and disposal of PFOA.  *Memo. in Opp*., p. 26. "Since the late 1980s, DuPont has addressed environmental issues relating to PFOA" through CRG.  *Cavanaugh Declaration*, ¶ 84.  For example, CRG worked on the United States Environmental Protection Agency's ("EPA") investigation of Washington Works under the Resources Conversation and Recovery Act ("RCRA"), which resulted in a Memorandum of Understanding with the EPA.  *Id*.  According to DuPont, Andrew Hartten of CRG was primarily responsible for this work.  *Id*.  DuPont collected and produced responsive documents from Mr. Hartten's files and the files of his team.  *Id*.  DuPont therefore argues that it has searched in good faith for information responsive to requests relating to disposal, sampling and emissions and produced such documents.  *Id*. at 28-29.

In reply, Little Hocking asserts that the *Memo. in Opp*. simply "perpetrate[s]" "deception[.]"  *Reply*, p. 19.  To that end, Little Hocking contends that DuPont has tried to minimize the importance of the P&S group even though DuPont's own documents reveal that the group "has responsibility for key waste areas, including on-site and off-site landfills used by DuPont for disposal of waste[,]. . . the Washington Works waste incinerator(s), the Washington Works bio-pond, and the Washington Works waste drum storage building."  *Id*. (citing

*Exhibits 10* and *11*).[16]  In addition, Little Hocking argues that
DuPont's assertion that the P&S group is not responsible for
environmental issues at Washington Works is "blatantly false" when
DuPont's own production reveals that the P&S group did have
involvement and responsibility for certain environmental issues.  *Id.*
at 20 (citing *Exhibits 12*, *13*, *14*, *15*, *16*, *17*, *18*, *19* and *29*).[17]
Little Hocking further rejects DuPont's assertion that outfall
sampling records do not "reside primarily" with the P&S group in light
of DuPont's own pre-audit questionnaire identifies P&S as the entity
keeping such records.  *Id.* at 21 (citing *Exhibit 20*, attached
thereto).  Little Hocking therefore seeks an order compelling DuPont
to search the files of P&S for responsive documents.  *Id.*

     After reviewing the record, the Court concludes that some
ambiguity exists as to whether all responsive documents from the P&S
group have been collected and produced.  As an initial matter,
although DuPont represents that materials relating to a particular
DuPont "team" or "group" do not "[g]enerally" reside in an assembled
file specific to each team or group, *Cavanaugh Declaration*, ¶ 75,
DuPont later acknowledges that the P&S group does have or maintain
files.  *Id.* at ¶ 80(a).  DuPont also acknowledges that the P&S group
is involved in sampling and waste disposal, *see*, *e.g.*, *id.* at ¶¶

---

[16] *Exhibit 10* is attached to the *Reply*, but *Exhibit 11*, marked confidential by
DuPont, is not attached.  *See Reply*, p. 4 n.1 (explaining that several
exhibits marked confidential may later be filed on the public record or, if
granted leave, under seal).  Instead, *Exhibit 11* was filed later after DuPont
withdrew its confidential designation.  *See* Doc. No. 123-6.
[17] *Exhibits 13*, *14*, *15*, *16*, *17*, *18* and *29* are attached to the *Reply*, but
*Exhibits 12* and *19*, marked confidential by DuPont, are not attached.  Instead
*Exhibits 12* and *19* are filed later after DuPont withdrew its confidential
designation.  *See* Doc. Nos. 123-7 and 123-8, respectively.

80(a), 82(a), but insists that information relating to this activity "does not reside *primarily*" in the P&S group's file. *Id.* at ¶ 80(a) (emphasis added). DuPont apparently takes this position based in no small part on its representation that the P&S group is responsible for things such as maintaining roadways, walkways and open spaces, minimizing the group's role in environmental matters. *See*, *e.g.*, *id.* at ¶¶ 80(b), (c), 82, 84.

However, other evidence in the record points to the P&S group's involvement in sampling, waste disposal and/or other environmental activities and establishes that the group does possess and control documents related to such activity. *See*, *e.g.*, *Exhibits 16* (string of DuPont emails dated April 2001 discussing a request for PFOA sampling and advising that a "work permit will need to be acquired from Power and Services before the start of work"), *17* (DuPont email dated September 21, 1999 advising that "waste material should not be sent to Dry Run landfill in steel drums. Power and Services has not been accepting steel drums at Dry Run since at least 1996"), *18* (excerpt of memo issued January 15, 1999 and revised on October 5, 2005 specifically noting that the P&S group oversees maintenance and repairs of certain outfalls from the Washington Works facility; oversees the collection and coordination of outfall sample analysis; and participates in investigations of outfall related issues) and *29* (email dated April 5, 2002 sent by environmental technician from P&S group providing pumping well operations information), attached to *Reply*. Indeed, DuPont has previously represented that the P&S group is the DuPont entity that maintains outfall monitoring records. *See*

*Exhibit 20* at document numbered 025-0147-0047401 (pre-audit questionnaire dated December 19, 2006 stating that outfall monitoring records are maintained by the P&S group), attached to *Reply*. This evidence undermines, or at least is in tension with, DuPont's representation that responsive information does not reside "primarily" in the P&S group's files. *See Cavanaugh Declaration*, ¶ 80(a).

In addition, the integrity of DuPont's search for responsive documents is further undermined by DuPont's initial representation that information relating to sampling and disposal practices resides in one place, *id.* (stating that such information "resides in the files of Washington Works' environmental group and its fluoropolymers manufacturing group"), in light of its later assertion that the information is located somewhere else, *see Memo. in Opp.*, p. 26 ("[A]s Little Hocking well knows, this information . . . [is located] in the files of DuPont's Corporate Remediation Group ('CRG')."). Indeed, even accepting that the P&S group shared information with other groups, *Cavanaugh Declaration*, ¶ 82(a), the Court is not confident, based on this record, that DuPont has collected and produced all responsive information. Where there is no evidence that searching for responsive documents in the files of the P&S group imposes a burden on DuPont, the Court cannot conclude, under these circumstances, that DuPont has fulfilled its discovery obligations. Accordingly, as it relates to responsive information, including source area and pathway information, located in the files of the P&S Group, *Little Hocking's Motion to Compel* is **GRANTED**. DuPont is **ORDERED** to search, review and produce responsive information from the P&S Group's files within

38

fourteen (14) days of the date of this *Opinion and Order*.

### 3. DuPont Consulting Solutions

Little Hocking contends that DuPont Consulting Solutions ("DCS") is responsible for "managing the PFOA issue[,]" which included developing a report of an environmental group. *Little Hocking's Motion to Compel*, p. 26 (citing *Exhibit 5* (a document with this entity's name across the top and dated May 1, 2003 and entitled "Managing the PFOA Issue") and *Exhibit 16* (power point presentation with this entity's name across the top dated September 2003 and regarding the non-profit environmental organization Environmental Working Group), attached thereto). DCS also collected yearly environmental data for DuPont's annual reports. *Id.* (citing *Exhibit 17*, attached thereto). Little Hocking complains that it has located in DuPont's production only "a smattering of documents that even mention" DCS. *Id.* at 27. Little Hocking further complains that DuPont has not searched the files of this entity's key individuals, Richard Lopez and James Bernard, and that the files of another individual, Paul Costello, have not been searched since the *Leach* case. *Id.* Little Hocking therefore seeks an order compelling DuPont to search for and produce all responsive documents from the files of DCS. *Id.*

According to DuPont, Paul Costello, now retired, was the head of DCS, which "was a DuPont sub-business that operated only until 2004." *Cavanaugh Declaration*, ¶ 95. Although DuPont confirmed that all responsive documents in Mr. Costello's files had been produced from other custodians, DuPont later produced Mr. Costello's files (which

had been produced in *Leach*.)  *Id*.  In response to *Little Hocking's*
*Motion to Compel*, DuPont's counsel also interviewed Mr. Costello.  *Id*.
at ¶ 96.  Mr. Costello "confirmed that DCS was not engaged to do any
PFOA related work, but Mr. Costello acted as a facilitator for
meetings regarding PFOA."  *Id*.  Mr. Costello also offered the
following information:

> a.    On one occasion, Mr. Costello was retained for a
> limited assignment for the fluoropolymers group.  Mr.
> Costello confirmed that DuPont's counsel had collected all
> of the documents relating to that work.  Those files have
> been produced.

> b.    Mr. Costello also confirmed that any PFOA-related
> documents [that] he or others in DCS created exist in his
> files.  Mr. Costello retired in 2003, his documents were
> collected in 2004 as part of the *Leach* matter and those
> documents were produced in this case.

*Id*.  DuPont therefore takes the position that there is no need to
supplement any files because DCS has not existed since 2004.  *Memo. in*
*Opp.*, p. 31 (citing *Cavanaugh Declaration*, ¶ 96).

Little Hocking, however, asserts that the documents previously
produced belie DuPont's assertions that DCS did no PFOA-related work
and that DCS only operated until 2004.  *Reply*, pp. 26-27 (citing
*Exhibit 25* at page numbered 092-0245-0004936 (document appearing to be
part of a DuPont power point presentation noting that, under a heading
of "Polymer Specialties," DuPont's "2008 Plans" include "DuPont
Consulting Solutions assisting with analysis of cost/investment
structure and growth opportunity assessment (MVP-type analysis");
*Exhibit 26* (email dated October 1, 2007 from DuPont's Gregory Myers
stating that "Brian is currently working in the DuPont Consulting

Solutions Group").[18]  *See also Exhibit 5*, attached to *Little Hocking's Motion to Compel* (a document with DCS's name across the top dated May 1, 2003 and entitled "Managing the PFOA Issue").  Little Hocking therefore asks this Court to order DuPont to search the DCS files for responsive information.

Viewing this record as a whole, the Court concludes that some ambiguity exists as to whether or not DuPont has produced all responsive DCS files.  Although Mr. Costello retired in 2003 and although DuPont represents that DCS has not existed since 2004, *Cavanaugh Declaration*, ¶ 96(b), other evidence in the record establishes that DCS remained active into 2007 and 2008.  *See Exhibit 25*, Doc. No. 130, pp. 1-3, and *Exhibit 26*, Doc. No. 123-12.  In addition, there is no evidence suggesting that updating the search and production of the DCS files would impose an unreasonable burden on DuPont.  In short, the Court disagrees with DuPont's assertion that "there is no need to supplement any [DCS] files[,]" which were last collected in 2004.  *Memo. in Opp.*, p. 31; *Cavanaugh Declaration*, ¶ 96(b).  The Court is not persuaded, however, that the collection and production of DCS files up to 2004 was defective.  *See*, *e.g.*, *Cavanaugh Declaration*, ¶¶ 95-96.  Accordingly, as it relates to responsive information residing in the files of the DuPont Consulting Group (or in the files of its custodians), *Little Hocking's Motion to Compel* is **GRANTED in part**.  DuPont is **ORDERED** to search, review and

---

[18] These exhibits, initially designated as confidential by DuPont, are not attached to the *Reply*.  Instead, *Exhibit 25* is filed separately under seal.  *See* Doc. No. 130, pp. 1-3.  Little Hocking later filed a redacted version of *Exhibit 26* after DuPont withdrew its confidentiality designation.  *See* Doc. No. 123-12.

produce responsive information from the files of the DuPont Consulting Group (or in the files of its custodians) within fourteen (14) days of the date of this *Opinion and Order*.  In complying with this *Order*, DuPont need search only such files from the period 2004 through the present.  If no new responsive documents are located, DuPont is **FURTHER ORDERED** to provide a declaration or affidavit explaining why DuPont refers to DCS as an active entity in 2007 and 2008 if DCS has not existed since 2004.

### 4.    Global C8 Team

Little Hocking asserts that, in 1993, DuPont's Global C8 Team worked "program options" for reduction of C8 in the groundwater aquifer being used at the Washington Works facility, addressing employees' exposure to C8 and ways to "[e]liminate high C-8 in water use by single family on private well on the western edge of the Washington Works." *Little Hocking's Motion to Compel*, p. 27 (quoting *Exhibit 18*, at documents numbered 176-2012-0001405 to 1406, attached thereto).  Little Hocking argues that DuPont's historic knowledge of contamination, regardless of the geographic location, bears directly on DuPont's acts or omissions as to the Washington Works facility. *Id.* at 27-28.  Little Hocking complains that the production does not establish, and DuPont has not provided, a "verifiable assurance," that production from the Global C8 Team is complete.  *Id.* at 28.

According to DuPont, the Global C8 Team "was formed in the 1990s to address issues relating to PFOA at DuPont facilities that handled PFOA." *Cavanaugh Declaration*, ¶ 92.  Members of this team include Roger Zipfel, Robert Ritchey, Gerald Kennedy, David Ramsey, Michael

42

McClusky and Daniel Weber. *Id*. at ¶ 93. In the *Leach* action, DuPont searched and produced documents from Global C8 Team members. *Id.* at ¶ 92. DuPont represents that these documents were also produced to Little Hocking. *Memo. in Opp.*, pp. 30-31. The Global C8 Team no longer exists because, in 2003, the PFOA Core Team assumed Global C8 Team's responsibilities for PFOA issues. *Cavanaugh Declaration*, ¶ 94. As a result, DuPont argues, no supplement to its production is necessary.

Little Hocking replies that, although DuPont does not dispute the importance of this team's files to this litigation, DuPont has produced "only a handful of records" from some custodians. *Reply*, p. 25. In Little Hocking's view, it is "not credible" that only a few records exist; "it is far more likely that central team files, associated with the work of this team, have not been produced in this case." *Id*. Little Hocking next argues that those documents actually produced establish that the files of certain key team members have never been searched and produced, including members Terry D. VanDell, Michelle Goodman, Maribeth Kruempelman and Walter M. Stewart. *Id*. For example, Ms. Goodman led the "technical effort in the Washington Works" facility; Ms. Kruempelman was the "lead technical resource at the Experimental Station for C-8 in water samples;" Mr. Stewart was the "lead environmental resource at the Washington Works"; and Mr. VanDell was the "[l]ead point on programs to reduce C-8 levels in the aquifer below the Washington Works[,]" led the "hydrology technical effort for Washington Works" and interfaced with the University of Delaware and other outside entities dealing with C8 in groundwater.

43

*Exhibit 24*, Doc. No. 123-11 at document numbered 062-2008-0004583.
Little Hocking seeks an order compelling DuPont to conduct a complete
search and production from the Global C-8 Team "(including all team
members' files and all centralized team files)." *Reply*, p. 26.

