IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


THE LITTLE HOCKING WATER ASSN., INC.,

      Plaintiff,


    vs.                                   Civil Action 2:09-cv-1081
                                        Judge Smith
                                        Magistrate Judge King

E.I. DU PONT DE NEMOURS & CO.,

      Defendant.


<u>OPINION AND ORDER</u>

      This matter is before the Court on *Little Hocking's Supplemental Motion to Extend Fact and Discovery Deadlines and Motion to Compel*, Doc. No. 161 ("*Motion to Compel*") and *Defendant E.I. Du Pont de Nemours and Company's Motion for Leave to Supplement Its Response in Opposition to Plaintiff The Little Hocking Water Association, Inc.'s Supplemental Motion to Extend Fact and Discovery Deadlines and Motion to Compel*, Doc. No. 172 ("*Motion to Supplement*").[1]

I.    **STATUS OF THE PENDING MOTIONS AND THE BURDEN OF HYBRID MOTIONS**

      Unfortunately, before turning to the merits of the present motions, the burden created by plaintiff The Little Hocking Water Association, Inc.'s ("Little Hocking") hybrid *Motion to Compel*, harvested from a motion for an extension of case deadlines, Doc. No. 161, requires an explanatory note and a warning to the parties.  This

---

[1] On March 22, 2012, defendant E.I. Du Pont de Nemours and Company ("DuPont") filed a motion for a formal hearing and for oral argument on the *Motion to Compel* and *Motion to Supplement*.  Doc. No. 192.  Because the Court concludes that neither a hearing nor oral argument is necessary, DuPont's motion is not well-taken.

*Opinion and Order* will address only those portions of Doc. No. 161 that seek an order compelling DuPont to produce certain witnesses and documents.[2]  In addressing Little Hocking's request, the Court also draws on related background information contained in other filings, including Little Hocking's original *Motion to Extend Fact and Expert Discovery Deadlines*, Doc. No. 156 ("*Motion to Extend*"), which is currently pending and which was supplemented by Little Hocking's *Motion to Compel*.  Therefore, part of Doc. No. 161 and all of Doc. No. 156 regarding Little Hocking's request to extend certain case deadlines will remain pending on the Court's motions list.  The requested extensions will be addressed at the status conference scheduled for March 26, 2013.  *See Order*, Doc. No. 171.    It goes without saying that this unnecessarily convoluted state of the record creates ambiguity and dramatically increases the burden on the Court. For example, in order to address the documents and depositions that Little Hocking seeks to compel, the Court must sort through more than 830 pages in eleven motions, briefs and notices (Doc. Nos. 156, 158, 160, 161, 164, 167, 170, 172, 173, 184, 185)[3] for what should have been

---

[2] The *Motion to Compel* first suggests that Little Hocking seeks only "answers to questions" in depositions, *id.* at 1, but the second page makes clear that Little Hocking actually seeks an order compelling both depositions *and* production of documents, *id.* at 2.  Although the introduction to the *Motion to Compel* purports to identify those documents, it does nothing of the sort. *See id.* at 1-2 (identifying these documents as "documents involving the circumstances surrounding the destruction of the documents and technology noted above[,]" but the "above" text unhelpfully describes these documents only as "a mass of technical documents" and "highly material documents *and* technology to 'read' surviving documents[.]")(emphasis in the original).
[3] Acknowledging that briefing on these discovery issues "is extensive[,]" Doc. No. 192, p. 3, DuPont apparently nevertheless concludes that these eleven filings are insufficient to provide the Court with enough information to issue a ruling on these issues, deciding to file yet another motion on March 22, 2013, totaling nearly 50 pages in length including exhibits, regarding the depositions of its Rule 30(b)(6) designees. *See* Doc. No. 192.  Although

a single motion to compel briefed in three filings.  *See* S.D. Ohio
Civ. R. 7.2(a)(2) ("No additional memoranda beyond those enumerated
[memorandum in opposition and reply memorandum] will be permitted
except upon leave of court for good cause shown.").

Ordinarily, the Court, which is under no obligation to sift
through the record to cobble together facts and arguments in order to
rule on a party's request, would decline to assume this burden.  *Cf.*
*Emerson v. Novartis Pharms. Corp.*, No. 09-6273, 446 F. App'x 733, at
*736 (6th Cir. Aug. 23, 2011) ("'[J]udges are not like pigs, hunting
for truffles' that might be buried in the record.") (quoting *United*
*States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)); *Salander v.*
*Comm'r of Soc. Sec.*, No. 11-15704, 2013 U.S. Dist. LEXIS 28472, at *6
(E.D. Mich. Feb. 5, 2013) ("[T]he court is not obligated to make
plaintiff's case for [it] or to 'wade through and search the entire
record' for some specific facts that might support [its] motion.")
(quoting *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir.
1989)).  Nevertheless, the current procedural posture of this already-
old case persuades this Court to address the merits of Little
Hocking's piecemeal *Motion to Compel* despite the unnecessary and time-
consuming burden that it imposes.

However, going forward, Little Hocking is **ADVISED** that it must
file separate motions if it seeks different forms of relief on

---

the discovery dispute addressed in that motion is not new, DuPont now invites
the Court, presumably when it is not sifting through the parties' multiple
and repetitive filings, to monitor depositions of its designees.  *See*, *e.g.*,
*id.* at 8-9 (asking, *inter alia*, that "any additional 'live' deposition of
DuPont's 30(b)(6) corporate designee(s) take place. . . before Magistrate
Judge King, so that any issues regarding the scope of the deposition and
behavior of counsel and witnesses may be promptly taken up and ruled on by
the Court").  The Court declines this invitation.

different topics rather than combining multiple types of motions, *i.e.*, a motion to compel and a motion to extend, in a single filing. Stated differently, Little Hocking is **SPECIFICALLY ADVISED** that a hybrid motion such as Doc. No. 161 will not be favorably received by the Court.  Filing separate motions reduces confusion during the briefing period, eliminates ambiguity in the record and saves the Court from wandering through the docket in an effort to piece together relevant facts and arguments.[4]

In addition, both parties are **ADVISED** that, to the extent that a party believes that subsequent "developments" require supplementation of an earlier filing, that party is **ORDERED** to request a conference with the Court before filing a motion to supplement, a brief or motion disguised as a "notice" that contains substantive argument and evidence (*e.g., Little Hocking's Notice Regarding Need for Status Conference*, Doc. No. 158 ("*Notice*")), or any other filing beyond those enumerated in S.D. Ohio Civ. R. 7.2(a)(2).  During any such conference, the requesting party must be prepared to establish good cause for the proposed supplementation.

Finally, the parties are **FURTHER ADVISED** that, as it relates to nondispositive motions, the Court will not permit the filing of such motions or related memoranda longer than 10 pages except with express leave of Court and demonstration that the complexity of the issue requires a lengthier filing.

---

[4] Similarly, references in a different motion or brief, *e.g.,* references that require the Court to simultaneously consider two sets of motions and briefing, are likewise unacceptable.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  Allegations and Claims

This Court has previously set forth in detail the allegations and claims in this litigation.  *See*, *e.g.*, *Opinion and Order*, Doc. No. 34. More briefly, Little Hocking supplies water to townships in Washington County, Ohio and in Athens County, Ohio.  *First Amended Complaint*, Doc. No. 23, at ¶ 21 ("*Amended Complaint*").  Little Hocking owns wellfields that are located in the State of Ohio, directly across the Ohio River from DuPont's Washington Works plant.  *Id*. at ¶¶ 26, 29. Little Hocking alleges that DuPont's waste disposal practices have resulted in the migration of hazardous perfluorinated compounds (collectively, "PFCs") into Little Hocking's wellfields.  *Id*. at ¶¶ 3, 5.  According to Little Hocking, DuPont uses at least one PFC, ammonium perfluorooctanoate ("APFO") in connection with its Teflon® related products.  *Id*. at ¶ 44.  APFO is the ammonium salt of "PFOA," the acronym used to identify the chemical perfluorooctanoic acid commonly referred to as "C8."  *Id*. at ¶¶ 45 n.1, 48.  Little Hocking also alleges that DuPont has used PFOA at its Washington Works plant from at least 1951 to the present.  *Id*. at ¶ 46.  Little Hocking alleges that DuPont has known of the "bio-persistence and toxicity of PFOA" for some time.  *Id*. at ¶ 52.

Little Hocking also alleges that DuPont's release of hazardous wastes has affected not only human health and the environment, but also the operations of its business, resulting in expense to it, including participating in the review of the Carbon Plant design plans

and testing the levels of PFOA and other PFCs in the blood of approximately 25 of its water users.  *Id.* at ¶¶ 148-180.

Little Hocking asserts endangerment claims under the Resources Conservation and Recovery Act, 42 U.S.C. § 6972 ("RCRA").  *Id.* at ¶¶ 181-190.  Little Hocking also asserts claims of nuisance, negligence, trespass, abnormally dangerous activity, conversion, unjust enrichment and declaratory judgment for indemnity.  *Id.* at ¶¶ 191-251.

**B.   Discovery History**

**1.   Pumping well data, groundwater flow model and related information**

Since the filing of this litigation approximately three years ago, the parties have engaged in discovery.  Little Hocking specifically sought, *inter alia*, information regarding the migration of C8 contamination from DuPont's Washington Works facility to Little Hocking's wellfields.  *Declaration of Justin Newman*, ¶ 4, attached as *Exhibit 1* to *Motion to Extend* ("*First Newman Declaration*").  More specifically, Little Hocking sought information regarding DuPont's groundwater flow model.  *Id.*  Little Hocking also requested information relating to DuPont's production wells, which Little Hocking believed was contained in the files of Washington Works Power & Services unit ("Power & Services unit").  *Id.* at ¶¶ 4-5.

The parties apparently agree that Little Hocking's Document Request No. 11 addresses this information.  *Memo. in Opp. to Motion to Compel*, p. 4; *Plaintiff Little Hocking Water Association, Inc.'s Reply in Support of Its Motion to Extend*, Doc. No. 167 ("*Reply to Motion to Extend*"), p. 7 (citing *Exhibit 5*, attached thereto).  In particular, this request seeks the following information:

> All documents relating to groundwater flow at and/or near
> the Washington Works Facility, including all groundwater
> flow models (and drafts of such models) produced for the
> Washington Works Facility; all documents generated,
> reviewed, considered and/or relied on for the development
> of each groundwater flow model for the Washington Works
> Facility; and, all communications discussing groundwater
> flow at the Washington Works Facility.

*Exhibit 5*, attached to *Little Hocking's Reply to Motion to Extend,*

PAGEID# 5286.[5]

According to Little Hocking, the requested information is

important because it believes that DuPont has publicly represented

that its operation of its production wells, particularly the Ranney

Well at the Washington Works facility (also referred to as the "super

well"), prevents contaminant migration.  *See*, *e.g.*, *Motion to Extend*,

pp. 3-6; *Reply to Motion to Extend*, pp. 1-2, 8-10; *Little Hocking's*

*Notice Regarding Need for Status Conference*, Doc. No. 158, pp. 2-3.[6]

As discussed *supra*, Little Hocking owns wellfields that are located

directly across the Ohio River from DuPont's Washington Works plant.

*Amended Complaint*, ¶¶ 26, 29.  Little Hocking alleges that DuPont's

waste disposal practices caused the migration of PFCs, particularly

C8, into Little Hocking's wellfields.  *Id*. at ¶¶ 3, 5, 44-46.  In

other words, whether or not production wells actually prevent

contaminant migration is significant to this litigation because Little

---

[5] It would be most helpful to the Court if a party seeking to compel the
production of documents were to identify *and* attach as an exhibit to the
initial motion to compel the discovery request that addresses the requested
documents, rather than waiting until a reply memorandum to provide this
information.  Here, the *Motion to Extend* purports to quote from Document
Request No. 11, but does not attach the actual request.  *See Motion to
Extend*, p. 6 n.6.  The actual *Motion to Compel* neither identifies the
language of the request nor attaches it as an exhibit.

