**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

THE LITTLE HOCKING WATER ASSN., INC.,

      Plaintiff,

    vs.                            Civil Action 2:09-cv-1081
                                    Judge Smith
                                    Magistrate Judge King

E.I. DU PONT DE NEMOURS & CO.,

      Defendant.

<u>OPINION AND ORDER</u>

      This litigation has been protracted and even a cursory review of the course of discovery makes clear that the discovery disputes, which have been many, have been vigorously litigated by both parties. This matter is now before the Court on plaintiff *Little Hocking's Motion for Sanctions Regarding Conduct of DuPont's Counsel During May 10, 2013 Myers Deposition*, Doc. No. 239 ("*Motion for Sanctions*").

**I.    BACKGROUND**

      Little Hocking owns wellfields directly across the Ohio River from DuPont's Washington Works Plant. *First Amended Complaint*, Doc. No. 23, ¶¶ 26, 29. The wellfields include four production wells that Little Hocking alleges "have been and continue to be contaminated by DuPont's release of [h]azardous [w]astes." *Id*. at ¶ 32. The alleged hazardous wastes consist of "perfluorinated compounds, precursors to perflourinated compounds and/or other toxic and hazardous materials that may be released with these perfluorinated compounds,"

collectively referred to as "PFCs." *Id.* at ¶ 5.  According to Little Hocking, DuPont uses at least one PFC, ammonium perfluorooctanoate ("APFO") in connection with its Teflon® related products.  *Id.* at ¶ 44.  APFO is the ammonium salt of "PFOA," the acronym used to identify the chemical perfluorooctanoic acid commonly referred to as "C8."  *Id.* at ¶¶ 45 n.1, 48.  Little Hocking alleges that DuPont has used PFOA at its Washington Works Plant from at least 1951 to the present.  *Id.* at ¶ 46.

This Court previously concluded that certain historic, *i.e.*, pre-2006, well pumping production data is discoverable under Fed. R. Civ. P. 26(b)(1).  *Opinion and Order*, Doc. No. 169, p. 66; *Opinion and Order*, Doc. No. 194, pp. 18-22.  The Court also addressed the purported destruction of such historic data as well as of the computer technology necessary to read this data.  *Opinion and Order*, Doc. No. 194, pp. 22-28.  More briefly, by way of background, from the early to mid-1980s until 2006, DuPont tracked well production information on a computer system, named "Vantage," that ran on a VAX computer; this information was stored on magnetic tapes.  *Id.* at 22-23 (citing *Declaration of John T. Myers* ("*Myers Declaration*"), which is attached as *Exhibit 3* to the *Motion for Sanctions*).[1]  The VAX computer uses now-outdated technology that has not been produced since the early 1990's.  *Id.* at 22.  Before DuPont transitioned to a new system, known as "IP-21," two years ago, Mr. Myers unsuccessfully attempted to retrieve

---

[1] DuPont has employed Mr. Myers since 1979 and he has "had an office at the Washington Works facility since 1999." *Myers Declaration*, ¶ 3.  He is "familiar with DuPont's current and preexisting systems used to monitor and record well production" and has "approximately 30 years of experience with monitoring and supporting DuPont Chemical Processes." *Id.* at ¶ 4.

usable information from some of the old data stored on degraded VAX
tapes.  *Id*. at 22-23.  He ultimately replaced tape backups by using
his computer's hard drive to store "raw VAX data."  *Id*. at 23.
Approximately two years ago, when DuPont switched to the IP-21 system,
DuPont dismantled the VAX unit and Mr. Myers developed a process to
translate VAX data into a readable format.  *Id*.  However, according to
Mr. Myers, it was impractical to process all of the retained data
because the process was extremely time consuming and data intensive.
*Id*. at 23-24.  In August 2012, after conducting an investigation at
the Washington Works Plant, DuPont was unable to locate any well
records on microfilm.  *Id*. at 24.

As noted *supra*, the Court permitted Little Hocking to conduct
discovery related to "the [alleged] failure to preserve or the
destruction of the pre-2006 pumping records maintained on back-up
tapes as well as the Vantage system and/or VAX computer." *Opinion and
Order*, Doc. No. 194. The Court specifically ordered the following:

> DuPont is **ORDERED** to produce a Rule 30(b)(6) corporate
> designee addressing these issues no later than April 19,
> 2013 for a deposition limited to no more than one 7-hour
> day.  In so ordering, Little Hocking is **ADVISED** to limit
> its inquiry to questions directly related to these issues.
> DuPont is **FURTHER ORDERED** to produce to Little Hocking, no
> later than seven (7) days prior to that deposition, all
> documents related to the preservation, failure to preserve
> and/or destruction of this historical data and technology.

*Id*. At p. 28.  The deadline for completing the deposition was later
extended to April 26, 2013, *Order*, Doc. No. 196, p. 2, and again
extended to May 10, 2013, *Opinion and Order*, Doc. No. 208, p. 8.

On May 7, 2013, Little Hocking served its Rule 30(b)(6)
deposition notice directed to two designees, Mr. Myers and Mark Eakle

("the designees").  *Exhibit 2* (Rule 30(b)(6) deposition notice), p. 1,

attached to *Motion for Sanctions* ("the Rule 30(b)(6) notice").  The

Rule 30(b)(6) notice advised that Little Hocking expected the

designees to testify on the following topics:

> • All Information known or reasonably available to DuPont
> about the maintenance and degradation or destruction of
> pre-2006 well records (and related technology, the Vantage
> system and VAX), including information related to the
> failure to preserve or the destruction of those records
> maintained on back-up tapes, as  well  as the Vantage
> system and/or VAX computer.
>
> • All Information known or reasonably available to DuPont
> about the preservation, failure to preserve and/or
> destruction of historical well records and  associated
> technology, including but not limited to: the roles and
> identities of decision makers and in-house counsel;
> retention instructions and/or hold orders given or
> Considered;  decisions about preservation  in  response to
> governmental  or  regulatory  obligations;  and  retention
> decisions based on threatened or filed litigation.
>
> • All Information known or reasonably available to DuPont
> about the circumstances related to DuPont's discovery of
> production well documents and media "just found."

*Id*. at PAGEID#: 7497.

After Little Hocking served the Rule 30(b)(6) notice, a dispute

arose as to the scope of Little Hocking's inquiry.  *Order*, Doc. No.

214.  On May 8, 2013, the Court addressed that disagreement and

clarified the appropriate scope of inquiry:

> As the Court understands the current dispute, plaintiff
> proposes to inquire into DuPont's duty to preserve such
> records, including the circumstances surrounding holds that
> were issued (or should have been issued) in connection with
> DuPont's governmental filing obligations or with other
> litigation involving DuPont.
>
> This Court agrees with DuPont that those lines of inquiry
> go far beyond the scope of the discovery authorized by the
> Court's order[, Doc. No. 194, p. 28].  Because those lines
> of inquiry were not authorized by the Court, plaintiff will

not be permitted to [pursue] them at the anticipated Rule
30(b)(6) deposition.