DuPont represents that it searched and collected responsive
documents from the files of specific Global C-8 Team members in *Leach*,
*Memo. in Opp.*, p. pp. 30-31 (citing *Cavanaugh Declaration*, ¶ 93), but
those members do not include the four individuals identified by Little
Hocking and described by DuPont as having "lead" roles in addressing
C-8 issues and efforts. *See Exhibit 24*, Doc. No. 123-11 at document
numbered 062-2008-0004583. Moreover, there is no evidence that
searching the files of these four individuals would impose an
unreasonable burden on DuPont. Because there is some question as to
the adequacy of DuPont's search and production of documents from this
team, as it relates to responsive documents from the Global C-8 Team,
*Little Hocking's Motion to Compel* is **GRANTED** subject to the following
limitations. DuPont is **ORDERED** to search the files of team members
Terry D. VanDell, Michelle Goodman, Maribeth Kruempelman and Walter M.
Stewart and produce responsive documents within fourteen (14) days of
the date of this *Opinion and Order*. If DuPont previously searched and
produced responsive documents from the files of these four team
members in the *Leach* litigation, DuPont need not search those files
again for the reasons stated *supra*. Instead, DuPont is **ORDERED** to
provide a declaration or affidavit confirming that it has previously
searched and produced responsive documents from the files of these
individuals.

### 5.    The PFOA Communications Team

Little Hocking contends that the PFOA Communications Team managed "internal and external communications and [] track[ed] data/assignments on the 'PFOA issue'" *Little Hocking's Motion to Compel*, p. 28 (citing *Exhibits 19* and *20*, attached thereto).  Little Hocking argues that this team's role in communicating with the public and environmental agencies underscores the importance of ordering DuPont to produce "this team's files (including all team members' files) and databases as kept in the ordinary course of business."  *Id*.

DuPont, however, represents that it "has produced files accessed by a number of present and former members of the PFOA Communications Team including Clif Webb, Dan Turner, Janet Smith, Diane Shomper, Dawn Jackson, Robin Ollis-Stemple, Leslie Beckhoff, Kathleen Forte, Irwin Lipp and Michele Reardon."  *Cavanaugh Declaration*, ¶ 97.  DuPont further represents that it has produced documents related to this team through the production of these custodians' files.  *Memo. in Opp.*, p. 32.

In reply, Little Hocking argues that "DuPont asks this Court and Plaintiff to believe that DuPont, a sophisticated multi-national corporation, does not store the work of the PFOA Communications Team in a centralized location, but instead scatters it among the files of dozens of employees[.]" *Reply*, pp. 27-28.  Little Hocking therefore urges this Court to accept that "DuPont does indeed store team documents in shared team locations."  *Id*. at 28.  Little Hocking also goes on to criticize DuPont's production as to the individual team custodians, taking the position that such production is deficient.

45

*Id*.  For example, Little Hocking complains that "despite the fact that many communications were supposed to be routed through Alexa Girardi, her files have never been searched."  *Id*. (citing *Exhibit 27*, attached thereto) (email dated April 24, 2003 entitled "Protocols for PFOA Communications Team" advising team members that "[f]or tracking purposes, each core team member should send the following information [regarding weekly totals related to consumer, employee, investor and government officials' questions/concerns] to Alexa Girardi by noon every Friday").  Little Hocking further complains that many members of the PFOA Communications Team are not on DuPont's custodians list, which further underscores the deficiency of DuPont's search.  *Id*. (comparing *Exhibit 27*, attached thereto (email to team members as they existed on April 24, 2003) to *Exhibit 18*, attached to *Cavanaugh Declaration* (list of custodians whose files were produced to Little Hocking)).  Finally, Little Hocking argues that, although there are references to this team's work, a search of the documents produced disclosed little of the team's actual work.  *Id.*  Little Hocking asserts that "[i]t is simply not plausible that these documents reflect all of the team's highly important public relations work."  *Id*.  Little Hocking therefore seeks an order compelling DuPont to search "all centralized files" and the files of all past and present team members.  *Id*.

The Court is not persuaded that additional responsive documents necessarily exist or that DuPont necessarily maintains a "centralized location" of this team's work simply because DuPont may be a "sophisticated multinational corporation" or because Little Hocking is

46

surprised by the alleged dearth of responsive documents from this team. *Cf. In re Porsche Cars N. Am., Inc.*, No. 2:11-md-2233, 2012 U.S. Dist. LEXIS 136954, at *32 (S.D. Ohio Sept. 25, 2012) (rejecting the plaintiffs' speculation that additional documents must exist because, *inter alia*, a defendant "is a technologically advanced company that surely maintains all of its documents in electronic form"). However, after reviewing the record, the Court does conclude that additional clarification as to the comprehensiveness of DuPont's search and production of responsive files of the PFOA Communications Team is necessary. *See, e.g., Exhibit 27*, attached to the *Reply*. Accordingly, as it relates to the PFOA Communications Team, *Little Hocking's Motion to Compel* is **GRANTED in part** with the following limitations. DuPont is **ORDERED** to search and produce responsive documents, if any, within fourteen (14) days of the date of this *Opinion and Order*, from the files of Alexa Girardi. DuPont is **FURTHER ORDERED** to provide a declaration or affidavit (1) as to whether DuPont maintains centralized file(s) for the PFOA Communications Team, identifying the number of and location of such file(s), and (2) confirming and explaining how its search and production of files of the team members to date (identified in *Cavanaugh Declaration*, ¶ 97) constituted a complete production of all responsive documents relating to the PFOA Communications Team, particularly if DuPont maintains centralized file(s) that were not searched.

### 6. Audit Team for Washington Works

Little Hocking acknowledges that DuPont has produced some documents regarding environmental audits, but believes that not all

responsive audit information has been produced. *Little Hocking's Motion to Compel*, p. 29.  Little Hocking represents that production of audit information has "been scattered throughout different individual custodian files[,]" even though DuPont "maintains its audit documents as project files." *Id.*  For example, Little Hocking argues that DuPont breaks down "audit learning" project files by year and by site and saves them in a shared electronic space, not by employee. *Id.* (citing *Exhibit 21* at documents numbered 011-0236-0000381, 011-0236-0000386 (Central Environmental Committee Meeting Minutes dated February 21, 2007 referencing "Audit Learnings" in the site "S:\Common Global\ECC Meeting Information\2007\02-07\Environmental Audit Learnings – Feb 2007 ECC.ppt"), attached thereto).  Little Hocking insists that not all responsive environmental audit information has been produced because DuPont "has maintained that only audit information regarding PFOA or areas where PFOA is used are relevant." *Id.*  The withholding of this information is improper, Little Hocking argues, because audits may provide important information about contaminant migration even if PFOA is not explicitly referenced. *Id.*

In response, DuPont admits that it conducts periodic audits of its practices at Washington Works, but denies that a "standing" Washington Works "Audit Team" exists. *Memo. in Opp.*, p. 29 (citing *Cavanaugh Declaration*, ¶ 87(a)).  Instead, the Washington Works environmental group headed by David F. Altman retains all of the findings relating to audits at the Washington Works facility. *Cavanaugh Declaration*, ¶ 87(a).  DuPont represents that it has collected, reviewed and produced the files of Mr. Altman and his team

as well as the documents that are located on databases or servers that
this group used. *Memo. in Opp.*, p. 29.  In responding to Little
Hocking's assertion that DuPont has not produced certain audit files
because of a single reference to "audit learnings," DuPont represents
that the "'audit learnings' file cited by Little Hocking is a non-
responsive PowerPoint presentation describing audits at three DuPont
facilities, not including Washington Works, that contained no mention
of PFOA, PFCs or Washington Works." *Cavanaugh Declaration*, ¶ 87(b).
Responding further to Little Hocking's suspicion that the server where
the document resides (WWCS4) was not searched, DuPont represents that
it reviewed WWCS4 and produced documents beginning with bates numbers
119.  *Id.* at ¶ 88.

Little Hocking nevertheless insists that the Washington Works
facility has an audit team.  *Reply*, pp. 22 (citing *Exhibit 21* at
document numbered 179-2009-0000930 (document entitled "Washington
Works Corp. Env. Audit" dated October 7-11, 2002 and containing a page
captioned "Washington Works Audit Team," which lists four individuals,
including Rob Pinchot as "Team Leader"), attached thereto).  Little
Hocking argues that DuPont's representation that there is no
"standing" audit team establishes that the team's membership changes
and insists that the various team files must be produced.  *Id.*  Little
Hocking goes on to contend that DuPont has not produced the central
audit team files, which is housed on DuPont's intranet.  *Id*.  For
example, DuPont has produced evidence detailing the procedures that
the audit team follows in storing and distributing audit team files on
DuPont's intranet.  *Id.* (citing *Exhibit 22*, Doc. No. 123-9, at pages

numbered 191-2009-0011756 ("Dupont audit teams will use [the]
Performer [module of TrendTracker] (client and on-line) to document
second-party audits. . . . The TrendTracker v3 folder contains the
Performer application files that are automatically created during the
installation process.  The installation files can be found on the
Dupont intranet site for TrendTracker.") and 191-2009-0011760
(entitled "Performer User Guide" and directing that "[a]fter the
Closing Conference, you will upload the Audit File to the intranet.
Storing the audit file on the intranet allows the audit team to easily
share the Audit File.")).  Little Hocking therefore seeks an order
compelling DuPont "to search all audit team related files, including
those files housed on DuPont's various intranets, for" responsive
documents.  *Id*.

Although DuPont represents that there is no "standing" Washington
Works audit team, *Cavanaugh Declaration*, ¶ 87(a), there is evidence of
the existence of an audit team.  *See*, *e.g.*, *Exhibit 21* at document
numbered 179-2009-0000930, attached to *Reply*.  It may be that DuPont
creates audit teams during the life of a particular audit or project
and that there is no "standing" audit team at any given time, but the
present record is ambiguous on this point.  In addition, DuPont's
instruction to audit team members to upload audit reports to the
intranet, *Exhibit 22*, Doc. No. 123-9, at document numbered 191-2009-
001760, warrants confirmation that all responsive audit documents have
been produced.  *See Cavanaugh Declaration*, ¶ 87(a) (representing that
Washington Works audit information is maintained by the Washington
Works environmental group).  Accordingly, as it relates to audit team

related files, *Little Hocking's Motion to Compel* is **GRANTED** with the following limitations.  DuPont is **ORDERED** to provide, within fourteen (14) days of the date of this *Opinion and Order*, a declaration or affidavit (1) explaining the existence of any DuPont audit teams, including, *inter alia*, what DuPont means when it represents that it has no "standing" audit team in light of, *inter alia*, *Exhibit 21* at document numbered 179-2009-0000930; and (2) identifying the location of responsive audit team related information, particularly in light of *Exhibit 22*, Doc. No. 123-9.  In preparing such declaration or affidavit, DuPont is **FURTHER ORDERED** to either confirm under oath that it has produced all responsive audit team related information or, if DuPont discovers upon further review that additional responsive documents exist, produce such additional information.

### 7. Washington Works "Environmental Control Group," "Environment Group" or "Environmental Central Group"

Little Hocking contends that Washington Works Environmental Group "is likely to have responsive information" because the group plays a central role in environmental activities at the Washington Works site. *Little Hocking's Motion to Compel*, pp. 29-30 (citing *Exhibit 22*, attached thereto).  However, Little Hocking also apparently concedes that it has received such responsive documents, although it complains that DuPont has not produced this group's files as they are kept in the usual course of business.  *Id*.

The Washington Works Environmental Control Group, headed by David F. Altman, is Washington Works' environmental group.  *Cavanaugh Declaration*, ¶ 78(b).  This group is "responsible for all environmental protection activities for all chemicals, processes, and

business units at Washington Works." *Id.* at ¶ 78(c).  The Washington

Works Environmental Control Group collects samples, monitors disposal

practices and reports sampling results to state and federal

regulators.  *Id.*  DuPont has identified and collected documents from

key past and present group custodians with PFOA and PFC related

environmental responsibilities, including David F. Altman, Allison

Crane, Robert Ritchey, Roger Zipfel and George Wytowich.  *Id.* at ¶ 79.

In reply, Little Hocking argues that the evidence belies DuPont's

assertion that no centralized file exists for this group.  *Reply*, p.

18 (citing *Exhibit 8*, Doc. No. 123-5, noting "the Environmental Group

file number in which the [Domestic Water Team] minutes are filed").

Little Hocking asks this Court for an order compelling DuPont to

search this group's centralized files.  *Id.* at 18-19.

It is not apparent to this Court whether DuPont maintains

centralized files for this group and, if so, whether a search of those

files is necessary.  DuPont represents that it has already searched

and produced responsive documents from the files of "key" past and

present group members, *Cavanaugh Declaration*, ¶ 79, which may already

encompass all responsive documents from this group.  Accordingly, as

it relates to the Washington Works Environmental Control Group, *Little

Hocking's Motion to Compel* is **DENIED**.  However, DuPont is nevertheless

**ORDERED** to produce, within fourteen (14) days of the date of this

*Opinion and Order*, a declaration or affidavit (1) as to whether DuPont

maintains centralized file(s) for the Washington Works Environmental

Control Group, identifying the number of and location of such file(s),

and (2) confirming and explaining how its search and production of

files of the team members to date (identified in *Cavanaugh Declaration*, ¶ 79) is a complete production of all responsive documents relating to this group, particularly if DuPont maintains centralized file(s) that were not searched.

### 8. Allowable Exposure Limits Committee

Little Hocking argues that the Allowable Exposure Limits Committee (the "AEL Committee") sets DuPont's internal Allowable Exposure Limits for chemicals used at its facility, including PFOA. *Little Hocking's Motion to Compel*, p. 30 (citing *Exhibit 23*, attached thereto). According to Little Hocking, Allowable Exposure Limits, which are levels designed to assure employee safety, are based on scientific evidence and studies selected by DuPont. *Id.* Little Hocking argues that "underlying PFOA-related information regarding the internal exposure limit(s) set by DuPont is important to understanding DuPont's historic internal knowledge of the hazards associated with PFOA." *Id.* However, because it can locate only "sporadic" documents from various custodians' files, Little Hocking seeks an order compelling DuPont "to produce all PFOA/PFC-related information found in the files of the AEL Committee and its members." *Id.*

"[T]he AEL Committee is an internal DuPont committee comprised of experts in toxicology, industrial hygiene, occupational medicine, pathology, and epidemiology." *Cavanaugh Declaration*, ¶ 98. This Committee "evaluates unregulated chemicals used throughout DuPont to determine if employee exposure limits should be set to protect worker health." *Id.* DuPont has produced approximately 2,000 documents related to the AEL committee, including committee meeting minutes.

*Id.* at ¶¶ 99-100 (citing *Exhibit 27*, list of AEL Committee meeting minutes identified by date and bates range, attached thereto).  DuPont represents that this responsive information was drawn from multiple AEL Committee members, including Robert Graham, who is the AEL Committee Secretary and who is responsible for maintaining the notes of this committee.  *Memo. in Opp.*, p. 32.