[6] DuPont contends that Little Hocking mischaracterizes DuPont's defenses.  *See*,
*e.g.*, *Memo. in Opp. to Motion to Extend*, pp. 9-10.

Hocking believes that a river pathway is the source of C8 contamination for Little Hocking's wellfields and surrounding environment. *Motion to Extend*, pp. 3-5.

Trying to reconstruct the discovery history relating to this single document request, Document Request No. 11, has been unnecessarily time-consuming. It appears to the Court that DuPont produced its groundwater flow model to Little Hocking on June 28, 2011. *Declaration of Gary T. Lombardo in Support of DuPont's Opposition to Little Hocking's Motion to Extend Fact and Expert Discovery Deadlines*, ¶ 9 ("*Lombardo Declaration*"),[7] attached to *Defendant's Memorandum in Opposition to Plaintiff's Motion to Extend Fact and Expert Discovery Deadlines*, Doc. No. 164 ("*Memo. in Opp. to Motion to Extend*"); *Exhibit 6*, attached to *Lombardo Declaration* (document entitled "Revised Groundwater Flow Model DuPont Washington Works Washington, WV" and dated January 2003) ("groundwater flow model" or "2003 model"). At the time of this production, DuPont believed that the groundwater model "captured all relevant project files[8] during the course of the *Leach*[9] litigation." *Declaration of Libretta P. Stennes in Support of DuPont's Opposition to Little*

---

[7] Gary T. Lombardo is counsel for DuPont in this action and has personally collected or supervised the collection of documents referenced in his declaration. *Id.* at ¶¶ 1, 3.

[8] Although neither party presents evidence clarifying its significance, the groundwater modeling project files are distinct from the groundwater flow model. The project files apparently contain technical data underlying the model. *See, e.g.*, *Memo. in Opp. to Motion to Extend*, pp. 7-8 (representing that project files related to the groundwater flow model contain "technical data (*e.g.*, mapping coordinates, synoptic water levels used in the model, river flow data, and well pumping information)").

[9] *Leach v. E.I. du Pont de Nemours and Company*, No. 01-6-608 (Cir. Ct. Wood County W. Va.), filed in August 2001, was a PFOA-related class action filed against DuPont alleging common law tort claims and a claim for medical monitoring. *See Opinion and Order*, Doc. No. 169, pp. 5-6.

*Hocking's Motion to Extend Fact and Expert Discovery Deadlines*, ¶ 8 ("*Stennes Declaration*"),[10] attached to *Memo. in Opp. to Motion to Extend*.[11]

DuPont represents that, at some time after the purported June 2011 production of the groundwater flow model and relevant *Leach* project files, Little Hocking advised that it could not locate "the groundwater modeling project files[.]" *Stennes Declaration*, ¶ 9. In response, DuPont Attorney Stennes contacted a DuPont employee, Andrew Hartten, to request the original documents in order to produce them to Little Hocking. *Id*. Because Mr. Hartten was unavailable because of illness in early January 2013, DuPont could not obtain the requested files until January 8, 2013. *Id*. at ¶ 10.

Thereafter, on January 9, 2013, DuPont produced a zip file containing electronic information (in the form of Microsoft Excel spreadsheets) underlying its groundwater flow model. *Id*. at ¶ 11; *Second Newman Declaration*, ¶¶ 12-15. DuPont represents in its briefing (not in a signed declaration) that this production included project file information not contained in the June 2011 production. *Memo. in Opp. to Motion to Extend*, p. 3 ("DuPont long ago produced the groundwater flow model and now has located and produced some additional documents from the project file."). It appears that this production of underlying information on January 9, 2013 may have included "a sampling of well flow meters from 1957 to 1980, and well flow rates from 1997, 1998, 1999, and 2001." *Id*. at 5.

---

[10] Libretta P. Stennes is also counsel for DuPont in this action. *Id*. at ¶ 1.
[11] Little Hocking, however, contends that DuPont did not produce electronic information underlying the groundwater flow model until January 9, 2013. *See Motion to Extend*, p. 12.

According to DuPont, the project files produced on January 9, 2013 "were produced as kept in the ordinary course of business and included, among other thing[s,] database readable files and mapping files." *Stennes Declaration*, ¶ 11.  Little Hocking, however, disagrees that all of the files were readable and asserts that "[t]he zip file contains over 1,000 electronic documents.  Many of the documents were in a format that could not be opened." *Second Newman Declaration*, ¶ 13.  Moreover, counsel for Little Hocking "was unable to determine whether the data [contained in the spreadsheets] was actual data or data that was created as part of a model.  Furthermore, [counsel] was unable to discern what underlying information was being summarized in the spreadsheet." *Id*. at ¶ 15.  Little Hocking further represents that it learned in late January that twelve spreadsheets in this production "were created from paper pumping well records – paper records that purportedly no longer exist." *Id*. at ¶ 16.

On January 7, 2013, DuPont produced summaries of pumping well data (contained in a series of Excel spreadsheets) for the years 2006 to 2012.  *First Newman Declaration*, ¶ 8; *Second Newman Declaration*, ¶¶ 4-5.  After receiving this information, Little Hocking asked DuPont about production of pre-2006 pumping well information.  *First Newman Declaration*, ¶ 8; *Second Newman Declaration*, ¶ 6; *Declaration of Anthony F. Cavanaugh in Support DuPont's Opposition to Little Hocking's Motion to Extend Fact and Expert Discovery Deadlines*, ¶¶ 5-6 ("*Cavanaugh Declaration*"), attached to *Memo. in Opp. to Motion to Extend*.

The Court conducted a status conference on January 9, 2013. *See Order*, Doc. No. 153.  During that conference, counsel for DuPont responded to Little Hocking's inquiry regarding pre-2006 pumping well information, explaining that "DuPont was unable to locate well pumping information other than what had been previously produced." *Cavanaugh Declaration*, ¶ 7.  Little Hocking understood this response to mean that all pre-2006 pumping well data was unreadable or had been destroyed.  *Id.; First Newman Declaration*, ¶ 9.  DuPont agreed to provide an additional explanation regarding the missing data. *Cavanaugh Declaration*, ¶ 7.

On January 24, 2013, counsel for DuPont provided a written explanation regarding, *inter alia*, DuPont's current and past practice of maintaining well pumping data and its efforts to recover historical data.  *Exhibit* 7 (letter dated January 24, 2013 from Libretta P. Stennes to D. David Altman) (citing *Declaration of John T. Myers*, attached thereto as *Exhibit A*) ("*Myers Declaration*"),[12] attached as *Exhibit 7* to *Lombardo Declaration*, which is attached to *Memo. in Opp. to Motion to Extend*.  This communication explained, *inter alia*, that, from the early to mid-1980s to 2006, DuPont tracked well production information on a computer system named "Vantage" that ran on a VAX computer and stored this information on magnetic tapes.  *Id.* at 1-2. Two to three years ago, DuPont transitioned to a new system, IP-21, for recoding well flow data.  *Id.* at 2.  Prior to this transition,

---

[12] Mr. Myers has been a DuPont employee since 1979 and has "had an office at the Washington Works facility since 1999." *Myers Declaration*, ¶ 3.  He is "familiar with DuPont's current and preexisting systems used to monitor and record well production" and has "approximately 30 years of experience with monitoring and supporting DuPont Chemical Processes." *Id.* at ¶ 4.

DuPont attempted to recover historical data from VAX magnetic tapes, but was unable to do so because of tape degradation. *Id*. "DuPont has been unable to determine whether these degraded backup tapes still exist; however, even if the tapes could be located, they could not be read without a VAX running the Vantage program, both of which are defunct." *Id*.

On the same day that DuPont provided this explanation, January 24, 2013, Little Hocking filed the *Motion to Extend*.

### 2. DuPont's Rule 30(b)(6) designees

On December 21, 2012, the Court conferred with counsel regarding a dispute related to, *inter alia*, Little Hocking's notices for Rule 30(b)(6) depositions, which DuPont believed were over-broad and unduly burdensome. *See Order*, Doc. No. 146, p. 1. The Court ordered Little Hocking to attempt "to more narrowly formulate the topics to be addressed," i*d*., and directed DuPont to formally designate its Rule 30(b)(6) deponents by December 24, 2012, if possible, but not later than December 27, 2012. *Id*. The Court further ordered DuPont to "make every effort to assure that each deponent is prepared for the deposition. In preparing for the deposition, each deponent must, *inter alia*, make reasonable inquiry of appropriate current and former employees." *Id*. The Court authorized Little Hocking to "request that the deponent be re-presented for deposition, at defendant's expense," should Little Hocking establish that DuPont's designation was unreasonable or that the designee had not reasonably prepared for the deposition. *Id*. at 2. Although the Court expected Little Hocking to complete all remaining Rule 30(b)(6) depositions within three days,

the Court expressed its willingness to extend that restriction upon a showing of good cause. *Id*.

On January 10 through January 17, 2013, Little Hocking took the depositions of Rule 30(b)(6) designees Laura Korte, Timothy Bingman, Robert Rickard, David F. Altman, [13] Roger Zipfel and Andrew Hartten. *See Exhibits 7-11*, attached to *Motion to Compel; First Newman Declaration*, ¶ 7; *Second Newman Declaration*, ¶ 11.  Little Hocking believes, however, that Ms. Korte and Messrs. Bingman, Rickard, Altman and Zipfel were unprepared to speak on their designated topics. *See*, *e.g.*, *Motion to Extend*, pp. 13-14; Doc. No. 158, pp. 5-7; *Motion to Compel*, pp. 7-10; *Plaintiff Little Hocking Water Association, Inc.'s Reply in Support of Its Supplemental Motion to Extend and Motion to Compel*, Doc. No. 173, pp. 10-14 ("*Reply to Motion to Compel*").  In addition, according to Little Hocking, the timing of DuPont's production of its groundwater flow model on January 9, 2013 prevented Little Hocking from conducting a comprehensive deposition of DuPont's Rule 30(b)(6) designee, Andrew Hartten, who was deposed on January 10, 2013. *Second Newman Declaration*, ¶¶ 11-17.

Unable to resolve disputes on these various discovery issues, the *Motion to Compel* was filed, and DuPont opposes the motion. *Defendant E.I. Du Pont de Nemours and Company's Response to Plaintiff The Little Hocking Water Association, Inc.'s Supplemental Motion to Extend Fact and Discovery Deadlines and Motion to Compel*, Doc. No. 170 ("*Memo. in Opp. to Motion to Compel*").  Thereafter, Little Hocking filed its *Reply to Motion to Compel*.

---

[13] DuPont's David Altman is, of course, not the same person as D. David Altman, Esq., trial counsel for Little Hocking.

DuPont has also filed a *Motion to Supplement* its opposition to the *Motion to Compel*, to which Little Hocking has responded. *Plaintiff Little Hocking Water Association, Inc.'s Supplemental Reply in Support of Its Supplemental Motion to Extend and Motion to Compel*, Doc. No. 184 ("*Response to Motion to Supplement*"). With the filing of *Defendant E.I. Du Pont de Nemours and Company Inc.'s Reply to Plaintiff The Little Hocking Water Association, Inc.'s Supplemental Reply in Support of Its Supplemental Motion to Extend and Motion to Compel*, Doc. No. 185 ("*Reply to Motion to Supplement*"), this matter is also ripe for resolution. The Court shall address each motion in turn.