*Id.*

On May 10, 2013, Little Hocking conducted the Rule 30(b)(6)
deposition of Mr. Myers ("the May 10th Myers Deposition").[2] *See*, *e.g.*,
*Declaration of D. David Altman*, ¶ 8, attached as *Exhibit 1* to the
*Motion for Sanctions* ("*Altman Declaration*"); *Exhibit 4*, attached to
*Motion for Sanctions*.  By agreement of the parties, the deposition
adjourned early with the understanding that Little Hocking would
depose Mr. Myers and the second Rule 30(b)(6) designee, Mr. Eakle, for
"about" four hours on July 10, 2013.  *Altman Declaration*, ¶¶ 11-13.[3]

Following the May 10th Myers Deposition, Little Hocking filed the
*Motion for Sanctions*, complaining that DuPont's counsel, Attorney
Niall Paul, (1) improperly instructed the witness not to answer
certain questions and blocked relevant lines of questioning; (2)
improperly signaled the witness; and (3) testified on key matters.  In
the motion presently before the Court, Little Hocking seeks payment of
all of its costs and fees related to the May 10th Myers Deposition,
costs and fees related to the filing of this *Motion for Sanctions,* and
an additional three deposition hours as well as the costs associated
with those additional hours.  DuPont opposes the *Motion for Sanctions*.
*DuPont's Response in Opposition to Little Hocking's Motion for*

---

[2] Although Mr. Myers was one of DuPont's Rule 30(b)(6) designees on the topic
of the alleged failure to preserve or the destruction of pre-2006 pumping
records, the Court previously denied Little Hocking's request to depose him
in his personal capacity.  *See Opinion and Order*, Doc. No. 208, p. 9.
[3] Later filings confirm that the deposition of Mr. Myers in fact continued on
July 10, 2013, *i.e.*, after the filing of the *Motion for Sanctions* on July 1,
2013.  *See*, *e.g.*, *Exhibit 18* (excerpt from deposition of Mr. Myers taken on
July 10, 2013), attached to *Little Hocking's Motion for Sanctions for Lack of
Reasonable Inquiry and Discovery Abuses*, Doc. No. 264.

*Sanctions Regarding Conduct of DuPont's Counsel during May 10, 2013 Myers Deposition*, Doc. No. 247 ("*DuPont's Opposition*").  With the filing of the *Reply in Support of Little Hocking's Motion for Sanctions Regarding Conduct of DuPont's Counsel During May 10, 2013 Myers Deposition*, Doc. No. 258 ("*Reply*"), this matter is ripe for resolution.

## II.  STANDARD

Rule 30(c)(1) of the Federal Rules of Civil Procedure requires (with certain exceptions inapplicable here) depositions to "proceed as they would at trial under the Federal Rules of Evidence[.]"  Rule 30(c) also governs objections raised during a deposition:

> An objection at the time of the examination . . . must be noted on the record, but the examination still proceeds; the testimony is taken subject to any objection.  An objection must be stated concisely in a nonargumentative and nonsuggestive manner.  A person may instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation ordered by the court, or to present a motion under Rule 30(d)(3) [addressing depositions through written questions].

Fed. R. Civ. P. 30(c)(2).

Under Rule 30(d)(2), a court "may impose an appropriate sanction - including the reasonable expenses and attorney's fees incurred by any party - on a person who impedes, delays, or frustrates the fair examination of the deponent."

## III.  LINES OF QUESTIONING "BLOCKED"

Little Hocking argues that Mr. Paul improperly instructed Mr. Myers not to answer certain questions and blocked relevant lines of questioning.  *Motion for Sanctions*, pp. 3-4, 9-10; *Reply*, pp. 5-7.

6

The Court shall address only the specific instances identified by Little Hocking.

**A.    Myers' CDs of Well Data**

Although the motion in this regard is difficult to follow, the Court understands that Little Hocking seeks sanctions as to testimony relating to CDs created by Mr. Myers that contain well data because (1) Mr. Paul prevented Mr. Myers from giving "uninterrupted testimony" regarding CDs of well data that Mr. Myers created and that Mr. Paul himself testified regarding the CDs while signaling to the witness, *Motion for Sanctions*, p. 3 (citing *Exhibit 4* (excerpt of Myers May 10th deposition, pp. 262-65)); and (2) Mr. Paul blocked inquiry as to DuPont's corporate answers related to what happened to the CDs after they were turned over to the Power & Services unit ("P&S") "years earlier."[4]  *Id*. at 4 (citing *Exhibit* 7, attached thereto); *Reply*, pp. 6-7 n.6 (citing, *inter alia*, *Exhibit* 7, attached to *Motion for Sanctions*).  DuPont disagrees that sanctions are appropriate, contending that Mr. Myers answered Mr. Altman's questions and that, in fact, Little Hocking later relied on that testimony as a basis for a request to broaden sanctions discovery. *DuPont's Opposition*, p. 9 (citing Doc. Nos. 216; 226, pp. 6-7; 235).

As to the allegation that Little Hocking's inability to obtain "uninterrupted testimony" arising from Mr. Paul's behavior warrants

---

[4] P&S apparently "tracks the water supply from the groundwater production wells for" the Washington Works facility, "controls the wastewater treatment facility, and oversees waste storage and disposal areas" and "collects and coordinates outfall sampling and participates in investigations of outfall-related problems." *Opinion and Order*, Doc. No. 169, pp. 32-33 (internal quotation marks and citations omitted).

sanctions, the Court has reviewed the relevant portion of the

transcript:

> Q. Sir, I put in front of you what's been marked for
> identification as Exhibit -- DuPont Exhibit 254, 254. This
> purports to be a set of photographs that were provided to
> us in newly discovered material, supposedly newly
> discovered material associated with well pumping data. Do
> you -- can you identify anything that resembles or
> you feel are the CDs that you testified about?
>
> A. Yeah, these look like the earlier style that were --
> the backup set.
>
> Q. Which -- which ones?
>
> MR. PAUL: Let's be clear. He's not designated on this
> topic, specifically not designated on the topic.
>
> MR. ALTMAN: I'm asking him if they look like the CDs that
> he made that he testified about. I believe he testified
> that it went up to the year 2006.
>
> A. Beyond that.
>
> Q. Even later than that?
>
> A. Like I said early on, when I was first experimenting
> with this, I would FTP a backup set - -
>
> Q. And you said that three times, but I'm asking—
>
> MR. PAUL: You've actually asked it more than three, David.
> Let him answer your question.
>
> Q. I know I'm just asking you the question. What -- are
> these the CDs that you made on your CD burner that you
> testified about earlier today?
>
> MR. PAUL: And this witness is not designated to cover this
> topic.
>
> MR. ALTMAN:  I'm just asking him if these are the CDs.
>
> MR. PAUL: And, hey, I'm telling you he's not designated to
> talk about these pictures of these CDs.
>
> Q. Well, I'm asking you about them. I want you to identify
> if these are the CDs that you testified about earlier
> today.

MR. PAUL:  He's testified about different CDs.

MR. ALTMAN:  I'm not asking about the discovery.

MR. PAUL:  No, I said he's testified about different types of CDs.

MR. ALTMAN:  Niall, you've got to stop.

MR. PAUL:  No, I don't.

MR. ALTMAN:  You've got to stop testifying.

MR. PAUL:  I'm not testifying.

MR. ALTMAN:  You object, tell him not to answer, do whatever – –

MR. PAUL:  I will do my job, David.  You did your job.

MR. ALTMAN:  You're not allowed to signal or signal the witness about what he should think about things.

MR. PAUL:  You have a question pending?  You should probably ask a question.