In reply, Little Hocking complains that Mr. Graham's files have not been updated since the *Leach* litigation, which settled several years ago.  *Reply*, p. 29.  Little Hocking also argues that production from various custodians is insufficient when DuPont maintains a central file for the AEL Committee, which may not have been searched. *Id.* (citing *Exhibit 28*, attached thereto).

This Court concludes that an updated search and production may be necessary.  Accordingly, as it relates to the AEL Committee, *Little Hocking's Motion to Compel* is **GRANTED in part** subject to the following limitations.  DuPont is **ORDERED** to search and produce additional responsive documents, if any, within fourteen (14) days of the date of this *Opinion and Order*, from the files of Robert Graham dating from the last collection in *Leach* to the present.  If DuPont's prior production already incorporated such a search of Mr. Graham's files, DuPont is **ORDERED** to provide a declaration or affidavit confirming that its prior search and production included the period dating from the last collection in *Leach* to the present.  DuPont is **FURTHER ORDERED** to provide, within fourteen (14) days of the date of this *Opinion and Order*, a declaration or affidavit (1) as to whether DuPont maintains centralized file(s) for the Allowable Exposure Limits

54

Committee, identifying the number of and location of such file(s), and (2) confirming and explaining how its search and production of files of the team members to date (identified in *Memo. in Opp.*, p. 32) is a complete production of all responsive documents relating to the this group, particularly if DuPont maintains centralized file(s) that were not searched.

### 9.    Washington Works Domestic Water Team

According to Little Hocking, the Washington Works Domestic Water Team tracks matters related to the use and sampling of DuPont's on-site production wells, including both process and drinking water wells. *Little Hocking's Motion to Compel*, pp. 30-31 (citing *Exhibit 24*, attached thereto). Little Hocking argues that central to this litigation is whether PFOA contamination has migrated (and continues to migrate) from the Washington Works facility through the subsurface until such contamination reaches Little Hocking's wellfields. *Id*. at 31. The effect, if any, that DuPont's production wells have on contaminant migration is important to this analysis. *Id*. Little Hocking believes that a source of relevant records, such as when the wells were installed, when they were pumping, the radius of influence that wells have on groundwater flow, is likely the Washington Works Domestic Water Team. *Id*. Because Little Hocking asserts that this team's files are relevant to evaluating the subsurface pathways on migration for groundwater contamination, it seeks an order compelling DuPont to search the files of this team and of all team members. *Id*.

DuPont represents that it, like Little Hocking, provides potable water to its employees through its own well system and, as a water

provider, must meet certain state and federal criteria.  *Memo. in Opp.*, p. 29.  The Washington Works Domestic Water Team oversees the production of potable water at Washington Works.  *Cavanaugh Declaration*, ¶ 89(a).  DuPont represents that "there are no specific domestic water team files regarding PFOA or PFCs.  Rather, that information is maintained by the individual members of the team."  *Memo. in Opp.*, pp. 29-30.  Alison Crane is the custodian responsible for PFOA issues on this team.  *Cavanaugh Declaration*, ¶ 89(a).  DuPont's counsel interviewed Ms. Crane and collected and produced responsive information from her files.  *Id.*

In reply, Little Hocking insists that DuPont's production confirms that this team's minutes are stored in a central file location.  *Reply*, p. 23 (citing *Exhibit 8*, Doc. No. 123-5, noting "the Environmental Group file number in which the [Domestic Water Team] minutes are filed").  Little Hocking also complains that it has been unable to locate documents referring to the Washington Works Domestic Water Team in Ms. Crane's files.  *Id.*  Finally, Little Hocking argues that the paucity of team minutes actually produced underscores the deficiency of DuPont's production.  *Id.*

It is not apparent to this Court whether DuPont maintains centralized files for this group and, if so, whether a search of those files is necessary.  DuPont has represented that it has already searched and produced responsive documents from Ms. Crane, the person responsible for PFOA issues for this team; such a search would presumably include all responsive documents from this team.  *Memo. in Opp.*, pp. 29-30; *Cavanaugh Declaration*, ¶ 89(a).  Accordingly, as it

relates to the Washington Works Domestic Water Team, *Little Hocking's Motion to Compel* is **DENIED**.  However, DuPont is nevertheless **ORDERED** to produce, within fourteen (14) days of the date of this *Opinion and Order*, a declaration or affidavit (1) as to whether DuPont maintains centralized file(s) for the Washington Works Domestic Water Team, identifying the number of and location of such file(s), and (2) confirming and explaining how its search and production of Ms. Crane's files is a complete production of all responsive documents relating to this group, particularly if DuPont maintains centralized files that were not searched and in light of Little Hocking's representation that Ms. Crane's files do not contain documents referring to this team.

> 10. **The Corporate Persistence/Bioaccumulation Team, the Business Regulatory Affairs Team, the Risk Leadership Team, the SHE Excellence Center, and the Fluorine Enterprise Marketing Sub Team**

Little Hocking argues that five teams, the Corporate Persistence/Bioaccumulation Team, the Business Regulatory Affairs Team, the Risk Leadership Team, the SHE Excellence Center, and the Fluorine Enterprise Marketing Sub Team, have responsibilities and information relevant to the issues in this case.  *Little Hocking's Motion to Compel*, pp. 31-33 (citing *Exhibits 25* and *26*, attached thereto).  For instance, the Corporate Persistence/Bioaccumulation Team provides "guidance for the evaluation of chemicals to determine their potential for persistence and bioaccumulation in the environment."  *Exhibit 25* at page numbered 003-0029-0001344.  The Business Regulatory Affairs Team, the Risk Leadership Team and the SHE Excellence Center provide support for the "Product Stewardship— Risk Characterizations and Risk Management for New and Existing Products."

57

*Id.* at page numbered 003-0029-0001345. The Fluorine Enterprise
Marketing Sub Team maps "the timing of the future PFOA
replacement/reduction technologies." *Exhibit 26*, at page numbered
023-0242-0003579. Little Hocking complains that DuPont has not
searched and produced responsive files from these teams. *Little
Hocking's Motion to Compel*, pp. 31-33.

DuPont disagrees that it has withheld responsive information from
these five groups, arguing that, in making this argument, Little
Hocking has misinterpreted a manual for new products. *Memo. in Opp.*,
p. 33 (citing *Exhibit 25*, attached to *Little Hocking's Motion to
Compel*). DuPont represents that these five groups are "ad-hoc groups
convened to address the formation of new products, and are not
standing business units within DuPont." *Cavanaugh Declaration*, ¶
101(a). Because the teams work with individual business units when
new products are developed, there is "no way to collect materials
directly from the 'team'" and that any documents generated by the team
are maintained by the business unit responsible for the new product.
*Memo. in Opp.*, p. 33. DuPont also represents that it is not aware of
any instance in which these five groups "addressed issues relating to
PFOA." *Cavanaugh Declaration*, ¶ 101(b). However, DuPont further
represents that, if a document relating to these teams referenced
PFOA, "it would have been collected from the custodians from the
fluoropolymers business identified in this case." *Memo. in Opp.*, p.
33.

Little Hocking disputes DuPont's representations, asserting that
DuPont's production reveals that these five teams "are available to

58

provide their specialized expertise in" various areas.  *Reply*, p. 30
(citing *Exhibit 30*, attached thereto, which includes a document
entitled "Product Stewardship—- Risk Characterizations and Risk
Management for New and Existing Products").  In addition, Little
Hocking argues that, contrary to DuPont's assertion that these groups
are temporary, the evidence reveals that the Persistence and
Bioaccumulation Team has a standing "database."  *Id.* (citing *Exhibit
30*, at page numbered 003-0029-0001340, noting that information related
to the medium, *i.e.*, air, soil, water, biological tissues, sediment,
in which a chemical substance/product is most likely to be found once
released into the environment "can be determined by using
environmental fate/distribution models (e.g., the DuPont Persistence
and Bioaccumulation [P&B] Database)").  Little Hocking also rejects
DuPont's representation that DuPont is unaware of these groups'
involvement in PFOA issues.  *Id.* at 30-31.  For example, DuPont's
production reveals that the SHE Excellence Center was involved in PFOA
issues.  *See Exhibit 31*, Doc. No. 130-1[19] at page numbered 054-0236-
000212402125 (signature block for member of this team approving report
of PFOA exposure assessment in a particular location); *Exhibit 32* at
page numbered 003-0002-0002233 through 2234, attached thereto
(document dated January 14, 2005 entitled "Washington works Health
Study Results:  Questions & Answers" and stating that the SHE
Excellence Center was involved in assessing the results of the
Washington Works PFOA exposure study of its workers).  Little Hocking

---

[19] This document is filed under seal.

therefore seeks an order compelling DuPont to search the central files of these teams and files of team members.  *Id*.

The Court concludes that some ambiguity exists as to whether DuPont has searched for and produced all responsive documents related to these groups.  Although DuPont represents that it is not aware of any instance in which any of these groups were involved in PFOA-related issues, *Cavanaugh Declaration*, ¶ 101(b), the Court agrees with Little Hocking that other evidence suggests that some of these groups did in fact participate in such activity.  *See*, *e.g.*, *Exhibit 26*, attached to *Little Hocking's Motion to Compel*; *Exhibit 31*, Doc. No. 130-1; *Exhibit 32*, attached to *Reply*.  Moreover, the evidence undermines, or at least creates ambiguity as to, DuPont's assertion that other business units, rather than any of these five teams, maintain documents related to the development of new products.  *See*, *e.g.*, *Exhibit 30*, attached to *Reply*.

Against this backdrop, and even accepting that other business units maintained documents created by these groups, *Memo. in Opp.*, p. 33, the Court is not confident that DuPont has collected and produced all responsive information.  Moreover, there is no evidence that searching for responsive documents relating to this group would impose an undue burden on DuPont.  The Court cannot conclude, under these circumstances, that DuPont has fulfilled its discovery obligations.  Accordingly, as it relates to the Corporate Persistence/Bioaccumulation Team, the Business Regulatory Affairs Team, the Risk Leadership Team, the SHE Excellence Center, and the Fluorine Enterprise Marketing Sub Team, *Little Hocking's Motion to*

60

*Compel* is **GRANTED** subject to the following limitations.  DuPont is
**ORDERED** to search, review and produce responsive information related
to these five groups within fourteen (14) days of the date of this
*Opinion and Order*.  DuPont is **FURTHER ORDERED** to provide a declaration
or affidavit detailing the nature of this search, including the
sources searched and search terms used.  If DuPont limits the scope of
its search because of a perceived burden, DuPont shall explain, with
appropriate support, why that limitation is necessary in light of the
alleged burden.

**V.    SPECIFIC DOCUMENT REQUESTS**

Little Hocking seeks to compel several categories of documents
that it represents are covered by its document requests and that
DuPont has refused to produce.  *Little Hocking's Motion to Compel*, pp.
34-41.[20]  The Court shall address each category in turn.

**A.    Washington Works' "Source Inventory" and Groundwater
Protection Plan**

Little Hocking contends that DuPont has refused to produce the
Washington Works' facility's pollution "Source Inventory" and
Groundwater Protection Plan.  *Id*. at 34.  According to Little Hocking,
a 2004 Facility Action Plan reveals that the Washington Works
Groundwater Pollution Source Inventory is an easily searchable
database.  *Id*. (citing *Exhibit 22* at page numbered 011-0236-0000565
(stating, *inter alia*, that the "Source Inventory" database provides
"easily searchable, comprehensive information on tanks, dikes, pumps,

---

[20] In addressing each category of documents, Little Hocking does not always
refer to specific document request numbers.  Stated differently, it is not
immediately apparent to the Court what document requests are covered by each
category of documents.

61

etc., the method of assuring control and recommendations for maintenance and repairs"), attached thereto).  Little Hocking contends that this Action Plan also establishes that the Source Inventory was used, along with other documents, to determine necessary corrective actions.  *Id*.  However, DuPont refuses to produce the "Source Inventory" and Groundwater Protection Plan because the documents contain non-PFOA information.  *Id*. (citing *Exhibit 27*, p. 6 (letter dated February 2, 2013 from Attorney Cavanaugh addressed to Attorney Newman stating, *inter alia*, that the Groundwater Protection Plan "deals with all chemicals used at Washington Works, and, as such, the 'source inventory' details any equipment and/or process that may contain any chemical that has any chance to be exposed to the soil within the plant boundaries," and, according to DuPont, this data goes "well beyond the scope of LHWA's document requests"), attached thereto).  Little Hocking rejects this rationale, asserting that source areas and pathways of migration are not usually contaminant specific.  *Id*. at 34-35.  Little Hocking argues that information in the "Source Inventory" is discoverable even if the documents discuss a particular pathway or source area in the context of another waste stream or chemical besides PFOA.  *Id*. at 35.

The Washington Works Groundwater Protection Plans and attendant "Source Inventories" "detail any equipment and/or process that may contain any chemical that has any chance to be exposed to the soil within the plant boundaries.  This includes such data as the location of fuel tanks for generators and process tanks for non-fluoroproducts-related applications."  *Cavanaugh Declaration*, ¶ 104.  According to

62

DuPont, this data covers hundreds of chemical processes that go beyond the scope of this case. *Memo. in Opp.*, p. 39. DuPont has already produced from other sources information relating to environmental releases of PFOA. *Id.* (citing *Exhibit 30* (document entitled "Retrospective Exposure Analaysis of Residents to Perfluorooctanoic Acid (PFOA) from 1951 to 2003" with an apparent subtitle of "Chemrisk" relating to PFOA material mass balance calculations prepared by Dennis Paustenbach, Ph.D., that tracks the fate and transport of every molecule of PFOA used at Washington Works from 1951-2003 (hereafter, "Chemrisk model")), attached to *Cavanaugh Declaration*; document numbered 051-2011-0001651 (purportedly a quarterly memorandum submission to the EPA that catalogs PFOA emissions from 2000 through the present), which does not appear to be produced as an exhibit).

In reply, Little Hocking notes that DuPont concedes that its outfalls into the Ohio River discharges C8 and that there is no dispute that part of the "recharge" of Little Hocking's drinking water aquifer is from Ohio River water. *Reply*, p. 34. Little Hocking rejects DuPont's reasons for withholding this information because DuPont's own documents reveal that the source inventory is easily searchable, enabling DuPont to locate PFC-related information, including that which shares multi-contaminant source information. *Id.* (citing *Exhibit 22*, attached to *Little Hocking's Motion to Compel*). Little Hocking next argues that DuPont's production of the Chemrisk model, which is a retroactive analysis of C8 released from the Washington Works facility, is not a sufficient substitute for searching the "Source Inventory" because the Chemrisk model does not

contain information about actual tanks, pipes, vessels and drains and which would be reflected in the groundwater pollution inventory. *Id.* at 34-35.