### III. *MOTION TO SUPPLEMENT*

DuPont seeks leave to supplement its *Memo. in Opp. to Motion to Compel* by submitting a summary of DuPont's efforts to prepare for various Rule 30(b)(6) depositions. *Motion to Supplement*, pp. 1-2 (citing summary, attached thereto as *Exhibit A* ("DuPont's Rule 30(b)(6) Summary")). Noting that Little Hocking had submitted multiple filings (Doc. Nos. 156, 158, 161, 167) addressing the preparedness of DuPont's Rule 30(b)(6) witnesses, DuPont represents that its Rule 30(b)(6) Summary would simply provide "a centralized location for ease of the Court's review" of the preparation efforts taken on behalf of DuPont, its counsel and its Rule 30(b)(6) designees. *Id*. at 2-3. Because its Rule 30(b)(6) Summary does not change DuPont's substantive arguments and does not contain any new evidence, DuPont takes the position that the Court's consideration of

14

this summary does not prejudice or otherwise surprise Little Hocking. *Id*. at 3.

On February 27, 2013, the Court ordered that "[i]f Little Hocking intends to respond to DuPont's motion, it shall do so no later than March 8, 2013. DuPont may reply, if at all, no later than March 13, 2013." *Order*, Doc. No. 175.

In response, Little Hocking argues that DuPont has not shown good cause for submitting its Rule 30(b)(6) Summary. *Response to Motion to Supplement*, pp. 1, 5. However, rather than "adding an entire pleading opposing a motion for leave," Little Hocking filed a "consolidated supplemental reply" to be considered only if the *Motion to Supplement* is granted, *i.e.*, only if the Court considers DuPont's Rule 30(b)(6) Summary. *Id*. at 1-2. In particular, Little Hocking offers its own chart summarizing each designee's purported failure to respond to certain questions. *Id*. at 3-5 (citing *Exhibit 1*, attached thereto ("Little Hocking's Rule 30(b)(6) Summary")). Notwithstanding the Court's prior *Order* providing DuPont an opportunity to file a reply memorandum, *Order*, Doc. No. 175, Little Hocking represents that its *Response to Motion to Supplement*, *i.e.*, its "consolidated supplemental reply," "eliminate[s] unnecessary additional briefs and make[s] the supplemental motion, filed on February 5, 2013, ripe for decision." *Id*. at 2.

DuPont argues in reply that good cause exists to grant the *Motion to Supplement*. *Reply to Motion to Supplement*, pp. 2-4. Pointing out that Little Hocking does not even suggest that it would be prejudiced by consideration of DuPont's Rule 30(b)(6) Summary, DuPont explains

15

that its summary centralizes information regarding the preparedness of DuPont's Rule 30(b)(6) designees in order "to assist the Court in ruling on Little Hocking's Supplemental Motion [to Compel]." *Id*. at 3-4. DuPont goes on to argue that Little Hocking's "consolidated supplemental reply," Doc. No. 184, is improper and violates S.D. Ohio Civ. R. 7.2(a)(2) and the Court's *Order*, Doc. No. 175, which permitted Little Hocking to respond only to the narrow issue of whether there was good cause to grant the *Motion to Supplement*. *Reply to Motion to Supplement*, pp. 5-6.

As set forth above, the briefing related to the issues raised in the *Motion to Compel* is already convoluted and voluminous. Although the Court appreciates DuPont's attempt to provide "a centralized location" of information related to the preparation and deposition of each disputed Rule 30(b)(6) designee, the Court declines to review yet another filing on this issue. Although DuPont represents that its Rule 30(b)(6) Summary does not contain "new" evidence but instead simply gathers details "otherwise scattered throughout declarations of counsel and various deposition transcripts," *Motion to Supplement*, pp. 2-3, it is not immediately apparent whether all the information offered in DuPont's Rule 30(b)(6) Summary is derived from the briefing and exhibits related to the *Motion to Compel* and *Motion to Extend*. Considering that both parties have had multiple opportunities to present their arguments and evidence throughout the briefing of the *Motion to Extend*, the *Notice* and *Motion to Compel*, the Court is not persuaded that additional filings (indeed, a fourth round of briefing)

on the same issues are warranted or necessary to assist the Court in its resolution of these discovery issues.

In short, DuPont has not established good cause and therefore its *Motion to Supplement* is **DENIED**.

## IV. STANDARD FOR MOTION TO COMPEL

The Federal Rules of Civil Procedure grant parties the right to "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense. . . ." Fed. R. Civ. P. 26(b)(1). Relevance for discovery purposes is extremely broad. *Lewis v. ACB Business Services, Inc.*, 135 F.3d 389, 402 (6th Cir. 1998). However, "district courts have discretion to limit the scope of discovery where the information sought is overly broad or would prove unduly burdensome to produce." *Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 305 (6th Cir. 2007) (citing Fed. R. Civ. P. 26(b)(2)). In determining the proper scope of discovery, a district court balances a party's "right to discovery with the need to prevent 'fishing expeditions.'" *Conti v. Am. Axle & Mfg.*, No. 08-1301, 326 Fed. Appx. 900, at *907 (6th Cir. May 22, 2009) (quoting *Bush v. Dictaphone Corp.*, 161 F.3d 363, 367 (6th Cir. 1998)).

Rule 37 authorizes a motion to compel a non-responsive party to comply with discovery if "a party fails to respond that inspection will be permitted—or fails to permit inspection—as requested under Rule 34." Fed. R. Civ. P. 37(a)(3)(B)(iv). In addition, Rule 37(a) expressly provides that "an evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer, or respond." Fed. R. Civ. P. 37(a)(4).

17

Finally, the party moving to compel discovery must certify that it "has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action." Fed. R. Civ. P. 37(a)(1).  *See also* S.D. Ohio Civ. R. 37.2.  This prerequisite has been met in this case. *See*, *e.g.*, *First Newman Declaration*, ¶¶ 6, 11-14, 16; *Second Newman Declaration*, ¶¶ 6, 12, and attachments thereto.

In the case *sub judice*, Little Hocking seeks an order compelling DuPont to produce certain documents and witnesses for deposition.  The Court shall address each issue in turn.

## V. HISTORICAL PUMPING WELL DATA UNDERLYING GROUNDWATER FLOW MODEL AND PUMPING WELL SUMMARIES

Since July 2010, as noted *supra*, Little Hocking has requested information regarding DuPont's production wells.  *First Newman Declaration*, ¶¶ 4-5; *Exhibit 5*, attached to *Reply to Motion to Extend,* PAGEID# 5286.  After attempting to piece together information from the parties' multiple (and, at times, disjointed) filings, the Court now understands that Little Hocking seeks to compel the production of (1) documents related to the purported destruction of historical pumping well data, *i.e.*, pre-2006 pumping well data residing on degraded magnetic tapes, which underlie both the groundwater flow model and pumping well summaries; (2) documents related to the purported destruction of technology, *i.e.*, the Vantage system and/or the VAX computer, used to read such historical pumping well data; and (3) the deposition of DuPont designee(s) with direct knowledge regarding this purported destruction of data and technology.

A.   *Opinion and Order*, Doc. No. 169, and the Scope of Document Request No. 11

As an initial matter, it is necessary to address the extent, if any, to which the Court's prior *Opinion and Order*, Doc. No. 169, impacts the present dispute relating to historical data.  Little Hocking previously moved to compel multiple categories of documents, including well production data.  *See* Doc. No. 105.  Specifically, Little Hocking previously sought "records relating to all wells on site and in the vicinity of the facility, including wells in the East Field, wells in the West Field, the 'Gallery' Well, the 'Ranney' well, and the wells on Blennerhasset Island." *Opinion and Order*, Doc. No. 169, p. 65 (citations omitted).  Because Little Hocking failed to refer to specific document request numbers, there was no way for the Court to determine what document request(s) addressed this category of documents.  *Id*. at 30, n.14; 61 n.20.[14]  On February 19, 2013, after the filing of the *Motion to Extend* and the *Motion to Compel,* but before these motions were ripe for resolution, this Court granted the earlier request to compel well production data.  *Id*. at 64-66.  Specifically, the Court ordered DuPont "to search and produce responsive information" relevant to well production.  *Id*. at 66.

Notwithstanding the varying language of Little Hocking's prior characterization of its request and the actual language of Document Request No. 11,[15] the parties apparently agree that the *Opinion and*

---

[14] In the same briefing previously considered by the Court, Little Hocking also failed to refer to specific interrogatory numbers.  *Id*. at 23 n.10.

[15] That request seeks:

All documents relating to groundwater flow at and/or near the Washington Works Facility, including all groundwater flow models

*Order*, Doc. No. 169, addressed Little Hocking's Document Request No. 11. *See Memo. in Opp. to Motion to Compel*, p. 4; *Reply to Motion to Compel*, pp. 7-8. However, the parties disagree as to the extent that this prior decision impacts the present dispute over historical data.[16] DuPont takes the position that Document Request No. 11 requested documents relating to the groundwater flow model. *Memo. in Opp. to Motion to Compel*, p. 2. Therefore, the 60 years' worth of historical data that Little Hocking believes that DuPont destroyed falls outside the scope of Document Request No. 11 and is irrelevant to the claims and defenses in this case. *Id.* DuPont also represents that it has already produced information responsive to Document Request No. 11, including the groundwater flow model and "all of the Model's data inputs *that were located.*" *Reply to Motion to Compel*, p. 4 (emphasis added). In other words, DuPont, representing that the groundwater flow model "is not built on 60 years' worth of well pumping data[,]" argues that the information underlying the groundwater flow model, *i.e.*, the information requested by Document Request No. 11, has been produced. *Id.* at 4-5.

Little Hocking, however, contends that the *Opinion and Order* confirms that the requested pumping well information is relevant and

<hr>

(and drafts of such models) produced for the Washington Works Facility; all documents generated, reviewed, considered and/or relied on for the development of each groundwater flow model for the Washington Works Facility; and, all communications discussing groundwater flow at the Washington Works Facility.

*Exhibit 5*, attached to *Little Hocking's Reply to Motion to Extend*, PAGEID# 5286.

[16] It goes without saying that had Little Hocking simply identified its document requests by number (and attached the request as an exhibit) in its earlier motion to compel, this ambiguity and confusion could have been easily avoided.

must be produced by DuPont.  *Reply to Motion to Compel*, pp. 7-8.
Little Hocking therefore argues that DuPont's insistence that Document
Request No. 11 does not cover the historical data is immaterial and
erroneous.  *Id.*  Little Hocking goes on to contend that DuPont's
earlier stance that the pumping of its production wells was a central
means to control groundwater flow at Washington Works undermines
DuPont's current argument that Document Request No. 11 does not cover
pumping records.  *Id*.

    This Court has already concluded that well production information
is discoverable under Fed. R. Civ. P. 26(b)(1).  *Opinion and Order*,
Doc. No. 169, p. 66.  In ordering DuPont to produce such information,
the Court, based on the record before it at the time, rejected
DuPont's argument that its prior production of, *inter alia*, "a
detailed groundwater model and materials related to its development"
fulfilled DuPont's "obligation to produce information responsive to
Little Hocking's request."  *Id*. at 65-66.  The Court further noted
that, although DuPont complained that Little Hocking's request would
require DuPont to search 60 years' worth of records, "DuPont has
offered no evidence that the burden of such a search outweighs the
value of this data."  *Id*. at 66.  In other words, the historical data
presently at issue falls within the Court's *Opinion and Order*, Doc.
No. 169.  Even having now considered the actual language of Document
Request No. 11, which seeks "[a]ll documents relating to groundwater
flow at and/or near the Washington Works facility," the Court cannot
say that pumping well information is unrelated to groundwater flow,
*i.e.*, that it falls outside the scope of Document Request No. 11.

Therefore, particularly in light of the prior *Opinion and Order*, Doc. No. 169, DuPont's current insistence that Document Request No. 11 does not address the historical data is not well-taken.