A.  It looks like if those are the CDs – they look like – they look like the CDs that I talked about or at least some of them because remember I made duplicates of all of these so, you know, maybe one set.

Q.  Where did the duplicates go?

A.  Normally I kept them together because the problem wasn't -- I wasn't worried about them being damaged in some way.  I was worried about them being unreadable.  And so the deal was I – I needed two so that at least one would be readable.

Q.  Can you identify this is likely to be your writing on these CDs?

A.  That's definitely my writing.  And that label there, that cute little label there, I made it my own personal little label maker.  I got the template for it and all that and I haven't used it in years.  But that's what I used in that day.  I stopped doing that because those plastic labels come off in your CD reader and have a tendency to do nasty things to the inside of it.  So at some point, I decided to quit making those cute little labels and just write on them with permanent marker.

Q.  So what was the total number of CDs that you turned
over to Power and Services?

MR. PAUL:  Objection, cumulative.

A.  I don't remember now and I said that I didn't remember.

MR. PAUL:  Exactly.

*Exhibit 4*, pp. 262-65.

Although Little Hocking contends that Mr. Paul blocked its
ability to secure the deponent's uninterrupted testimony on this
topic, as DuPont points out, Little Hocking later relied on Mr. Myers'
substantive testimony regarding the CDs as a basis for a request to
broaden sanctions discovery.  *See*, *e.g.*, Doc. No. 264, PAGEID#: 8474-
8477.

The Court next considers whether Mr. Paul improperly blocked
inquiry as to DuPont's "corporate answers" related to what happened to
the CDs when they were turned over to P&S:

Q.  So you don't know who you addressed the email to?

A.  Somebody who needed to know.

Q.  And why -- what sparked your sending the email?  What
caused you to send the email?

A. Form and substance.  You know, I did something.  I had
essentially changed the custody of the -- of the CDs and I
wanted to let the people know it was done and who had it.

Q.  But you're the 30(b)(6) witness for DuPont.

A.  I understand.

Q.  You were personally involved on top of that with this,
but you don't know who you turned the CDs over to?

MR. PAUL:  He told you who did it.

Q.  But you don't know who ultimately got them?

A.  No, I don't.

10

Q.  So that information is available to DuPont, correct?

MR. PAUL:  What?  Objection as to form, speculation.

Q. Have you asked anyone who got the CDs?

A. No.

MR. PAUL: This witness has not been designated on the discovery of the just found data. He's not designated to –

MR. ALTMAN: I'm not asking about that.

MR. PAUL: I'm telling -- yeah, you are.

MR. ALTMAN: No.

MR. PAUL: Yes, you are.

MR. ALTMAN: I'm asking him –

MR. PAUL: Yes, you are.

MR. ALTMAN: -- whether he knows who the CDs were turned over to.

MR. PAUL: Right.

THE WITNESS: Ultimately?

MR. ALTMAN: After –

MR. PAUL: Asked and answered. He's answered that question.

MR. ALTMAN: Niall, stop talking.

MR. PAUL: No.

Q. After it went to the administrative assistant, do you know, does DuPont know, have any way of knowing who the CDs were turned over to?

MR. PAUL: And cumulative.

A. Okay. That does seem like out of scope of my designation.

Q. I'm asking –

A. I understand.

11

Q. The court is going to decide that and the question is do you know who Ms. Scofield turned over the CDs to?

MR. PAUL: He's answered that question.

Q. Do you know personally?  That's the question you've answered –

MR. PAUL: He's not here to testify personally.  Feel free to answer it.

A. I do not know.

*Exhibit* 7, pp. 103-05, attached to *Motion for Sanctions.*

A:  The answer to the question is after giving – after I gave them to Brenda Scofield –

Q:  Yes.

A:  -- I have no personal knowledge of what happened to them after that.

Q:  And I'm asking you if DuPont knows in that first step –

A:  In my preparation material, I have no information from my preparation material that – that suggests – that even talks about that.

Q:  Did anybody –

MR. PAUL:  David, let me help you here.  Your option.  You changed your terms and referred to these CDs and he adopted your term.  I'm happy to leave it that way.  But you – he talked about these CDs as being something different than what you talked about them being.  He called them archived.  You called them backup.  You might ask him about that.

MR. ALTMAN:  You are doing nothing but signaling the witness.  The record is very clear.

MR. PAUL:  All right.  Never mind.  That's great.  The record is clear.  They were back up CDs.

Q:  When did you archive materials?  Did you archive them on CDs?

A:  Yes.  Yes, I did.

Q:  And the archives were always in your office up until you turned them over to Power and Services?

MR. PAUL:  Objection as to form and mischaracterizes the witness's prior testimony.

A:  As I said before, yes, they were.

Q:  So there were no other archives other than these CDs in your office?

A:  No, that's not true.

MR. PAUL:  That's not what he said.

Q:  Where were the archives?

MR. PAUL:  Listen.  Listen because – listen to his question.  You just said what he said was accurate.  Listen to his question and answer his question.

MR. ALTMAN:  Now you're instructing the witness.

MR. PAUL:  I am instructing him to listen to your question. Answer his question, pay attention –

MR. ALTMAN:  You're signaling the witness -- you're signaling the witness on what to testify.

MR. PAUL:  Really because all I'm telling you to do, John is listen to the question and answer the question.

Q:  What other archives were there other than the CDs you kept in your office?

A:  I had copies of the data on the PC that I burned the CDs on because basically the data came from the Vantage machine to my PC and then was burned to the CD.  But I didn't delete it off of the PC –

Q:  Right.

A:  -- as performing – I would to that, yes, because I had CDs but based on space constraints on the – on the PC, so the PC also had the archives also.

MR. PAUL:  And are you limiting the question to the CDs only as compared to the tapes that he had already described to you which were also archived?

Q:  Are there any other archives besides what you just testified about?  During your time at DuPont, where there any other archives?

MR. PAUL:  Objection as to form, vague.

13

A:  Well, I have a question and that is what are you talking about?  What — what — what other archives are you thinking about?

Q:  No.  The question is what other archives do you know about and that's what you have to answer.

MR. PAUL: He's asking you — are you asking well pumping archives, tape archives, CD archives?

Q:  Where were the archives of the media of the kind you were handling besides what you already testified about?

MR. PAUL:  Relating to well pumping records, David?

Q:  Were there any other archives generally concerning the kind of electronic media you've been talking about?

MR. PAUL:  Objection as to form, vague.

A:  Eventually there were.

Q:  Where?

A:  On a shared drive, WWCS-4.

Q:  And where was that located?

A:  Somewhere in Washing [sic] Works.  I don't know where it is located specifically.  It's just a network address as far as I'm concerned.

Q:  What year did that become an archive?

A:  2008, somewhere around there when I — when I moved the 2004 to 2010 zipped archives to — to the powerhouse shared server so they would have them going forward.

Q:  Now, you're talking about 2004 to 2010 zipped archives. Are they the CDs you're talking about or are they something else?

A:  No.

Q:  These are zipped drives?

A:  These are data on the CDs.  The CD is just a media.

*Id.* at 106-10.

Despite Mr. Paul's numerous objections, this excerpt demonstrates that Mr. Myers provided substantive testimony about the CDs.