The Court concludes that the Washington Works' pollution "Source Inventory" and Groundwater Protection Plan contain information that falls within the ambit of discovery under Fed. R. Civ. P. 26(b)(1). In so concluding, the Court does not find that the production of the Chemrisk model and of DuPont's quarterly memorandum to be a sufficient substitute for searching and producing information responsive to Little Hocking's request. Moreover, although DuPont represents that the requested information involves a "large volume of data" that covers "hundreds of chemical processes," *Memo. in Opp.*, p. 39, DuPont has presented no evidence that conducting a search of the requested sources would impose on it a burden that outweighs the value of this evidence. Accordingly, as it relates to Washington Works' pollution "Source Inventory" and Groundwater Protection Plan, *Little Hocking's Motion to Compel* is **GRANTED**. DuPont is **ORDERED** to search and produce responsive information within fourteen (14) days of the date of this *Opinion and Order*.

**B.    Wells Production Data**

Little Hocking contends that whether there is a subsurface pathway of migration that has carried (and continues to carry) PFC-laden waste from the Washington Works facility to Little Hocking's wellfields is a fundamental issue in this case. *Little Hocking's Motion to Compel*, p. 35. According to Little Hocking, this pathway has yet to be comprehensively analyzed and therefore Little Hocking

64

seeks DuPont's well production records in order to evaluate subsurface pathways of migration from the Washington Works facility. *Id.* Because DuPont has refused to produce such records, Little Hocking seeks an order compelling production of well-related information, including "records relating to all wells on site and in the vicinity of the facility, including wells in the East Field, wells in the West Field, the 'Gallery' Well, the 'Ranney' well, and the wells on Blennerhasset Island." *Id.* at 35-36.

In response, DuPont rejects Little Hocking's assertion that PFOA pathways have yet to be comprehensively analyzed and that Little Hocking needs production well records to evaluate pathways of migration. *Memo. in Opp.*, p. 40. DuPont previously produced a detailed groundwater model and materials related to its development. *Id.* According to DuPont, this model, part of the "2001 Consent Order with the WVDEP, OEPA and USEPA," is a collaborative effort of DuPont, hydrogeologists and environmental engineers. *Id.* (citing *Exhibit 24*, attached to *Cavanaugh Declaration*).[21] DuPont explains that this material describes in detail the hydrology and physical characteristics of the subsurface area around Washington Works and details the pumping rates for "all if the 50 process and supply wells located within the model," which includes the information that DuPont seeks. *Id.* (citing *Exhibit 31*, attached to *Cavanaugh Declaration*).

Little Hocking replies that DuPont has not disputed the relevance of the requested information and that DuPont does not assert that it

---

[21] Although DuPont describes this as the GIST report and refers the Court to pages 45-47, in fact, *Exhibit 24*, attached to the *Cavanaugh Declaration*, appears to be Little Hocking's 28-page Rule 30(b)(6) notices of deposition and related information.

has provided the raw production well and drain information.  *Reply*, p. 35.  Little Hocking rejects DuPont's suggestion that the production of the GIST report should satisfy Little Hocking, arguing that it seeks the underlying data so that it "can evaluate the validity of the conclusory public report."  *Id*.

The Court concludes that the well production information is discoverable under Fed. R. Civ. P. 26(b)(1).  In addition, based on the present record, the Court is not satisfied that the GIST report and related information previously produced to Little Hocking fulfilled DuPont's obligation to produce information responsive to Little Hocking's request.  Finally, although DuPont apparently complains that the present request would require DuPont to search 60 years' worth of records, *Memo. in Opp.*, p. 40, DuPont has offered no evidence that the burden of such a search outweighs the value of this data.  Accordingly, as it relates to well production information, *Little Hocking's Motion to Compel* is **GRANTED**.  DuPont is **ORDERED** to search and produce responsive information within fourteen (14) days of the date of this *Opinion and Order*.

C.   **Washington Works Environmental Manual(s) and the Washington Works Minimization Plan**

According to Little Hocking, DuPont refers to the Washington Works Environmental Manual as a comprehensive manual assisting the Washington Works facility in meeting its environmental responsibilities.  *Little Hocking's Motion to Compel*, p. 36.  The manual, which contains names and contact numbers of persons with site or area responsibility/knowledge of environmental issues, is electronically available.  *Id*. (citing, *Exhibit 28* at page numbered

66

179-2009-0000032, attached thereto).  Little Hocking complains that, despite the relevance of all versions of the manuals, DuPont refuses to produce the manuals because they contain both PFOA and non-PFOA related information.  *Id.* (citing *Exhibit 27* (letter dated February 2, 2012 from Attorney Cavanaugh addressed to Attorney Newman), attached thereto).  Little Hocking contends that the manuals likely contain contamination source evidence and contain the names of persons with knowledge of environmental issues.  *Id.*

DuPont, however, argues its counsel reviewed the Washington Works Environmental Manuals and "determined that they were not responsive to any of Little Hocking's Document Requests because they do not address PFOA or other PFCs." *Cavanaugh Declaration*, ¶ 108.  DuPont also complains that Little Hocking has changed the purpose underlying the request, asserting now that Little Hocking needs the information in order to identify the names of persons with knowledge of environmental issues. *Memo. in Opp.*, p. 41.  DuPont represents, however, that it has already produced to Little Hocking the identity of people responsible for environmental issues at Washington Works.  *Id.*

In reply, Little Hocking insists on production of the Washington Works Environmental Manual because "[i]t would be incredible for a jury to learn that the environmental rules book of DuPont did not include anything to cover the company's admitted decades of releases of a substance that lasts hundreds of years in the environment." *Reply*, pp. 37-38.  Little Hocking also argues that the "comprehensive" manual, which presumably sets forth procedures for units generating and handling C8 waste, is important to establish a breach of the

67

standard of care. *Id*. at 38. Little Hocking further contends that
the manual contains sections addressing matters directly at issue in
this case, including outfall ownership, "solid and hazardous waste
management plans," waste handling procedures, drain color coding
information and air modeling information. *Id*. (citing *Exhibit 39*
(email dated November 19, 2002, addressing "Env Manual Updates," which
include sections on the various issued identified *supra*), attached
thereto). In so arguing, Little Hocking rejects DuPont's attempt to
limit discovery to only documents that mention C8. *Id*. at 39.

The Court concludes that the Washington Works Environmental
Manual does not fall within the ambit of discoverable information.
First, the record is undisputed that the manual does not address PFOA
or other PFCs. *Cavanaugh Declaration*, ¶ 108. Second, DuPont has
already provided the names of individuals responsible for
environmental issues at the Washington Works facility. Finally,
Little Hocking's proffered reasons for requesting the manual do not
persuade this Court that the information within the manual is
reasonably calculated to lead to the discovery of admissible evidence.
Accordingly, as it relates to Washington Works Environmental Manual(s)
and the Washington Works Minimization Plan,[22] *Little Hocking's Motion
to Compel* is **DENIED**.

### D. Documents Describing the Drain System at Washington Works

According to Little Hocking, a facility's drain system is often a
central pathway for contaminant migration. *Little Hocking's Motion to*

---

[22] To the extent that the Washington Works Minimization Plan is a different
document than the Environmental Manual, Little Hocking's request to compel
production of the Plan is without merit and was not separately addressed by
the parties.

68

*Compel*, p. 36.  Little Hocking contends that DuPont's Washington Works
facility disposes of its contaminated process water and storm water
through a series of pipes, sumps and catch basins that eventually
drain into the Ohio River or into the soils and groundwater.  *Id*. at
36-37 (citing *Exhibit 29* at page numbered 191-2009-0002785 (email
dated November 1, 2002 and stating, *inter alia*, that "[i]n the present
permit, individual process wastewater streams with direct discharge
were already characterized for the state"), attached thereto; *Exhibit
30*, Doc. No. 112, at pages numbered 026-0206-00027861 to 867; *Exhibit
31* at page numbered 011-0169-0001229).  DuPont previously represented
that a comprehensive search for drain records was not conducted and
only drain-related information that happened to reference PFOA were
produced.  *Id*.  Little Hocking contends that this limited information
does not provide a complete depiction of the facility's drain systems
or drain maintenance issues. Little Hocking therefore seeks production
of current and historic drain information at the Washington Works
facility.  *Id*.

Although it did not respond substantively to Little Hocking's
request for drain information, DuPont apparently takes the position
that Little Hocking's request for "every scrap of paper detailing
drains, sumps, and other general plant infrastructure" relates to
"chemicals and processes not at issue in this case" and is "totally
irrelevant to Little Hocking's allegations that DuPont contaminated
its well fields with PFOA and other PFCs." *Memo. in Opp.*, p. 38.

After careful review of the record, the Court concludes that the
drain information requested by Little Hocking falls within the ambit

of discoverable information under Fed. R. Civ. P. 26(b)(1).

Accordingly, as it relates to drain information, including historic

and current information about drain maintenance issues and the layout

of the drains, at the Washington Works facility, *Little Hocking's

Motion to Compel* is **GRANTED**. DuPont is **ORDERED** to search for and

produce information responsive to this request within fourteen (14)

days of the date of this *Opinion and Order*.

   **E.    "CAR" and "ITRIP" Documents**

   Little Hocking contends that DuPont has used electronic systems,

known as "CAR" and "ITRIP," to track environmental audit information

at its Washington Works facility. *Little Hocking's Motion to Compel*,

p. 37. Little Hocking asserts that these systems likely contain

responsive information, but complains that DuPont has refused to

search these sources because they are limited to mundane activities

such as fixing leaky faucets. *Id*. at 37-38 (citing *Exhibit 27*,

attached thereto). Little Hocking contends that DuPont's 2004

facility Action Plan establishes that these systems were used to track

environmental auditing issues, track corrective actions taken at the

Washington Works facility and track the timing of environmental

reports and the notification of persons responsible for such reports.

*Id*. at 38 (citing *Exhibit 22* at page numbered 011-0236-0000552).

   "The CAR and ITRIP are systems that function as a 'to-do-list' at

large for the entire Washington Works plant." *Cavanaugh Declaration*,

¶ 109(a). DuPont represents that the systems are not an auditing

program, but serve as a "task scheduling engine" that tracks all kinds

of tasks, "environmental or otherwise, including the scheduling of

faucet repairs and snow removal." *Id*. Any kind of required corrective action is entered into the system. *Id*. Because Washington Works is a huge facility, it can generate hundreds of actions per day, most of which would be irrelevant to this action. *Memo. in Opp*., p. 41. DuPont represents that "any actions relating to PFOA or PFCs reside[] in the files of the custodians from whom DuPont has collected material (*e.g.*, David F. Altman, Okey Tucker and Andrew Hartten)[.]" *Id*. at 41-42. DuPont further represents that there is no need produce these databases because these actions are detailed in the Facility Action Plan previously produced to Little Hocking. *Id*. at 42 (citing *Exhibit 22*, attached to *Little Hocking's Motion to Compel*).

In reply, Little Hocking rejects DuPont's attempt to minimize the importance of CAR and ITRIP, asserting that DuPont's own 2004 Facility Action Plan belies DuPont's assertion:

> **The internal environmental auditing program and the related corrective action response system, recently changed from the CAR system to the ITRIP system**, appear to be excellent practices worthy of consideration of other sites. The Site Environmental Control Group has instituted an excellent system for tracking of required environmental reports and for tickling the responsible person.

*Reply*, pp. 36 (quoting *Exhibit 22* at page numbered 011-0236-0000552) (emphasis added by Little Hocking). Little Hocking further argues that other DuPont documents suggest that the ITRIP system is fully searchable and highly effective. *Id*. at 37 (citing *Exhibit 38*, Doc. No. 123-15, at pages numbered 179-2007-0002672 through 2689). Little Hocking therefore seeks an order compelling DuPont to search the CAR and ITRIP systems for responsive documents "(e.g., searches for PFC incidents/corrective actions and searches for drain-related

71

incidents/corrective actions)."

Little Hocking's arguments are not well-taken.  Although the record establishes that these systems are searchable and may contain information relating to environmental tasks and related corrective action, the record is uncontroverted that DuPont has already collected and produced responsive information from other sources.  Little Hocking offers nothing, other than its own speculation, to persuade this Court that additional, previously unproduced information resides in the CAR and ITRIP systems.  Under these circumstances, any burden associated with a search through such expansive systems outweighs the value of locating responsive information, which was likely previously produced in any event.  Accordingly, as it relates to the CAR and ITRIP systems, *Little Hocking's Motion to Compel* is **DENIED**.

### F.    DuPont's Board of Directors

Little Hocking alleges that DuPont's "highest levels of corporate management," including DuPont CEO Charles ("Chad") Holliday, are aware of and involved in DuPont's C8 issues.  *Little Hocking's Motion to Compel*, pp. 38-39 (citing, *inter alia*, *Exhibit 32* (document entitled "Safety in DuPont Chemistries" with Mr. Holliday's name appearing at the bottom, which states, *inter alia*, that DuPont does "not believe our products are significant contributors to PFOA exposure[,]" that there is "no evidence that demonstrates that PFOA causes adverse human health effects in any segment of the human population"); *Exhibit 33* (email containing announcement dated February 5, 2007 entitled "DuPont Introduces New High-Performance Products with Reduced PFOA Content: Alternative Technologies Will Enable Company to Eliminate Use of PFOA

by 2015," including quote from Mr. Holliday that DuPont is committed
to eliminate the need to make, buy or use PFOA by 2015); *Exhibit 35*
(document entitled "Leaders Conference Call – Thursday, August 12 –
8:00 a.m. (EDT)," reciting statements from Mr. Holiday including a
statement that "[t]he purpose of this call is to make sure that DuPont
leaders have the full context of our position and actions related to
PFOA, particularly as you communicate with employees, customers and
other stakeholders") attached thereto).  Although the record
establishes the involvement of the Board of Directors and although
Little Hocking has specifically requested corporate minutes relating
to PFOA, DuPont has refused to search corporate minutes for responsive
documents.  *Id*. at 39 (citing *Exhibit 4* (a document containing
"[e]xcerpts" from Little Hocking's discovery requests), attached
thereto).  Little Hocking represents that DuPont has not produced
responsive information from DuPont's current CEO, Ellen Kullman, and
that DuPont has produced to Little Hocking only the documents from Mr.
Holliday that DuPont produced in other litigation.  *Id*.  Little
Hocking therefore seeks an order compelling DuPont to search for
"board-related files, including minutes, for documents that are
responsive" to Little Hocking's requests.  *Id*.