**B.    Discovery Regarding Alleged Destruction of Back-Up Tapes and Technology (Vantage System and/or VAX Computer)**

Having so concluded, the Court now turns to the issue of the purported destruction of historical pumping well data and the computer technology necessary to read this data.  By way of background, DuPont currently uses a system known as "IP-21" to track and monitor well production data.  *Myers Declaration*, ¶ 5.  DuPont has used IP-21 for just over two years, which "limits the extent of material recorded by the system."  *Id*.  All of the data recorded by IP-21 "since its inception is stored on hard drives and is accessible provided the proprietary software is used."  *Id*.  Therefore, data stored on IP-21 is unreadable and cannot be used or manipulated without access to the proprietary IP-21 software.  *Id*. at ¶ 7.  In addition, well pumping data is stored only in its "raw database form" and is exported only on "an as needed basis, such as for cost accounting purposes."  *Id*. at ¶ 8.

From the mid-1980's through early 2012, DuPont's Washington Works facility used an internal software system known as "Vantage" "to accomplish largely the same task as the IP-21 system."  *Id*. at ¶¶ 9-10.[17]  According to DuPont, Vantage could operate only on a VAX computer, which used now-outdated technology and which has not been produced since the early 1990's.  *Id*. at 11.  Vantage, having less

---

[17] During the IP-21 installation process, both IP-21 and Vantage were running simultaneously.  *Id*. at ¶ 10.

data reporting capabilities than IP-21, stored back-up data on digital
tapes in VAX format and stored "[l]imited data" on the VAX's hard
drive.  *Id*. at ¶ 12.

Before DuPont transitioned to IP-21, Mr. Myers unsuccessfully
attempted to retrieve usable information from some of the old data
stored on degraded tapes.  *Id*. at ¶ 13.  His attempts to retrieve the
data ended when the tapes broke his tape reader machine.  *Id*.

Because he recognized the limitations of the tape drive data
backups, Mr. Myers began to store "raw VAX data" on his desktop
workstation hard drive in the mid-2000's.  *Id*. at ¶ 14.  Essentially,
Mr. Myers used his computer to replace tape backups.  *Id*.  The raw VAX
data retrieved from his computer "could only be processed at the time
by a VAX machine running Vantage[.]"  *Id*.

The Washington Works facility no longer has a VAX machine.  *Id*.
at ¶ 15.  DuPont dismantled the unit previously used to run the
Vantage system at the time it transitioned to IP-21.  *Id*.  DuPont
chose to dismantle the unit because of "its age, the fact that it was
obsolete technology and the unavailability of replacement hardware."
*Id*.

Around the time of the transfer to IP-21, Mr. Myers developed a
complex process to translate "binary VAX history data" into a readable
format.  *Id*. at ¶ 16.  This process "could only be used on raw data
that had been previously exported in VAX format from a VAX computer
running Vantage to a PC."  *Id*. at ¶ 18.  However, Mr. Myers, who
tested this process on some post-2006 data, avers that it was

impractical to process all of the retained data because the process was extremely time consuming and data intensive. *Id*. at ¶¶ 16-17.

According to Mr. Myers, the "spreadsheets" previously produced to Little Hocking represented "pumping figures exported from the Vantage (and later IP-21) system for cost accounting purposes. To my knowledge 2006 was the first year that this cost accounting process was automated via Microsoft Excel." *Id*. at ¶ 19.

DuPont further represents that, in August 2012, it investigated the Washington Works facility and was "unable to locate any information that leads to any well records on microfilm." *Exhibit* 7, p. 2, attached to *Lombardo Declaration* (letter dated January 24, 2013 from DuPont Attorney Stennes to Little Hocking Attorney Altman). In updating the Court about its compliance with the *Opinion and Order*, Doc. No. 169, DuPont also represents that it will produce any well production data located in storage boxes. *See* Doc. No. 180, p. 13.

Little Hocking contends that this history establishes that DuPont partially or completely destroyed material evidence, *i.e.*, pre-2006 pumping well information, and the means to read this evidence, *i.e.*, Vantage system/VAX, while Little Hocking actively sought production of the pumping well data. *Motion to Extend*, pp. 7-8; *Reply to Motion to Extend*, pp. 4-6; *Motion to Compel*, pp. 4-6; *Reply to Motion to Compel*, pp. 8-10. Little Hocking seeks discovery in the form of documents and deposition testimony regarding this destruction / failure to preserve, explaining that the *Myers Declaration* and DuPont's letter dated January 24, 2013 leave many important questions unanswered. *See*, *e.g.*, *Reply to Motion to Extend*, pp. 5-7; *Reply to Motion to Compel*,

pp. 4-5. For example, Little Hocking argues that it is important to know who made the decision to dismantle the Vantage system/VAX during the pendency of litigation and what, if any, steps were taken to preserve the now degraded back-up tapes. *Reply to Motion to Extend*, pp. 5-6; *Reply to Motion to Compel*, pp. 4-5. Little Hocking contends that, under relevant federal law, it is entitled to conduct discovery on these matters. *Reply to Motion to Compel*, pp. 8-10 (citing, *inter alia*, *Zubulake v. Warburg*, 220 F.R.D. 212, 222 (S.D. N.Y. 2003)). In seeking this discovery, Little Hocking clarifies that it "has not pleaded, nor is it pursuing at this time, a tort claim for spoliation under Ohio law." *Id*. at 8. However, after it conducts discovery on this issue, Little Hocking "may then elect to seek evidentiary sanctions warranted by the record." *Id*. at 10.

Conversely, DuPont denies that it destroyed any documents or equipment, arguing that "neither the natural degradation of back-up tapes nor inadvertent misplacement of alternative backup data" establishes spoliation. *Memo. in Opp. to Motion to Compel*, pp. 10-11 (citing, *inter alia*, the *Myers Declaration*, ¶ 14). Similarly, DuPont contends that it disassembled the obsolete VAX computer because of its age and the unavailability of replacement hardware, not in an attempt to destroy evidence. *Id*. at 11 (citing *Myers Declaration*, ¶ 15). Moreover, "the magnetic back-up tapes were never reasonably accessible records, and DuPont had no obligation to preserve them." *Memo. in Opp. to Motion to Extend*, p. 13 (citing, *inter alia*, *Zubulake*, 220 F.R.D. at 218).

This Court does not agree with DuPont's assertion that *Zubulake* necessarily obviates DuPont's obligation to preserve back-up tapes containing relevant evidence that DuPont believes were not "reasonably accessible." Instead, *Zubulake* provides an exception to the general rule cited by DuPont, *i.e.*, that a party must preserve, once litigation is reasonably anticipated, *all* back-up tapes storing documents of "key players":

> The scope of a party's preservation obligation can be described as follows: Once a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a "litigation hold" to ensure the preservation of relevant documents. As a general rule, that litigation hold does not apply to inaccessible backup tapes (*e.g.*, those typically maintained solely for the purpose of disaster recovery), which may continue to be recycled on the schedule set forth in the company's policy. On the other hand, if backup tapes are accessible (i.e., actively used for information retrieval), then such tapes would likely be subject to the litigation hold.

> However, it does make sense to create one exception to this general rule. If a company can identify where particular employee documents are stored on backup tapes, then the tapes storing the documents of "key players" to the existing or threatened litigation should be preserved if the information contained on those tapes is not otherwise available. This exception applies to *all* backup tapes.

*Zubulake*, 220 F.R.D. at 218 (emphasis in the original). *See also Owner-Operator Indep. Drivers Ass'n v. Comerica Bank,* 860 F. Supp. 2d 519, 538 (S.D. Ohio 2012) ("Once the duty to preserve attaches, a party must 'suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents.'") (quoting *Zubulake*, 220 F.R.D. at 218).

Additionally, the United States Court of Appeals for the Sixth Circuit has recently explained that a

> party seeking an adverse inference instruction based on the destruction of evidence must establish (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to [a] party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.

*Stocker v. United States*, 705 F.3d 225, 235 (6th Cir. 2013) (quoting *Beaven v. U.S. Dep't of Justice*, 622 F.3d 540, 553 (6th Cir. 2010)). A party may establish the requisite "culpable state of mind" "through a 'showing that the evidence was destroyed knowingly, even if without intent to breach a duty to preserve it,' but even negligent conduct may suffice to warrant spoliation sanctions under the appropriate circumstances." *Id.* (quoting *Beaven*, 622 F.3d at 554).

Accordingly, in the context of alleged intentional destruction of relevant evidence, other courts have permitted discovery to determine whether discovery sanctions, if any, were appropriate. *See*, *e.g.*, *Cruz v. Target Corp.*, 2012 U.S. Dist. LEXIS 43192 (N.D. Ill. Mar. 29, 2012) (permitting discovery where the plaintiffs seek "to determine whether Defendant's destruction of evidence may be cause for discovery sanctions"); *Burgos v. Satiety, Inc.*, No. 10-CV-2680, 2011 U.S. Dist. LEXIS 149707 (E.D. N.Y. Dec. 30, 2011) (permitting discovery relevant to the issue of whether a party's disposal of certain evidence warrants an adverse inference); *In re Zurn Pex Plumbing Prods. Liab. Litig.*, MDL No. 08-1958, 2008 U.S. Dist. LEXIS 96356 (D. Minn. Nov. 26, 2008) (granting motion to compel Rule 30(b)(6) deposition limited to a particular topic in order to determine, *inter alia*, if discoverable evidence has been inadvertently destroyed).

Here, Little Hocking has not pleaded a claim for spoliation and has represented to the Court that it is not pursuing such a claim at this time. Instead, Little Hocking focuses its attention on details related to the preservation, or lack thereof, of the historical data and related technology to determine whether there is a basis for sanctions. *Reply to Motion to Compel*, pp. 8-9. For the reasons stated *supra*, the Court has already determined that the pre-2006 pumping records are relevant to the claims and issues in this case. Absent additional information about the maintenance and degradation or destruction of these records (and related technology, the Vantage system and VAX), Little Hocking cannot determine whether sanctions are appropriate. Accordingly, to the extent that the *Motion to Compel* seeks discovery related to the failure to preserve or the destruction of the pre-2006 pumping records maintained on back-up tapes as well as the Vantage system and/or VAX computer, that motion is **GRANTED.** DuPont is **ORDERED** to produce a Rule 30(b)(6) corporate designee addressing these issues no later than April 19, 2013 for a deposition limited to no more than one 7-hour day. In so ordering, Little Hocking is **ADVISED** to limit its inquiry to questions directly related to these issues. DuPont is **FURTHER ORDERED** to produce to Little Hocking, no later than seven (7) days prior to that deposition, all documents related to the preservation, failure to preserve and/or destruction of this historical data and technology.

## VI. DEPOSITIONS OF ALLEGED UNPREPARED RULE 30(B)(6) DESIGNEES

Little Hocking complains that several of DuPont's Rule 30(b)(6) designees were unprepared to testify on various previously disclosed

topics and seeks an order compelling DuPont to re-produce these designees for depositions on these topics at DuPont's expense.  *See Motion to Extend*, pp. 13-14; *Reply to Motion to Extend*, pp. 14-18; *Notice*, pp., 5-7; *Motion to Compel*, pp. 6-11; *Reply to Motion to Compel*, pp. 10-14.  DuPont counters by arguing that Little Hocking improperly refused to clarify Little Hocking's more than 60 topics, spanning multiple decades, and that DuPont expended reasonable effort to prepare these deponents.  *Memo. in Opp. to Motion to Extend*, pp. 15-17; *Memo. in Opp. to Motion to Compel*, pp. 8-10.