**B.    Existence of Pumping Data on Microfiche**

Little Hocking argues that "Mr. Paul obstructed and instructed Mr. Myers not to answer essential foundational questions about whether pre-2006 pumping records existed on microfiche or were destroyed." *Motion for Sanctions*, p. 3 (citing *Exhibit 5*, attached thereto). *See also Reply*, pp. 6-7.  DuPont insists that the record establishes that Mr. Myers answered Little Hocking's questions.  *DuPont's Opposition*, pp. 8-9 (citing *Exhibit 5*, attached to *Motion for Sanctions*).

The record reflects the following exchange on this issue:

 [Q.] Were you aware that a designee on the topic that
included well pumping data testified in November of 2012
that well pumping data still existed on microfiche?

MR. PAUL: Objection and mischaracterizing that witness's
testimony and outside this witness's designation.

A. Well, nothing I done in preparation, nothing I done in
my experience with DuPont puts me in a position to give you
a credible answer.

Q. And I take it you're not aware that the data we're
ultimately -- what this deposition is about is available on
microfiche today?

MR. PAUL: Objection and outside the scope.

A. Because I don't know anything about microfiche.  I don't
know anything about that.

MR. PAUL:  It's outside the scope of his designation.  Now
you can keep asking questions.  Now, by me allowing you to
ask questions outside the scope of his designation, are you
going to use that later that you're allowed to ask more
because if you are, then we'll stop.

MR. ALTMAN:  No, this is --

MR. PAUL:  No, then we'll stop, David.  You're trying to do
-- I allowed you earlier.

15

MR. ALTMAN: You're talking far more than the witness—

MR. PAUL: I'm sorry. I'm sorry that you believe that, but I'm asking a question. If I allow him to answer this question, are you going to use it later --

MR. ALTMAN: Object--

MR. PAUL: -- that somehow we waived an objection?

MR. ALTMAN: Object, instruct him not to answer --

MR. PAUL: I'm asking -

MR. ALTMAN: -- and stop making speeches.

MR. PAUL: I'm asking - okay. Great. You know what, it's outside his designation. He can't answer the question.

*Exhibit 5*, pp. 134-37, attached to *Motion for Sanctions*.

This exchange establishes that Mr. Altman asked Mr. Myers if the deponent knew anything about the microfiche and Mr. Myers answered the question, testifying that he did not. *See also Exhibit 10*, p. 133 (demonstrating that the witness knows nothing about microfiche). Although Mr. Paul later asserted that Mr. Myers "can't answer the question[,]" that assertion came after Mr. Myers had already responded to Mr. Altman's questions about microfiche.

   C.   *Myers Declaration*

Little Hocking complains that Mr. Paul "blocked the questioning of Mr. Myers on the *foundation* for the destruction story **provided to this Court via Mr. Myers' own declaration**." *Motion for Sanctions*, p. 3 (emphasis in original). *See also Reply*, p. 6. According to Little Hocking, Mr. Paul interrupted this testimony to argue that Mr. Myers had not been designated for questions related to Mr. Myers' own declaration. *Motion for Sanctions*, p. 4 (citing *Exhibit 6* (the May

16

10th Myers Deposition, pp. 139-44), attached thereto).  DuPont disagrees, arguing that Little Hocking obtained substantive testimony regarding the *Myers Declaration* upon which Little Hocking later relied in its requests for broader sanctions.  *DuPont's Opposition*, p. 9 (citing *Exhibit 6* (the May 10th Myers Deposition, pp. 139-44), attached to the *Motion for Sanctions*; Doc. No. 226, pp. 5-6; Doc. No. 226-5, pp. 160-64, 168-70).

The transcript excerpt cited by Little Hocking reveals that a dispute arose when Mr. Altman questioned Mr. Myers about statements contained in the affidavit of another person, one Anthony Cavanaugh. More specifically, Mr. Altman asked Mr. Myers if the deponent was aware that Mr. Cavanaugh had collected spread sheets regarding DuPont's well pumping records at the Washington Works Plant from 2006 through the end of 2012 and that Mr. Cavanaugh had advised the Court that the pumping records were gone.  *See Exhibit 6* (the May 10th Myers Deposition, pp. 139-41), attached to the *Motion for Sanctions*. Notwithstanding Mr. Paul's objection to this line of questioning, Mr. Altman continued to ask Mr. Myers about Mr. Cavanaugh's declaration:

> Q:  Let's go to No. 7 on Page 2 [of Mr. Cavanaugh's declaration].  Read what it says at – after the 7.
>
> A:  At a status hearing held Wednesday, January 9, 2013, I informed counsel for Little Hocking that DuPont was unable to locate well pumping information other than what had been previously produced.  At this point, Little Hocking accused DuPont of destroying records and wanted further explanation which DuPont agreed to provide.
>
> Q:  Do you understand that was the information you provided in your declaration?
>
> MR. PAUL:  Objection as to form and –

Q:  Did that – did you understand that that triggered the information that you ultimately provided in your declaration?

MR. PAUL:  Objection as to form and outside the scope.  The witness is not here to testify personally.

MR. ALTMAN:  Niall –

MR. PAUL:  He's not here to testify personally.

MR. ALTMAN:  -- stop making speeches.  I understand –

MR. PAUL:  This is beyond the scope of his designation in which to speak for DuPont.

MR. ALTMAN:  I disagree.

MR. PAUL:  Okay.  Well, I'm glad – can you designate for him what he's going to testify on behalf of DuPont?

MR. ALTMAN:  Niall, you can take anything I ask him and say it's beyond his designation.  There's a point you long exceeded that's unreasonable, but I don't want to waste the time on the record –

MR. PAUL:  The witness has been designated to discuss the alleged destruction of –

MR. ALTMAN:  I'm just asking the question.

MR. PAUL:  Right.

MR. ALTMAN:  You don't have to – you do not have to keep talking.

MR. PAUL:  Right.  I do because I need to say this.  It's beyond the scope of his designation.  He's not going to answer the question.

MR. ALTMAN:  You already said that four times.

MR. PAUL:  He's not going to answer the question.

MR. ALTMAN:  You're instructing him not to answer?

MR. PAUL:  Sure.

MR. ALTMAN:  Okay.  All right.  Well, let's end up the morning with one last exhibit since you've instructed him not to testify further about Mr. Cavanaugh's deposition.

        MR. PAUL:  Declaration.

        MR. ALTMAN:  Declaration.  Excuse me.  Thank you.

*Id.* at 141-44.

        As an initial matter, without more explanation or detail, this
excerpt is difficult to follow as it relates to the alleged
obstruction of testimony regarding the *Myers Declaration*.  Stated
differently, it is not immediately clear how this testimony regarding
Mr. Cavanaugh's declaration establishes that DuPont prevented Mr.
Myers from testifying about the deponent's own declaration.  Moreover,
other portions of the May 10th Myers Deposition establish that Mr.
Myers provided substantive response regarding his own declaration
addressing the destruction of storage tapes, responses that were later
relied upon by Little Hocking.  *See, e.g.*, Doc. No. 226-5 (excerpt
from the May 19th Myers Deposition, pp. 160-76).

        **D.    DuPont's Records Retention Policies**

        Little Hocking also complains that Mr. Paul prevented Mr. Myers
from answering questions related to DuPont's records retention
policies with respect to well data.  *Motion for Sanctions*, pp. 9-10
(citing *Exhibit 11*, attached thereto).  The cited portion of the
transcript, however, reveals that Mr. Myers ultimately answered
questions regarding the records retention policy:

        Q:  Has the ordinary – was the ordinary record retention
        policy for well pumping data suspended to your knowledge?