    In response, DuPont rejects Little Hocking's characterization of
documents reflecting Mr. Holliday's involvement in PFOA-related
matters.  *Memo. in Opp.*, p. 34.  DuPont contends that while Mr.
Holliday was aware of certain facts and issues related to PFOA, that
awareness was "only at a high level appropriate to his position and
many other responsibilities" and that Mr. Holliday relied upon other

people responsible for such issues. *Id*. (citing *Exhibit 28*, pp. 57, 130 (excerpt from Holliday deposition transcript dated March 12, 2004), attached thereto). Indeed, DuPont contends that this Court previously noted that the role of board members of a global corporation such as DuPont stands in sharp contrast to the role of the board members of a non-profit water association. *Id*. (providing no citation to the record). DuPont represents that it "has collected, reviewed and produced documents from the personnel reporting to high level executives, including the Board of Directors." *Id*. Under these circumstances, DuPont argues, to compel it to search 60 years of Board materials would impose an unwarranted burden on it. *Id*. at 34-35.

Little Hocking rejects DuPont's assertion that a search of Board documents is burdensome and rejects, too, DuPont's attempt to minimize Mr. Holliday's role in PFOA-related issues. *Reply*, pp. 31-32. Little Hocking contends that the Board "frequently discussed" PFOA-related issues, but that DuPont has produced no documents that reveal the substance of those discussions. *Id*. at 32 (citing *Exhibit 34*, Doc. No. 123-13; *Exhibit 35*, Doc. No. 123-14; *Exhibit 36*, attached to *Reply*). Little Hocking therefore seeks an order compelling DuPont to "produce all documents relating to and reflecting the Board's discussions, decisions, and actions relating to PFOA." *Id*. at 33.

This Court agrees that the evidence reflects that the materials, particularly the minutes, of meetings of the Board of Directors are reasonably likely to lead to the discovery of admissible evidence. *See*, *e.g.*, *Exhibit 34*, Doc. No. 123-13; *Exhibit 35*, Doc. No. 123-14; *Exhibit 36*, attached to *Reply*. Moreover, there is no evidence that

this information was collected and produced to Little Hocking through the production of files of personnel reporting to high level executives, including the Board of Directors. The present record is less clear, however, as to whether searching the Board's minutes for the last 60 years imposes an unreasonable burden on DuPont. *See*, *e.g.*, *Memo. in Opp.*, pp. 34-35 (asserting that requiring DuPont to conduct such a search amounts to an unwarranted, "burdensome review"). As the party resisting production of relevant information, it is DuPont that bears the burden of showing why this discovery should be limited. *See*, *e.g.*, *Hughes v. Guanciale*, No. 1:03-cv-261, 2006 U.S. Dist. LEXIS 13884, at *4 (S.D. Ohio Mar. 17, 2006). The current record does not establish that the burden and expense associated with such a search justifies any limitation in DuPont's obligation to search the minutes of its Board of Directors. Accordingly, to the extent that it relates to materials relating to the Board's discussions, decisions and actions relating to PFOA, *Little Hocking's Motion to Compel* is **GRANTED** subject to the following limitations. DuPont is **ORDERED** to, within fourteen (14) days of the date of this *Opinion and Order*, search and produce from its files responsive materials relating to the Board's discussions, decisions and actions relating to PFOA. If DuPont determines that conducting such a search imposes an unreasonable burden on it, the parties are **DIRECTED** to meet and confer in an attempt to minimize that burden. Although the Court expects the parties to exhaust all extrajudicial efforts in resolving any dispute in this regard, the parties shall promptly notify the Court if they are unable to reach agreement.

**G.     Washington Works Environmental Coordinator Committee**

Little Hocking asserts that the records of the Washington Works Environmental Coordinator Committee "would necessarily also address broader issues at issue in this litigation, such as contamination source areas and pathways of migration." *Little Hocking's Motion to Compel*, p. 40.  According to Little Hocking, although DuPont asserts that it has tried to collect and produce all information relating to meetings addressing PFOA-related issues, DuPont nevertheless refuses to produce the records of this committee because they do not exclusively address PFOA, PFCs or fluoroproducts and may cover any of the business located at Washington Works. *Id.* (citing *Exhibit 27*, attached thereto).  Moreover, Little Hocking represents that it has found no minutes from certain years and only one set of minutes from other years. *Id.*  According to Little Hocking, "[e]ven if this Court were to adopt DuPont's overly restrictive view of relevance (*i.e.*, only those minutes that discuss PFOA are responsive), it is highly likely that more sets of minutes deal with PFOA issues[.]" *Id.*

The Washington Works Environmental Coordinator Committee, also known as the Central Environmental Committee ("CEC"), "deals with Washington Works facility-wide environmental issues that include PFOA, but also range far beyond PFOA." *Cavanaugh Declaration*, ¶ 109(b).  In response to Little Hocking's document requests, DuPont "collected and reviewed all existing CEC minutes and agendas and produced responsive information to Little Hocking." *Id.*  This production included materials from 35 separate CEC meetings relating to PFOA. *Id.* at ¶ 110.  Noting that Little Hocking's claims are limited to PFOA and

other PFCs, DuPont takes that position that no further production is necessary. *Memo. in Opp.*, p. 42.

In reply, Little Hocking first challenges the completeness of DuPont's search because no minutes have been produced since 2007 and, in Little Hocking's view, "[i]t is highly doubtful that the environmental committee has not talked about C-8 since 2007." *Reply*, p. 39. Little Hocking also complains that DuPont's standard of relevancy is too narrow and argues that a broader, more appropriate search would capture additional minutes revealing the names of key environmental personnel. *Id*. Little Hocking further argues that these records are relevant even if C8 is not mentioned because they contain information about wastewater treatment plant issues, which includes C8. *Id*. at 39-40 (citing *Exhibits 41* and *42* (CEC minutes dated 2001 and 2002), attached thereto).

This Court has previously concluded that "information relat[ing] to the dispersal of a chemical across the Ohio River" is relevant to the "alleged pathways of migration, if any, of the contaminants at issue in this action . . . ." *Order*, Doc. No. 146, p. 2. Similarly, the Court now concludes that materials relating to the Washington Works Environmental Coordinator Committee (or CEC) fall within the ambit of discoverable information under Fed. R. Civ. P. 26(b)(1). Accordingly, as it relates to materials relating to the Washington Works Environmental Coordinator Committee (or CEC), including meeting minutes, agendas and presentations, *Little Hocking's Motion to Compel* is **GRANTED**. DuPont is **ORDERED** to search and produce responsive

information from the files of this Committee within fourteen (140 days of the date of this *Opinion and Order*.

**H.    The Weinberg Group**

Little Hocking requested the production of documents relating to the Weinberg Group, a science-based advocacy group that previously advised DuPont in the management of the PFOA issue.  *Little Hocking's Motion to Compel*, pp. 40-41 (citing *Exhibit 6*, attached thereto). Little Hocking complains that the "smattering" of Weinberg related documents actually produced by DuPont "tends to indicate that DuPont has not fully complied with Document Request No. 4[.]"  *Id.* at 41. Little Hocking argues that its request for documents relating to this group and PFOA is key to determining if and how DuPont "has implemented the Weinberg strategy to shape the scientific debate surrounding PFOA."  *Id.*  Little Hocking also contends that this information is relevant to its claim of imminent and substantial danger.  *Id.*

DuPont rejects Little Hocking's alleged deficiencies in the production of Weinberg Group documents, arguing that its search was sufficiently broad to capture responsive documents.  *Memo. in Opp.*, p. 35.  In this regard, DuPont explains that, in *Rhodes*, it served a third party subpoena on the Weinberg Group and inspected responsive documents.  *Stennes Declaration*, ¶ 11.  According to DuPont's counsel, these documents "consisted of a series of resumes of various scientists who potentially could serve as spokespeople on PFOA issues that may have emerged."  *Id.* at ¶ 12.  Based on this review, DuPont did not copy these documents for production to the *Rhodes* plaintiffs.

*Id*. at ¶ 13. The "Weinberg Group was not retained to identify experts
for DuPont in PFOA litigation." *Id*. at ¶ 12.  DuPont is "not aware of
additional responsive documents in DuPont's care, custody and control
not already produced." *Stennes Declaration*, ¶ 14.  In any event,
DuPont contends, Little Hocking is free to conduct its own third party
discovery of the Weinberg Group.  *Memo. in Opp.*, p. 35.

    In reply, Little Hocking insists on production of all Weinberg
Group documents, asserting that DuPont documents show that this group
worked with DuPont's Jane Brooks in screening potential experts and
relating to other "discrete assignments" on the safety of PFCs.
*Reply*, p. 41 (citing *Exhibit 44*, Doc. No. 123-16 (chart listing
organizations and their key persons as well as comments relating to
DuPont's interaction with such organizations); *Exhibit 45* (email
string from 2005, including email from Myron Weinberg at Weinberg
Group, offering his group's services and expressing interest in
meeting with DuPont), attached thereto)).  Little Hocking complains
that "none of the smattering of documents" referring to this group
reflects discrete assignments performed for DuPont, which establishes
that DuPont has failed to produce all responsive information.  *Id*.

    Little Hocking's arguments are not well-taken.  As an initial
matter, as discussed *supra*, Little Hocking's mere suspicion that more
responsive documents must exist is insufficient to warrant judicial
intervention.  Moreover, after reviewing *Exhibits 44* and *45,* the Court
disagrees with Little Hocking's contention that these documents
establish that DuPont hired the Weinberg Group or that DuPont worked
with this group on matters that likely generated documents responsive

to Little Hocking's discovery requests.  In light of DuPont's representation that it did not hire the Weinberg Group and that DuPont is unaware of any additional responsive documents, *Stennes Declaration*, ¶¶ 12, 14, there is nothing more for the Court to compel. Accordingly, as it relates to Weinberg Group documents, *Little Hocking's Motion to Compel* is **DENIED.**

**VI.  INTERROGATORIES**

Little Hocking alleges a number of deficiencies in many (or most) of DuPont's answers to interrogatories.  *Little Hocking's Motion to Compel*, pp. 43-72.  The Court shall address each issue (or interrogatory, as appropriate) in turn.

**A.  Alleged Violations of Rule 33(d)**

Little Hocking alleges that DuPont's responses to many interrogatories violate Rule 33(d) because those responses merely refer to thousands of documents or, in some instances, simply point to all documents produced from various custodians.  *Little Hocking's Motion to Compel*, pp. 44-52 (citing *Exhibit 45* (listing 25 interrogatories that purportedly fail to comply with Rule 33(d), including Interrogatory Nos. 4, 6, 7, 8, 9, 10, 11, 14, 15, 18, 20, 21, 23, 24, 25, 26, 27, 28, 35, 36, 38, 39, 40, 41, 81), attached thereto).  Little Hocking complains that this response unfairly burdens Little Hocking with the task of searching thousands of documents to determine which document(s) are responsive to each interrogatory.  *Id*.  For example, DuPont referred to the files of custodian David Booth, whose files contain more than 25,000 documents, in response to 13 different interrogatories.  *Id*. at 46 (citing

*Exhibit 45*).  Moreover, those files allegedly contain information that is highly technical or is difficult for Little Hocking to interpret. *Id*. at 46-48.  Little Hocking argues that the burden imposed on it in attempting to decipher DuPont's references to thousands of documents greatly exceeds any burden on DuPont in making specific response to each interrogatory.  *Id*. at 49-53.

DuPont responds that, in light of Little Hocking's overly broad interrogatories (and Little Hocking's ever-changing interpretation of its own interrogatories), its invocation of Rule 33(d) was proper. *Memo. in Opp.*, pp. 43-48.  By way of illustration, DuPont notes that Interrogatory No. 38 asks that every communication that DuPont has ever had with the USEPA or the OEPA regarding PFOA or other PFCs be identified.  *Id*.  Moreover, DuPont represents that, although there is no single file responsive to this request, it referred Little Hocking to the files of persons who regularly corresponded with the USEPA and OEPA.  *Id*. at 46.  DuPont takes the position that the burden of locating and identifying responsive documents within these files is the same for both parties.  *Id*.  More specifically, DuPont represents that the files are searchable and that Little Hocking is, like DuPont, able to conduct its own keyword searches.  *Id*. at 46-48.  Indeed, DuPont argues, its response to the interrogatories permits Little Hocking to more effectively retrieve responsive documents because it knows better than DePont what Little Hocking needs to support its claims.  *Id*. at 47-48.  Moreover, DuPont notes that it provided detailed narrative responses when possible.  *Id*. at 45-46 (citing Interrogatory No. 41).

In reply, Little Hocking disputes that the burden of searching these documents is equal because, in some instances for example, it does not know the types of studies at issue or the identity of certain consultants. *Reply*, pp. 42-44.  Little Hocking therefore contends that DuPont should perform the searches if it knows "the key word searches that would locate the documents that contain its answers[.]" *Id*. at 44.

Rule 33(d) provides:

If the answer to an interrogatory may be determined by examining, auditing, compiling, abstracting, or summarizing a party's business records (including electronically stored information), and if the burden of deriving or ascertaining the answer will be substantially the same for either party, the responding party may answer by:

(1) specifying the records that must be reviewed, in sufficient detail to enable the interrogating party to locate and identify them as readily as the responding party could; and

(2) giving the interrogating party a reasonable opportunity to examine and audit the records and to make copies, compilations, abstracts, or summaries.

Parties may rely on Rule 33(d) only "where the answers to interrogatories may be found in the business records of the party upon whom the interrogatories have been served." *Calhoun v. Liberty Northwest Ins. Corp.*, 789 F. Supp. 1540, 1549-50 (W.D. Wash. 1992). In addition, use of Rule 33(d) "requires first that the information actually be obtainable from the documents." *In re Sulphuric Acid Antitrust Litig.*, 231 F.R.D. 320, 325 (N. D. Ill. 2005).  As noted, a party may use Rule 33(d) where the "burden of deriving or ascertaining the answer will be substantially the same for either party." Fed. R. Civ. P. 33(d).  The "'[r]elevant factors in the burden analysis are:

(1) the cost of the necessary research, (2) the nature of the relevant records, and (3) the interrogated party's familiarity with its own records.'" *United States v. Kellogg Brown & Root Servs.*, 284 F.R.D. 22, 30 (D. D.C. 2012) (quoting *HandiCraft Co. v. Action Trading S.A.*, 2004 WL 6043510, *5 (E.D. Mo. 2004)). Finally, "directing the opposing party to an undifferentiated mass of records is not a suitable response to a legitimate request for discovery." *Sungjin Fo-Ma, Inc. v. Chainworks, Inc.*, No. 08-CV-12393, 2009 U.S. Dist. LEXIS 58059, at *13 (E.D. Mich. Jul. 8, 2009) (internal quotation marks and citations omitted).