Under Rule 30(b)(6), a party may depose a corporation by issuing a notice or subpoena that "describe[s] with reasonable particularity the matters for examination."  Fed. R. Civ. P. 30(b)(6).  The corporation "must then designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on its behalf; and it may set out the matters on which each person designated will testify."  *Id*.  The corporation's designee must be "knowledgeable about the subjects described in the notice" and the corporation must "prepare that witness to testify not just to his or her own knowledge, but the organization's knowledge."  *Montgomery v. Sanders*, No. 3:07-cv-470, 2013 U.S. Dist. LEXIS 37757, at *2 (S.D. Ohio Mar. 19, 2013) (citing *Prosonic Corp. v. Stafford*, No. 2:07-CV-0803, 2008 U.S. Dist. LEXIS 80778 (S.D. Ohio June 2, 2008)).  In addition, the party seeking the Rule 30(b)(6) deposition "must designate the areas of inquiry with reasonable particularity, and the [corporation] must designate and adequately prepare the witness to address those matters."  *Id*.  *See also Starlight International, Inc.*

*v. Herlihy*, 186 F.R.D. 626, 639 (D. Kan. 1999) ("Corporations . . . have a duty to make a conscientious, good-faith effort to designate knowledgeable persons for Rule 30(b)(6) depositions and to prepare them to fully and unevasively answer questions about the designated subject matter.").

Finally, "[t]he production of an unprepared witness is tantamount to a failure to appear, and warrants the imposition of sanctions." *Martin County Coal Corp. v. Universal Underwriters Ins. Servs., Inc.*, No. 08-93, 2010 U.S. Dist. LEXIS 118722, at *12 (E.D. Ky. Nov. 8, 2010) (quoting *United Technologies Motor Systems, Inc. v. Borg-Warner Automotive, Inc.*, No. 97-cv-71706, 1998 U.S. Dist. LEXIS 21837, at *4 (E.D. Mich. Sept. 4, 1998)).  *See also Resolution Trust Corp. v. S. Union Co.*, 985 F.2d 196, 197 (5th Cir. 1993) ("If that [corporate] agent is not knowledgeable about relevant facts, and the principal has failed to designate an available, knowledgeable, and readily identifiable witness, then the appearance is, for all practical purposes, no appearance at all" and subject to sanctions).

Here, the allegedly unprepared designees include the following individuals:  Laura Korte, Timothy Bingman, Robert Rickard, David F. Altman, Roger Zipfel and Andrew Hartten.  *See, e.g., Motion to Compel*, pp. 7-13.  The Court shall address each designee in turn.

A.    **Laura Korte**[18]

As with many of the disputed designees discussed *infra*, it is difficult to determine the precise nature of Little Hocking's dissatisfaction with Laura Korte's testimony.  Despite this unnecessary challenge, the Court, after piecing the arguments together, understands Little Hocking's position as follows.

1.    **Matters related to the GAC plant (Topic 15)**

DuPont designated Ms. Korte to address issues related to Little Hocking's Granulated Activated Carbon treatment facility ("GAC plant"),[19] identified in one of Little Hocking's Rule 30(b)(6) notices as Topic 15.  *Motion to Extend*, p. 14; *Reply to Motion to Extend*, p. 16 (citing to *Exhibit 13*, attached thereto (deposition notice dated January 4, 2013)).  Topic 15 specifically covers the following information:

> All information known or reasonably available to DuPont about DuPont's development, operation, and maintenance of measures (e.g., granular activated carbon filtration) implemented by it or its contractors — at the six public drinking water utilities (e.g., Lubeck Public Service District, Little Hocking Water Association) in the vicinity of the Facility[20] and at on-site process/drinking water supplies at the Facility — to filter PFOA from water supplies, including associated costs and the results for the use of such measures.  This topic expressly includes the effectiveness of such remedial measures to filter from drinking water supplied by the nearby drinking water

---

[18] Little Hocking first identifies this designee as "Linda Korte," *Motion to Extend*, p. 14, but then later refers to her as "Laura Korte."  *See*, *e.g.*, *Reply to Motion to Extend*, p. 16.  The Court understands this designee's proper name to be Laura Korte.  *See Exhibit* 7, PAGEID# 4865, attached to *Motion to Compel*.

[19] The GAC plant, built near Little Hocking's wellfields, "is an interim attempt to lower PFOA concentrations in the water pumped into Little Hocking's Distribution System (i.e. the water sent to Little Hocking's water users)."  *Amended Complaint*, ¶ 135.

[20] The "Facility" refers to the Washington Works facility.  *See Exhibit 13*, PAGEID# 5323, attached to *Reply to Motion to Extend*.

> utilities: (a) PFCs other than PFOA and (b) chemical
> substances that might be expected to degrade into, form, or
> otherwise result in the presence of PFOA and/or other PFCs
> in the environment. Additionally, this topic expressly
> includes the length of time that DuPont will continue to
> operate, maintain, and pay the cost of the Little Hocking
> GAC plant.

*Exhibit 13*, PAGEID# 5331-5332, attached to *Reply to Motion to Extend*.

Little Hocking argues that Ms. Korte was unprepared to speak during her January 11, 2013 deposition regarding the following particular GAC plant issues: (1) the development and effectiveness of GAC as a means to filter C8 from the water; (2) maintenance issues related to the GAC plant; and (3) the costs associated with the maintenance and operation of the GAC plant. *See, e.g., Motion to Extend*, p. 14; *Reply to Motion to Extend*, p. 16; *Motion to Compel*, p. 7; *Reply to Motion to Compel*, p. 13.

### a. Development and effectiveness of GAC treatment

Little Hocking contends that Ms. Korte "was unprepared to speak to DuPont's development of GAC as a means to filter C8 from water[.]" *Motion to Extend*, p. 14. Other than this allegation, Little Hocking offers no other specific argument or evidence related to this issue. Although the Court has reviewed that portion of Ms. Korte's deposition attached to the *Motion to Compel*, *Exhibit 7*, that excerpt does not support Little Hocking's allegation in this regard. Accordingly, as it relates to re-opening Ms. Korte's deposition to address the development and effectiveness of GAC as a means to filter C8, the *Motion to Compel* is **DENIED**.

### b.    GAC plant maintenance issues

Little Hocking also contends that Ms. Korte was unprepared to address "maintenance issues associated with operation of Little Hocking's GAC plant." *Motion to Extend*, p. 14.  *See also Reply to Motion to Extend*, p. 16 (citing *Exhibit* 7, attached thereto); *Reply to Motion to Compel*, pp. 13-14 (citing *Exhibit* 7, attached to *Reply to Motion to Extend*).  In support, Little Hocking relies on Ms. Korte's testimony that she was unaware of any maintenance problems after speaking with Tom Clutter, apparently a DuPont contractor working at the GAC plant:

> [Q:]  . . . The question that I should have more precisely asked is more the day-to-day problems with the operation of Little Hocking's GAC plant internally, not the outcome of the water after filtration, but the operation itself. Computer problems, equipment malfunctions, electronic problems, have you, as part of your preparation today, looked into any of that?
>
> A:    I spoke with — as I said before, I spoke with Tom Clutter for about 45 minutes.  We talked about the typical operation, what he does on a day in, day out week — weekly basis.
>       He did not mention any specific problems or chronic problems.
>
> Q:    Okay.  He's a — he's a very responsive individual at Little Hocking.  And nothing I should say should reflect, in DuPont's eyes, that there's any problem with Mr. Clutter.
>       But he did not tell you about the chronic operational problems with certain systems at the GAC plant?
>
>       MS. STENNES:    Objection to form.
>
>       THE WITNESS:    No, he did not.
>
> BY MR. ALTMAN:
>
> Q:   Okay.  And did he — he did not show you, and nobody else showed you, the documentation of those problems?
>
>       MS. STENNES:    Objection to form.

        THE WITNESS:     No.

BY MR. ALTMAN:

Q:   Okay.  Because what I was going to ask you was the
cost of dealing with those specific problems because what
we have is a general estimate of 500,000 a year, but as the
plant has continued to operate, it has had a series of
problems.
       Okay.  Well, if you don't know about those, there's no
way you can answer questions about how much those cost;
correct?

A:   Correct.

*Exhibit* 7, PAGEID# 4868-4870, attached to *Motion to Compel*.

In response, DuPont represents that it made a good faith effort

to prepare Ms. Korte for her deposition because counsel "participated

in multiple meetings with Laura Korte, David Boothe, and Andrew

Hartten to prepare Ms. Korte to testify as to the Granular Activated

Carbon ("GAC") Treatment Plant installed at Little Hocking." *Stennes*

*Declaration*, ¶ 6(e).  DuPont also argues that the deposition excerpt

offered by Little Hocking does nothing to establish that Ms. Korte was

unprepared to speak on the designated issue. *Memo. in Opp.*, p. 15

n.8.  According to DuPont, this excerpt simply suggests that, "in the

DuPont contractor's view, there are no chronic problems [at the GAC

plant]." *Id.*

DuPont's arguments are well-taken.  After reviewing the

deposition excerpt, the Court cannot conclude that Ms. Korte was

unprepared to speak to maintenance problems at the GAC plant. Although

this excerpt makes clear that Little Hocking's counsel apparently

believes that there are maintenance problems, Little Hocking points to

no evidence supporting this belief.  In other words, nothing offered

persuades this Court that Ms. Korte was unprepared simply because she apparently relied on discussions with Mr. Clutter who did not advise her of any maintenance problems.  Indeed, the excerpt establishes - or at least suggests - that Little Hocking trusts Mr. Clutter.  *See Exhibit* 7, PAGEID# 4868-4869 (Little Hocking's counsel insisting that nothing counsel says during Ms. Korte's deposition should reflect a problem with Mr. Clutter, "a very responsive individual at Little Hocking"), attached to *Motion to Compel*.  Accordingly, as it relates to re-opening Ms. Korte's deposition regarding maintenance issues at the GAC plant, the *Motion to Compel* is **DENIED**.

### c.    GAC plant costs

The Court understands that Little Hocking believes that Ms. Korte was unprepared to testify on GAC plant-related costs because, after apparently being shown one of DuPont's answers to interrogatories, she was unfamiliar with the annual operation and maintenance figure contained in that answer:

> Q:    Okay.  But you do agree that it [a document shown to the designee] at least appears to be DuPont's sixth supplemental responses and objections to Little Hocking's first set of interrogatories and it's specifically Interrogatory Number 40?
>
> A:    That's correct.
>
> Q:    And look at Page 7.
> The last sentence on Page 7 states that the operation and maintenance costs for Little Hocking GAC plant is approximately $500,000 per annum; correct?
>
> A:    That's what the sentence says.
>
> Q:    And DuPont performs change-outs at the GAC plant for Little Hocking; correct?
>
> A:    Correct.

Q:    And, by the way, did you know about the $500,000
estimate before — to annual — strike that.
      Did you know about the annual $500,000 O & M cost
before you came in to the deposition today?

A:    I had not seen that number.

Q:    Okay.  So, in other words, you did not — nobody told
you what it cost annually to operate and maintain the
plant?

A:    No.

Q:    Okay.  Do you know how much each carbon change-out at
Little Hocking costs?

A:     No.

*Exhibit* 7, PAGEID# 4866-4867, attached to *Motion to Compel*.

As discussed *supra*, counsel for DuPont spent multiple meetings
preparing Ms. Korte for her deposition on matters related to the GAC
plant.  *See Stennes Declaration*, ¶ 6(e).  DuPont also argues that
Little Hocking's Rule 30(b)(6) notices were overbroad and failed to
comply with Rule 30(b)(6)'s requirement that topics be stated with
"reasonable particularity."  *Memo. in Opp. to Motion to Compel*, pp.
15-16 (citing *Exhibits 1-3*, attached to *Lombardo Declaration*) (Little
Hocking's Rule 30(b)(6) notices served on July 10, 2012, August 30,
2012 and January 4, 2013).  DuPont insists that its multiple
preparation sessions with Ms. Korte amounted to "a good faith effort
to prepare [this] designee[] to respond to examination in a reasonable
manner."  *Id*. at 16.