        MR. PAUL:  Objection as to form, vague.  Objection as to
        form generally and irrelevant and this witness is not
        designated to talk in terms of any – neither witnesses are
        designated to talk in terms of any kind of preservation
        obligation or preservation activity.

        MR. ALTMAN:  I'm asking in the ordinary –

MR. PAUL:  Let me finish my objection.  I'm making an objection.

MR. ALTMAN:  You're making a long talking objection.

MR. PAUL:  Unfortunately they're necessary.  And so this witness has not been designated to cover this topic.  He's not here to testify personally.  I suppose if the witness is capable of answering the question he can try to answer.

Q:  Was the ordinary record retention policy on well pumping data suspended at any point to your knowledge?

MR. PAUL:  Objection, vague.  Same objections as previously, but again, same objection as vague.

A:  To my knowledge, not specifically.  However, if there were any general – yeah, not specifically to my knowledge.

Q:  To your knowledge, were any C8 related documents ever destroyed as part of the swing into spring program?

A:  To my knowledge?

Q:  Yes.

A:  No.  To my knowledge, it was a pain in the butt, but we tried – I had to keep a safety – I had to keep a safety presentation that I had done because we were talking about C8 forever and we're talking about no official record whatsoever but just a safety meeting that I led that mentioned C8.  I couldn't get rid of the freaking overheads.  It was -- yes.  No.  To my knowledge, no C8 documents no matter how trivial, no matter how ridiculous, no matter how wasteful of space were disposed of.

*Exhibit 11* (Myers May 10th Deposition, pp. 76-77), attached to the *Motion for Sanctions*.

**E.    "Background Facts"**

Little Hocking also argues that Mr. Paul improperly blocked "testimony on basic background facts, such as the filing of the Little Hocking complaint against DuPont and the date that Little Hocking learned of the C8 contamination that did not involve the circumstances of holds issued in other litigation." *Motion for Sanctions*, p. 9

(citing *Exhibits 16* and *17* (containing excerpts from the May 10th Myers Deposition, pp. 41-43, 52-54, attached thereto). *See also Reply*, p. 8. DuPont, however, contends that these areas of inquiry and questions seeking Mr. Myers' personal opinion on unrelated matters exceeded the scope of the May 10th Myers Deposition and disregarded the Court's limitations on the deposition. *DuPont's Opposition*, pp. 2-3.

This Court agrees with DuPont. As set forth *supra*, the Court permitted Little Hocking to conduct a Rule 30(b)(6) deposition "related to the [alleged] failure to preserve or the destruction of the pre-2006 pumping records maintained on back-up tapes as well as the Vantage system and/or VAX computer[.]" *Opinion and Order*, Doc. No. 194, p. 28. The Court specifically prohibited inquiry into "DuPont's duty to preserve such records, including the circumstances surrounding holds that were issued (or should have been issued) in connection with DuPont's governmental filing obligations or with other litigation involving DuPont." *Order*, Doc. No. 214.

Little Hocking's first example of this "background" examination contains a dispute regarding the discovery of contamination in the wellfields:

> Q: Okay. Let me show you what we have marked and we're not going to go into any depth in this at all, but I just want to see if you recollect this. Can you identify this document? Do you remember seeing this document?
>
> MR. PAUL: Objection as to form and this is wildly outside the scope. You want to first tie it to the scope of this deposition, David?
>
> Q: I'm just asking a background fact.
>
> MR. PAUL: Well, not -- what does it have to do with the issue of --

MR. ALTMAN:  We're not going to argue.

MR. PAUL:  We are going to argue because, you know what, the court has been very clear at the limit of this; and she's instructed you more than once just the other day telling you to be very careful not to exceed the topics that she's allowed you to go and here you go again.

MR. ALTMAN:  This is background[.][5]

MR. PAUL:  It is not -- a background of destroy -- destruction of data?

MR. ALTMAN:  Don't get -- Niall, yes.

Q:  Do you - do you - do you - did you ever see the article before?

A:  This article?

Q:  Yes.

A:  No.

Q:  Are you aware that on January 16, 2002, there was an event where DuPont told Little Hocking there was contamination in its well field and that contamination --

MR. PAUL:  Objection as to form.  Objection as to scope. Objection as to relevance.  Are you asking the witness personally?  He's not here personally.

Q:  Do you --

MR. PAUL:  He's not here personally as a personal witness.

Q:  Is DuPont aware that this happened?

MR. PAUL:  Is DuPont aware that DuPont told Little Hocking something?  Is that the question?

MR. ALTMAN:  Now these are talking --

MR. PAUL:  Is that the question?

---

[5] A question mark appears in the transcript after this line, *see Exhibit 16*, p. 42, line 3, leading DuPont to argue that Little Hocking does not believe that such questions were simply background.  *DuPont's Opposition*, p. 3.  For purposes of this discussion, the Court accepts Little Hocking's representation that the question mark is a typographical error and not a question.  *See Reply*, p. 8 n.11 (citing *Declaration of Robin A. Burgess*, ¶¶ 9-10, attached thereto as *Exhibit 3*).

MR. ALTMAN: You are not here to question –

MR. PAUL: I am here to limit the scope of your deposition as the court has already done.

MR. ALTMAN: I know you're here to limit the scope. This is simple background and you're taking it way beyond the simple answer to the question.

MR. PAUL: Right. Right. You calling it simple background doesn't make it so, David.

Q: Did you know that the event in this headline took place?

A: This was not something I prepared for.

Q: Did you know that it happened?

MR. PAUL: Asked and answered. Asked and answered. Now you're asking him a personal question. He's not here personally.

*Exhibit 16*, excerpt from May 10th Myers Deposition, pp. 41-43, attached to *Motion for Sanctions*.

Little Hocking also insists that questioning regarding a 2007 notice of a law violation and the filing of the instant litigation were appropriate subjects of background inquiry of Mr. Myers:

Q: And were you aware that there was a notice letter sent by Little Hocking, federal notice letter, on June 6, 2007?

MR. PAUL: The witness is not designated on any topic regarding any notice or letter sent by Little Hocking and he's not going to answer any questions regarding that.

MR. ALTMAN: The only question I have is –

MR. PAUL: You're asking him a personal question about his personal witness. He's not designated as a corporate rep to speak on that and he's not here to testify as a personal witness.

MR. ALTMAN: I'm asking if it's background of your knowledge as a corporate designee were you aware that a federal notice, a notice of violation of federal law, was sent to DuPont on or about June 6, 2007?

23

MR. PAUL: The witness is not designated to address that topic so he won't answer any questions on that topic.

MR. ALTMAN:  So you're instructing him not to answer –

MR. PAUL:  Yeah, he won't answer any questions on that.

MR. ALTMAN:  Okay.  Well this has been marked for identification as 233 and we're tendering it along with the last few.

            (Exhibit No. 233 proffered.)

MR. ALTMAN:  And, again, I'm only asking if you're aware of this, that a federal complaint which is the subject of this lawsuit was filed by Little Hocking against DuPont.

MR. PAUL:  The witness is not here to testify personally and has not been designated to testify on that topic and will not answer any questions on that topic.  It's outside the scope of this deposition.

MR. ALTMAN:  That's fine.