Here, the disputed interrogatories and their answers span several exhibits and hundreds of pages. *See*, *e.g.*, *Exhibit 39*, Doc. No. 112, pp. 11-21 (*DuPont's Third Supplemental Responses and Objections to LHWA's First Set of Interrogatories*) (filed under seal); *Exhibit 42* (*DuPont's Fifth Supplemental Responses and Objections to LHWA's First Set of Interrogatories*), attached to *Little Hocking's Motion to Compel*; *Exhibit 43* (*DuPont's Sixth Supplemental Responses and Objections to LHWA's First Set of Interrogatories*, Interrogatory Nos. 20, 21, and 36), attached to *Little Hocking's Motion to Compel*; *Exhibit 44*, Doc. No. 112, pp. 30-41 (*DuPont's Sixth Supplemental Responses and Objections to LHWA's First Set of Interrogatories*, Interrogatory No. 40) (filed under seal). Although Little Hocking briefly summarizes the nature of some of these interrogatories, *Little Hocking's Motion to Compel*, pp. 49-51, Little Hocking does not provide the text of each disputed interrogatory. Moreover, although Little Hocking carefully lists the number of documents responsive to each of

its interrogatories, *Exhibit 45*, attached to *Little Hocking's Motion to Compel*, Little Hocking does not provide the Court with an organized, comprehensive articulation why each answer fails to comply with Rule 33(d). Instead, Little Hocking refers, in a somewhat disjointed fashion, to claimed defects in only certain answers. *See*, *e.g.*, *Little Hocking's Motion to Compel*, pp. 47-48 (referring to Interrogatory Nos. 4, 35). Stated differently, it is not immediately apparent to the Court whether Little Hocking's objection to each disputed answer is based only on the number of responsive documents or whether Little Hocking asserts other challenges to each answer. Little Hocking's failure to provide this information burdens the Court with sifting through multiple exhibits and hundreds of pages to confirm the nature and scope of each interrogatory and leave the Court with only speculation as to why Little Hocking characterizes each answer as deficient. The Court declines to undertake this burden.[23] Accordingly, as it relates to interrogatories that purportedly fail to comply with Rule 33(d), including Interrogatory Nos. 4, 6, 7, 8, 9, 10, 11, 14, 15, 18, 20, 21, 23, 24, 25, 26, 27, 28, 35, 36, 38, 39, 40, 41, 81, *Little Hocking's Motion to Compel* is **DENIED.**

B.   **Alleged Deficiencies in Narrative Responses**

---

[23]In any event, it appears to the Court that the burden of ascertaining the answer appears to be substantially the same for each party. Little Hocking's broadly worded interrogatories invite expansive responses. Moreover, Little Hocking offers no persuasive explanation why it cannot perform its own search of the documents, nor does it explain why its burden in doing so outweighs that borne by DuPont should it be required to provide specific response to Little Hocking's broadly worded interrogatories.

Little Hocking contends that DuPont's narrative responses to multiple interrogatories fail to comply with Rule 33.  *Little Hocking's Motion to Compel*, pp. 53-72.

### 1.    Interrogatories related to witnesses

#### a.    Interrogatory Nos. 2 and 21

Little Hocking seeks an order compelling more complete responses to Interrogatory Nos. 2 and 21.  *Little Hocking's Motion to Compel*, pp. 53-55.  Interrogatory No. 2 requests DuPont to:

> Identify each current and former Washington Works Facility Employee who is or has been responsible for compliance with (including reporting requirements under) state and federal environmental laws and describe the environmental compliance responsibilities of each employee listed.

*Exhibit 42*, p. 6, attached to *Little Hocking's Motion to Compel*.  In responding to this interrogatory, DuPont registered a number of objections but identified ten DuPont employees at the Washington Works facility by name and job description who "have or once had job responsibilities for that facility's compliance with state and federal environmental regulations relevant to the use and disposal of PFOA from 1980 to the present[.]"  *Id*. at 7-9.

Interrogatory No. 21 requests DuPont to:

> Identify each likely past and/or present Facility source of PFOA or other PFCs released into the environment from the Washington Works Facility (including manufacturing operations, material handling practices, deep injection well leaks, sewer discharges or leaks, pipe discharges or leaks, drain discharges or leaks, tank leaks or overflows, container leaks or overflows, barrel leaks, drum leaks, discharges to and/or from trenches and/or tunnels and/or subsurface areas) and identify all persons who have knowledge or may have knowledge relating to each source.

*Id*. at 33.  In response to this interrogatory, DuPont registered a number of objections but directed Little Hocking to specific

information identified by bates numbers, including reports and a
publicly-available article.  *Id*. at 33-35.  Relying on Rule 33(d),
DuPont also referred Little Hocking to additional documents.  *Id*. at
35.

Little Hocking argues that the identity of individuals with
knowledge of this facility's waste-handling, disposal and
environmental compliance practices is critical to, *inter alia*,
determining the sources of PFOA and other PFCs from the facility.  *Id*.
According to Little Hocking, DuPont's answers to Interrogatory Nos. 2
and 21 are deficient for three reasons.  *Id*. at 54-55.  First, as to
the response to Interrogatory No. 2, Little Hocking complains that
DuPont improperly limited its response to those individuals with PFOA-
related compliance responsibilities rather than those with information
relating to the facility's pattern and practice of compliance, waste
handling and disposal, which is relevant to its claim under RCRA as
well as to its claims of negligence and for punitive damages.  *Id*. at
54.  Second, Little Hocking argues that DuPont's answer to both
interrogatories fails to identify a single individual actually
responsible for handling or disposing of facility waste materials.
*Id*. at 54-55.  Third, Little Hocking complains that, even though the
Washington Works facility has used PFOA (a chemical that allegedly
lasts for more than 2000 years) since the early 1950's, DuPont
improperly limited its response to the period 1980 to the present.
*Id*. at 55.  Little Hocking asks for information relating to the period
1948 to the present.  *Id*.

DuPont responds that it properly limited its response to these interrogatories to DuPont employees responsible for environmental compliance. *Memo. in Opp.*, p. 49.  Little Hocking's interpretation of the interrogatories, DuPont argues, would arguably include every manufacturing and maintenance employee who has ever worked at Washington Works because such an employee would be "responsible" for following environmental regulations and/or handling waste as part of the manufacturing process.  *Id*.

DuPont's answers were reasonably limited to PFOA and other PFCs. To interpret the interrogatories to include anyone who, *inter alia*, handles any kind of waste would amount to nothing more than an unwarranted fishing expedition.  On the other hand, the Court agrees with Little Hocking that DuPont's answers are unreasonably limited to the period 1980 to the present, considering that there is apparently no dispute that DuPont has used PFOA since the early 1950s. Accordingly, as it relates to Interrogatory Nos. 2 and 21, *Little Hocking's Motion to Compel* is **GRANTED in part and DENIED in part** consistent with the foregoing.  DuPont is **ORDERED** to provide a supplemental answer within fourteen (14) days of the date of this *Opinion and Order*.

### b. Interrogatory No. 4

Little Hocking seeks the identity of

each consultant (including The Weinberg Group and other
public relations firms and The Sapphire Group and other
risk management firms) that works or has ever worked for
DuPont on issues relating to PFOA and/or other PFCs and
describe the work each consultant was contracted to perform
and/or actually performed.

*Exhibit 42*, Interrogatory No. 4, p. 10, attached to *Little Hocking's Motion to Compel*.  In response to this interrogatory, DuPont asserted a number of objections but identified multiple contractors or consultants who "have provided services to DuPont relating to PFOA at Washington Works" and provided a short, often two-word, description of each such service.  *Id*. at 10-12. Relying on Rule 33(d), DuPont also referred Little Hocking to additional documents.  *Id*. at 12.

Little Hocking complains that DuPont's response is unreasonably limited to work related to PFOA at Washington Works and that the descriptions about the work each consultant performed or was contracted to perform are insufficient.  *Little Hocking's Motion to Compel*, p. 56.

The Court concludes that DuPont properly limited its answer to consultant work related to PFOA at Washington Works.  However, the Court agrees that the brief descriptions about the work each consultant performed or was contracted to perform are insufficient. Accordingly, as it relates to Interrogatory No. 4, *Little Hocking's Motion to Compel* is **GRANTED** to the extent that it seeks a meaningful description of the work each consultant performed or was contracted to perform, but is **DENIED** to the extent that it seeks information beyond PFOA-related consultant work at Washington Works.  DuPont is **ORDERED** to provide a supplemental answer within fourteen (14) days of the date of this *Opinion and Order*.

### c.    Interrogatory No. 36

Interrogatory 36 asks DuPont to describe "all PFC-related training or education DuPont provides and/or has provided to its

88

employees, including when such training education first began and who
designed such training or education." *Exhibit 42*, p. 55, attached to
*Little Hocking's Motion to Compel*.  In response to this interrogatory,
DuPont raised a number of objections and, relying on Rule 33(d),
referred Little Hocking to specific documents.  *Id.*

Little Hocking argues that this answer is deficient because it
fails to provide dates related to training and fails to identify
individuals who designed such training or education.  *Little Hocking's
Motion to Compel*, p. 56.  Little Hocking further contends that this
information is relevant to its negligence claim, *i.e.*, DuPont's
internal standard of care as to PFOA is relevant to its duty to inform
Little Hocking about contamination and associated health risks.  *Id.*
at 56-57.  DuPont does not appear to defend this answer in its *Memo.
in Opp.*

Little Hocking's arguments are well-taken.  There is no evidence
that the burden of deriving or ascertaining the answer to this
interrogatory would be substantially the same for both parties.  *See*
Fed. R. Civ. P. 33(d).  Accordingly, as it relates to Interrogatory
No. 4, *Little Hocking's Motion to Compel* is **GRANTED.**  DuPont is
**ORDERED** to provide a supplemental response to this interrogatory
within fourteen (14) days of the date of this *Opinion and Order*.

### d.    Interrogatory No. 43

This interrogatory asks DuPont to identify all persons with
knowledge "of any facts set forth in DuPont's *Answer to Plaintiff's
First Amended Complaint* and state in detail the substance of the
knowledge possessed or the knowledge that may be possessed by each

person relating to any of the DuPont's affirmative defenses." *Exhibit 42*, p. 63, attached to *Little Hocking's Motion to Compel*. In response to this interrogatory, DuPont raised a number of objections but referred Little Hocking to DuPont's initial disclosures and answer to Interrogatory No. 1. at 62-63. DuPont also commented that "many of these affirmative defenses are principally legal in nature and their specific bases are largely within" counsel's knowledge. *Id.* at 63.

Little Hocking complains that this answer is deficient because it does not represent whether DuPont's Rule 26 disclosure list provides a complete list of persons with knowledge of DuPont's affirmative defenses. *Little Hocking's Motion to Compel*, p. 57. Little Hocking also complains that DuPont's answer provides no information about the substance of knowledge possessed by these individuals. *Id.* DuPont has not responded to the substance of these complaints.

Little Hocking's arguments are well-taken. Accordingly, as it relates to Interrogatory No. 43, *Little Hocking's Motion to Compel* is **GRANTED.** DuPont is **ORDERED** to provide a supplemental answer within fourteen (14) days of the date of this *Opinion and Order*.

### 2. Interrogatories related to contamination-related facts

#### a. Interrogatory No. 3

This interrogatory asks DuPont to describe "each internal computer network (i.e. intranet) maintained by DuPont, including a description of each PFC-related intranet site." *Exhibit 42*, p. 9, attached to *Little Hocking's Motion to Compel*. Consistent with the Court's previous discussion of the intranet issue, including DuPont's

follow-up response, *Little Hocking's Motion to Compel* is **DENIED** as it relates to Interrogatory No. 3.

### b.    Interrogatory No. 9

Interrogatory No. 9 seeks information related to an October 20, 1986 memorandum, including actions taken by DuPont "in response to concerns expressed by DuPont's management in Wilmington, Delaware" and all information underlying the basis for each concern. *Exhibit 42*, p. 9, attached to *Little Hocking's Motion to Compel*. Little Hocking complains that DuPont's answer is deficient because it responds only as to information dating from the late 1990s. *Little Hocking's Motion to Compel*, p. 58. DuPont has not responded to Little Hocking's contentions in this regard.

Little Hocking's arguments are well-taken. Accordingly, as it relates to Interrogatory No. 9, *Little Hocking's Motion to Compel* is **GRANTED.** DuPont is **ORDERED** to provide a supplemental answer within fourteen (14) days of the date of this *Opinion and Order*.

### c.    Interrogatory No. 10

This interrogatory asks DuPont to provide all known facts "about the techniques for PFOA removal from soil and groundwater, including identifying all research, data, reports and studies concerning PFOA-related remediation techniques." *Exhibit 42*, p. 18, attached to *Little Hocking's Motion to Compel*. Little Hocking complains that DuPont's response is incomplete in that DuPont concedes that it is aware of studies relating to GAC filtration in removing other PFCs and effectiveness of other means to remove PFOA from groundwater, but does not identify those studies. *Little Hocking's Motion to Compel*, p. 59.

Little Hocking also complains that, although DuPont states that it has not participated in or evaluated studies regarding the removal of PFOA from soil, it did not state whether it is aware of any such studies. *Id*. DuPont has not responded to this complaint.

Little Hocking's arguments are well-taken. Accordingly, as it relates to Interrogatory No. 10, *Little Hocking's Motion to Compel* is **GRANTED.** DuPont is **ORDERED** to provide a supplemental answer within fourteen (14) days of the date of this *Opinion and Order*.

### d.    Interrogatory No. 14

This interrogatory asks DuPont to identify "each DuPont plant in the United States where PFOA is manufactured and/or used and for each DuPont plant identified, list the specific PFOA salt(s) manufactured and/or used." *Exhibit 42*, p. 27, attached to *Little Hocking's Motion to Compel*. In response to this interrogatory, DuPont asserted a number of objections, but also responded, *inter alia*, that the Washington Works plant has used and continues to use APFO and that its Fayetteville, North Carolina, facility manufactures APFO. *Id.* at 27-28. Invoking Rule 33(d), DuPont also referred Little Hocking to additional responsive documents. *Id.* at 28.

Little Hocking argues that this answer is deficient because DuPont identifies only the Washington Works and the New Jersey facilities, but that DuPont's Chambers Works, New Jersey, site maintains PFOA-related data related to environmental treatment. *Little Hocking's Motion to Compel*, pp. 59-60 (citing *Exhibit 51*, attached thereto). Little Hocking therefore seeks a narrative

response to this interrogatory.  DuPont has not responded to this contention.

Little Hocking's arguments are well-taken.  Accordingly, as it relates to Interrogatory No. 14, *Little Hocking's Motion to Compel* is **GRANTED.**  DuPont is **ORDERED** to provide a supplemental answer within fourteen (14) days of the date of this *Opinion and Order*.