As set forth *supra*, the Court previously ordered Little Hocking
to attempt "to more narrowly formulate the topics to be addressed" by
late December 2012.  *Order*, Doc. No. 146, p. 1.  In comparing the Rule
30(b)(6) notice served on August 30, 2012, *Exhibit 2*, PAGEID# 5076,

attached to the *Lombardo Declaration*, and the notice served on January 4, 2013, *Exhibit 13*, PAGEID# 5331-5332, attached to *Reply to Motion to Extend*, there appears to be little or no change to the lengthy scope of the topic addressing GAC plant issues.  Moreover, the Court notes that the most recent Rule 30(b)(6) notice served on January 4, 2013 came after the December 27, 2012 deadline for DuPont to designate its Rule 30(b)(6) deponents.  *Order*, Doc. No. 146, p. 1.  Taking this record as a whole, the Court cannot conclude that DuPont failed to comply with the Court's prior *Order*, Doc. No. 146, or otherwise failed to make a good faith effort to prepare Ms. Korte for her deposition on January 11, 2013.  Nevertheless, the Court is not unsympathetic to Little Hocking's desire to obtain more specific information related to the annual maintenance and operating costs associated with the GAC plant, which were generally referenced in the Rule 30(b)(6) notices. Accordingly, as it relates to re-opening Ms. Korte's deposition to address the narrow issue of annual maintenance and operation costs associated with the GAC plant, the *Motion to Compel* is **GRANTED in part**.  DuPont is **ORDERED** to re-produce Ms. Korte for a deposition, not to exceed one (1) hour, no later than April 12, 2013.  In so ordering, the Court does not conclude that Ms. Korte failed to reasonably prepare for the deposition in this regard and, therefore, Little Hocking is not entitled to fees or expenses related to the re-opening of this deposition.

      **2.    Affirmative defenses**

Little Hocking also complains that DuPont designated Ms. Korte to speak "on certain affirmative defenses but was completely unaware of

specific facts reasonably available to DuPont that directly contradict some of those defenses and was therefore unable to speak to the impacts of those defenses." *Motion to Compel*, p. 7 (citing *Exhibit 7*, attached thereto (excerpt from Korte deposition)).  Other than this conclusory assertion, Little Hocking offers no other details about Ms. Korte's designation as it relates to specific affirmative defenses or any other details explaining why her testimony is deficient.  Although the Court has reviewed the deposition excerpt provided by Little Hocking, the Court is unable to conclude that Ms. Korte was unprepared in this regard and that a re-opening of her deposition on this issue is warranted.  Accordingly, as it relates to re-opening Ms. Korte's deposition on the issue of "certain affirmative defenses," the *Motion to Compel* is **DENIED**.

### B.    Timothy Bingman

Little Hocking argues that DuPont designated Timothy Bingman to address the Memorandum of Understanding ("MOU") between the United States Environmental Protection Agency ("US EPA") and DuPont, identified by Little Hocking as Topic 8 and Topic 20 in its Rule 30(b)(6) notice.  *Motion to Extend*, p. 14; *Notice*, pp. 5-6; *Reply to Motion to Extend*, pp. 16-17; *Motion to Compel*, p. 8; *Reply to Motion to Extend*, pp. 10-11.  Although Little Hocking failed to provide the text of these topics or otherwise point to a specific exhibit identifying the notice and its topics, the Court, after considerable effort, determined that Topics 8 and 20 address the following:

> 8.    All information known or reasonably available to DuPont about the:  (a) Final report of the Peer Consultation Panel Conducting the Review for the Scientific Peer Consultation Process for the Site Environmental

38

Assessment program as part of the DuPont-EPA Memorandum of
Understanding in Phase II Workplan, by Michell J. Small,
July 15, 2009; and (b) the Revised Groundwater Flow Model,
Washington Works, Washington, WV, by Corporate Remediation
Group, January 2003, including all prior models and all
successor models.

\*                    \*                    \*                    \*

20.  All information known or reasonably available to
DuPont regarding DuPont's Memorandum of Understanding with
the United States EPA ("MOU"), including all work performed
and data collected in connection with the MOU, all reports
(including the "final report") created in connection with
the MOU, and discussions or negotiations with USEPA
concerning work performed, not performed, or to be
performed under the MOU.

*Exhibit 13*, PAGEID# 5330, 5333, attached to *Reply to Motion to Extend*

(Rule 30(b)(6) notice served on January 4, 2013).  According to Little

Hocking, Mr. Bingman was DuPont's designee for "part of Topic 8" and

DuPont's "sole designee" for Topic 20.  *Motion to Compel*, p. 8.

Little Hocking goes on to contend that, notwithstanding DuPont's

representation that Mr. Bingman would be prepared to address all of

Topic 20, *Reply in Support of Motion to Extend*, p. 17 (citing *Exhibit

14*, attached thereto) (email from Attorney Stennes dated December 28,

2012, providing a chart of topics and designees listing "Tim Bingman"

for Topic 20), Mr. Bingman testified at his deposition on January 10,

2013 that he was "designated for [Topic] 8A having to do with the Peer

Consultation Panel, and [Topic] 20, only to the extent that it relates

to the Peer Consultation Panel."  *Exhibit 8*, PAGE ID# 4878-4879,

attached to *Motion to Compel*.  Little Hocking specifically complains

that Mr. Bingman was therefore unprepared to address certain reports

that DuPont submitted as part of the MOU.  *Reply in Support of Motion*

*to Compel*, pp. 10-11 (citing *Exhibit 8* (excerpt from Bingman deposition), attached to *Motion to Compel*).

In response, DuPont contends that Little Hocking's representation that "Mr. Bingman was designated for more than the Peer Consultation Panel is untrue." *Memo. in Opp. to Motion to Extend*, p. 16 n.9. DuPont represents that counsel for the parties, including DuPont Attorneys Stennes and Lombardo and Little Hocking Attorneys Altman and Newman, conferred on the evening of December 30, 2012. *Stennes Declaration*, ¶ 7; *Lombardo Declaration*, ¶ 15. During that discussion, "Mr. Altman indicated that he still had questions about data in the MOU." *Stennes Declaration*, ¶ 7. DuPont advised that Mr. Bingman would testify only as to the Peer Consultation Panel ("PCP"). *Stennes Declaration*, ¶ 7; *Lombardo Declaration*, ¶ 15. DuPont further advised that it "was designating Andrew Hartten to testify as to all other aspects of DuPont's Memorandum of Understanding ("MOU") with the United States EPA." *Lombardo Declaration*, ¶ 15. *See also Stennes Declaration*, ¶ 7 (advising that "any further questions [beyond the Peer Consultation Panel] regarding the MOU should be directed to Andrew Hartten").

Having considered the record as a whole, the Court cannot say that DuPont failed to properly prepare Mr. Bingman for his deposition. Although a December 28, 2012 an email from DuPont suggests that Mr. Bingman was previously offered as the sole designee as to Topic 20, *Exhibit 14*, attached to *Reply to Motion to Extend*, the uncontroverted evidence establishes that, on December 30, 2012, DuPont clarified that Mr. Bingman was the designee as to PCP issues in Topic 20 and that Mr.

Hartten was DuPont's designee as to all other aspects related to the MOU in that topic. *Stennes Declaration*, ¶ 7; *Lombardo Declaration*, ¶ 15. There is no evidence that Mr. Bingman was unprepared to testify as to PCP issues. *See also Stennes Declaration*, ¶ 6(f) (explaining deposition preparation of Mr. Bingman to address PCP activities). Moreover, to the extent that Little Hocking continued to rely on the earlier representation that was later modified by DuPont, or to the extent that Little Hocking refused to accept DuPont's later representation, that mistaken reliance (or refusal to accept a later designee) does not serve as a basis for granting the requested relief. Accordingly, as it relates to the re-opening of the Rule 30(b)(6) deposition of Timothy Bingman related to the MOU, the *Motion to Compel* is **DENIED**.

### C.  Dr. Robert Rickard

Little Hocking complains that DuPont designee Dr. Robert Rickard was unprepared to testify as to (1) various affirmative defenses, including a "key affirmative defense on health and environmental issues"; and (2) business and corporate level responses to the C8 contamination issue. *See Motion to Extend*, p. 14; *Reply to Motion to Extend*, p. 17; *Motion to Compel*, p. 8; *Reply to Motion to Compel*, pp. 12-13. Once again, Little Hocking does not cite to its 30(b)(6) notice to provide the Court with the exact text of these topics. However, in reading the Dr. Rickard's deposition excerpt, the Court understands that Topic 28 addresses the issues related to DuPont's affirmative defenses. *See Exhibit 9*, PAGEID# 4897, attached to *Motion to Compel*. In addition, in its last filing addressing Dr. Rickard's

41

testimony, Little Hocking represents that Topic 26 addresses the second topic related to DuPont's responses to the C8 contamination. *See Reply to Motion to Compel*, p. 12.  The Court shall address each topic in turn.

### 1.   Affirmative defenses (Topic 28)

Topic 28 specifically addresses:

> 28.  All Information known or reasonably available to DuPont to support or negate the affirmative defenses in DuPont's Answer to the First Amended Complaint, expressly including all Information about any facility or entity that DuPont contends contributed to the PFOA in the Wellfields.

*Exhibit 3*, PAGEID# 5095 (Rule 30(b)(6) notice served on January 4, 2013), attached to *Lombardo Declaration*.

As noted *supra*, Little Hocking argues that Dr. Rickard was unprepared on this topic because he could not provide the factual bases for a "key affirmative defense on health and environmental issues."  Little Hocking does not identify this affirmative defense by number, but the Court extrapolates from Little Hocking's proffered exhibit containing a disputed interrogatory and response that this "key affirmative defense" is DuPont's Twenty-Third Affirmative Defense, which asserts the following:

> Plaintiff's claims are barred by virtue of the fact that there is no reliable scientific epidemiologic and/or medical basis to support a claim that exposure to any of the substances referenced in the Complaint in the quantities which actually exist or existed in surface water, groundwater and/or air has proximately caused any negative or harmful impact on Plaintiff's property, human health, and/or the environment, past, present or future.

*Exhibit 15*, PAGEID# 5341 (excerpt reflecting DuPont's answer to Interrogatory No. 66), attached to *Reply to Motion to Extend*.

In support of its position that Dr. Rickard was unprepared to
address this affirmative defense, Little Hocking contends that Dr.
Rickard did not specify upon which studies Little Hocking relied upon
that, in DuPont's view, were flawed.  *Reply to Motion to Extend*, p. 17
(citing *Exhibit 15* (DuPont's response to Interrogatory No. 66),
attached thereto); *Motion to Compel*, p. 8 (citing *Exhibit 9* (Rickard
deposition excerpt), attached thereto).  Although Little Hocking fails
to provide a pinpoint cite to the deposition pages that support its
position in this regard, the Court assumes that Little Hocking relies
on the following testimony:

> Q:   Did you review certain — in preparation for your
> testimony on Topic 28 today, did you review certain of
> DuPont's responses to Interrogatories 44 through 80?
>
> A:   I'm not aware of reviewing those, no.
>
> Q:   Okay.  You did not review these, 44 through 80,
> interrogatory responses — strike that.
>    You did not review these Interrogatory Responses 44
> through 80 in preparation for today?
>
> A:   Right now I'm confused in terms of what are the
> interrogatory responses that I've had — I'm actually not
> certain whether I've reviewed these.
>
> *          *          *          *
>
> Q:   Directing your attention to Pages 93 and 94 of the
> exhibit I put in front of you, Interrogatory 66 concerns
> DuPont's 23rd affirmative defense; correct?
>
> A:   That is correct.
>
> *          *          *          *
>
> Q:   Please direct your attention to the first full
> paragraph — first full paragraph on Page 94.
>    In that paragraph DuPont's response [to Interrogatory
> No. 66] discussed flawed studies, a misinterpretation of
> PFOA epidemiology, and animal toxicity studies, faulty dose
> response assessments, end points of questionable relevance
> to PFOA, inappropriate data selection, outdated models, and

studies that fail to evaluate the type and degree of
uncertainty associated with their assessments.
Is that what it says?

A:    I believe you've read it correctly.