*Exhibit 17*, excerpt from May 10th Myers Deposition, pp. 51-54, attached to *Motion for Sanctions*.

The Court disagrees with Little Hocking that this line of questioning falls within the scope of Mr. Myers' Rule 30(b)(6) deposition.  As noted *supra*, the Court permitted inquiry only into the alleged failure to preserve or the destruction of the pre-2006 pumping records maintained on back-up tapes as well as the Vantage system and/or VAX computer.  The Court specifically prohibited inquiry into, *inter alia*, DuPont's duty to preserve in connection with its governmental filing obligations and other DuPont litigation.  *Order*, Doc. No. 214.  Mr. Paul's resistance to this inquiry is consistent with these limitations.

IV.   **"SIGNALING" THE WITNESS AND ATTORNEY "TESTIMONY" ON "KEY MATTERS"**

Little Hocking also complains that Mr. Paul improperly signaled to the witness and testified during the May 10th Myers Deposition. *Motion for Sanctions*, pp. 7-9 (citing to *Exhibits 9*, *10*, *11*, *12*, *13*, *14* and *15* attached thereto); *Reply*, pp. 3-5 (citing to *Exhibits 7*, *9*, *12* and *13*, attached to *Motion for Sanctions*; *Exhibit 1*, attached to *Reply*).  DuPont denies that Mr. Paul's objections or instructions constitute "signaling." *DuPont's Opposition*, pp. 6-7.

A.   *Exhibit 7*, **attached to** *Motion for Sanctions*

Little Hocking refers first to the following exchange:

Q:  So there was no other archives other than these CDs in your office?

A:  No, that's not true.

MR. PAUL:  That's not what he said.

Q:  Where were the archives?

MR. PAUL:  Listen.  Listen because – listen to his question.  You just said what he said was accurate.  Listen to his question and answer his question.

MR. ALTMAN:  Now you're instructing the witness.

MR. PAUL:  I am instructing him to listen to your question. Answer his question, pay attention –

MR. ALTMAN:  You're signaling the witness – you're signaling the witness on what to testify.

MR. PAUL:  Really because all I'm telling you to do, John, is listen to the question and answer the question.

Q:  What other archives were there other than the CDs you kept in your office?

A:  I had copies of the data on the PC that I had burned the CDs on because basically the data came from the Vantage machine to my PC and then was burned to the CD.  But I didn't delete it off of the PC –

Q:  Right.

A: -- as performing -- I would do that, yes, because I had
CDs but based on space constraints on the -- on the PC, so
the PC also had the archives also.

*Exhibit* 7, pp. 107-09, attached to *Motion for Sanctions*.

Although the Court cannot condone Mr. Paul's interruptions of Mr.

Altman's examination during this exchange, the record reflects that

Mr. Myers provided substantive response to Mr. Altman's inquiry.

   **B.    *Exhibit 9*, attached to *Motion for Sanctions***

The next cited example contains the following exchange:

Q:  So you understand that all that information has been
turned over to Little Hocking?

MR. PAUL:  Objection as to form.  He would have no idea --

A:  I have no idea of course.

Q:  Do you have any idea?

A:  I have lots of ideas but not about that.  I really
don't know if any of that stuff has been sent to you.  All
I know is that it's still available.

*Exhibit 9*, p. 114, attached to *Motion for Sanctions*.

Again, the record reflects that Mr. Myers answered Mr. Altman's

original question and responded to a follow-up question.

   **C.    *Exhibit 10*, attached to *Motion for Sanctions***

Little Hocking also refers to the following exchange:

Q:  Did anybody tell you about microfiche?

MR. PAUL:  I'm sorry?  What was the question?

Q:  Did anybody tell you about well pumping records being
stored on microfiche?

A:  I've not seen anything like that.

26

Q:  Do you have any idea how the data or information about well pumping would go from where it originates to microfiche?

A:  You want me to speculate?

Q:  No.  I want you to --

MR. PAUL:  No.  And this is far outside – this is far outside the scope of his designation.  He is not designated to talk on this topic and he can't offer personal testimony and he's not designated on anything like this.  So I'm telling him not to answer the question as a representative of DuPont.  And he's not here personally, so he's not prepared to answer that question.

Q:  So you know of no well pumping records that are on microfiche?

A:  Nothing in my preparation told me that that was the case.

Q:  Beyond your preparation, do you know of any well pumping –

A:  From my work?

Q:  Yes.

A:  Nope.

Q:  So no matter what I ask you about microfiche you're not going to know about because you don't know anything about well pumping records on microfiche?

A:  On microfiche?

Q:  Right.  You have no idea how any record would have gotten on microfiche from some other media, correct?

MR. PAUL:  Objection as to form.

Q:  Some well pumping record would have gotten onto microfiche from some other media?

MR. PAUL:  Objection as to form.

A:  It would be speculation[.][6]

---

[6] *Exhibit 10* cuts off this portion of Mr. Myers' response, but see *Exhibit 5*, p. 134, attached to *Motion for Sanctions*, for the rest of his answer.

*Exhibit 10*, pp. 132-33.

It is not apparent to the Court that Mr. Paul obstructed the deponent's testimony on this topic. Moreover, Little Hocking has established no prejudice in connection with Mr. Myers' testimony in this regard. For example, Mr. Myers indicated that he did not know the answer to Mr. Altman's question even before Mr. Paul registered his objection. *See Exhibit 5*, p. 132, lines 14-17. Moreover, following that objection, Mr. Myers went on to confirm that he did not know the answers to Mr. Altman's questions. *See Exhibit 5*, p. 133.

    **D.**    ***Exhibit 11*, attached to *Motion for Sanctions***

Little Hocking complains that Mr. Paul improperly signaled to the witness during inquiry relating to records retention policies. *See Motion for Sanctions*, p. 8 (citing *Exhibit 11*, attached to thereto). As discussed *supra*, p. 19, the Court has concluded that the deponent provided substantive response to Mr. Altman's inquiry in this regard.

    **E.**    ***Exhibit 12*, attached to *Motion for Sanctions***

The Court next considers the following exchange:

Q: Let me show you what has been marked as exhibit -- DuPont Exhibit 255 for identification. It purports to be a February 6, 2006, meeting agenda.

A: 2006, whoa.

Q: And then just for the record, direct your attention to the last --

MR. PAUL: David, I think the witness's reaction is he sees there's two different dates on it. I think at the bottom there's one date, at the top there's --

A: I have a feeling they mistyped it because the bottom looks automatically generated.

MR. PAUL: I wouldn't guess.

Q: So there's another typo on these. That's fine. But
the point I'm making is look at the last bullet on the
second page. It says Enviance is needing data from our
current system open paren Vantage closed paren to put into
their detailed destruction, semicolon, follow up to see if
that can be postponed so we can provide data from IP-21
system from beginning.

A: Yeah, my thinking is – is a [sic] there a question
here?

*Exhibit 12*, pp. 266-67, attached to *Motion for Sanctions*.

This exchange, Little Hocking argues, "show[s] how Mr. Paul's

improper signaling deprived Little Hocking of its right to elicit

binding testimony from DuPont." *Motion for Sanctions*, p. 8. *See also*

*Reply*, p. 4. This Court disagrees. Rather, Mr. Paul's "signaling"

and Mr. Myers' testimony regarding dates had nothing to do with Mr.