### e.    Interrogatory No. 15

This interrogatory asks DuPont to identify each known location "in Ohio or West Virginia where PFOA-containing waste from a DuPont plant identified in response to interrogatory no. 14 is or has ever been disposed, stored, or incinerated." *Exhibit 42*, p. 28, attached to *Little Hocking's Motion to Compel.*  Little Hocking complains that DuPont provides no narrative response but simply refers Little Hocking to four documents that are not responsive to the interrogatory. *Little Hocking's Motion to Compel*, p. 61.  DuPont has does not responded to this complaint.

Little Hocking's arguments are well-taken.  Accordingly, as it relates to Interrogatory No. 15, *Little Hocking's Motion to Compel* is **GRANTED.**  DuPont is **ORDERED** to provide a supplemental answer within fourteen (14) days of the date of this *Opinion and Order*.

### f.    Interrogatory No. 16

Interrogatory No. 16 asks DuPont to identify "and describe the chemical process(es) DuPont uses or has used to manufacture PFOA." *Exhibit 42*, p. 30, attached to *Little Hocking's Motion to Compel.* DuPont responds that "[t]he process used by DuPont to manufacture PFOA

is not at issue in this case, and any PFOA used by DuPont at Washington Works was manufactured elsewhere." *Id.*

Little Hocking argues that the PFOA used by DuPont is not pure C8, but rather contains a mixture of other PFCs and is impacted by the manufacturing process used. *Little Hocking's Motion to Compel*, p. 61. Little Hocking therefore contends that the information sought in this interrogatory is "relevant to the types of other PFCs that have been and may continue to be released by DuPont." *Id.*

In response, DuPont argues that the interrogatory does not seek information about the purity of PFOA and that DuPont's response was appropriate. *Memo. in Opp.*, p. 51. DuPont also complains that Little Hocking has disregarded the information regarding the purity of PFOA provided in response to Interrogatory No. 17. *Id.*

In reply, Little Hocking insists that a complete answer would address the "purity issue" and that the documents identified as responsive to Interrogatory No. 17 do not provide a complete answer to this interrogatory. *Reply*, p. 45-46.

Little Hocking's arguments are not well-taken. The Court concludes that DuPont has reasonably interpreted the interrogatory and has answered appropriately. Accordingly, as it relates to Interrogatory No. 16, *Little Hocking's Motion to Compel* is **DENIED.**

### g.   Interrogatory No. 17

This interrogatory asks DuPont to identify "each byproduct or other substance, including other PFCs, created during the manufacture of PFOA." *Exhibit 42*, p. 30, attached to *Little Hocking's Motion to*

*Compel*.  DuPont responded that "[t]he process used by DuPont to manufacture PFOA is not at issue in this case, and any PFOA used by DuPont at Washington Works was manufactured elsewhere."  *Id*.  DuPont further responded by referring Little Hocking to specific documents that "reflect the available analysis for the APFO used in the [sic] those processes."  *Id*.

    As with Interrogatory No. 16, the Court concludes that DuPont has reasonably interpreted Interrogatory No. 17 and has answered appropriately.  Accordingly, as it relates to Interrogatory No. 17, *Little Hocking's Motion to Compel* is **DENIED.**

### h.    Interrogatory No. 18

    Interrogatory No. 18 asks DuPont to identify "each PFOA salt that is or has been used at DuPont's Washington Works Facility and describe the process(es) in which each PFOA salt is or has been used."  *Exhibit 42*, p. 31, attached to *Little Hocking's Motion to Compel*.  Little Hocking complains that DuPont's response is evasive because it identifies ammonium salt, but fails to confirm that APFO is the only PFOA salt used at Washington Works.  *Little Hocking's Motion to Compel*, pp. 62-63 (citing *Exhibit 39*, Doc. No. 112, pp. 14-18).[24] Little Hocking therefore seeks identification of all PFOA sources from Washington Works, not just sources of PFOA from ammonium salt.  Little Hocking insists that this information is critical to its understanding of where and how DuPont releases PFOA from the Washington Works facility and to a complete remedy under RCRA.  *Id*. at 63.

---

[24] DuPont's response is filed under seal.

In response, DuPont argues that the Federal Rules of Civil Procedure do not require "such nonsensical affirmation that the sworn answer expressed is the only answer." *Memo. in Opp.*, p. 50.

DuPont's argument is well-taken and the Court concludes that DuPont responded appropriately to this interrogatory.  Accordingly, as it relates to Interrogatory No. 18, *Little Hocking's Motion to Compel* is **DENIED**.

### i.   Interrogatory No. 19

This interrogatory asks DuPont to identify "each PFC other than PFOA that is or has been related to any manufacturing process at DuPont's Washington Works Facility and describe each such manufacturing process." *Exhibit 42*, p. 31, attached to *Little Hocking's Motion to Compel*.  Little Hocking complains that DuPont improperly limited its response to the "use" of any other PFC in "manufacturing of fluoropolymers" at Washington Works, but that the interrogatory seeks information as to "any manufacturing process" at the Washington Works facility.  *Little Hocking's Motion to Compel*, pp. 63-64; *see also Exhibit 39*, Doc. No. 112, pp. 18-19.[25]  Little Hocking explains that the requested information is critical to establishing Washington Works as the source of contaminants in Little Hocking's wellfields and in the blood of its customers.  *Little Hocking's Motion to Compel*, p. 64.  DuPont has does not responded to this portion of Little Hocking's motion.

Little Hocking's arguments are well-taken.  Accordingly, as it relates to Interrogatory No. 19, *Little Hocking's Motion to Compel* is

---

[25] DuPont's response is filed under seal.

**GRANTED.** DuPont is **ORDERED** to provide a supplemental answer within fourteen (14) days of the date of this *Opinion and Order*.

### j.   Interrogatory No. 22

Interrogatory No. 22 asks DuPont to identify "each deep injection well in West Virginia and Ohio used to dispose of DuPont waste, including the location of each well, the wastes disposed of in each well, and the period of time during which each well was in operation." *Exhibit 42*, p. 35, attached to *Little Hocking's Motion to Compel*. Little Hocking complains that DuPont's response is evasive because, *inter alia*, it does not identify two wells located on the Washington Works property that are identified in documents produced elsewhere by DuPont. *Little Hocking's Motion to Compel*, p. 64 (citing *Exhibit 58*, attached thereto). Little Hocking argues that DuPont has improperly limited its response by stating that it has not used injection wells in Ohio or West Virginia for disposal of Washington Works waste "containing PFOA or 'PFOA precursors' as defined by LHWA." *Id.* (quoting *Exhibit 42*, attached thereto). DuPont has does not responded to this complaint.

Little Hocking's arguments are well-taken. Accordingly, as it relates to Interrogatory No. 22, *Little Hocking's Motion to Compel* is **GRANTED.** DuPont is **ORDERED** to provide a supplemental answer within fourteen (14) days of the date of this *Opinion and Order*.

### k.   Interrogatory No. 40

Interrogatory No. 40 asks DuPont to provide the following information:

> State the annual monetary costs incurred to date by DuPont
> with respect to: (a) the removal of PFOA from Washington

> Works Facility air emissions; (b) the removal of PFOA from
> Washington Works Facility effluent discharges; (c) research
> and development associated with PFOA alternatives; (c)
> [sic] the LHWA granular activated carbon ("GAC") plant.

*Exhibit 42*, p. 58, attached to *Little Hocking's Motion to Compel*.

Little Hocking complains that DuPont's response is incomplete because

it provides no air emissions or effluent related costs prior to 2004.

*Little Hocking's Motion to Compel*, p. 65 (citing *Exhibit 42*, Doc. No.

112, pp. 35-37).[26] Little Hocking argues that other documents belie

DuPont's assertion that it was unable to locate responsive records

prior to 2004. *Id*. (citing *Exhibit 53*, attached thereto, representing

that the Chemrisk report noted that historic cost records for the

amount of C8 used at Washington Works were available from every year

from 1951 to 1980). Little Hocking suggests that, if DuPont maintains

these detailed historical costs, "it is highly likely that it also

maintains detailed historical cost information for its PFOA-related

control technologies." *Id*.

Little Hocking's arguments are not well-taken. Other than its

unfounded suspicion that DuPont maintains responsive historical data

because it retains other historical data, Little Hocking offers

nothing to persuade this Court that DuPont has improperly withheld

information or that DuPont's sworn response is otherwise deceptive or

incomplete. Accordingly, as it relates to Interrogatory No. 40,

*Little Hocking's Motion to Compel* is **DENIED.**

### l.    Interrogatory No. 81

This interrogatory asks DuPont to identify the date it "first

tested for PFOA in blood, including the results of that testing and

---

[26] DuPont's response is filed under seal.

all actions taken by DuPont in response to that testing." *Exhibit 42*,
p. 109, attached to *Little Hocking's Motion to Compel*.  Little Hocking
argues that DuPont's response is deficient for a number of reasons.
*Little Hocking's Motion to Compel*, p. 66.  First, Little Hocking
complains that DuPont's response states when it began monitoring for
"organic fluorides," as opposed to PFOA, in the blood of employees.
*Id*.  Second, DuPont does not provide the results of such testing.  *Id*.
Third, DuPont's representation that, since 1978, it has "developed
ongoing blood surveillance for PFOA in workers" does not provide such
critical information as whom DuPont notified of the test results, what
steps, if any, were taken to reduce PFOA blood levels and what
attempts, if any, were undertaken to study the impact of PFOA in
blood.  *Id*.  DuPont has not responded to these contentions.

    Little Hocking's arguments are well-taken.  Accordingly, as it
relates to Interrogatory No. 81, *Little Hocking's Motion to Compel* is
**GRANTED.**  DuPont is **ORDERED** to provide a supplemental answer within
fourteen (14) days of the date of this *Opinion and Order*.

> **3.**    **Interrogatories related to DuPont's position on
>         Washington Works as the source of contamination of the
>         wellfields**

>         **a.    Interrogatory No. 32**

    This interrogatory asks, "[i]f DuPont contends that its
Washington Works Facility is not the primary source of the PFOA in
LHWA's Wellfield, state all material facts supporting that
contention." *Exhibit 42*, p. 46, attached to *Little Hocking's Motion
to Compel*.  Little Hocking complains that DuPont's response states
that there are many environmental sources of PFOA and that "DuPont is

not aware of data sufficient to conclusively determine all sources of PFOA in LHWA's wellfield." *Little Hocking's Motion to Compel*, p. 67 (citing *Exhibit 42*, p. 47).  Little Hocking also notes that DuPont cites to more than three dozen studies from which Little Hocking may derive the interrogatory answer.  *Id*.  Little Hocking argues, *inter alia*, that conclusive data is unnecessary for DuPont to state its own position.  *Id*.  DuPont has not responded.

Little Hocking's arguments are well-taken.  Moreover, at this stage in the litigation, DuPont's assertion that this interrogatory is "premature," *Exhibit 42*, p. 46, attached to *Little Hocking's Motion to Compel*, is now moot.  Accordingly, as it relates to Interrogatory No. 32, *Little Hocking's Motion to Compel* is **GRANTED.**  DuPont is **ORDERED** to provide a supplemental answer within fourteen (14) days of the date of this *Opinion and Order*.

            **b.    Interrogatory No. 33**

This interrogatory asks, "[i]f DuPont contends that there is no subsurface pathway for PFOA to migrate from the Washington Works Facility to the LHWA Wellfield, state all material facts supporting that contention." *Exhibit 42*, p. 51, attached to *Little Hocking's Motion to Compel*.  DuPont responds, *inter alia*, that this contention interrogatory is "premature."  *Id*.  As it did with respect to Interrogatory No. 32, the Court **GRANTS** *Little Hocking's Motion to Compel* as it relates to Interrogatory No. 33.  DuPont is **ORDERED** to provide a supplemental answer within fourteen (14) days of the date of this *Opinion and Order*.

### 4. Interrogatories related to factual bases for DuPont's affirmative defenses

On November 10, 2011, the Court ordered DuPont to review and supplement its answers to interrogatories that address the factual bases underlying DuPont's affirmative defenses. *Order*, Doc. No. 82, p. 2. Little Hocking argues that DuPont has nevertheless failed to supplement its responses and/or that DuPont's supplemental answers remain deficient. *Little Hocking's Motion to Compel*, pp. 69-70 (explaining these perceived deficiencies and citing to *Exhibit 42*, Interrogatory Nos. 54-60, 62, 64-66, 68, 69, 72, 73 and 75, attached thereto). DuPont has not responded to this argument.

Little Hocking's arguments are well-taken. Accordingly, as it relates to interrogatories that address the factual bases underlying DuPont's affirmative defenses, specifically Interrogatory Nos. 54-60, 62, 64-66, 68, 69, 72, 73 and 75, *Little Hocking's Motion to Compel* is **GRANTED.** DuPont is **ORDERED** to provide a supplemental answer within fourteen (14) days of the date of this *Opinion and Order*.

### 5. Interrogatories relating to DuPont's communications with "materially relevant entities"

#### a. Interrogatory Nos. 7 and 8

Interrogatory No. 7 asks DuPont to identify "each communication between DuPont and its Epidemiology Review Board ("ERB") or an ERB member relating to PFOA and/or other PFCs including each presentation given by DuPont to the ERB relating to PFOA and/or other PFCs." *Exhibit 42*, p. 14, attached to *Little Hocking's Motion to Compel*. Similarly, Interrogatory No. 8 asks DuPont to identify "each internal communication between or among DuPont representatives discussing

101

statements, conclusions, and/or opinions of the ERB concerning PFOA and/or other PFCs." *Id.* at 16.  In response, DuPont provided the names of ERB[27] members, a brief description of its communications with EAP and the identity of the DuPont employees who are or were primary contacts with the EAB.  *Id.* at 14-16.  DuPont also provided a list of the EAB minutes located by DuPont and the files of EAB members who were subpoenaed in prior ligation, which included communications between DuPont and EAB.  *Id.; Memo. in Opp.*, pp. 47-48.

Nevertheless, Little Hocking complains that the response to Interrogatory No. 7 fails to describe the "multiple" PFOA-related presentations given by DuPont to EAB and that DuPont's reference to 13,000 documents is insufficient.  *Little Hocking's Motion to Compel*, p. 71.  Little Hocking also argues that the response to Interrogatory No. 8 is deficient because it simply refers to DuPont's response to Interrogatory No. 7, which presents a different question.  *Id.* at 71-72.

DuPont responds that its answers were appropriate and made in good faith.  *Memo. in Opp.*, pp. 47-48.  It produced the files of EAB members separately and on easily identifiable CDs bearing the name of each EAB member.  *Id.*  Although Little Hocking asks for the identification of each and every communication between DuPont and EAB for the past 22 years, DuPont represents that it does not maintain in the ordinary course of business an "EAB" file that readily answers Little Hocking's interrogatory.  *Id.* at 48.  Instead, responsive documents are scattered across DuPont's production and there is no way

---

[27] ERB is now known as the Epidemiology Advisory Board ("EAB").  *Memo. in Opp.*, p. 47.

to identify them other than to run a keyword search. *Id*. DuPont contends that the burden of running such a search is no greater for Little Hocking than for DuPont and that its reference to those documents was therefore proper. *Id*. In reply, Little Hocking disagrees, persisting in its request that the Court compel DuPont to fully respond. *Reply*, pp. 44-45.