*Exhibit 9*, PAGEID# 4897 - 4899, attached to *Motion to Compel.*

When asked to identify the "PFOA epidemiology and animal toxicity
studies" that DuPont contends were misinterpreted by Little Hocking,
and the alleged "faulty dose response assessments," Dr. Rickard
expressed his opinions as to the strength of certain studies, but
indicated that he was uncertain as to which studies Little Hocking
apparently relied upon in support of its position. *Id.* at PAGEID# 4900
– 4901. "Since I'm not directly knowledgeable of what Little Hocking
is relying on, I can't directly address that." *Id.* at PAGEID# 4902 –
4903.  Dr. Rickard also testified that he did not know which specific
studies, in DuPont's view, Little Hocking had inappropriately
selected.  *Id.* at PAGEID# 4904.  When asked to identify what "outdated
models" DuPont contends that Little Hocking is relying on, Dr. Rickard
responded, "Again, I'm not certain the specific ones that Little
Hocking is relying on."  *Id.* at PAGEID# 4905.  As to which studies
that, DuPont contends, fail to evaluate the types and degree of
uncertainty associated with their assessment, Dr. Rickard testified:
"Again, I don't have the specifics of what Little Hocking is relying
on.  I can only speak to what DuPont relies on."  *Id.* at PAGEID# 4095
– 4906.

In disagreeing that Dr. Rickard was unprepared for his deposition
as it relates to this affirmative defense, DuPont first explains that
counsel met with Dr. Rickard "to review chronology of PFOA issues and

locate facts for various 30(b)(6) topics" and "reviewed DuPont's interrogatory responses relating to affirmative defenses[.]" *Stennes Declaration*, ¶ 6(b), (i). DuPont goes on to defend Dr. Rickard's testimony, arguing that "DuPont does not yet know what studies Little Hocking intends to rely upon to demonstrate that PFOA may present an imminent and substantial endangerment to human health or the environment, because Little Hocking has unilaterally elected to defer discovery of this information until the expert phase." *Memo. in Opp. to Motion to Extend*, p. 17.

Little Hocking's argument is not well-taken. It appears to the Court that DuPont's Twenty-Third Affirmative Defense referred to DuPont's own studies and data. The fact that Dr. Rickard was unprepared to testify to the studies and data upon which Little Hocking intends to rely cannot be held against DuPont. As it relates to this issue, the *Motion to Compel* is **DENIED**.

## 2. DuPont's response to C8 issues (Topic 26)

Topic 26 specifically addresses the following:

26. All Information known or reasonably available to DuPont regarding DuPont's management and corporate level response and handling of PFOA contamination in the vicinity of the Facility, including at the Wellfields.

*Exhibit 3*, PAGEID# 5095 (Rule 30(b)(6) notice served on January 4, 2013), attached to *Lombardo Declaration*.

Little Hocking complains that Dr. Rickard was unprepared to testify on this issue because, prior to his deposition, he "failed to even speak to a key DuPont in-house attorney widely known for his serious concerns about DuPont's leadership on the C8 issue." *Motion to Compel*, p. 8 (citing *Exhibit 9* (deposition excerpt of Dr. Rickard),

attached thereto).  Other than this sentence, Little Hocking provides no other information, background or context to explain why this purported failure to talk to an unknown in-house counsel establishes that Dr. Rickard was unprepared on this topic.  Instead, Little Hocking generally points to Dr. Rickard's deposition excerpt (and providing no citation to specific pages), apparently assuming that the Court will, after reading the excerpt, be able to glean this necessary information and formulate Little Hocking's argument.  Although Little Hocking goes on to flesh out its argument and cites to new evidence in its *Reply to Motion to Compel*, pp. 12-13, this expanded argument does not appear to be in response to anything raised in DuPont's *Memo. in Opp.*  Little Hocking's decision to wait until its reply memorandum to explain why Dr. Rickard is unprepared on this topic has deprived DuPont of the opportunity to respond to this argument.  The Court has no obligation, and therefore will not, consider arguments raised for the first time in a reply brief.  *See, e.g., Ross v. Choice Hotels Int'l*, 882 F. Supp.2d 951, 958 (S.D. Ohio ) ("This Court has explained time and again that a 'reply brief is not the proper place to raise an issue for the first time.' . . . Consequently, the Court need not and will not consider [a party's] new or newly recast arguments.") (citations omitted).  Accordingly, as it relates to re-opening Dr. Rickard's deposition regarding DuPont's response to C8 issues (Topic 26), the *Motion to Compel* is **DENIED**.

### D.    David F. Altman

Little Hocking complains that designee David F. Altman was unprepared to address (1) river "mixing zone" studies (Topics 6 and

7), and (2) drains and outfalls as a potential source of C8 contamination (Topic 9). *Motion to Extend*, p. 14; *Reply to Motion to Extend*, p. 15; *Motion to Compel*, pp. 8-10; *Reply to Motion to Compel*, p. 12. Once again, Little Hocking fails to provide the actual text of these topics or otherwise direct the Court to an exhibit containing the Rule 30(b)(6) notice. Nevertheless, the Court will address each topic in turn.

### 1. River "mixing zone" studies (Topics 6 and 7)

After sifting through the multiple exhibits, the Court determined that Topics 6 and 7 specifically address the following:

> 6. All Information known or reasonably available to DuPont about the past and current flow characteristics of the Ohio River (e.g., river hydraulics, pattern of sedimentation, erosion issues, mixing zone issues, hydrology, preferential flow pathways, and barriers to flow) in the vicinity of: (a) Blennerhassett Island; (b) the [Washington Works] Facility; and (c) Little Hocking's Wellfields.

> 7. All Information known or reasonably available to DuPont about any mixing zone study, investigation, or inquiry of the Ohio River performed regarding the [Washington Works] Facility, including: (a) the 1999 ACT related study; (b) any mixing zone dilution study involving dye concentrations from Facility outfalls; and (c) DuPont's models predicting C8 concentrations in the Ohio river (including the model predicting C8 concentrations in the Ohio River to be above the community exposure guideline approximately 50% of the time).

*Exhibit 3* (Rule 30(b)(6) notice served on January 4, 2013), attached to *Lombardo Declaration*.

Little Hocking complains that Mr. Altman was unprepared to address these topics because he was unable to testify "on the basics of the model that was at the heart of the mixing zone report[,]" *Motion to Compel*, p. 8, "the so-called CORMIX model[.]" *Reply to*

*Motion to Extend*, p. 15.  To support its assertion that Mr. Altman was

unprepared in this regard, Little Hocking apparently relies on Mr.

Altman's testimony during his deposition on January 17, 2013 that he

failed to investigate various CORMIX models:

> Q:    So did you check into the uses of various CORMIX
> models as part of your preparing for the deposition?
>
> A:    No, sir.  I didn't realize that that was — there would
> be a question related to this.  My focus of this was on the
> mixing zone report proper.

*Exhibit 10*, PAGEID# 4909 (Mr. Altman's deposition excerpt), attached

to *Motion to Compel*.

DuPont denies that Mr. Altman was unprepared to discuss his

designated topics and details the preparation prior to his deposition,

including the specification of the various individuals whom he

contacted in order to discuss the mixing zone study.  *Cavanaugh*

*Declaration*, ¶ 8 (identifying, *inter alios*, one of the authors of the

study as someone whom he contacted).  DuPont goes on to argue that the

various uses of the CORMIX modeling system were beyond the scope of

the deposition and that Mr. Altman's failure to investigate this issue

does not establish that he was unprepared to testify on the designated

topic.  *Memo. in Opp. to Motion to Extend*, pp. 16-17.

This Court agrees.  Topic 7 seeks testimony regarding "models

predicting C8 concentrations in the Ohio river" related to the mixing

zone study.  Although Little Hocking identifies the "CORMIX" model as

a "key part of the mixing zone study[,]"[21] Little Hocking provides no

---

[21] The Court understands from DuPont's representations that the third party
contractor that performed the mixing zone study used a particular type of
model, CORMIX, which is an acronym for the Cornell Mixing Zone Expert System.
*Memo. in Opp. to Motion to Extend*, p. 16.

background or basic information that would establish this model's significance.  *Reply to Motion to Extend*, p. 15.  Therefore, based on the present record, the Court cannot conclude that Mr. Altman was unprepared simply because he could not testify regarding details of the various CORMIX models.  In other words, the evidence offered fails to persuade this Court that Topic 7 required the level of preparation and detail sought by Little Hocking during the deposition.  *See also Exhibit 10*, PAGEID# 4909 (establishing that CORMIX three is the output model used).  Indeed, the scant excerpt related to this testimony suggests that Mr. Altman was able to answer some questions related to the model technique.  *Exhibit 10*, PAGEID# 4909 - 4910, attached to *Motion to Compel*.  Accordingly, as it relates to re-opening Mr. Altman's deposition regarding the mixing zone report (Topics 6 and 7), the *Motion to Compel* is **DENIED**.

> ### 2. Drains and outfalls as a potential source of C8 contamination (Topic 9)

Topic 9 specifically addresses the following:

> 9.  All Information known or reasonably available to DuPont about waste handling, treatment, storage and/or disposal activities at each potential source area and/or solid waste management unit at the [Washington Works] Facility, including[, *inter alia*, various outlets/outfalls, stormwater outfalls; and sewer system or drain system.]

*Exhibit 3* (Rule 30(b)(6) notice served on January 4, 2013), attached to *Lombardo Declaration*.

Little Hocking argues that Mr. Altman was not prepared to speak on this topic because he failed to investigate "the sources of the storm water held in a major storm water retention pond at the facility, could not say how long the pond had been there, and could

49

not say with any certainty whether the pond had ever been tested for C8." *Motion to Compel*, p. 9 (citing *Exhibit 10* (Mr. Altman's deposition excerpt), attached thereto). Little Hocking also contends that Mr. Altman failed to investigate "changes to the drainage areas at the facility and even failed to investigate C8 sampling events at facility storm water outlets." *Id*. DuPont offers no response on this issue. The Court therefore accepts Little Hocking's uncontroverted argument and supporting testimony. Accordingly, as it relates to re-opening Mr. Altman's deposition regarding drains and outfalls as a potential source of C8 (Topic 9), the *Motion to Compel* is **GRANTED in part and DENIED in part**. Specifically, DuPont is **ORDERED** to re-produce Mr. Altman on this narrow issue for a deposition not to exceed two (2) hours no later than April 12, 2013. However, because the deposition testimony reflects that Mr. Altman was able to provide some substantive responses on this topic, the Court cannot conclude that he was unprepared for his deposition. Therefore, Little Hocking's request for fees and expenses related to the re-opening of this deposition is not well-taken.

**E.    Roger Zipfel**

Little Hocking represents that DuPont designated Roger Zipfel to testify regarding river concentration models involving C8 (Topic 7(c)) and drain investigation issues (Topics 11 and 12). *Reply to Motion to Compel*, p. 11. The Court shall address each topic in turn.

**1.    River models relating to C8 (Topic 7(c))**

Topic 7(c) specifically addresses the following:

7.    All Information known or reasonably available to DuPont about any mixing zone study, investigation, or

50

> inquiry of the Ohio River performed regarding the
> [Washington Works] Facility, including. . . (c) DuPont's
> models predicting C8 concentrations in the Ohio River
> (including the model predicting C8 concentrations in the
> Ohio River to be above the community exposure guideline
> approximately 50% of the time).

*Exhibit 3*, PAGEID# 5091 (Rule 30(b)(6) notice served on January 4,

2013), attached to *Lombardo Declaration*.

Little Hocking complains that Mr. Zipfel was unprepared on this

topic because he "did not review key river models conducted by DuPont

on the Ohio River" and therefore could not answer related questions.