Altman's substantive examination. *See Exhibit 12*, p. 267, lines 10-

17.

**F.** ***Exhibit 13*, attached to *Motion for Sanctions***

Little Hocking complains that the following exchange demonstrates

Mr. Paul's "testifying" for the witness:

Q: I'm going to show you what we've marked as Exhibit 243.
This is an exert [sic] from Andrew Hartten's 30(b)(6)
testimony in November 2012 about well pumping data. Did
you talk to Mr. Hartten at any time prior to his 30(b)(6)
deposition in November 2012?

MR. PAUL: Objection as to relevance. Objection as to
form. Objection to outside the scope.

A: I did not.

Q: Do you know Andrew Hartten?

A: I do not.

Q: And in this exert [sic] from his deposition, would you
take a little time and look it over. He mentions that
there was an inventory list of microfiche with historical
pumping records on it.

MR. PAUL:  And you've given him how many pages, David, of a multi volume?

MR. ALTMAN:  I'm just asking --

MR. PAUL:  How many pages did you give him?

Q:  Well, let me ask you a question.  On the exert [sic] from the deposition that you have on Page 548, does Mr. Hartten say that there are microfiche with historic well pumping data on it?

MR. PAUL:  Objection as to form.

A:  That's what it says.

Q:  And do you know that it says on that same page that he knows they still exist.  His answer is because Allison Crane and I went over an inventory list of records that are on microfiche.  Is that what it says?

MR. PAUL:  Is the part where he says, David, that he was mistaken also given to the witness?

MR. ALTMAN:  That's outrageous, Niall.

MR. PAUL:  Really?

MR. ALTMAN:  Yes, outrageous.

MR. PAUL:  Really, it's outrageous?  You know what's outrageous, David --

MR. ALTMAN:  I am asking --

MR. PAUL:  -- is giving him portions of deposition testimony.

Q:  I am asking you if that's what it says, sir.

MR. ALTMAN:  You're coaching the witness, Niall.

MR. PAUL:  You tell me how this is connected to the topics, David.

MR. ALTMAN:  Oh, it's connected to his testimony this morning.

Q:  Do you see this --

30

MR. PAUL:  Listen, nothing that happened this morning gives you permission to go outside what the court ordered.

MR. ALTMAN:  I'm not going outside anyway --

MR. PAUL:  Right.

MR. ALTMAN:  -- what the court asks.  Now just stop talking.  You're going -- you're making a mockery of this process.

MR. PAUL:  Right.  I'm glad you feel that way, David.

MR. ALTMAN:  You didn't tell me about microfiche this morning, did you?

A:  No, I did not.

Q:  Why not?

A:  I don't know anything about it.

*Exhibit 13*, pp. 129-31, attached to *Motion for Sanctions*.

The Court strongly disapproves of defense counsel's efforts to interject DuPont's positions into the course of plaintiff's deposition inquiry.  Certainly, DuPont has a right to attempt to clarify the witness' testimony, if it perceives a need to do so, but that attempt must await the completion of plaintiff's inquiry.  Having so concluded, however, the Court is not persuaded that this excerpt establishes prejudice to plaintiff's ability to make inquiry of the deponent.  Mr. Myers testified that he had no knowledge about microfiche and that testimony is consistent with his testimony elsewhere in record.  *See*, *e.g.*, *Exhibit 5* (excerpt from May 10th Myers Deposition, pp. 134-37); *Exhibit 10* (excerpt from May 10th Myers Deposition, pp. 132-33), attached to *Motion for Sanctions*.

**G.    The Denvir Letter**

Little Hocking argues that Mr. Paul "preempted certain lines of questioning by *testifying* that Mr. Myers obviously had no understanding of those issues [including a letter signed by Attorney James P. Denvir ("the Denvir Letter")], instead of allowing Mr. Myers to answer critical questions." *Motion for Sanctions*, p. 9 (citing *Exhibit 14* and *15*, attached thereto) (emphasis in original). Little Hocking asserts that the Denvir Letter "included information that flatly contradicted **Mr. Myers's own declaration**[,]" and describes the Denvir Letter as referring to well pumping "CDs" even though "the existence of these CDs w[as] misleadingly omitted from Mr. Myers's Declaration." *Id.* (citing *Exhibits 3* (*Myers Declaration*) and *15*, (Denvir Letter), attached thereto)(emphasis in original). *See also Reply*, p. 8. According to Little Hocking, Mr. Paul's behavior "deprives Little Hocking of the witness' candid answers. This is quintessential bad faith conduct." *Motion for Sanctions*, p. 9 (citing *Exhibit 15*, attached thereto). *See also Reply*, p. 5 (citing *Exhibit 1*, attached thereto)). DuPont disagrees, contending that Mr. Myers testified that he had no knowledge of the contents of the Denvir Letter and that Mr. Paul did not prevent Mr. Altman from establishing that the deponent lacked such knowledge. *DuPont Opposition*, p. 8 (citing *Exhibit 7*, attached thereto).[7]

---

[7] Because *Exhibit 7* (May 10th Myers Deposition, pp. 242-61, 274-76), attached to *DuPont's Opposition,* contains the testimony in *Exhibit 14* (May 10th Myers Deposition, pp. 259-60) and *Exhibit 1* (May 10th Myers Deposition, p. 253), attached to *Reply*, the Court will refer to *Exhibit 7*, attached to *DuPont's Opposition* for ease of reference when referring to this testimony.

By way of background, Mr. Denvir[8] contacted the United States Department of Justice on approximately September 12, 2005 regarding a grand jury subpoena, dated May 17, 2005, directed to DuPont.  *Exhibit 15*, attached to *Motion for Sanctions*.  The Denvir Letter states in relevant part:

> John Meyers [sic], an employee at Washington Works, monitors and records well water data at the facility.  He does not monitor the well water for chemistry but rather for flow.  He maintains approximately 180,000 electronic files of this data from 1985 - present representing an hourly monitoring of the pressure, temperature and flow of all facility wells.  The data from 1996 to present is on CDs.  However, the data from 1985-96 is stored on a "Vax Server".  According to our forensic specialists, it would take approximately 500 hours to convert this Vax Server data into a readable form.
>
> Similarly, the Chambers Works facility keeps several hundred magnetic tapes from its own Vax Servers containing process data from operations on site that come from over 6,000 different instruments.  The instruments monitor conditions from the site's processing areas such as temperatures, volumes, flow rates, and tank levels in 1 minute samples that measure reactions of products that may contain C8 as an ingredient, but which instruments do not make measurements of C8.
>
> Paragraphs 3 and 16 of the Subpoena request documents relating to the "transportation" of C8.  Because the well water and instruments contain C8, a broad read of the Subpoena could arguably encompass these records.  We suggest that at this time, DuPont produce the Meyers' CDs, but defer on the production of information from the Vax Server data due to the burden of production and the fact that the materials may not be relevant to your investigation.  Should you determine that this data is relevant after review of the CDs, we can revisit the matter again for discussion.

*Exhibit 15*, PAGEID# 7569, attached to *Motion for Sanctions*.

Mr. Altman questioned Mr. Myers at length regarding the Denvir Letter:

---

[8] It appears that Mr. Denvir is a member of the law firm Bois Schiller & Flexner, LLP.  *See Exhibit 15*, attached to *Motion for Sanctions*.