Little Hocking's arguments are not well-taken. Considering the broad scope of these interrogatories, DuPont's narrative answers and reliance on documents (provided in a searchable format) pursuant to Rule 33(d) are sufficient. Accordingly, as it relates to Interrogatory Nos. 7 and 8, *Little Hocking's Motion to Compel* is **DENIED**.

### b. Interrogatory No. 37

This interrogatory asks DuPont to identify "all communications between DuPont and any laboratory, including MPI Research (formerly known as Exygen Research, Inc.), referencing LHWA." *Exhibit 42*, p. 54, attached to *Little Hocking's Motion to Compel*. In response, DuPont states that:

> DuPont sends samples to MPI Research (formerly Exygen, both collectively referred to herein as "MPI"). Draft analytical results are provided by MPI to DuPont. DuPont provides any comments or concerns about the draft results to MPI. MPI then finalizes the results and sends a final analytical report to DuPont. DuPont sends copies of the analytical data from LHWA samples directly to LHWA. The MPI employees with whom DuPont has corresponded or does regularly correspond include: Daniel Wright, Patricia De Lisio, Matthew Ross, Devin Kyle, Paul Connoly, Mark Ammerman, John Flaherty, Karen Risha, Amy Sheehan, and Mindy Kresly. Upon information and belief, no communications between DuPont and any laboratory exist referencing LHWA other than the analytical data and related materials already produced.

*Id*.

Little Hocking complains that DuPont's assertion that it has no additional communications beyond that already produced "ignores its own lab's history with Little Hocking." *Little Hocking's Motion to Compel*, p. 72 (citing *Exhibit 42*, attached thereto). Little Hocking also asks that DuPont identify the data and "related materials" already produced. *Id.*

DuPont has represented under oath that no communications exist beyond the information previously produced. Based on this record, the Court can compel no more. Nevertheless, the Court agrees that DuPont should identify the referenced information previously produced to Little Hocking. Accordingly, as it relates to Interrogatory No. 37, *Little Hocking's Motion to Compel* is **GRANTED** to the extent that it seeks identification of the analytical data and "related materials" previously produced, but **DENIED** in all other respects. DuPont is **ORDERED** to provide a supplemental answer within fourteen (14) days of the date of this *Opinion and Order*.

## VII. DISCOVERY RELATED TO "OTHER PFCs" AND SITES BEYOND WASHINGTON WORKS

Little Hocking asks that any relief granted by the Court extend to other PFCs and to DuPont sites other than Washington Works, including DuPont's Fayetteville, North Carolina, plant and the Chambers Works, New Jersey, Plant. *Little Hocking's Motion to Compel*, pp. 15-16; *Reply*, pp. 47-48. However, Little Hocking emphasizes that it does not ask the Court to compel DuPont to re-search any sources already searched in this case or in any prior litigation. *Reply*, p. 48.

The Court has already addressed, in the context of specific requests to compel documents and information, discovery involving other PFCs and other plants.  Accordingly, as it relates to Little Hocking's separate and redundant request for information relating to other PFCs and sites beyond Washington Works, *Little Hocking's Motion to Compel* is **DENIED as moot**.

## VIII. SEARCH TERMS

Little Hocking seeks an order compelling DuPont to use "key words [] guided by Little Hocking's requests" to search ESI collected in the prior PFOA-related cases and certain databases.  *Little Hocking's Motion to Compel*, p. 42.  *See also Reply*, pp. 7, 14-15.  DuPont opposes Little Hocking's request based on Little Hocking's delay in raising this issue; DuPont also argues that the requested search constitutes a fishing expedition and would pose an unreasonable burden on DuPont.  *Memo. in Opp.*, pp. 15-19.

By way of background, prior to June 2011, DuPont searched ESI collected in this case "using a list of search terms tailored to Little Hocking's Document Requests."[28]  *Cavanaugh Declaration*, ¶¶ 41-43, 49; *Exhibit 3* (letter from Craig Woods to David Altman dated June 2, 2011) and *Exhibit 21* (DuPont's list of search terms), attached thereto.  DuPont's list of search terms was divided into two columns:

---

[28] The parties dispute whether Little Hocking was given the opportunity to provide input in crafting these original search terms.  *See, e.g., Newman Declaration*, ¶ 15 ("DuPont's original search terms used in this case were developed by DuPont without an opportunity for input from Little Hocking."); *Exhibit 3*, attached to the *Cavanaugh Declaration* ("[T]he required disclosure of the parties' search terms has been contemplated as a provision of the ESI protocol for some time, but the parties' inability to agree on the deposition provisions sought by LHWA left DuPont with no choice but to proceed with its searches and document production").

"List A" and "List B."  *Exhibit 21*, attached to *Cavanaugh Declaration*.[29]  According to DuPont, "Possibly Responsive" documents "will contain at least one term from each column."  *Id*.  In other words, a "Possibly Responsive" document contains terms from both columns; documents containing a term or terms appearing in only List A or List B would not be characterized as  "Possibly Responsive."  DuPont also added "Wildcard Operators" to some of the search terms.  *Id*.  These "Wildcard Operators" were designed to guarantee that variations of certain words were included in a search.  *Id*.; *Exhibit 3*, p. 2, attached to *Cavanaugh Declaration*; *Attachment F*, p. 2, attached to *Newman Declaration*.

On June 2, 2011, DuPont provided to Little Hocking a list of terms purportedly used to search ESI collected in this action.  *Exhibit 3*, p. 4, attached to *Cavanaugh Declaration*.  However, the list that DuPont provided to Little Hocking was a single column list, not the double list described *supra*.  *Id*.  Little Hocking later learned that DuPont's list of search terms actually contained two columns and, while the parties continued to communicate for months, they were unable to agree[30] on a list of search terms or on the scope of such an ESI search.  *See*, *e.g.*, *Attachments A* through *F*, attached to *Newman Declaration* (correspondence between the parties); *Exhibits 5*, *6*, *7*, *9*,

---

[29] List A appears to contain chemical and salt names and identifiers, such as "PFOA," "APFO" and "C8."  *Id*.  List B, on the other hand, is a longer list and contains diverse terms such as "Altman," "Griffin," "Health Effect" and "Cancer."  *Id*.

[30] Although Little Hocking represents that the parties were "ultimately able to agree on several terms that would be added to the list[,]" *Little Hocking's Motion to Compel*, p. 43, DuPont contends that the assertion "that the parties have agreed that additional search terms should be employed distorts the record."  *Memo. in Opp.*, p. 17.  This issue is addressed *infra*.

attached to *Cavanaugh Declaration* (correspondence between the parties); *Exhibit 64*, attached to *Little Hocking's Motion to Compel* (Little Hocking's list of requested search terms); *Exhibit 9*, attached to *Reply*; *Order*, Doc. No. 82, pp. 1-2; *Order*, Doc. No. 85, p. 1; *Order*, Doc. No. 92, p. 1 (directing Little Hocking to propose ESI search terms).

Little Hocking now apparently seeks a new ESI search that (1) incorporates Little Hocking's proposed list of search terms contained in *Exhibit 64*, attached to *Little Hocking's Motion to Compel*, and (2) covers all data collected in DuPont's PFOA-related litigation, *i.e.*, data from the *Leach*, *Rhodes* and *Rowe* actions, which apparently dates back to the 1950's. *Little Hocking's Motion to Compel*, pp. 41-42; *Memo. in Opp.*, pp. 15-19; *Reply*, pp. 7, 14-15. The Court will address each request in turn.

**A.    Little Hocking's list of proposed search terms**

Contending that DuPont's list did not include terms that would capture information responsive to many of Little Hocking's document requests, Little Hocking now proposes its own list of search terms. *Little Hocking's Motion to Compel*, p. 42; *Exhibit 64*, attached thereto; *Reply*, p. 14. DuPont, however, complains that Little Hocking seeks to compel DuPont to run a new set of 84 search terms, some of which, *e.g.,* "salt" and "treatment," would "yield all manner of non-responsive information." *Memo. in Opp.*, p. 17. Although DuPont acknowledges that, in May 2012, it offered to run an additional search utilizing 54 of Little Hocking's suggested search terms beginning with the end of the *Rhodes* litigation, *Memo. in Opp.*, p. 18 (citing *Exhibit*

*16*, attached to *Cavanaugh Declaration*), "DuPont made the offer to avoid motion practice on this issue [the search terms]; Little Hocking elected to adhere without justification to all of its demands." *Id*. After *Little Hocking's Motion to Compel* was filed, and in light of additional discovery obligations and the discovery deadline, DuPont represents that running this search is now not feasible. *Id*. at 18-19.

In reply, Little Hocking agrees to DuPont's two-column search method and contends that, under such a search method, DuPont has not shown why Little Hocking's proffered search terms are too broad. *Reply*, pp. 14-15. In addition, Little Hocking points out that its proposed list includes a subset of chemical identifiers specific for PFOA salts. *Id*.

The Court concludes that running a search, subject to certain limitations discussed *infra*, using Little Hocking's two-column list will not impose an undue burden on DuPont and is reasonably calculated to lead to the discovery of admissible evidence. Indeed, DuPont apparently rests its resistance to such a search on, *inter alia*, its need to complete depositions which are now complete. *Memo. in Opp.*, pp. 18-19.

**B.  Scope of ESI Search Using Search Terms**

The ESI collected in this action has been loaded onto a searchable litigation server. *Cavanaugh Declaration*, ¶ 49 (citing *Exhibit 21*, attached thereto). However, the *Rhodes* and *Leach* data is not reasonably accessible because it would force DuPont "to access backup data in storage on physical media." *Id*. at ¶ 69. Based on the

108

present record, the Court concludes that a search of all reasonably accessible data, *i.e.*, all material collected since the end of the *Rhodes* litigation, is warranted and would not impose an undue burden on DuPont (assuming that the discovery completion is extended for such a search). Accordingly, as it relates to its request to update DuPont's search of ESI using Little Hocking's search terms, *Little Hocking's Motion to Compel* is **GRANTED** on the condition that such a search utilizes Little Hocking's proposed two-column list of search terms (*see Exhibit 64*, attached to *Little Hocking's Motion to Compel*) and that such a search is limited to all reasonably accessible data, *i.e.*, all material collected since the end of the *Rhodes* litigation. DuPont is **DIRECTED** to forthwith conduct that search and to produce responsive documents.

## IX. PRODUCTION IN THE ORDINARY COURSE OF BUSINESS

Little Hocking also complains that DuPont has failed to produce all documents as kept in the ordinary course of business, complaining that DuPont often removed documents from shared databases and scattered certain documents across various custodians. *Little Hocking's Motion to Compel*, p. 19; *Reply*, pp. 9-12. Referring to documents that reveal team databases or sites, Little Hocking argues that "there is simply no truth to the assertion that teams do not store documents in shared locations." *Reply*, p. 11.

DuPont, however, represents that it "collected files as they were maintained by custodians in the normal course of their business either in their personal files or in files shared with other employees." *Cavanaugh Declaration*, ¶ 71. *See also id*. at ¶ 77 (representing that

it produced responsive documents from the Washington Works environmental files as kept in the ordinary course of business).

Under Rule 34(b)(2)(E)(i), a responding party may either produce documents "as they are kept in the usual course of business" or "organize and label them to correspond to the categories in the request." This rule is designed to give structure to the production thereby minimizing the risk of confusion. *Johnson v. Kraft Foods N.A., Inc.*, 236 F.R.D. 535, 540 (D. Kan. 2006). Where the responding party chooses to produce the documents as they are kept in the usual course of business, it is the responding party that bears the burden of establishing that the documents were actually produced as they were kept in the ordinary course of business. *See*, *e.g.*, *United States v. Briggs*, 831 F. Supp. 2d 623, 629 (W.D. N.Y. 2011). To carry this burden, a responding party must do more than merely assert that it produced documents as they were maintained in the ordinary course. *See*, *e.g.*, *Johnson*, 236 F.R.D. at 540-41. Once the documents are produced as they are kept in the ordinary course of business, "Rule 34 imposes no further duty to organize and label the documents to correlate to the particular request to which they are responsive." *FDIC v. Cuttle*, No. 11-cv-13442, 2012 U.S. Dist. LEXIS 170015, at *5 (E.D. Mich. Nov. 30, 2012).

Here, DuPont's representation that it collected and produced files as they were maintained in the ordinary course of business, *Cavanaugh Declaration*, ¶ 71, is supported by other evidence in the record. As discussed at length *supra*, several DuPont "teams" or "groups" do not maintain shared files or in a central location. To

the extent that the files of multiple custodians represent the files of a particular team, DuPont has no obligation to organize and label the particular documents. *See Cuttle*, 2012 U.S. Dist. LEXIS 170015, at \*5. Accordingly, as it relates to the request to compel DuPont to produce documents in the ordinary course, *Little Hocking's Motion to Compel* is **DENIED**.

## X.  RULE 30(B)(6) DEPOSITION REGARDING SEARCH FOR DOCUMENTS

Finally, Little Hocking seeks an order compelling DuPont to produce a witness for a Fed. R. Civ. P. 36(b)(6) deposition to testify on DuPont's search of electronic databases. *Little Hocking's Motion to Compel*, pp. 22-23; *Reply*, pp. 41-42. Little Hocking represents that it "has no idea about the full number of shared servers and databases that exist within DuPont" and that it therefore cannot "determine the scope of DuPont's failure to search shared servers/databases." *Little Hocking's Motion to Compel*, p. 22.

This request is not well-taken. As set forth *supra*, DuPont has responded to Little Hocking's discovery requests and has explained those discovery responses under penalty of perjury. *See*, *e.g.*, *Cavanaugh Declaration*. In addition, to the extent that DuPont's production was ambiguous, the Court has required DuPont to supplement and explain its answers and to specify, where appropriate, whether centralized team files exist and/or whether production is complete. Under these circumstances, Little Hocking has not persuaded this Court that a Rule 30(b)(6) deposition on DuPont's search of electronic databases is necessary. *Little Hocking's Motion to Compel* is **DENIED** to this extent.

111

**WHEREUPON**, *Plaintiff Little Hocking Water Association's Amended Motion to Compel Defendant DuPont to Comply With Its Discovery Obligations*, Doc. No. 105, is **GRANTED in part and DENIED in part** consistent with the foregoing.


February 19, 2013                    *s/Norah McCann King*
                                     Norah M<sup>c</sup>Cann King
                              United States Magistrate Judge