*Reply to Motion to Extend*, pp. 15-16 (citing *Exhibit 11* (Mr. Zipfel's

deposition excerpt), attached to *Motion to Compel*).  In support,

Little Hocking cites to testimony regarding Mr. Zipfel's failure to

review certain evidence.  *Reply to Motion to Compel*, p. 11 (citing

*Exhibit 11*, page 5, attached to *Motion to Compel*).  After reviewing

the cited page, the Court assumes that Little Hocking relies on the

following exchange:

> Q:   With your magnifying glass or otherwise, did you
> review the results of these models in preparing for this
> deposition?
>
> A:   I did not.
>
> Q:   Did somebody tell you not to?
>
> A:   No.

*Exhibit 11*, PAGEID# 4931, attached to *Motion to Compel*.

However, the surrounding pages do not provide the context of this

exchange and the Court cannot understand the significance of the

document at issue in this line of questioning.  Without this

information, the Court cannot say whether failure to review such

information establishes that Mr. Zipfel was unprepared on this topic.

Moreover, DuPont describes various efforts and steps taken to prepare Mr. Zipfel for his deposition. *Memo. in Opp. to Motion to Compel*, p. 9; *Cavanaugh Declaration*, ¶ 9. In addition, after he was unable to answer a question during his deposition on January 17, 2013 about an email written by Robert Pinchot, a current DuPont employee, Mr. Zipfel telephoned and spoke with Mr. Pinchot "regarding modeling C-8 in the Ohio River." *Cavanaugh Declaration*, ¶ 10. Taking the record as a whole, the Court cannot conclude that DuPont failed to provide a properly prepared Rule 30(b)(6) designee on this topic. Accordingly, as it relates to Little Hocking's request to re-open the deposition of Mr. Zipfel on the topic of river model relating to C8 (Topic 7(c)), the *Motion to Compel* is **DENIED**.

### 2. Drain investigation (Topics 11 and 12)

Topics 11 and 12 specifically address the following:

11. All Information known or reasonably available to DuPont about the Drain System at the Facility from 1940 through the present, including but not limited to the location of said current and former Drain System, potential sources of PFC waste releases into or from that system, modification of the Drain System including the placement of, removal of, excavation of, addition to, repair of and/or replacement of any component of the Drain System.

12. All Information known or reasonably available to DuPont about each investigation of and information gathering about discharges into or releases from the Sewer System or Drain System at the Facility, including any dye testing; drain color coding activities; leak detections; leak repairs; excavation; or any testing of any soil, sludge, fill material, and/or sediment in the Drain System or beneath the Drain System component parts, and the names of current and/or former employees who participated in such investigation and/or information gathering.

*Exhibit 3*, PAGEID# 5091 – 5092 (Rule 30(b)(6) notice served on January 4, 2013), attached to *Lombardo Declaration*.

The Court understands that Little Hocking believes that Mr. Zipfel was unprepared to testify regarding these topics for two reasons. First, Little Hocking contends that Mr. Zipfel did not review documents related to dye testing "that were performed on drains in the Fluoropolymers area" even though he knew about this testing. *Reply to Motion to Compel*, p. 11 (citing *Exhibit 11* (Mr. Zipfel's deposition excerpt), pp. 21-22, attached to *Motion to Compel*). After reviewing the cited pages, the Court agrees that Mr. Zipfel could not answer several questions related to dye testing in the Flouroproducts division. *See Exhibit 11*, PAGEID# 4947 - 4949, attached to *Motion to Compel*. However, Mr. Zipfel responded to other questions regarding dye testing in this area. *Id.* Moreover, DuPont represents that Mr. Zipfel's preparation included discussions with others regarding the fluoropolymers area. *See Cavanaugh Declaration*, ¶ 9(i), (j).

Second, Little Hocking argues that Mr. Zipfel was unprepared because he was unable to address "critical components of the drain system, including C8 source areas referred to as the wood-lined trenches." *Id.; Motion to Compel*, p. 9. In reviewing the relevant testimony, the Court agrees that Mr. Zipfel was unable to respond to several questions related to wood-lined trenches, but was prepared to answer other questions regarding the trenches. *See Exhibit 11*, PAGEID# 4939 - 4945 (Mr. Zipfel's deposition excerpt), attached to *Motion to Compel*.

Accordingly, as it relates to Little Hocking's request to re-open Mr. Zipfel's deposition on the narrow issues of river concentration models involving C8 (Topic 7(c)) and drain investigation issues,

specifically in the fluoropolymers area (Topics 11 and 12), the *Motion to Compel* is **GRANTED in part and DENIED in part**.  DuPont is **ORDERED** to re-produce Mr. Zipfel on these specific topics for a deposition, not to exceed three (3) hours, no later than April 12, 2013.  However, because the Court concludes that Mr. Zipfel was prepared to speak to some extent on these topics, Little Hocking's request for fees and expenses related to the re-opening of this deposition is not well-taken.

**VII.  DEPOSITIONS RELATED TO ALLEGED BELATED DOCUMENT PRODUCTION**

Little Hocking contends that DuPont's production of summaries of well production on January 7, 2013 and production of electronic information underlying DuPont's groundwater flow model on January 9, 2013 were untimely, warranting additional discovery.  *Motion to Extend*, pp. 12-13; *Motion to Compel*, p. 10; *Reply to Motion to Compel*, pp. 14-15.  The Court shall address each issue in turn.

**A.  Andrew Hartten**

Little Hocking represents that DuPont designated Mr. Hartten to address pumping well records as well as DuPont's groundwater flow model.  *Notice*, p. 7; *Motion to Compel*, p. 12.  Mr. Hartten's deposition was taken on January 10, 2013, shortly after the production of the summaries of pumping information and electronic information underlying the groundwater flow model.  *Exhibit 4* (Mr. Hartten's deposition transcript), attached to *Motion to Extend*.  Little Hocking argues that the timing of this January production prevented Little Hocking from fully preparing and questioning Mr. Hartten on January 10, 2013.  *See*, *e.g.*, *Second Newman Declaration*, ¶¶ 11-17.  However,

as set forth in the discovery history detailed above, the record is inconclusive as to whether some or all of this information was previously produced to Little Hocking in June 2011.

After considering the evidence and arguments of the parties, the Court concludes that a limited re-opening of Mr. Hartten's deposition is warranted. Accordingly, as it relates to the request to re-open Mr. Hartten's deposition regarding the summaries of pumping records produced on January 7, 2013 and the electronic information underlying DuPont's groundwater flow model on January 9, 2013, the *Motion to Compel* is **GRANTED in part and DENIED in part**. DuPont is **ORDERED** to re-produce Mr. Hartten for further deposition, lasting no more than four (4) hours, on these topics no later than April 12, 2013. Because of the discovery history described *supra*, Little Hocking's request for fees and costs associated with this re-opened deposition is not well-taken.

**B. Depositions of Other Named Witnesses**

Little Hocking also argues that the January 2013 production prevented it from adequately preparing for and deposing the following individuals: (1) David Booth; (2) Alison Crane; (3) Roger Zipfel; and (4) David F. Altman. *Motion to Compel*, p. 11. Other than this conclusory assertion, however, Little Hocking offers no other supporting argument or evidence. Accordingly, as it relates to the request to re-open of these four individuals based on the January 2013 production of documents, the *Motion to Compel* is **DENIED**.

**C.   Unknown Designee(s) Regarding January 7 & 9, 2013
      Production**

Notwithstanding Little Hocking's representations as to Mr.
Hartten's designation relating to pumping records and the groundwater
flow model discussed *supra*, Little Hocking nevertheless asks for an
order compelling DuPont to produce designee(s) to address the
documents produced in January 2013.  *Motion to Compel*, pp. 12-13;
*Reply to Motion to Compel*, p. 15.  In reviewing the record,
particularly in light of the re-opened deposition of Mr. Hartten,
Little Hocking has failed to persuade this Court that the requested
deposition is warranted.  Accordingly, as it relates to Little
Hocking's request for the deposition of a designee to address the
documents produced in January 2013, the *Motion to Compel* is **DENIED**.

 **WHEREUPON**, *Little Hocking's Supplemental Motion to Extend Fact
and Discovery Deadlines and Motion to Compel*, Doc. No. 161, is **GRANTED
in part and DENIED in part** consistent with the foregoing.[22]

 *Defendant E.I. Du Pont de Nemours and Company's Motion for Leave
to Supplement Its Response in Opposition to Plaintiff The Little
Hocking Water Association, Inc.'s Supplemental Motion to Extend Fact
and Discovery Deadlines and Motion to Compel*, Doc. No. 172, is **DENIED**.

 In light of the above, *Defendant E.I. Du Pont de Nemours and
Company's Motion for Oral Argument on Outstanding Motions and for
Entry of Order Prohibiting or Limiting Additional Testimony from
DuPont's Rule 30(b)(6) Corporate Designees*, Doc. No. 192, is **DENIED as**

---

[22] Although Little Hocking concedes that "the issue is not ripe for a motion
[to compel,]" it nevertheless goes on to complain that DuPont has not
provided proper answers to Little Hocking's requests for admissions.  *Motion
to Compel*, p. 13.  Based on its own concession, the Court need not, and does
not, take any position on this concededly undeveloped discovery issue.

**moot**. Nevertheless, all parties are **REMINDED** that the Court expects counsel to behave in a professional manner and to abide by the Federal Rules of Civil Procedure.

Finally, the recent filing of multiple, repetitious motions and briefs on the same issue has wasted the parties' resources and this Court's time. Accordingly, both parties are **REMINDED** of the following:

1.    A hybrid motion, *i.e.*, a single filing combining multiple topics and forms of relief, such as Doc. No. 161, will not be favorably received by the Court;

2.    Any party that concludes, based on subsequent developments, that supplementation of an earlier filing is necessary, must request a conference with the Court before filing (a) a motion to supplement, (b) a substantive brief or motion disguised as a "notice" (*e.g.*, Doc. No. 158), (c) a notice of supplemental authority, or (d) any filing beyond those enumerated in S.D. Ohio Civ. R. 7.2(a)(2).[23] The requesting party must be prepared to establish good cause for the proposed supplementation;

3.    As it relates to nondispositive motions, the Court will not permit the filing of such motions or related memoranda longer than 10 pages[24] except with express leave of Court, which will be only

---

[23] Emails to the undersigned containing arguments and evidence, unless specifically invited in advance, are similarly improper.

[24] As discussed *supra*, nondispositive motions and briefs incorporating by reference the substance of or portions from other motions or briefs are also unacceptable. In addition, filings with multiple footnotes in small font containing substantive arguments as a means around this page limitation are likewise unacceptable.

sparingly granted, and upon demonstration that the complexity of the issue requires a lengthier filing;

4.   As it relates to nondispositive motions, any party referring to or arguing about any discovery request or testimony of a witness or designee, must, at the earliest opportunity (*i.e*, in the initial motion or brief opposing the motion), (a) identify the discovery request by number and describe the content of the request, and/or identify the witness's or designee's full name and provide the topic(s) number (and summary of topic) covered by the deposition notice or subpoena; (b) attach as an exhibit a copy of the discovery request and/or deposition notice or subpoena; and, if applicable, (c) attach as an exhibit a copy of the relevant portions of the deposition transcript; and

5.   As it relates to the resolution of nondispositive motions, separate motions requesting oral argument or evidentiary hearing on such nondispositive motions (*e.g.*, Doc. No. 192) will not be well-received.[25]

In short, the Court will no longer tolerate unnecessarily voluminous motions and briefs or repetitive filings or piecemeal litigation.  The parties are therefore **SPECIFICALLY ADVISED that a failure to comply with any of these limitations MAY RESULT IN THE DENIAL OF A NONDISPOSITIVE MOTION.**

March 25, 2013                         *s/Norah McCann King*
                                       Norah M$^c$Cann King
                                       United States Magistrate Judge

---

[25] The Court assures the parties that it will notify them should it conclude that oral argument or an evidentiary hearing is necessary to the resolution of any nondispositive motion.