Q:  You maintain – is it correct that you maintain – and you can have a continuing objection, Niall – 180,000 files of Washington Works environmental data in 2005?

A:  I have no idea where anybody got those numbers.

Q:  Didn't they get them from you?

MR. PAUL:  Objection as to form.

A:  They didn't get them from me.

Q:  Well, let me ask you this.  So is it inaccurate to say that you had 180,000 files at Washing [sic] Works environmental data in 2005?

A:  If I were going to –– no, this is –– this is nuts.  I'd have to do calculations in order to determine, approximate – an approximate number of files for all of this and I'd have to have access to a lot of information that I don't have right now.  If that were ballpark for that, huh, let me think.  20 years.

Q:  Is that too low or too high?

A:  I don't know what they're talking about.  If they're talking about Vantage archive files, there are a lot of them because there's one Vantage archive file for every archive and every tag.

*Exhibit* 7, pp. 243-44, attached to *DuPont's Opposition*.

A:  If I were to do a rough calculation just now, which I just did –

Q:  Yes.

A:  –– it would be low by almost an order of magnitude.

Q:  So you would have over a million, 800,000?

A:  Assuming a small number of archives and small number of tags per archive and 20 years.

Q:  Fair enough.

A:  And that's just for 2005.

Q:  Fair enough.

A:  Now understand I would not put my – I would not sign that at all.  I just tried to give you a ballpark figure.

34

Q:  I understand.  You did what I asked you to do.

MR. PAUL:  Mr. Myers also indicated that he didn't understand – he wasn't sure what they meant by files.

A:  That's exactly right.  If those are not archive files, the numbers mean nothing.

*Id*. at 245-46.

Q:  Let's put that on the back burner because I'm just talking about -- I appreciate that.  I understand that that's -- you need to know what he meant by files.  I completely understand.  But I'm asking you about the CDs from 1996 through 2005.  Does that sound reasonable and accurate?

A:  It sounds reasonable, possible.

Q:  And the data from 1985 through 1996 was available through the VAX server according to this letter, correct?

A:  Yeah.  And I'm not sure what he's talking about there.  I'm really not.  It's possible the Vision system existed in that time, but I don't know.

*Id*. at 247.

Q:  Have you not seen this letter or the subpoena?

A:  No.

Q:  Recently?

A:  Never.  Not now, not 10 years ago or actually 8 years ago.

*Id*. at 251.

Q:  What would have caused the tapes to be more difficult to review than the CDs?

MR. PAUL:  Objection.  And, again, I'm not sure what you're talking about the tapes.

MR. ALTMAN:  The tapes that Mr. Denvir is talking about.

MR. PAUL:  Okay.

MR. ALTMAN:  The Vantage material --

MR. PAUL:  I don't think he's talking about the tapes.

MR. ALTMAN:  The problem is --

MR. PAUL:  Where does it say tapes?

Q:  The Vantage -- the VAX server data, what kind of material - where is that kept?

MR. PAUL:  Where does Mr. Denvir say tapes?  You've once again represented something to him that Mr. Denvir didn't say.

MR. ALTMAN:  Now you're arguing in court.

MR. PAUL:  I'm arguing with you to try to stop misrepresenting what documents say and you clearly have said to him —

Q:  How do you read a VAX server data?  What kind of medium is that?

MR. PAUL:  Objection as to form because he doesn't have any idea what Jim Denvir meant.

Q:  I'm asking you a question that has nothing to do with Jim Denvir.

A:  And the answer is impossible to answer and the reason it is impossible to answer is that VAX server means nothing.  Which VAX server, which VAX, which Vantage machine, what year, what hardware did that machine have on it.  I don't know any of that.  Like you, you know, if he's talking about Water Treatment, it means one thing.  If he's talking about the old Vision system, it means something else.

Q:  What about the –

A:  I just don't know.

*Id.* at 253-55.

Q:  Mr. Denvir suggested it would take 500 hours to convert that server data to a readable form; is that accurate?

MR. PAUL:  Objection as to form.  He has no idea what Mr. Denvir meant by that.  He's already told you that.  He told you he hadn't seen that document beforehand.

Q:  Would it take 500 hours to convert data from 1985 to 1996 that was on the VAX server into a readable form?

MR. PAUL:  The witness has already told you he didn't even understand what he necessarily meant by VAX server in this instance.

MR. ALTMAN:  Niall --

MR. PAUL:  He did.

MR. ALTMAN:  -- you're testifying for him.

MR. PAUL:  Well, you shouldn't --

MR. ALTMAN:  I'll tell you what.

MR. PAUL:  -- be asking him these questions.

A:  All right.  I don't know where the 500 hours came from. I don't know who this guy Denvir is and I've never tried to recover that data.  So I have no idea how much time it would take to do it.  I've never attempted to recover a fraction of that data, so I can't estimate how much time it would take to do it.

Q:  Do you question the forensic expert --

A:  I don't know.

Q:  -- that said that it would take 500 hours to do it?

MR. PAUL:  Objection.  How in the world would this witness know that?

Q:  I mean if you have – that's what I'm asking you.  Do you have some reason to question the accuracy of his statement?

A:  Yes, I just did.  I myself who actually managed the system don't know how much time it would take to do that. I figure it would take a long time, but I don't know because personally I wouldn't guess about it.  I would try it.

*Id*. at 259-61.

This exchange reflects that Mr. Myers responded to Mr. Altman's questions about the Denvir Letter, testifying that he had never seen the Denvir Letter or the related subpoena and explaining that he would

37

need more information in order to answer some of Mr. Altman's questions.

      **H.   Sanctions Based on Defense Counsel's Failure to Be Concise**

      Finally, Little Hocking represents that the May 10th Myers Deposition transcript reflects more lines spoken by Mr. Paul than by the deponent. *Motion for Sanctions*, p. 2; *Reply*, pp. 1-3. However, standing alone, this calculation is just simply meaningless.

**V.   DISCUSSION**

      Review of Little Hocking's complaints as to specific portions of the May 10th Myers Deposition persuades the Court that the progress of the deposition was impeded to some extent by the confusion, in some instances, arising out of Mr. Altman's terminology and by Mr. Altman's efforts, in other instances, to argue with the deponent or to exceed the scope of the deposition established by the Court. At times, Mr. Paul went too far in addressing these issues; at other times, Mr. Paul improperly interjected himself into the flow of Mr. Altman's inquiry. Both counsel, on occasion, demeaned themselves by engaging in petty bickering with each other. The Court expects all counsel – in this and in all lawsuits – to pose well-prepared questions to the deponent, to refrain from arguing with the witness, to register – concisely and just once – objections to a particular question, to instruct a witness not to answer a question only if authorized by Fed. R. Civ. P. 30(c)(2), and to refrain from argument between counsel.

      Although the Court concludes that the boundaries of proper conduct at the May 10th Myers Deposition were crossed on occasion, the Court nevertheless concludes that the imposition of sanctions is

unwarranted because Little Hocking has not established that it was ultimately prevented from conducting a "fair examination of the deponent."  Fed. R. Civ. P. 30(d)(2).

**WHEREUPON**, *Little Hocking's Motion for Sanctions Regarding Conduct of DuPont's Counsel During May 10, 2013 Myers Deposition*, Doc. No. 239, is **DENIED**.


December 17, 2013                        *s/Norah McCann King*
                                          Norah M$^{c}$Cann King
                                United States Magistrate Judge