IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| THE LITTLE HOCKING WATER ASSOCIATION, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | Case No. 2:09-CV-1081 |
| v. | : | |
| | : | JUDGE ALGENON L. MARBLEY |
| E.I. du PONT de NEMOURS and COMPANY, | : | |
| | : | Magistrate Judge King |
| Defendant. | : | |

## OPINION & ORDER

## I.    INTRODUCTION

This matter is before the Court on the Parties' Cross-Motions for Summary Judgment. Little Hocking Water Association, Inc. ("Little Hocking" or "Plaintiff") seeks partial summary judgment on its Trespass (Count IV) and Conversion (Count VI) claims against E.I. du Pont Nemours and Company ("DuPont" or "Defendant"). (Doc. 345). Defendant opposes, and moves for summary judgment on all of Plaintiff's claims (Counts I-VIII), including: Imminent and Substantial Endangerment under Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972; Public and Private Nuisance; Negligence; Trespass; Abnormally Dangerous or Ultrahazardous Activity; Conversion; Unjust Enrichment; and, Declaratory Judgment for Indemnity. (Doc. 346). For the reasons stated below, Defendant's Motion is **GRANTED** in part and **DENIED** in part, and Plaintiff's Motion is **GRANTED.**

## II.    BACKGROUND
### A.  Factual History

Plaintiff brings this action under RCRA, 42 U.S.C. § 6972(a)(1)(B), and Ohio common law and statutory law, claiming Defendant's waste disposal practices have caused imminent and

substantial harm to health and the environment, and caused it tort-related injuries. Plaintiff is a non-profit public water provider whose business is to provide potable water to approximately 12,000 people in ten different townships in southeast Ohio. Defendant owns and operates the Washington Works Facility (the "Facility") in West Virginia, approximately 1,300 feet down river from Plaintiff's Wellfield.

Little Hocking alleges that its Wellfield, which consist of approximately forty-five (45) acres of land as well as the soil and groundwater beneath the land, have been contaminated by DuPont . (Doc. 23). The alleged hazardous wastes are PFOA (perfluorooctanoic acid), otherwise known as C8, and other PFCs (perfluorinated compounds), which have shorter and longer carbon chains than C8 but have similar properties. These allegedly hazardous wastes are used in the manufacture of Defendant's Teflon® related products. Defendant has used C8 in its manufacturing processes from 1951 until it was phased out completely in June 2013. Defendant does not contest the fact that it released C8, or the amount of C8 it released. Nor does it contest that it released C8 via air emissions, water disposal, and at sites near or on the Facility.

### 1. Defendant's Knowledge of C8 in Environment and its Health Effects

By 1981, DuPont was studying the dangers of C8 exposures posed to its employees, and since 1982, its Medical Director, Dr. Karrh, had recommended reducing emissions for health reasons. (Doc. 345-6; Doc. 345-7).[1]  Throughout the 1980s DuPont set goals for reducing off-site air and river releases of C8 because it "accumulates in the blood and [] the future is unknown." (Doc. 345-10). DuPont acknowledged that the legal and medical departments would most likely take a position of total elimination. *Id*. In 1984, DuPont detected C8 in the Little Hocking Water

---

[1] In his memo, Dr. Karrh recommends taking available practical steps to reduce C8 exposure because knowledge of chronic health effects of long-term exposure to C8 is limited; it is retained in the blood for a long time; and, there is "obviously great potential for current or future exposure of members of the local community from emissions leaving the Plant perimeter."

supply at .8 ppb. (Doc. 345-11). Defendant dumped 150,000 pounds of C8 into the Ohio River from 1980 to 1989, and 330,000 pounds from 1990 to 1999, thereby showing that they doubled emissions into the environment in the 1990s. (Doc. 345-5, Nos. 16-17).

DuPont purchased the C8-contaminated Lubeck Public Service District property in 1991. In 1987, an internal memo recommended that DuPont make this purchase, even though other potential properties were less expensive, because any price difference would be justified by "elimination of the use of these wells as a source of public drinking water." (Doc. 345-15).

Further, emails from DuPont's in-house counsel, John Bowman and Bernard Reilly, indicate that as of 2000 they had been attempting to get Defendant to take action on C8 releases since the 1990s. (Docs. 345-16, 17). In a 2000 email, Bowman states that "Bernie and I have been unsuccessful in even engaging the clients in any meaningful discussion of the subject [of C8 emissions]. . . we continued to increase our emissions into the river in spite of internal commitments to reduce or eliminate the release of this chemical into the community and the environment because of our concern about the biopersistence of this chemical." With respect to the same subject, Reilley states in 2001: "[t]he business did not want to deal with this issue in the 1990s, and now it is in their face, and some are still clueless. Very poor leadership…."

Defendant states that is has been trying to phase out C8 and recapture it since the 1988, and that it has spent more than fifteen million dollars in these efforts.

### 2. EPA Administrative Orders on Consent and the GAC

C8 is biopersistent and can remain in the environment for hundreds if not thousands of years. In 2011 and 2012, a panel approved by DuPont in relation to other litigation, found "probable links" between exposure to C8 and six human diseases. Some studies analyzing the effects of C8 exposure in animals show it causes adverse health effects.

In 2002, DuPont met with representatives of Little Hocking to notify them of the presence of C8 in its water supply. In March 2002, DuPont entered into an agreement with the United States Environmental Protection Agency ("USEPA") whereby DuPont agreed to provide alternate drinking water for any public drinking water source, including Little Hocking, with C8 contamination levels greater than 14 parts per billion ("ppb"), a risk-based health protective screening level.

In January 2004, DuPont presented Little Hocking with the offer to build a granular activated carbon filtration ("GAC") Facility to treat its water. Plaintiff was reluctant to accept this option, as it preferred a total clean-up of its Wellfield. Eventually, Plaintiff consented. Thus, since late 2007, water from the Wellfield is pumped to the Facility—which is on land purchased by DuPont because the Wellfield was not suitable for such a Facility—and back to the Wellfield to be distributed to customers.

In 2006, DuPont signed an Administrative Order on Consent ("AOC") with the USEPA. In the 2006 AOC, the EPA determined that pursuant to the Safe Drinking Water Act, and for the purposes of the AOC:

> C-8 is a contaminant present in or likely to enter a [public water system] or a [underground source of drinking water] which may present an imminent and substantial endangerment to human health at concentrations at or above .50 ppb in drinking water. EPA has based this determination on its interpretation of animal and human studies, and on the results of environmental sampling and monitoring in the vicinity of the Facility. The .5 ppb action level is a precautionary level to reduce exposure to the population living in the vicinity of the Facility.

(Doc. 346 at ¶ 32). Then, in 2009, the USEPA issued a second AOC, requiring Defendants to reduce the C8 water levels to .4 ppb. Thus, pursuant to the AOC, Defendant is bound to operate and maintain the GAC water treatment plant indefinitely until C8 water levels are below 0.4 ppb. The GAC has reduced the C8 in Little Hocking's water to undetectable levels.

### 3. C8 Pathways

Defendant does not contest the fact that it released C8 or the amount of C8 it released. Defendant does contest whether multiple pathways of migration of C8 from the Facility to the Wellfield exist. In its own field investigation of the Wellfield conducted pursuant to the AOC, Defendant states that "revised groundwater modeling by DuPont supports the previous conclusion that no current groundwater migration pathway exists beneath the Ohio River to the Little Hocking Well Field."

It concluded that the only possible pathway of C8 was that it was transported via air emissions from DuPont's stacks by wind, and was deposited on Little Hocking's Wellfield vegetation and surface soils. Then, precipitation and possible flooding leaches the C8 downward through the unsaturated zone through the aquifer, and that groundwater containing C8 is pumped from the aquifer through the production wells.

Plaintiff's expert, Dr. Franklin Schwartz, a hydrogeologist at Ohio State University, states there is a water pathway from the contaminated soil surrounding the plant, to the Ohio River, and finally to the Little Hocking Wellfield. (Doc. 370-1). Schwartz states that C8, released from various sources at the Facility directly into the Ohio River, enters the River as a dissolved phase, and then is captured by wells at Little Hocking as induced infiltration of river water through sediments at the river bottom. He calls this water pathway the "River Pathway." In addition, Plaintiff's expert, Dr. Staci Simonich, opines that unless remediated, C8 released by the Facility that has sorbed to the River's sediment will act as an ongoing source of C8 into the River Pathway and to the Little Hocking Wellfield. (Doc. 369-15 at 183-5, 338-341).

#### *4. Alleged Harm to Plaintiff and its Wellfield as a Result of C8 Contamination*

First, Plaintiff states that it ceased expansion projects due to C8 contamination. The first was a five-year plan, originally drafted in 1995, which includes the blueprint for three projects to expand its water supply to three areas—Decatur Township 250, Barlow Township 261, and Palmer Square. Further, Plaintiff alleges that its plans to drill a new production well were hindered because of the presence of C8. The Plaintiff purchased the land in 1985, and has considered adding the well since 1987. Additionally, Little Hocking avers that it has lost $900,000 in revenue due to these lost opportunities to expand its customer base. For instance, due to the delay in the Palmer Project, a neighboring water district has already provided water to the Palmer Square area. (Doc. 370-20 at 800).

In addition, Plaintiff states that while it has not "lost profits" due to loss of use of the Wellfield, it has suffered a decrease in revenue due to reduced user demand and a decrease in the rate of growth of new taps due to C8 contamination. (Doc. 370-23 at ¶ 9). For example, during the two year bottled water program, Plaintiff states 83% of its user base stopped purchasing its water for cooking and drinking. *Id*.

Plaintiff states that it shut down Well Number Five in 2001 because it had the highest levels of C8. Well Five was only used sparingly or intermittently because of high levels of iron and manganese and only accounted for 2% of the total well pumping usage for 2001. Griffin states "five was there when we needed it. There are times when one of the other wells may be down out of service for some reason and we would have to use five in conjunction."

Plaintiff also states that the presence of the C8 and the GAC interferes with Plaintiff's business operations and costs it money. Little Hocking's General Manager, Bob Griffin, learned of the presence of C8 in its Wellfields in 2002. Since that time, Griffin's professional life has

been "consumed" with the issue and he has worked continuously with agencies regarding the contamination. Plaintiff states that it has monetized its costs for hiring consultants, conducting testing, and diverting personnel all in furtherance of restoring the Wellfield. Further, Plaintiff states that prior to the C8 contamination, its water did not require treatment, other than the Ohio-mandated addition of chlorine and fluoride. (Doc. 345-1 at ¶ 49). Now, the contamination causes it to do biweekly testing for contamination, forces it to have all maintenance approved by DuPont, and forces it to comply with new regulatory requirements.

Lastly, Plaintiff states that C8 harms the environment on the Wellfield and beyond. Dr. Kannan, an eco-toxicologist and expert of C8, collected samples and tested soil, leaves, grass, and earthworms on the Wellfield. (Doc. 369-25A). He found high concentrations of C8 in all of the tests and samples. *Id*. Similarly, Plaintiff's expert, Dr. Peden-Adams, an environmental toxoligist, opines that high levels of C8 found in plants and animals in Wellfield will move through the food chain and may be accumulating in species with deleterious effects for a number of species. (Docs. 370-29, 367-27).

## B. Procedural Background

Plaintiff filed the first complaint on November 27, 2009, and an amended complaint on March 15, 2010. After nearly five years of discovery, both parties filed cross-motions for summary judgment. Plaintiff filed a Motion for Partial Summary Judgment on its trespass and conversion claims, (Doc. 345), and Defendant filed a Motion for Summary Judgment on all of Plaintiff's claims. (Doc. 346). Both motions have been fully briefed, and are ripe for review.

## III. Standard

Federal Rule of Civil Procedure 56 provides, in relevant part, that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." A fact is deemed material only if it "might affect the outcome of the lawsuit under the governing substantive law." *Wiley v. United States,* 20 F.3d 222, 224 (6th Cir. 1994) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

The necessary inquiry for this Court is "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden,* 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson,* 477 U.S. at 251-52). In evaluating such a motion, the evidence must be viewed in the light most favorable to the nonmoving party. *United States S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013). The court reviewing a summary judgment motion need not search the record in an effort to establish the lack of genuinely disputed material facts, however. *Guarino v. Brookfield Township Trustees*, 980 F.2d 399, 404 (6th Cir.1992). Rather, the burden is on the nonmoving party to present affirmative evidence to defeat a properly supported motion, *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir.1989), and to designate specific facts that are in dispute. *Anderson*, 477 U.S. at 250; *Guarino*, 980 F.2d at 404–05.

To survive the motion, the nonmoving party must present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.,* 8 F.3d 335, 339-40 (6th Cir. 1993). The mere existence of a scintilla of evidence in support of the opposing party's position will be insufficient to survive the motion; there must be evidence on which the jury could reasonably find for the opposing party. *See Anderson,* 477 U.S. at 251; *Copeland v. Machulis,* 57 F.3d 476, 479 (6th Cir. 1995); *see also*

*Mitchell v. Toledo Hospital,* 964 F.2d 577, 582 (6th Cir. 1992) (finding that the suggestion of a mere possibility of a factual dispute is insufficient to defeat a motion for summary judgment) (citing *Gregg v. Allen-Bradley Co.,* 801 F.2d 859, 863 (6th Cir. 1986)).

## IV. Analysis

### A. RCRA, 42 U.S.C. § 6972(a)(1)(B)—Count I

The Resource Conservation and Recovery Act ("RCRA") "is a comprehensive environmental statute that governs the treatment, storage, and disposal of solid and hazardous waste." *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 483 (1996). RCRA's primary purpose is not "to effectuate the cleanup of toxic waste sites" but, rather, "to reduce the generation of hazardous waste and to ensure the proper treatment, storage, and disposal of that waste which is nonetheless generated, 'so as to minimize the present and future threat to human health and the environment.' 42 U.S.C. § 6902(b)." *Id.* While "[c]hief responsibility for the implementation and enforcement of RCRA rests with the Administrator of the Environmental Protection Agency (EPA), see §§ 6928, 6973," like other environmental protection laws, "RCRA contains a citizen suit provision, § 6972, which permits private citizens to enforce its provisions in some circumstances." *Id.*

The citizen suit provision of RCRA states, in pertinent part, that any person may commence a civil action on his own behalf:

> against any person . . . including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal Facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment

42 U.S.C. § 6972(a)(1)(B).

In sum, for a citizen plaintiff to prevail on a claim under the "imminent and substantial endangerment provision" ("ISE"), the plaintiff must prove:

> (1) that the defendant is a person, including, but not limited to, one who was or is a generator or transporter of solid or hazardous waste or one who was or is an owner or operator of a solid or hazardous waste treatment, storage, or disposal Facility; (2) that the defendant has contributed to or is contributing to the handling, storage, treatment, transportation, or disposal of solid or hazardous waste; and (3) that the solid or hazardous waste may present an imminent and substantial endangerment to health or the environment.

*Parker v. Scrap Metal Processors, Inc.*, 386 F.3d 993, 1014-15 (11th Cir. 2004) (quoting *Cox v. City of Dallas,* 256 F.3d 281, 292 (5th Cir. 2001); *see* 42 U.S.C. § 6972(a)(1)(B).

Unlike § 6972(a)(1)(A), the provision concerning EPA prosecution of violations of RCRA, the ISE citizen provision, "explicitly considers the environmental and health effects of waste disposal and authorizes suit any time there is an 'imminent and substantial endangerment to health or the environment.'" *Parker*, 386 F.3d at 1014. The Supreme Court has clarified that "[t]he section applies retroactively to past violations, so long as those violations are a present threat to health or the environment." *Meghrig* 516 U.S. at 485–86, (1996) (holding that the imminence standard does not require an existing harm, meaning ongoing disposal of a solid or hazardous waste, but the *threat* of harm due to disposal in the past of solid or hazardous waste must be present and ongoing).

When analyzing the remedies available to private citizens under RCRA, the Supreme Court held that "under a plain reading of this remedial scheme, a private citizen suing under § 6972(a)(1)(B) could seek a mandatory injunction, *i.e.*, one that orders a responsible party to 'take action' by attending to the cleanup and proper disposal of toxic waste." 516 U.S. at 484. Accordingly, courts have consistently held that "[t]he 'endangerment' provision in RCRA Section 7003(a) is one of the statute's most important enforcement tools, and it is intended to 'give broad authority to the courts to grant all relief necessary to ensure complete protection of the public health and the environment.'" *United States v. Aceto Agric. Chems. Corp.,* 872 F.2d

10

1373, 1383 (8th Cir.1989); *see also United States v. Waste Indus., Inc.,* 734 F.2d 159, 167 (4th Cir.1984) ("Section 7003 is a congressional mandate that the former common law of nuisance, as applied to situations in which a risk of harm from solid or hazardous waste exists, shall include new terms and concepts which shall be developed in a liberal, not a restrictive, manner."); *United States v. Price,* 688 F.2d 204, 211 (3d Cir.1982) ("By enacting the endangerment provisions of RCRA ... Congress sought to invoke the broad and flexible equity powers of the federal courts....").

Little Hocking seeks an injunction pursuant to § 6972(a)(1)(B), the imminent and substantial endangerment ("ISE") provision requiring a cleanup of its Wellfield contaminated by C8, and an investigation into the continued sources of C8 contamination, such as Ohio River sediment, which are present in the surrounding environment due to Defendant's past C8-disposal practices. (Doc. 369 at 28).

Defendant argues that it is entitled to summary judgment on Plaintiff's ISE claim because Plaintiff: (1) lacks standing; (2) failed to meet the notice requirements of an ISE claim; (3) is barred by the case *Baker v. Chevron USA, Inc.*, No. 1:05-CV-227, 2011 WL 3652249 (S.D. Ohio Aug. 19, 2011) *aff'd* sub nom. *Baker v. Chevron U.S.A. Inc.*, 533 F. App'x 509 (6th Cir. 2013); and (4) fails to meet all three prongs of the ISE standard. The Court will take each argument in turn.

### 1. Standing

When determining whether a Plaintiff has standing to pursue a claim under RCRA's ISE provision, courts apply nothing more than the traditional Article III analysis. *See Maine People's Alliance And Natural Res. Def. Council v. Mallinckrodt, Inc.,* 471 F.3d 277, 283 (1st Cir. 2006) (finding "there is nothing in RCRA's text or history that suggests a congressional intent to erect

statutory standing barriers beyond those imposed by Article III of the Constitution…"); *see also Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 399 F.3d 248, 254-55 (3d Cir. 2005); *Parker v. Scrap Metal Processors, Inc.*, 386 F.3d 993, 1003 (11th Cir. 2004). Thus, courts apply the "familiar three-part algorithm: a would-be plaintiff must demonstrate a concrete and particularized injury in fact, a causal connection that permits tracing the claimed injury to the defendant's actions, and a likelihood that prevailing in the action will afford some redress for the injury." *Maine People's Alliance And Natural Res. Def. Council*, 471 F.3d at 283. "*Laidlaw,* the Supreme Court's most recent explication of the injury-in-fact requirement in litigation arising under the federal environmental laws, instructs that courts may not 'raise the standing hurdle higher than the necessary showing for success on the merits in an action.'" *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 399 F.3d 248, 255 (3d Cir. 2005) (quoting *Friends of Earth, Inc. v. Laidlaw Envtl. Services (TOC), Inc.,* 528 U.S. 167, 181 (2000)).

Defendant argues that in light of the fact that C8 is being removed from the drinking water by the GAC Facility, Little Hocking would only be entitled to a remedy under the ISE provision for C8 contamination that may pose an imminent and substantial endangerment to the environment. Defendant further argues that insofar as the injury is an environmental risk linked to contamination of the Wellfield, Little Hocking lacks standing because it is not an environmental organization, and thus environmental cleanup is not germane to its organizational purpose. Instead, Little Hocking is an association whose sole purpose is to provide potable water to its customers. With the GAC in place, therefore, Defendant asserts that Little Hocking is not experiencing an injury germane to its purpose, and, thus, no injury at all.

Plaintiff responds that it does not seek associational standing on behalf of its members, consumers of its water. Instead, Plaintiff argues that according to Article III jurisprudence,

"[u]nquestionably, an association may have standing to assert an injury to itself regardless of whether its members also have standing." *Am. Canoe Ass'n, Inc. v. City of Louisa Water & Sewer Comm'n*, 389 F.3d 536, 544 (6th Cir. 2004) (citing *Warth,* 422 U.S. at 511, 95 S.Ct. 2197 ("There is no question that an association may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy."); *accord U.S. Student Ass'n Found. v. Land*, No. 08-CV-14019, 2010 WL 1131493, at *2 (E.D. Mich. Mar. 23, 2010).

Plaintiff argues that contamination of its own Wellfield is an injury-in-fact to itself, which can be redressed under the RCRA ISE provision allowing for injunctive relief upon the showing that such contamination may present an imminent and substantial endangerment to health and the environment. Plaintiff claims it is entitled to relief under the ISE provision in the form of a clean-up of C8 on its land and an investigation into sources of contamination. Plaintiff argues that this case is similar to the case *Parker v. Scrap Metal Processors, Inc.*, which found injury in fact under RCRA based upon evidence demonstrating that potentially hazardous material from defendant's landfill had entered plaintiff's property, causing soil contamination. 386 F.3d 993, 1003 (11th Cir. 2004). Thus, Little Hocking argues that this Court should follow *Parker* and hold that evidence showing contamination of the environment on Little Hocking's Wellfield, which undeniably is traceable to Defendant, is sufficient evidence showing causation, redressability, and injury-in-fact.

This Court finds that an individual person or company can establish standing to pursue a citizen's suit under RCRA by alleging injury-in-fact due to the presence of contamination on its property, traceable to the Defendant, which may cause substantial and imminent harm to health or the environment. *See Parker* 386 F.3d 993, 1003 (clear finding of standing in RCRA case for

waste on private property); *accord Tilot Oil, LLC v. BP Products N. Am., Inc.*, 907 F. Supp. 2d

955 (E.D. Wis. 2012) (standing assumed in case involving RCRA case for disposal practices

leading to contamination of private property). This holding is consistent with the Supreme

Court's decision in *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, which

considered whether an environmental organization had standing to enforce a National Pollutant

Discharge Elimination System ("NPDES") permit in a citizen suit under the Clean Water Act.

528 U.S. 167 (U.S. 2000). In *Laidlaw*, the Court rejected Defendant's argument that the plaintiff

organization lacked standing from the outset to seek injunctive relief because the plaintiff

organization failed to show during trial that the Clean Water Act permit violations resulted in

any health risk or environmental harm. *Id*. at 181. The Court rejected this argument, explaining:

> [t]he relevant showing for purposes of Article III standing . . . is not injury to the environment but injury to the plaintiff. To insist upon the former rather than the latter as part of the standing inquiry . . . is to raise the standing hurdle higher than the necessary showing for success on the merits in an action alleging noncompliance with an NPDES permit.

*Id.* at 169.

The *Laidlaw* Court then determined that by "[f]ocusing properly on injury to the

plaintiff," the district court had found sufficient injury to establish standing. *Id*. 181-82. In terms

of injury to plaintiff's members, the *Laidlaw* Court noted that members complained that they

refrained from engaging in activities near or in the river for fear of defendant's contamination of

it. *Id*. 182. Further, the Court noted one member stated that her home near the river and Facility

had a lower value than similar homes, and that she believed the pollutant discharges accounted

for some discrepancy. *Id*. at 182-183. In sum, the *Laidlaw* Court determined that proof that the

contamination actually harmed the environment was not required by Article III to establish

standing; instead, it was enough that evidence that the defendant's "discharges, and the affiant

14

members' reasonable concerns about the effects of those discharges, directly affected those affiants' recreational, aesthetic, and economic interests." *Id.* at 183-84.

In the case *sub judice*, Plaintiff has reasonable concerns about the effects on human health and the environment related to Defendant's admitted discharges of C8 onto Plaintiff's Wellfield. Further, Plaintiff's concerns about those discharges affect its economic interests in land ownership and in running its business, providing potable water. A diminished use of its land and the aquifer beneath it "out of a reasonable fear and concern of pollution…constitutes an injury in fact that may be redressed." *Maine*, 211 F. Supp.2d at 254 (citing *Laidlaw*, 528 U.S. at 181-84); *see also Interfaith Cmty. Org.* 399 F.3d at 257-58 (3d Cir. 2005) (finding injury in fact in a RCRA claim in which individual plaintiffs showed "direct and present concerns, neither general nor unreasonable," regarding polluted site). While in order to receive relief under RCRA the Plaintiff must show that Defendant's past disposal of C8 on Plaintiff's Wellfield may present an imminent and substantial endangerment to human health or the environment, the only injury it must show for purposes of standing to bring a RCRA ISE claim is evidence that the defendant's discharges, and Little Hocking's reasonable concerns about the effects of those discharges, directly affected its economic interests in running a water distribution Facility. If this Court or a jury finds that Defendant is liable under RCRA for the environmental contamination of Plaintiff's Wellfield, then Plaintiff's injury may be redressed through injunctive relief.

## 2. Notice

Defendant argues that this Court lacks subject matter jurisdiction over Count I because Plaintiff failed to meet mandatory pre-filing notice requirements under 42 U.S.C.A. § 6972(b)(1)(A)[2] in order to make a claim under § 6972(a)(1)(A) for violations of RCRA. *See*

---

[2] "No action may be commenced under subsection (a)(1)(A) of this section--(A) prior to 60 days after the plaintiff has given notice of the violation to--(i) the Administrator; (ii) the State in which the alleged violation occurs; and

15

*Sierra Club Ohio Chapter v. City of Columbus*, 282 F. Supp. 2d 756, 763 (S.D. Ohio 2003) (Marbley, J) (holding notice provision in RCRA and Clean Water Act are virtually identical, and citizen's notice to violators under either act must strictly comply with statutory notice requirements). Specifically, Defendant argues that Plaintiff failed to provide notice to the West Virginia EPA region—where any potential RCRA violations could have occurred—in violation of § 6972(b)(1)(A) . Defendant does not allege that Plaintiff failed to comply with notice requirements under § 6972(b)(2)(A),[3] necessary to pursue an ISE citizen's suit under § 6972(a)(1)(B). Rather, Defendant avers that insofar as Plaintiff alleges violations of RCRA under § 6972(a)(1)(A), and failed to comply with the corresponding § 6972(b)(1)(A) notice provision, the entire notice is faulty, including notice of the ISE claim. Defendant does not cite case law for this specific proposition.

Plaintiff responds that Little Hocking is not alleging RCRA regulatory violations occurring at the Plant in West Virginia under § 6972(a)(1)(A). It states its notice letter identified the ISE provision, § 6972(a)(1)(B), as the only basis of its RCRA suit. (Notice Letter, Doc. 370-16). While the notice does state that it is served pursuant both to § 6972(b)(1)(A) and (b)(2)(A), the relevant question is whether Plaintiff seeks relief under § 6972(a)(1)(B), and § 6972(a)(1)(A). Here, Plaintiff states unequivocally that it only seeks relief under § 6972(a)(1)(B), and that its use of the word "violation" refers to violations of the ISE provision.

---

(iii) to any alleged violator of such permit, standard, regulation, condition, requirement, prohibition, or order…" 42 U.S.C.A. § 6972(b)(1)(A).

[3] "No action may be commenced under 42 U.S.C.A. § 6972 (a)(1)(B) prior to ninety days after the plaintiff has given notice of the endangerment to—(1) the Administrator; (2) the State in which the alleged endangerment may occur; and, (3) the Defendant." 42 U.S.C.A. § 6972(b)(2)(A).

Accordingly, the Court finds Defendant's argument without merit. This Court adds, however, that it will not consider an argument under Count I unless it unambiguously relates to a claim for relief under § 6972(a)(1)(B).

### 3. Whether the Court Lacks Jurisdiction over Remediation at the Wellfield Based on the 2009 AOC and *Baker v. Chevron*

Next, Defendant argues that according to *Baker v. Chevron*, this Court lacks subject matter jurisdiction over any additional remediation efforts it might order pursuant to § 6972(a)(1)(B). 2011 WL 3652249. In *Baker*, Plaintiffs brought common law claims for property damage as a result of Defendant's alleged negligence in releasing contaminants into the groundwater. Nearly twenty years prior to the case, the Defendant and the EPA entered into a "comprehensive consent order" which included a "comprehensive remediation plan" to capture groundwater contamination. *Id*. at *11-12.  Plaintiffs argued that in order to remediate fully the contamination, defendant should be taking steps and actions beyond what the EPA consent order required. The *Baker* court responded that because:

> the consent decree has been approved and entered, and the remediation is ongoing, the Court, does not have jurisdiction to either require Chevron to implement specific remediation projects or impose liability on Chevron for things Plaintiffs think Chevron should have done—like drill additional monitoring wells. *See, e.g., United States v. Akzo Coatings of Am., Inc.,* 949 F.2d 1409, 1454–55 (6th Cir.1991) ("[O]nce the consent decree is entered by a federal court—giving the decree the force of law—alternative state remedies may not be pursued.") (CERCLA).

*Id.* at *12.

This Court finds that neither *Baker*, nor the case it relies on, *Azko*, preclude this Court's jurisdiction over Plaintiff's § 6972(a)(1)(B) claim. Both cases unambiguously state that once a consent decree is entered by a federal court to remediate a specific environmental harm, a plaintiff may not pursue state law claims, either common or statutory, for further remediation of the same harm. Issues of federal preemption underlie the holdings in both cases. In the case *sub*

17

*judice*, in contrast, Plaintiff seeks remediation beyond administrative consent orders, not federal court orders, and seeks remediation under federal, not state law.

Citizen suits, like those pursuant to § 6972(a)(1)(B), typically "function as a form of statutory enforcement in addition to, or in conjunction with, enforcement by an administrative agency or other governmental entity." *Esso Standard Oil Co. (Puerto Rico) v. Rodriguez-Perez*, 455 F.3d 1, 6 (1st Cir. 2006), *as amended on denial of reh'g (July 28, 2006).* In addition, no other statutory preclusion provision under § 6972 (b)(2)(A)-(C)[4] applies to this RCRA citizen suit. Defendant does not contest this. In fact, even when EPA consent orders pursuant to CERCLA are in place, courts in this Circuit and elsewhere have found that such consent orders do not preclude citizen suits under RCRA, where the consent order did not remediate all of the harm. *Organic Chems. Site PRP Grp. v. Total Petroleum, Inc.,* 6 F.Supp.2d 660, 665 (W.D. Mich.1998) (denying motion to dismiss RCRA citizen suit for cleanup of soil contamination where plaintiff alleged EPA had taken action only with respect to groundwater contamination); *A–C Reorg. Trust v. E.I. DuPont de Nemours & Co.,* 968 F.Supp. 423, 430–31 (E.D.Wis.1997) (holding RCRA claim regarding groundwater contamination not futile where EPA consent order only expressly covered surface contamination and might not extend to groundwater). In sum, this court does not lack jurisdiction over this RCRA action based on the 2009 AOC and *Baker v. Chevron*.

---

[4] Citizen's suits under 42 U.S.C.A. § 6972 (a)(1)(B) are only subject to two statutory limitations: (1) notice requirements; and (2) preclusion where a state or federal agency is diligently pursuing one of several enumerated judicial or administrative enforcement actions. § 6972 (b)(2)(A)-(C). The second limitation is only implicated where: (1) the EPA has engaged in a civil action under § 6973 of RCRA, or has engaged in a civil action, incurred costs related to remediation or cleanup, or obtained a court order, consent decree cleanup or removal action pursuant to CERCLA; or (2) the state is prosecuting an action pursuant to § 6972 (a)(1)(B), engaging in a removal action pursuant to CERCLA, or has incurred costs related to remediation or cleanup.

### 4. Whether Plaintiff is Entitled to Relief under 42 U.S.C. § 6972(a)(1)(B)

The citizen suit provision of RCRA states, in pertinent part, that any person may

commence a civil action on his own behalf:

> against any person . . . including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal Facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment

42 U.S.C. § 6972(a)(1)(B). Plaintiff argues that Defendant is a past generator of C8 who has

contributed to the disposal of C8 via air pathways and water pathways, and that C8 is a solid or

hazardous waste which presents an imminent and substantial endangerment to health or the

environment. Plaintiff seeks redress for past generation of C8, including a cleanup of its

Wellfield and an investigation into whether river soil deposits of C8 from Defendant's prior

disposal of C8 may be a continuous source of contamination to the Wellfield. This Court will

address Plaintiff's entitlement to relief under the ISE provision for Defendant's past generation

of C8 only insofar as that relief relates to an injury-in-fact to the Defendant and not an injury to

the Little Hocking community as a whole.

Defendant's first argument is that Plaintiff cannot meet the ISE standard because it

cannot show Defendant disposed of a solid or hazardous waste. As the statue defines a hazardous

waste as a subset of solid waste, the Court must determine whether Defendant disposed of solid

waste. *United States v. Sims Bros. Const.*, 277 F.3d 734, 740 (5th Cir. 2001) ("Under RCRA, for

waste to be hazardous it must be "'solid waste.'").

Defendant's second argument is that even if the Court finds Defendant disposed of a solid

waste, Plaintiff cannot meet the ISE standard because such disposal does not present an

imminent and substantial endangerment to health or the environment.

19

### a. Disposal of a Solid Waste

Defendant contends that Plaintiff's claim is beyond RCRA's remedial reach because Defendant did not dispose of solid waste within the meaning of the statute. While both parties concede that C8 reached the Wellfield via air pathways, the parties dispute whether C8 reached and continues to reach the Wellfield via water pathways.

### i. Via Water

Defendant argues that Plaintiff is not entitled to remedial relief for any of the C8 on its property due to Defendant's disposal of C8 via water pathways for three reasons: (1) Plaintiff has failed to establish a water pathway whereby C8 traveled by water into Little Hocking's Wellfield; (2) any claims based on discharges from point sources covered by Clean Water Act ("CWA") National Pollutant Discharge Elimination System ("NPDES") permits are shielded from liability under the CWA, and thus a finding of liability under RCRA for the same discharges would be in conflict with CWA, which is not permitted under RCRA; and (3) C8 allegedly disposed of via water pathways is not a solid waste because discharges from point sources covered under Clean Water Act NPDES permits are excluded from the definition of solid waste under RCRA.

### (1). Whether Plaintiff Has Failed to Establish a Water Pathway

Plaintiff states that Defendant disposed of C8 via the Ohio River, and that C8 continues to enter the Ohio River via seeps from DuPont's adjacent landfill and C8-contaminated soil at the Plant. Further, Plaintiff argues that according to its expert witness, Dr. Franklin Schwartz, a hydrogeologist at Ohio State University, there is a water pathway from the contaminated soil surrounding the plant, to the Ohio River, and finally to the Little Hocking Wellfield. (Declaration of Dr. Schwartz, Doc. 370-1). Schwartz states that C8 released from various sources at the Plant

enters the Ohio River as a dissolved phase, and is captured by induced infiltration by Little

Hocking's wells. *Id*. at ¶ 17. He explains that Little Hocking's wells are sited and designed to

draw in river water. *Id*. Unless these soil pathways to the Ohio River are investigated and then

remediated, Plaintiff argues, C8 will continue to contaminate its Wellfield. In addition, Plaintiff's

expert, Dr. Staci Simonich, opines that unless remediated, C8 released by the Plant that has

sorbed to the River's sediment will act as an ongoing source of C8 into the River Pathway and to

the Little Hocking Wellfield. (Deposition of Simonich, Doc. 369-15 at 183-5, 338-341).

Defendant retorts that neither Dr. Simonich nor Dr. Schwartz has established a

groundwater or river pathway of C8 to the Little Hocking Wellfield. As to Dr. Simonich,

Defendant argues that she has failed to establish a scientifically valid estimate of the C8 in the

sediment within Little Hocking's capture zone. As to Dr. Schwartz, Defendant argues he is

unable to identify the size, shape, or location of the river water capture zones of the four Little

Hocking wells or how far he thinks the capture zones extend. Without a scientifically valid and

reliably identified capture zone, Defendant contends, Plaintiff has not met its burden of showing

a past or present water pathway of exposure.

Viewing Plaintiff's expert testimony in the light most favorable to Plaintiff, this Court

finds the Plaintiff has raised genuine issues of material fact concerning the existence of a water

pathway from the Ohio River to the Little Hocking Wellfield. Additionally, the Plaintiff has

established a genuine issue of material fact concerning whether the river pathway is a continuing

source of contamination to the Wellfield due to contaminated river sediment. Defendant's

assertion that Dr. Schwartz cannot identify the exact size, shape, and location of the capture zone

does not nullify the assertion that one exists. Similarly, Defendant's assertion that Dr. Simonich

has not identified the exact quantity of C8 in the river sediment does not undermine her assertion

that it exists.

### (2). Conflicts with the Clean Water Act

Defendant argues that Plaintiff cannot show Defendant "disposed" of a "solid or

hazardous waste" via industrial discharges which are point sources because under RCRA,

industrial discharges from point sources subject regulation under section 402 of the CWA are

excluded from the definition of "solid waste." Under RCRA § 6903(27), the term "solid waste"

is defined as:

> any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control Facility and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities, **but does not include** solid or dissolved material in domestic sewage, or **solid or dissolved materials in** irrigation return flows or **industrial discharges which are point sources subject to permits under section 1342 of Title 33…**

(emphasis added).

In addition, the regulation interpreting §6903(27) states that the following are not solid waste for

the purposes of RCRA:

> (2) Industrial wastewater discharges that are point source discharges subject to regulation under section 402 of the Clean Water Act, as amended.
> [Comment: This exclusion applies only to the actual point source discharge. It does not exclude industrial wastewaters while they are being collected, stored or treated before discharge, nor does it exclude sludges that are generated by industrial wastewater treatment.]

40 C.F.R. § 261.4. Section 402 of the CWA establishes the NPDES permit program to regulate

point source discharges of pollutants into navigable waters of the United States.

Plaintiff responds that since DuPont's NPDES permits do not include C8, discharges of

C8 via point sources are not excluded from the definition of solid waste under RCRA §

6903(27). This Court disagrees. The text of RCRA § 6903(27) and 40 C.F.R. § 261.4 state

unambiguously that all point source discharges subject to regulation under section 402 of the CWA, regardless of whether there is a permit in place, cannot be considered solid waste under RCRA. *See Inland Steel Co. v. E.P.A.*, 901 F.2d 1419, 1422 (7th Cir. 1990) (finding the exemption from the definition of solid waste under RCRA § 6903(27) "is for discharges subject to the permit requirements of section 402 of the Clean Water Act, not for possession of a permit as such."). This Court concludes, therefore, that regardless of the content of the discharge and whether every substance released in the discharge is regulated under Section 402 of the CWA, such discharges in their entirety are not solid waste under RCRA if they are subject to the CWA NPDES permit scheme.[5]

Plaintiff also argues that some of DuPont's continuing releases of C8 into the Ohio River are not from point sources and thus fall outside of the CWA NPDES permitting scheme. The first alleged source of contamination is C8 from the highly contaminated "perched zone" underneath the Riverbank Landfill and from anaerobic digestion ponds. To support this contention, Plaintiff cites to test results showing the presence of C8 in these two locations, which the EPA obtained pursuant to a Memorandum of Understanding it entered into with DuPont to conduct environmental monitoring of C8 and its effects on the environment. Further, Plaintiff's expert describes how C8 seeps from the Defendant's Riverbank Landfill into the Ohio River. (Doc. 369-15 at 292). The second alleged source of C8 contaminated is soil throughout the Facility, including a 750-ton pile, which allegedly is a source of C8 into the Ohio River via DuPont's overland flow of storm-water run-off. (See Doc. 369-9). Further, Plaintiff argues that as the

---

[5] Since this Court has held that Defendant's discharges covered by the NPDES permitting scheme are not solid waste under RCRA, this Court does not need to address Defendant's argument that the Facility's discharges covered by NPDES permits are covered by 33 U.S.C. § 1342(k)—the CWA "permit shield"—and thus are outside of RCRA's remedial reach under 42 U.S.C. § 6905(a). *See Coon ex rel. Coon v. Willet Dairy, LP*,. 536 F.3d 171, 173-74 (2d Cir. 2008) (holding that § 6905(a) of the CWA prevents any under claims under RCRA that would be barred under the Clean Water Act's ("CWA") NPDES permit shield).

Facility is right on the riverbank, rainwater infiltrates these soils, becomes groundwater, and enters the Ohio River via seeps and erosion of the soil. The final source of C8 contamination is storm-water run-off, including from roof drains, that works its way to the Ohio River.

Defendant retorts that it is undisputed that all process discharges should be excluded, and that once these process emissions are excluded, Little Hocking has not pointed to evidence in the record to establish the source or amounts of the alleged non-process emissions. Defendant puts forth evidence showing the NPDES permits, issued August 4, 2003 and August 26, 2011, together allow the Facility to dispose of untreated storm water via over twenty specified outlets into the Ohio river within a 0.7 mile portion of the riverbank, and also permits wastewater discharges from the local landfill.

A "point source" is defined in the Clean Water Act as:

> [A]ny discernible, confined, and discrete conveyance, including, but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged. This term does not include return flows from irrigated agriculture.

40 C.F.R. § 260.10. The DuPont Facility has NPDES permits for the discharge of untreated storm water via over twenty outlets into the Ohio River. Thus, these outlets, and the storm water discharge from them, are excluded from the definition of solid waste, as they exit point sources that are unambiguously covered by an NPDES permit. *See* 42 U.S.C. §6903(27); 40 C.F.R. § 261.4. Plaintiff alleged in its Response that untreated storm water from Facility roof drains, soil, and other sources are discharges not from point sources. Plaintiff did not identify, however, the exact location from where this rainwater exits the Facility. If this untreated storm water in fact exits from these designated, permitted outlets, such discharges are from point sources, and are governed by the CWA.

In its reply, Defendant states simply that the Facility has permits for untreated storm water, but does not state that the outlets for which it has permits are the exclusive exit points for all storm water. Other circuits have held that runoff caused primarily by rainfall around activities that employ or cause pollutants, and contaminated runoff and groundwater from contaminated soil, may or may not be point sources subject to regulation by the CWA. *United States v. Earth Sciences, Inc.*, 599 F.2d 368, 373 (10th Cir. 1979) (interpreting the CWA and holding "mining and the other categories listed in s 1314(f) (2) may involve discharges from both point and nonpoint sources, and those from point sources are subject to regulation"). This Court holds, therefore, that there is a genuine issue of material fact whether some of the storm water runoff from contaminated soil and buildings, which eventually reaches the Ohio River, but which does not exit the Facility through a discrete conveyance, involves disposal of solid waste cognizable under RCRA.

In terms of C8 that seeps into the Ohio River from the C8 contaminated Riverbank Landfill, and which seeps into the groundwater and eventually the Ohio River from C8 contaminated soils, this Court also finds that there is a genuine issue of material fact whether these sources of contamination involve disposal of solid waste cognizable under RCRA. RCRA's solid waste exclusion "applies only to the actual point source discharge. It does not exclude industrial wastewaters while they are being collected, stored or treated before discharge, nor does it exclude sludges that are generated by industrial wastewater treatment." 40 C.F.R. § 261.4(a)(2); see *United States v. Dean*, 969 F.2d 187, 194 (6th Cir. 1992). Courts have interpreted this to mean that substances in wastewater that harm the environment while being stored in disposal ponds, or substances which leak, spill, or are poured onto the ground, thus contaminating soil, groundwater or surface waters, are not point source discharges. *See*

*Humboldt Baykeeper v. Union Pac. R. Co.*, No. C 06 02560 JSW, 2006 WL 3411877, at *6
(N.D. Cal. Nov. 27, 2006); *Dean*, 969 F.2d at 194.

In contrast, *Williams Pipe Line Co. v. Bayer Corp.* found that petroleum spills and leaks
that made their way to navigable waters via groundwater were industrial discharges from a
Facility, which it held was a point source in and of itself, and thus such discharges were subject
to an NPDES permit. 964 F. Supp. 1300, 1328-29 (S.D. Iowa 1997). Accordingly, it held that
these spills and leaks were excluded from the definition of "solid waste" under 42 U.S.C. §
6903(27), and outside of RCRA's remedial reach. *Id*. The *Williams* Court noted, however, that
other courts had determined that petroleum discharged through leaks and spills into soil meets
the definition of discarded material, and thus constitutes solid waste, but distinguished those
cases because the defendants there were not subject to abatement and remediation conditions
established under an NPDES permit, as was the case in *Williams*. It also acknowledged that not
all courts consider groundwater that is hydraulically connected to navigable waters to be
encompassed by the CWA. *Id*.

In this case, DuPont is not subject to abatement and remediation conditions established
under NPDES permits of which this Court has been made aware. Further, this Court declines to
interpret the solid waste exclusion so broadly as to make it impossible for solid waste dumped or
leaked onto the ground at a Facility, but which makes its way to navigable waters via
groundwater and seepage, to be subject to RCRA's ISE provision. The RCRA scheme itself
defines "disposal" as

> the discharge, deposit, injection, dumping, spilling, leaking, or placing of any
> solid waste or hazardous waste into or on any land or water so that such solid
> waste or hazardous waste or any constituent thereof may enter the environment or
> be emitted into the air or discharged into any waters, including ground waters

42 U.S.C.A. § 6903.

26

Thus, in its definition of "disposal" RCRA presupposes that its remedial framework reaches solid waste that is placed directly in water, or placed on land and then eventually discharged into water. An expansive reading of the solid waste exclusion—whereby any toxic waste from a Facility that is placed on land, and which eventually make its way to navigable waters, is not solid waste under RCRA—contradicts the language of §6903. *Mitchell v. Chapman,* 343 F.3d 811, 825 (6th Cir.2003) ("Under accepted canons of statutory interpretation, we must interpret statutes as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous.").

Further, other circuits have found that solid waste disposed onto land by waste disposal facilities, which may or does make its way to navigable waters, or waste dumped directly into navigable waters, is covered by the ISE provision. *See Maine People's Alliance And Natural Res. Def. Council v. Mallinckrodt, Inc.,* 471 F.3d 277, 281 (1st Cir. 2006) (finding application of RCRA ISE provision where industrial Facility dumped tons of mercury-laden waste directly into river); *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.,* 399 F.3d 248, 263 (3d Cir. 2005) (finding application of RCRA ISE provision where waste from a dump site made its way to a river); *Cox v. City of Dallas, Tex.,* 256 F.3d 281, 286-87 (5th Cir. 2001) (finding significant in its determination that an ISE existed that there was an imminent threat that solid waste at a dumping site would make its way to a nearby creek, which was a tributary to a river). Accordingly, this Court finds that C8 dumped into the Riverbank Landfill and its anaerobic ponds, and into the soil surrounding the Facility, and which makes its way into the Ohio River through seepage, is not covered by the solid waste exclusion under RCRA. The Court finds that the Plaintiff need not

quantify the exact amount of such seepage in order for this Court to determine that C8 was disposed of and reached the Ohio River.

A narrow reading of the solid waste exclusion, such as the one followed in *Williams*, would entail that any pollutants stored or dumped on the ground at waste sites or industrial facilities, which eventually enter navigable waters, are in no way subject to the remedial protection of the ISE provision due to the definition of solid waste under RCRA § 6903(27). Such a reading of RCRA would undermine the broader purpose of Section 6972(a)(1)(B), which was "intended to confer upon the courts the authority to eliminate any risks posed by toxic wastes," which, under the definition of 'disposal,' unambiguously includes risks to navigable waters. *Interfaith Cmty. Org.*, 399 F.3d at 260 (quoting S.Rep. No. 98–284, 98th Cong., 1st Sess. at 59 (1983).

### ii. Via Air

Defendant agrees that C8 from the DuPont Facility was transported via air emissions from DuPont's stacks by wind, and was deposited on Little Hocking's Wellfield vegetation and surface soils. It also agrees that precipitation and possible flooding leaches the C8 downward through the unsaturated zone through the aquifer, and that groundwater containing C8 is pumped from the aquifer through the production wells. Defendant asserts, however, that air emissions of C8 particulate matter via industrial stacks does not constitute disposal of solid waste under RCRA. Accordingly, Defendant argues that insofar as C8 is currently on Plaintiff's land due to air emissions, such deposits cannot be remediated under RCRA's ISE provision.

Defendant argues, first, that air emissions of C8 do not constitute "solid waste" under RCRA's definition. The portion of the definition of "solid waste" under RCRA that applies to Defendant's air emissions of C8 is that it is a "discarded material, including solid, liquid,

28

semisolid, or contained gaseous material resulting from industrial . . . operations." § 6903(27).

Defendant argues that since C8 was released into the air via stacks, it is not included in the

definition of solid waste because it was an "uncontained" gaseous material, not a "contained"

gaseous material as required by RCRA. *See United States v. Sims Bros. Const.,* 277 F.3d 734,

740 (5th Cir. 2001) (holding that "[f]or gaseous material to be 'solid waste' it must be

'contained.'"). The court in *Sims Bros Const.*, however, dealt unambiguously with a contained

gas—the storage of canisters of contained gas—and was not required to analyze the question in

the case *sub judice*. In this case, the Court must determine whether the release into the air of a

substance in "particle form" via a stack, which is then deposited onto the ground in particle form,

and enters the groundwater, constitutes disposal of "solid waste."

Plaintiff urges this Court to follow a case from this Circuit, *Citizens Against Pollution v.

Ohio Power Co.*, and find that particulate matter released via the air, which then "touches down"

onto the ground, constitutes disposal of solid waste under RCRA. No. C2-04-CV-371, 2006 WL

6870564, at *3-5 (S.D. Ohio July 13, 2006). In that case, byproducts of coal combustion at

defendant's coal-burning Facility passed through various equipment and then exited a stack as

part of a flue gas. *Id.* at * 1. The flue gas took the shape of a plume and appeared to touch down

on the land, causing plaintiff's members to experience watery eyes, burning throats, headaches,

and breathing problems. *Id.* at 2. First, the *Citizens* Court held that the flue gas emissions were

"discarded material" within the definition of solid waste. It reasoned that the definition of

"discarded" included the synonym "abandon," which the Federal Register defined as "*disposed*

of, or burned or incinerated, or accumulated, stored or treated (but not recycled) before or in lieu

of being abandoned by being disposed of, burned, or incinerated." 40 C.F.R. § 261.2(b)." *Id.* at

*4 (emphasis added). The Court then found that RCRA's definition of "disposal"[6] required only

some evidence that the discharge touches down onto land, which the flue gas had, and did not

necessarily require the discharge to enter the environment, air or waters. *Id*. The Court then held

it need not address Defendant's assertion that flue gas was not a solid waste because it was not

"solid, liquid, semisolid, or contained gaseous material:"

> As previously noted, the RCRA is a remedial statute that is to be interpreted broadly.
> *Davis,* 148 F.3d at 609. Keeping that principle in mind, the definition of solid waste
> encompasses 'other *discarded material, including solid, liquid, semisolid, or contained
> gaseous material'* resulting from industrial, commercial, mining, and agricultural
> operations...." (Emphasis Added). The Court held above that the flue gas was discarded
> material resulting from industrial operations within the meaning of the RCRA; thus, the
> Court essentially held that the flue gases were solid waste within the meaning of the Act.
> The Court need not additionally determine whether the flue gas is a 'liquid, solid,
> semisolid, or contained gaseous material' because, interpreting the provision liberally, the
> reference to those materials in regards to discarded material is merely illustrative, not
> comprehensive. Accordingly, the Court need not and shall not determine whether the flue
> gas is a 'liquid' under the RCRA.

*Id*. at *5.

Plaintiff argues that under *Citizens*, the discharge of C8 particles into the air, which then

fall onto land, constitutes disposal of "solid waste;" C8 was a discarded or disposed of material,

discharged from the industrial plant, which touched down onto the ground.

Defendant urges this Court to follow, instead, *Ctr. for Cmty. Action & Envtl. Justice v.

BNSF R. Co.*, 764 F.3d 1019 (9th Cir. 2014). There, the Ninth Circuit held that emissions of

particulate matter in diesel exhaust by trains and vehicles in Defendants' railyards—which were

discharged into the air, fell onto the ground and water nearby, and then re-entrained into the

atmosphere, causing elevated cancer risk—did not meet the definition of "disposal" under RCRA

§ 6903(3). *Id*. at 1024. Specifically, it held that under § 6903(a) "disposal" is strictly confined to

---

[6] "disposal" is defined as "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any
solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or
any constituent thereof may enter the environment or be emitted into the air or discharged into any waters,
including ground waters." 42 U.S.C.A. § 6903(3).

a particular order, in which solid waste is "*first* placed 'into or on any land or water' and is *thereafter* 'emitted into the air, '" and thus disposal directly into the air which then fell on the ground was not "disposal" under RCRA. *Id*. For further support, the Court noted that the term "emissions" was absent from the definition of disposal, even though that term was present in other portions of the statute. *Id*. Finally, the Court rejected plaintiff's contention that since RCRA has an "air emissions" provision— § 6924(n), which covers gas discharges from solid waste dump sites—that "emitting" must fall within the statute's reach. *see* § 6924(n). *Id*. at 1025. (distinguishing § 6924(n) from the rest of the remedial scheme and finding that the necessity to include § 6924(n) in RCRA indicated that RCRA did not otherwise intend to regulate air emissions through § 6972(a)(1)(B)). *Id*.[7]

After completing its statutory analysis, the Ninth Circuit acknowledged that to the extent the term "disposal" remained ambiguous—and conflicted with the reasoning in *Citizens Against Pollution,* which held air emissions did constitute disposal—"the statutory and legislative histories of both RCRA and the Clean Air Act resolve that ambiguity." *Id*. at 1025-26.

The Court reasoned that RCRA was passed in 1976—six years after passage of the CAA—to close the "last remaining loophole in environmental law…unregulated land disposal and discarded … hazardous waste." It held, accordingly, that RCRA governs only "land disposal" while the CAA, in contrast, governs air pollutants. *Id*. at 1026-9. In support, the Court reasoned that the first and only overlap between RCRA and the CAA was passed in 1984 when Congress added a provision to RCRA governing gaseous emissions from the waste in surface impoundments and landfills that may be emitted into the air. *Id*. at 1027-28. (citing S.Rep. No.

---

[7] The *BNSF Railway* Court also reasoned that since the emission of diesel particulate matter did not meet the definition of "disposal," the Court did not need to consider parties' arguments regarding whether the diesel particulate matter was a "solid waste" under RCRA. *Id*. at 1024.

98–284, at 63 (1983)). The Ninth Circuit also recounted a series of provision in the Clean Air Act addressing railroad emissions. *Id*. at 1027-29. It concluded that the legislative history made clear that any regulatory gap over diesel emissions from locomotives and indirect sources, such as railyards, resulted from "a reasoned decision made by Congress that we are not at liberty to disturb." *Id*. at 1030. Thus, the Ninth Circuit held that that the legislative histories of RCRA and the CAA confirmed its reading of the RCRA's text, that diesel particulate matter first emitted into the air, which later falls onto the ground or water, is not governed by RCRA, and its failure to be covered by the CAA is of no consequence *Id*. at 1029.

This Court declines to follow the Ninth Circuit's narrow reading of RCRA's text and legislative history, and finds *BNSF Railway* factually distinguishable from the case *sub judice*. The Ninth Circuit reasoned that to the extent the term "disposal" remained ambiguous, RCRA's legislative history resolved any doubt surrounding the Court's order-of-disposal rule. In contrast, this Court finds that RCRA's legislative history and purpose supports a finding in this case that the aerial emissions of C8 particulate matter, which fell onto the ground, remained there, and contaminated the groundwater, constitutes disposal of solid waste under RCRA. Thus, this Court follows the rationale in *Citizens*.

While the BNSF Court found that Congress left an intentional regulatory gap over locomotive and indirect source emissions of diesel particulate matter, this Court does not find that Congress left an intentional regulatory gap over the type of aerial emissions of solid particulate matter in this case. In *BNSF Railway*, the diesel particulate matter fell onto the land, and then was swept back up into the air, causing harm to those who inhaled it. In contrast, in the case *sub judice*, solid C8 particles are emitted into the air, fall onto the ground, remain there, and then contaminate the soil and groundwater. This Court finds that this type of soil and

32

groundwater contamination is precisely the type of harm RCRA aims to remediate in its definition of "disposal:" "the deposit . . . or placing of any solid . . . . waste into or on any land or water so that such solid waste or hazardous waste . . . may enter the environment . . . or discharged into any waters, including ground waters."

Further, this Court does not find that the passage of the 1984 RCRA Amendment constitutes evidence that RCRA only covers pollutants directly placed onto land. The 1984 Amendment makes clear that RCRA does not cover emissions that cause air pollution, unless those air emissions arise from hazardous toxins released into the air from toxic waste dumps. In this case, however, the harm caused by Defendant's release of C8 particles into the air is not to air quality, but to the land and the water on which the C8 particles land and remain. If the same waste entered the soil and groundwater via seeps or dumping directly from a waste treatment plant or industrial Facility, however, a private citizen harmed by such soil and groundwater contamination would have standing to pursue an ISE claim. This Court finds, therefore, that these two scenarios present a distinction without a difference.[8]

As the Ninth Circuit explained in *BNSP Railway*, RCRA was passed to "eliminat[e] the last remaining loophole in environmental law, that of unregulated land disposal of discarded materials and hazardous wastes." 764 F.3d at 1026. Under the rationale in *Citizens*, the focal point of the wide-reaching ISE provision is the harm caused by the placement of industrial waste on land and in water. Thus, this Court holds that when interpreting what constitutes land disposal of solid waste under RCRA, the Court should proceed on a case-by-case basis, keeping in mind

---

[8] A timely case note in the Harvard Law Review underscores this Court's rationale in distinguishing BNSF Railway Co. from this case. The case note points out that the Ninth Circuit's "restriction of 'disposal' to require discharge *initially* to land or water without first traveling through the air, if applied strictly, may exempt from citizen suits some disposals of solid substances through the air in gaseous or semiliquid form even though they contribute to hazardous waste contamination of land or water. . . . Future courts should avoid the negative consequences of the *BNSF Railway Co.* court's bright-line order-of-disposal rule by relying on an individualized inquiry into the nature of each alleged disposal." *Recent Cases*: Center for Community Action & Environmental Justice v. BNSF Railway Co., 128 HARV. L. REV. 1272 (2015).

as the guiding principle that "RCRA is a remedial statute that is to be interpreted broadly." 2006 WL 6870564 at \*5; *see also Interfaith Cmty. Org.* 399 F.3d at 260 (finding RCRA is a remedial statute "intended to confer upon the courts the authority to eliminate any risks posed by toxic wastes"). Accordingly, this Court holds that Defendant's aerial emissions of C8, which landed on Plaintiff's Wellfield, and contaminated the soil and groundwater, constitutes disposal of solid waste under RCRA's ISE provision.

### b. Imminent and Substantial Endangerment

Next, the Court will address Defendant's argument that the presence of C8 on Plaintiff's Wellfield does not present an imminent and substantial endangerment to health or the environment. Defendant argues that the GAC Facility abates any potential endangerment to human health resulting from C8 on Plaintiff's Wellfield, and that the Plaintiff has not been able to prove any endangerment to the environment due to on C8 on the Wellfield.

According to 42 U.S.C. § 6972(a)(1)(B), the Plaintiff need only demonstrate that C8 "may present" an imminent and substantial endangerment. *Parker v. Scrap Metal Processors, Inc.*, 386 F.3d 993, 1014-15 (11th Cir. 2004). The term "endangerment" means a threatened or potential risk of harm, and does not require proof of actual harm or even risk of harm. *See Maine* 211 F. Supp. 2d at 246 ("Under § 6972(a) of RCRA, it is not necessary that Plaintiffs show that the contamination is harming, or will harm, health or the environment.") (citing *Dague v. City of Burlington,* 935 F.2d 1343, 1355–56 (2nd Cir.1991), *rev'd on other grounds,* 505 U.S. 557, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992)); *Price,* 688 F.2d at 211; *United States v. Waste Industries, Inc.,* 734 F.2d 159 (4th Cir.1984). This lenient and sweeping provision communicates Congress's intent "to confer upon the courts the authority to grant affirmative equitable relief to the extent necessary to eliminate any risk posed by toxic wastes." *Maine*, 471 F.3d at 287.

34

The Supreme Court has determined that "an endangerment can only be 'imminent' if it 'threatens to occur immediately,'" meaning that "there must be a threat which is present now, although the impact of the threat may not be felt until later." *See Meghrig v. KFC Western, Inc.,* 516 U.S. 479, 485-86 (1996) (citations omitted). Thus, the RCRA remedial scheme does not include reimbursements for past cleanup efforts, where no potential risk of harm remains. *Id.* at 486.

Further, the Supreme Court has stated that an endangerment is "substantial:"

> if there is some reasonable cause for concern that someone or something may be exposed to risk or harm ... if remedial action is not taken. Courts will not find that an imminent and substantial endangerment exists if the risk of harm is remote in time, completely speculative in nature, or de minimis in degree.

*Maine*, 211 F. Supp. 2d at 246 (citing *Reserve Mining Company v. Environmental Protection Agency,* 514 F.2d 492, 520 (8th Cir.1975) (*en banc* )) (internal citations and quotations omitted); *accord Bd. of Cnty. Comm'rs of Cnty. of La Plata, Colorado v. Brown Grp. Retail, Inc.*, 768 F. Supp. 2d 1092, 1109 (D. Colo. 2011).

### i. Endangerment to Health

Defendant contends, first, that there is no imminent and substantial endangerment to human health related to the presence of C8 on Plaintiff's Wellfield, because any endangerment has been fully abated by the U.S. EPA's 2006 and 2009 Administrative Orders on Consent ("AOCs"). In the 2006 AOC, the EPA determined that pursuant to the Safe Drinking Water Act, and for the purposes of the AOC:

> C-8 is a contaminant present in or likely to enter a [public water system] or a [underground source of drinking water] which may present an imminent and substantial endangerment to human health at concentrations at or above .50 ppb in drinking water. EPA has based this determination on its interpretation of animal and human studies, and on the results of environmental sampling and monitoring in the vicinity of the Facility. The .5 ppb action level is a precautionary level to reduce exposure to the population living in the vicinity of the Facility.

(Doc. 346 at ¶ 32). Pursuant to the AOC, Defendant provided for the operation and maintenance of a GAC water treatment plant that reduced Little Hocking's C8 water levels to .5 ppb. Then, in 2009, the EPA office issued a second AOC, requiring Defendant to reduce the C8 water levels to .4 ppb. Both parties agree that at present, the GAC Facility has reduced the C8 in Little Hocking's water to undetectable levels. Defendant argues, therefore, that even if C8 is present in the Wellfield's soil and water supply, any endangerment it may cause to human health has been fully remediated by the GAC; thus, it is beyond RCRA's reach. *See Leister v. Black & Decker (U.S.), Inc.*, 117 F.3d 1414 at *3 (4th Cir. 1997) ("[b]y definition . . . § 6972(a)(1)(B) excludes waste that no longer presents a danger."); *See also Price v. United States Navy,* 39 F.3d 1011, 1019 (9th Cir. 1994) (finding that since plaintiff could not show soils under its house presented any threat to public health or environment, RCRA claim could not stand). In *Leister,* the Court found that plaintiffs failed to show imminent and substantial threat of harm to human health simply by pointing to the presence of a pollutant on their dairy farm, because drinking water from the well was the "most direct pathway of exposure," but a filtration system had eliminated any threat. *Id.; accord Two Rivers Terminal, L.P. v. Chevron USA, Inc.,* 96 F. Supp. 2d 432, 446 (M.D. Pa. 2000) (holding that mere presence of contaminants in groundwater could not prove imminent and substantial endangerment to human health where no one was drinking the water).

Similarly, Defendant cites to *Tilot Oil, LLC v. BP Products N. Am., Inc.*, a case in which defendant caused contamination of groundwater beneath one of plaintiff's industrial buildings. Remediation efforts already in place included continuous operation of a ventilation fan in the basement, and a remediation effort to remove contamination from the basement. 907 F. Supp. 2d 955, 958-60 (E.D. Wis. 2012). The Court concluded that while ongoing remediation does not automatically create a situation lacking a remedy under RCRA, just because an additional

36

remedy "*could* be fashioned" does not mean a remedy is necessary under RCRA where there is a lack of a potentially imminent and substantial endangerment. *Id*. at 964. The Court held that even though further remedy was available, such as a separation barrier between the two properties, the current remedies in place had eliminated any substantial or imminent endangerment to human health. The court made clear, however, that:

> [s]imply because remediation is currently occurring does not eliminate the question of whether the extent of remediation is appropriate in order to abate a possibly imminent and substantial endangerment. It is conceivable that existing remedial action could be insufficient, leaving a continuing threat of substantial harm from contamination and, thus, a continuing RCRA violation.

*Id*. at 964.

Plaintiff replies that genuine issues of material fact remain concerning the sufficiency of current remediation efforts and whether they actually abate any imminent and substantial endangerment to Little Hocking's water customers. Plaintiffs argues that: (1) Defendant should have to operate the GAC at non-detect permanently to protect the chronically exposed Little Hocking population, which experts will show cannot tolerate any more C8; and (2) Defendant should have to perform a comprehensive investigation and/or remediation of all source areas and pathways that may present a threat to human health in the Little Hocking area.

As to Plaintiff's first contention, the Court agrees with the rationale in *Leister* and *Tilot*, and determines that no additional remedy is necessary at this time. Plaintiff asks that this Court order DuPont to operate the GAC such that it removes C8 to non-detect permanently. Defendant, however, currently removes C8 from Little Hocking's water to non-detectable levels, despite the AOC, which only demands it bring C8 to .4 ppb. Plaintiff fails to raise facts that show a threat exists, at this time or in the foreseeable future, that Defendant cease to operate the GAC at non-detect levels. Accordingly, no additional remedy under RCRA is necessary at this time, as

Defendant's remediation efforts abate any potential substantial or imminent endangerment to human health due to the presence of C8 on Plaintiff's Wellfield.

As to Defendant's second contention, Plaintiff only has standing to demand a remedy for injury to itself. *Am. Canoe Ass'n, Inc. v. City of Louisa Water & Sewer Comm'n*, 389 F.3d 536, 544 (6th Cir. 2004). As such, this RCRA action relates only to whether the C8 contamination on Plaintiff's Wellfield presents an imminent or substantial endangerment to human health. Further, aside from a person drinking the Plaintiff's untreated water, Plaintiff has not demonstrated that the C8 contamination on its Wellfield presents a threat to human health via any other pathway of exposure. Accordingly, this court hereby **GRANTS** Defendant Summary Judgment for any RCRA claims related to endangerment to health.

### ii. Endangerment to the Environment

Liability under RCRA's ISE provision can rest on a showing of substantial and imminent endangerment to human health *or* the environment. *See Interfaith Cmty. Org.,* 399 F.3d at 263 (holding that a showing of environmental endangerment is all that is required under § 6972(a)(1)(B)); *Maine People's Alliance*, 471 F.3d at 282 (analyzing separately whether imminent and substantial endangerment exists to human health or the environment); *Tilot Oil* 907 F. Supp. 2d at 967-68 (same).

Defendant argues that Plaintiff cannot meet its burden to show that the C8 on its Wellfield may present a substantial or imminent endangerment to the environment. Defendant contends, first, that Plaintiff's expert witness, Dr. Mark Dilley, performed an ecological inventory of Plaintiff's land, which showed "no overt signs of stress" to the environment at the Little Hocking site. Given the alleged sixty years of contamination, Defendant asserts, any threat would have become evident by this time. Further, Defendant cites to *Maine People's Alliance*

38

*And Natural Res. Def. Council v. Mallinckrodt, Inc.*, and argues that the mere presence of C8 contamination is not enough to show substantial and imminent endangerment to the environment due to disposal of C8 on Plaintiff's Wellfield.  471 F.3d at 282; *compare Tilot Oil,* 907 F. Supp. 2d at 967-68 (rejecting groundwater contamination as ISE per se, but finding that "a lack of ongoing remediation might allow a finding of endangerment to the environment" even without any clear showing of threat to the nearby river). Since the Wellfield's environment shows no overt signs of stress, and mere presence of C8 is not enough to show imminent and substantial endangerment, Defendant claims it is entitled to summary judgment on any RCRA environmental endangerment claims.

Plaintiff responds that the uncontroverted presence of C8 in the Wellfield's groundwater, as well as complete absence of any remediation effort, is sufficient to show imminent and substantial endangerment to the environment. *See Interfaith Cmty. Org.* 399 F.3d at 263 (holding liability under RCRA for contamination to groundwater and rivers because the ISE provision "imposes liability for endangerments to the environment, including water in and of itself"). The *Interfaith* Court, relying on the New Jersey Administrative Code, reasoned that groundwater and rivers are themselves environmental receptors "due to their status as an environmentally sensitive natural resource." *Id*.

Even without resolving whether a showing of contamination in rivers and groundwater is sufficient alone to show endangerment to the environment, the holding in *Maine People's Alliance* is informative and applicable to this case. 471 F.3d at 282. The Appellate Court found that high mercury content in river sediment was not enough to show imminent and substantial endangerment to the environment. *Id*. Next, however, the Appellate Court noted that the mercury was traveling downriver, entering animals, and magnifying throughout the food web, in humans

39

and animals alike. *Id*. The Appellate Court concluded that the standard for ISE claims under RCRA is "lenient," and permitted a finding of endangerment whenever the "punitive polluter 'may' have caused an imminent and substantial endangerment."  *Id*. Thus, the Appellate Court concluded that the ISE standard is satisfied by a showing of "'a reasonable scientific concern for the environment.'" *Id.* In this case, like in *Maine People's Alliance*, Plaintiff has proffered expert testimony that C8 is present in plants and animals on the Wellfield and could magnify throughout the foodweb.  Plaintiff asserts that its expert, Dr. Dilley, only documented the presence of flora and fauna on the Wellfield, and made no evaluation as to the actual health of either.

Defendant retorts that even if Plaintiff has shown the presence of C8 in plants and animals on the Wellfield, and predicted that C8 will spread from the Wellfield throughout the foodweb, Plaintiff has failed to establish the exact degree of exposure to C8 currently existing on the site, if any, and has failed to establish a hazardous contamination level of C8 for the different environmental receptors.

Defendant is incorrect that the Plaintiff must establish the exact degree of exposure to and risk associated with C8. Plaintiff need not, "quantify the risk of harm in order to establish an endangerment … because the evaluation of a risk of harm involves medical and scientific conclusions that clearly lie on the frontiers of scientific knowledge, such that 'proof with certainty is impossible.'" *Maine*, 211 F. Supp. 2d at 247 (citing *Reserve Mining* Company, 514 F.2d at 520) (internal citations and quotations omitted). In this case, like in *Maine*, there is a genuine issue of material fact about whether the endangerment is substantial and imminent—the record shows there is a reasonable cause for concern that plants and animals in the Wellfield, and

living things in the greater environment, may continue to be exposed to a risk of harm if C8 is not removed from the Wellfield.

Plaintiff cites to studies analyzing the effects of C8 exposure in animals which suggest it causes developmental toxicity, physical and developmental delays, endocrine disruption, and neonatal mortality. Further, the EPA made a preliminary determination that C8 is a potentially toxic substance that should be limited in human beings to .4 ppb. In addition, a panel of six experts has determined that there is a correlation between exposure to C8 in the region surrounding the DuPont Facility and six human diseases. Such harm is likely to occur in plants and animals similarly experiencing high exposure to C8, as they are on the Wellfield. Drawing all inferences in favor of the non-moving party, Plaintiff has met its burden of pointing to facts in the record showing a substantial and imminent risk of harm to the living things in the Wellfield's environment that is not merely speculative. Any investigations in which DuPont has participated since 1989 that analyze the effects C8 has on health and the environment resulted in findings that C8 is potentially toxic and should be abated and removed from the environment. "[I]f an error is to be made in applying the endangerment standard, the error must be made in favor of protecting public health, welfare and the environment." *Interfaith Cmty. Org.* 399 F.3d at 259; *See also Price,* 688 F.2d at 213–14 (noting that § 6972(a)(1)(B) contains " 'expansive language' " that confers " 'upon the courts the authority to grant affirmative equitable relief to the extent necessary to eliminate *any risk* posed by toxic wastes' ").

As there are genuine issues of material fact concerning each prong of the ISE provision, Defendant's Motion for Summary Judgment on Count I is hereby **DENIED**.

41

## B. Nuisance—Count II

Plaintiff alleges that the C8 released from the Facility contaminated its Wellfield and continues to do so, and thus constitutes a public and private nuisance, both absolute and qualified. Defendant argues that Plaintiff cannot assert any form of public nuisance because it has not suffered an injury different in kind from the general public. In addition, Defendant contends that Plaintiff cannot assert a claim for absolute private nuisance because Defendant's emissions were at all times permitted under the relevant regulatory schemes. Finally, Defendant asserts that Plaintiff cannot prove a claim for qualified private nuisance because it cannot prove that Defendant's C8 disposal practices caused a foreseeable risk of harm to Plaintiff's Wellfield.

At common law, "[n]uisance is a term used to designate the wrongful invasion of a legal right or interest." *Banford v. Aldrich Chem. Co.*, 126 Ohio St. 3d 210, 213, 932 N.E.2d 313, 317 (citing *Taylor v. Cincinnati,* 55 N.E.2d 724, 729 (Ohio 1944). A nuisance can be either public or private. *Green v. Begley Co.*, No. 1:08CV77, 2008 WL 4449065, at *2 (S.D. Ohio Sept. 29, 2008). A public nuisance is "an unreasonable interference with a right common to the general public," including, among others, "with public health, safety, peace, comfort, or convenience;" private nuisance, on the other hand, is a "nontrespassory invasion of another's interest in the private use and enjoyment of land." *Brown v. Scioto Cty. Bd. of Commrs.*, 87 Ohio App. 3d 704, 712, 622 N.E.2d 1153, 1158 (1993); *Paulus v. Citicorp N. Am., Inc.*, No. 2:12-CV-856, 2013 WL 5487053, at *6 (S.D. Ohio Sept. 30, 2013).

Private citizens generally do not have standing to bring public nuisance claims. *Cleveland Hous. Renewal Project, Inc. v. Wells Fargo Bank, N.A.*, 188 Ohio App. 3d 36, 46, 934 N.E.2d 372, 380. They may only do so if they "establish (1) an interference with a public right and (2) that [they] ha[ve] suffered an injury distinct from that suffered by the public at large." *Paulus*

42

2013 WL 5487053, at *6 (citing *Kramer v. Angel's Path, L.L.C.*, 174 Ohio App.3d 359, 367, 882 N.E.2d 46, 52 (Ohio Ct.App.2007)). "[T]he majority view regards the special injury as an injury suffered by the plaintiff which is different in kind rather than degree from that suffered by other members of the public exercising the same public right." *Cleveland Hous. Renewal Project, Inc.*, 188 Ohio App. 3d at 46, 934 N.E.2d at 380.

Further, both private and public nuisances may be either qualified or absolute. *Hager v. Waste Technologies Indus.*, 2002-Ohio-3466, ¶ 72 (citing *Brown,* 87 Ohio App.3d at 713, 622 N.E.2d 1153). An absolute nuisance is "based upon either intentional conduct or abnormally dangerous conditions, and as such, a rule of absolute liability applies." *Id.* at ¶ 71. In contrast, a qualified nuisance is "premised on negligence," and "consists of anything lawfully but so negligently or carelessly done or permitted as to create a potential and unreasonable risk of harm[ ] which, in due course, results in injury to another." *Id. (citing Brown, 87 Ohio* App.3d at 713, 622 N.E.2d 1153).

Having reviewed the framework of nuisance law, the Court will first address Defendant's argument that it is entitled to summary judgment on Plaintiff's public nuisance claim.

### 1. Public Nuisance

Defendant argues that Little Hocking lacks standing to pursue a public nuisance claim because it has not suffered an injury different in kind from the general population. The Court holds that it need not address Defendant's argument because Plaintiff fails to raise a claim for any form of public nuisance.

In this case, Defendant has introduced uncontroverted evidence that "the operations at Washington Works are sanctioned by law." (Doc. 346 at 34). Under Ohio common law, a Facility that "operates under the sanction of law cannot be a common-law public nuisance"

43

because "conduct which is fully authorized by statute or administrative regulation is not an

actionable tort."  *Brown*, 87 Ohio App. 3d at 713, 622 N.E.2d at 1159 (finding emissions of

sewage disposal plant were governed and permitted under a comprehensive regulatory scheme,

and thus could not constitute a common-law public nuisance). While the court in *Brown* found

that odors emitted from a licensed Facility could not constitute a common-law public nuisance, it

found a genuine issue of material fact existed as to whether it could constitute a statutory public

nuisance under O.A.C. § 3745–15–07, which proscribes any emissions that endangered the

health, safety or welfare of the public or causes unreasonable damage, unless those emissions

were not subject to regulation. *Id*. Thus, under Ohio law, statutes and administrative regulations

that define certain conduct as being a public nuisance trump the common law rule that regulated

activity cannot constitute a public nuisance. *See, e.g., Hager*, 2002-Ohio-3466, ¶¶ 68-92 (finding

that despite fact that hazardous waste Facility's emissions could not qualify as a common law

public nuisance based on the mere existence of Facility's operations, it could under a showing of

violation of Ohio Adm.Code 3745-15-07(A)); *Chance v. BP Chemicals, Inc.*, 77 Ohio St. 3d 17,

22-23, 670 N.E.2d 985, 990 (finding that even though defendant operated a well pursuant to a

permit, that did not insulate it from statutory public nuisance liability under R.C. 6111.08, which

stated that a grant of a permit did not preclude a plaintiff's common law right to suppress

nuisance or abate pollution).

        In addition, the Court in *Brown* further concluded that just as a duly licensed Facility

cannot be a common-law public nuisance, but only a statutory public nuisance, "because of the

governmental authorization to operate, it likewise cannot be an absolute statutory nuisance."

*Brown*, 87 Ohio App. 3d at 714, 622 N.E.2d at 1160. Instead, the plaintiff must establish

negligence, i.e., qualified nuisance, in order for a "duly licensed and regulated" Facility to be

found liable for maintaining a nuisance." *Id*. In sum, if the Defendant is a permitted Facility, authorized by the government to operate in the way that Plaintiff alleges caused a public nuisance, Plaintiff only has recourse under a theory of statutory qualified public nuisance.

Plaintiff, however, fails to assert that Defendant is in violation of any nuisance statute. Accordingly, Plaintiff is not entitled to relief under a theory of statutory qualified public nuisance, and the Court need not analyze whether Plaintiff has in fact suffered special injury.

### 2. Private Nuisance

A private nuisance is defined as a "nontrespassory invasion of another's interest in the private use and enjoyment of land," and can be further divided into absolute or qualified nuisance. *Hager*, 2002-Ohio-3466, ¶¶ 127-132. The Court in *Hager* explains, however, that "a Facility duly licensed and regulated under state law cannot be subject to absolute nuisance. *Id*. (citing Brown at 800, 622 N.E.2d 1153). Plaintiff argues that since C8 is not regulated, the *Hager* rule barring liability for absolute nuisance for licensed facilities does not apply to this case.

In *City of Cleveland v. Ameriquest Mortgage Sec., Inc*., the court analyzed the difference between "not legally prohibited" activity—which can be the subject to a finding of absolute nuisance—and conduct that is affirmatively regulated—which cannot be subject to a finding of absolute nuisance.  621 F. Supp. 2d 513, 526 (N.D. Ohio 2009) *aff'd sub nom. City of Cleveland v. Ameriquest Mortgage Sec., Inc.*, 615 F.3d 496 (6th Cir. 2010). It held that while a Facility that is licensed to operate is subject to a regulatory scheme, and thus its operations could not be subject to a finding of absolute nuisance, an illegal gun market, in contrast, could be subject to a finding of absolute nuisance. The Court reasoned that even though a complex regulatory scheme regulated sale of guns, that scheme did not regulate the precise gun-sales practices at issue. Thus,

this Court finds that even though C8 was not regulated during much of the time that Defendant disposed of it, the Facility's precise manufacturing and disposal activities were unambiguously regulated, and, thus, cannot be subject to a finding of absolute nuisance. Therefore, like in *Hager*, which involved emissions from a licensed Facility, "the only basis for which [Plaintiff] may recover under a [private] nuisance theory is that of qualified private nuisance." *Id.*

Negligence must be proven to warrant recovery under a qualified private nuisance theory. *Id.* Ohio courts and courts in this Circuit have held that at the summary judgment stage, nuisance and negligence "merge, as the nuisance claims rely upon a finding of negligence." *Paulus*, 2013 WL 5487053, at *7 (citing *Allen Freight Lines,* 64 Ohio St.3d at 274-76 (Ohio Ct.App.1993)); *see also Merino v. Salem Hunting Club,* No. 07 CO 16, 2008 WL 5124549, at *1 (Ohio Ct.App. Dec. 4, 2008); *Brown,* 87 Ohio App.3d at 717, 622 N.E.2d at 1162). Accordingly, at this stage in the proceedings, the private qualified nuisance claim, (Count II), and the negligence claim, (Count III), merge. This Court will analyze next whether Plaintiff can show negligence, and thus recover under a qualified private nuisance theory.

### a. Negligence and Foreseeability

In order to establish negligence, "a plaintiff must allege facts showing: a 'duty running from the defendant to the plaintiff, breach of duty by that defendant, damages suffered by the plaintiff, and a proximate cause relationship between the breach of duty and the damages.'" *Paulus,* 2013 WL 5487053, at *7 (quoting *Hester v. Dwivedi,* 89 Ohio St.3d 575, 578, 733 N.E.2d 1161, 1164 (Ohio 2000)).

> The existence of a duty depends on the foreseeability of the injury. The test for foreseeability is whether a reasonably prudent person would have anticipated that an injury was likely to result from the performance or nonperformance of an act. The foreseeability of harm usually depends on the defendant's knowledge. In determining whether [defendant] should have recognized the risks involved, only those circumstances which [it] perceived, or should have perceived, at the time of

46

[its] actions should be considered. Until specific conduct involving an unreasonable risk is made manifest by the evidence presented, there is no issue to submit to the jury.

*Menifee v. Ohio Welding Products, Inc.*, 15 Ohio St. 3d 75, 77, 472 N.E.2d 707, 710 (1984); *accord McQueen v. Perry*, 2012-Ohio-5522, ¶ 10 (finding injury is foreseeable if a defendant knew or should have known that his act was likely to result in harm to someone).

Defendant argues that Plaintiff has failed to present evidence showing foreseeable risk of harm to its Wellfield from Defendant's C8 emissions. Specifically, Defendant contends that since C8 is not harmful, its knowledge that its C8 emissions were falling on Plaintiff's Wellfield is not enough, alone, to prove foreseeability. (citing *Ramirez v. Akzo Nobel Coatings, Inc.*, 153 Ohio App. 3d 115, 120, 791 N.E.2d 1031, 1035). In *Ramirez,* the Court found that plaintiffs' claim for nuisance based on hazardous dumping near their property—which did not actually infiltrate their property—could not go forward on the basis of stigma damages alone. Instead, plaintiffs had to prove damages resulting from the nuisance itself. According to *Ramirez*, Defendant argues, Plaintiff cannot meet its burden of showing foreseeable injury because C8 has not caused substantial injury to Plaintiff's Wellfield, and Defendant did not know that C8 had any potential to cause injury of any kind.

Plaintiff responds that the record shows that a reasonably prudent person would have anticipated that C8 was toxic and that its discharge would damage nearby water supplies. (citing *Di Gildo v. Caponi*, 18 Ohio St. 2d 125, 130, 247 N.E.2d 732, 736 (1969) ("It is not necessary that the defendant should have anticipated the particular injury."). Further, Plaintiff contends that Defendant had actual knowledge that such damage would occur. Plaintiff relies on the following uncontested facts:

(1) DuPont was studying the dangers of C8 exposures posed to its employees by 1981, and its Medical Director, Dr. Karrh, recommended since 1982 to reduce emissions for health reasons. Doc. 345-6; Doc. 345-7.

(2) Defendant throughout the 1980s set goals for reducing off-site air and river releases of C8 because it "accumulates in the blood and [] the future is unknown." (Doc. 345-10). Defendant acknowledged that the legal and medical departments would most likely take a position of total elimination. It also noted by 1984 that detectable levels of C8 were present in the Little Hocking water system. (Doc. 345-11).

(3) The record shows, however, that Defendant failed to actually reduce emissions, and actually dumped 150,000 pounds of C8 into the river from 1980 to 1989, and 330,000 pounds from 1990 to 1999, thereby doubling emissions into the environment from the 1980s to the 1990s. (Doc. 345-5, Nos. 16-17).

(4) DuPont purchased the C8-contaminated Lubeck Public Service District property in 1991. In 1987, an internal memo recommended that DuPont make this purchase, even though other potential properties were less expensive, because any price difference would be justified by "elimination of the use of these wells as a source of public drinking water." (Doc. 345-15). Plaintiff argues this purchase demonstrates that DuPont understood: (1) C8 posed a risk to humans; (2) C8 emissions from the Facility had contaminated surrounding water supplies; and (3) DuPont faced potential liability for such contamination.

(5) Emails from Defendant's in-house counsel, John Bowman and Bernard Reilly, indicate that as of 2000, they had been attempting to get Defendant to take action on C8 releases since the 1990s. (Docs. 345-16, 17). Bowman states in 2000 in his email that "Bernie and I have been unsuccessful in even engaging the clients in any meaningful discussion of the subject . . .

48

we continued to increase our emissions into the river in spite of internal commitments to reduce

or eliminate the release of this chemical into the community and the environment because of our

concern about the biopersistence of this chemical." With respect to the same subject, Reilley

states in 2001: "[t]he business did not want to deal with this issue in the 1990s, and now it is in

their face, and some are still clueless."

Plaintiff avers that the above facts in the record create a genuine issue of material fact as

to whether a reasonably prudent person would have anticipated that the discharge of C8 into the

river and air would result in harm to the community, including to the water supply, and, thus, to

Plaintiff's Wellfield and business operations.

Relying on *Menifee*, Defendant responds that none of the above evidence shows that

Defendant anticipated in the 1980s and 1990s that C8 could cause injury to people or the

environment, and thus could not have anticipated injury to Plaintiff's Wellfield . 15 Ohio St. 3d

at 77, 472 N.E.2d at 710 ("Until specific conduct involving an unreasonable risk is made

manifest by the evidence presented, there is no issue to submit to the jury."). Defendant argues

that any purported adverse environmental or health effects are still undetermined by science and

DuPont has provided water treatment since 2005. Defendant avers that the evidence Plaintiff

points to in the record shows Defendant's mere worry about potential image and litigation issues,

which is unrelated to foreseeability of harm. Moreover, Defendant states that while an isolated

test showed C8 levels of 0.8 ppb in the Little Hocking Wellfield in March 1984, subsequent tests

in 1984, 1987, and 1998 showed undetectable amounts of C8, thus calling into question the

initial test results.

The Court is not persuaded by Defendant's urgings that its lack of knowledge regarding

the precise harm to human health and the environment posed by C8 precludes a potential finding

49

of foreseeable injury in this case. Based on the above, this Court finds that a reasonable jury could conclude that evidence of C8 in public water supplies, including Little Hocking's, combined with Defendant's knowledge of the biopersistence of C8 in people's blood and the environment, presented an unreasonable risk that was made manifest by clear evidence presented to the Defendant. *See Menifee* 15 Ohio St. 3d at 77, 472 N.E.2d at 710 (1984). A reasonable jury also could conclude that Defendant's partial, yet incomplete response to warnings about the potential health and environmental risks posed by C8, and its knowledge of C8 on Plaintiff's Wellfield, together raise a genuine issue of material fact regarding the foreseeability of Plaintiff's injury. The standard is that injury is foreseeable, not that the precise injury is predicted to occur. *See Di Gildo*, 18 Ohio St. 2d at 130, 247 N.E.2d at 736. Therefore, summary judgment is not appropriate as to Plaintiff's merged negligence and qualified private common-law nuisance claims on the grounds that the injury was not foreseeable.

### b. Injury

Defendant argues that it is entitled to summary judgment on Plaintiff's private qualified nuisance claim since Plaintiff has not put forth evidence of injury.

A landowner's damages for nuisance "may include diminution in the value of the property, costs of repairs, loss of use of the property, and compensation for annoyance, discomfort, and inconvenience." *Banford*, 126 Ohio St. 3d at 213, 932 N.E.2d at 317 (citing *Widmer v. Fretti* (1952), 95 Ohio App. 7, 16–17, 116 N.E.2d 728). The plaintiff in a nuisance claim is also entitled to recover "reasonable restoration costs, plus the reasonable value of the loss of use of the property between the time of the injury and the time of restoration," so long as it can be shown that the alleged restoration costs were not actually incurred in preparation for litigation. *Weber v. Obuch*, 2005-Ohio-6993, ¶ 12-14. A landowner may only recover damages

for nuisance, however, for "real, substantial, and material injury and not for 'trifling annoyance[s] and unsubstantiated or unrealized fears.'" *Id.*

Plaintiff has set forth the following evidence of its nuisance damages: (1) loss of use damages, including loss of the right to use the Wellfield for three water expansion projects (the "five year plan"), and loss of well five; (2) annoyance damages; and (3) restoration damages. Defendant argues that Plaintiff cannot show it has suffered any injuries as a result of Defendant's disposal of C8.

As to loss of use, Defendant contends that Plaintiff cannot show any loss of use of its property as a result of C8 contamination. Throughout litigation, Plaintiff has argued that the C8 contamination interfered with its Five-Year Plan, originally drafted in 1995, which includes the blueprint to expand its water supply to three areas: Decatur Township 250, Barlow Township 261, and Palmer Square. Further, Plaintiff has alleged that the C8 contamination hindered its plans to drill a new production well.

First, regarding the Five-Year Plan, Defendant responds that the Plaintiff cannot sustain an injury under private nuisance to expand into land it does not yet own. *Gevelaar v. Millennium Inorganic Chemicals*, 2013-Ohio-435, ¶¶ 30-31 (holding plaintiff could not recover on nuisance action to recover for alleged damage to property he does not own or rent). Next, Defendant avers that these plans are purely speculative, and have moved very slowly; thus, their disruption cannot be linked to the C8 contamination. In terms of drilling another well, Defendant argues that Plaintiff purchased the land in 1985, and has considered adding the well since 1987, thus proving such plans are purely speculative. Finally, Defendant puts forth evidence showing that the population in the surrounding area has declined, and that this population decline is the reason Plaintiff has not moved forward with expansion.

51

Defendant cites to *Baker v. Chevron USA*, Inc., a case in which the Court analyzed whether households experienced interference with future improvement plans due to subsurface contamination. No. 1:05-CV-227, 2011 WL 3652249, at *15 (S.D. Ohio Aug. 19, 2011) *aff'd sub nom. Baker v. Chevron U.S.A. Inc.,* 533 F. App'x 509 (6th Cir. 2013). The Court found no injury for loss of use where: (1)  plaintiffs had not presented evidence of "non-speculative plans for improving the property that they have abandoned;" (2) plaintiffs' improvement plans prior to contamination moved at a "snail's pace"; and (3) plaintiffs admitted not to have taken any "concrete steps" toward improvement of their properties prior to the contamination. *Id*.

Plaintiff responds that *Gevelaar* is inapposite because the loss of the three projects into other townships was not an attempt to make a claim based on loss of property it does not yet own, but instead a claim for interference with its use of its own groundwater to supply to other townships. Additionally, Plaintiff argues that the Five-Year Plan was far from speculative.

In his deposition, Little Hocking's Manager, Mr. Griffin, explained that the "five year plan outlined what the board and manager would like to do, depending on the amount of financing we could get from an increase in our fees." (Doc. 346-23). Griffin also testified that the board approved the plan, and took some steps toward it. *Id*. While Griffin also stated that "you never know if you're going to double a system just because you'd like to," this statement, alone, does not make the plan speculative. Plaintiff contends that evidence shows Griffin's time was consumed by the C8 contamination, and that as a result he was unable to implement the Five-Year Plan, including the three expansion projects. (Doc. 345-1). Additionally, Little Hocking avers that it has lost $900,000 in revenue due to the loss of opportunity to expand its customer base. For instance, due to the delay in the Palmer Project, a neighboring water district has already provided water to the Palmer Square area. (Doc. 370-20 at 800). In addition, Plaintiff

argues that although it has not "lost profits" due to loss of use of the Wellfield, it has suffered a decrease in revenue due to a decline in demand and the rate of growth of new taps. (Doc. 370-23 at ¶ 9). For example, most of Little Hocking customers reduced their dependence on Plaintiff's water under the bottled water program. *Id*.

This Court finds that Plaintiff has presented genuine issues of material fact concerning damages related to loss of use of its property. Unlike the households in *Baker*, Plaintiff had actually outlined a five-year plan and taken steps toward it. As the person primarily responsible for pushing the plan forward, a reasonably jury could find that Griffin's absorption with responding to C8 contamination, as well as the interference with the use of the Wellfield itself due to the contamination, hindered the completion of the Five-Year Plan. The fact that another company secured the business of the Palmer community shows that such an expansion project was a real, and not purely speculative, possibility.

Further, C8 interfered with Plaintiff's use of the Wellfield insofar as it could not supply drinking or cooking water to its customers. Regardless of revenues for the years in which the bottled water program was operating, this Court infers that such revenues would have been higher but for the C8 contamination. Plaintiff has not adduced sufficient evidence, however, to show that plans since 1987 to drill the new production well were more than speculative, or were hindered because of C8 contamination specifically.

Defendant also argues that the existence of the GAC Facility defeats Little Hocking's claims for interference with use of the Wellfield. Defendant relies on *Baker v. Chevron* and *Lueke v. Union Oil Co. of Ca*, two cases that found that the plaintiffs had not suffered a substantial or unreasonable interference with the use of their property because the harm caused by pollutants had been remediated. No. 1:05-CV-227, 2011 WL 3652249, at *15 (S.D. Ohio

Aug. 19, 2011) *aff'd sub nom. Baker v. Chevron U.S.A. Inc.,* 533 F. App'x 509 (6th Cir. 2013);

No. OT-00-008, 2000 WL 1545077 (Ohio Ct. App. Oct. 20, 2000). In *Lueke*, Defendant had

installed a carbon filter to remove contamination from a homeowner's water; in *Baker* the

Defendant had installed a remediation system at its Facility that prevented harmful vapors from

reaching the surface and harming nearby homeowners. The Court finds that both cases are

inapposite to the case *sub judice*. In *Lueke* and *Baker*, the basis of the plaintiffs' interference with

use claims were the health risks posed by contamination, and such interference was actually

remediated by filtration. In contrast, in this case, while the GAC remediates the harm C8 poses to

human health, it does not undo the other harms C8 poses to the Plaintiff, which are outlined

*supra* and include interference with expansion projects, with revenues from water sales, etc.

Additionally, Plaintiff argues that under *Banford*, it can recover for annoyance damages

without having to show physical discomfort, since it has shown interference with use. 126 Ohio

St. 3d at 215 (holding plaintiff may recover for annoyance and discomfort for a nuisance,

including fear and other emotions, without a physical component if the annoyance or discomfort

are connected to the person's loss of use or enjoyment).

This Court finds that Plaintiff misinterprets *Banford*, which held that a Plaintiff need not

show debilitating and severe physical injury in order to recover for annoyance damages when

such damages are related to loss of use of property. *Banford* clarified:

> [i]n the cases that have awarded damages for annoyance and discomfort, the type
> of the nuisance had affected a person's senses, resulting in physical discomfort.
> 'Cases supporting recovery for personal discomfort or annoyance involve either
> excessive noise, dust, smoke, soot, noxious gases, or disagreeable odors as a
> premise for awarding compensation. *Widmer v. Fretti,* 95 Ohio App. at 18, 52
> O.O. 343, 116 N.E.2d 728. These conditions affect one's sight, sound, smell,
> hearing, or touch, which may cause a physical discomfort

126 Ohio St. 3d at 214-15. While the Plaintiff points to case law showing that an association can claim annoyance or discomfort on behalf of its members, Plaintiff fails to cite to any case which shows that a company can claim annoyance or discomfort to itself. Such a failure is understandable considering companies do not have senses and cannot feel discomfort.

Lastly, Plaintiff argues that it is entitled to restoration damages. *See Weber v. Obuch*, 2005-Ohio-6993, ¶ 12-14; *Banford*, 126 Ohio St. 3d at 213. Plaintiff states that it has monetized its costs for hiring consultants, conducting testing, and diverting personnel, all in furtherance of restoring the Wellfield. Defendant responds that a claim for restoration damages to restore property for which you cannot prove loss is nonsensical. Also, Defendant contends that damages to which Plaintiff cites are not actually restoration damages, as they are related to sampling done under consent order, attorney's fees, oversight work of consent order, and litigation activity. In support of this argument, Defendant relies on evidence not actually placed in the record, and which this Court cannot access. (Doc. 370-18). Accordingly, such evidence cannot be used to undermine Plaintiff's claim that it has expended monetized costs on restoration of the Wellfield. Therefore, clear genuine issues of material fact exist concerning cognizable restoration costs to Plaintiff.

In sum, the Court found *supra* that genuine issues of material fact preclude summary judgment on Plaintiff's Nuisance Claim, Count II, which merged with Plaintiff's Negligence claim, Count III. Thus, Summary Judgment is hereby DENIED on Counts II and III.

### C. Trespass—Count IV

Parties present cross-motions for summary judgment on Plaintiff's trespass claim. "A common-law tort in trespass upon real property occurs when a person, without authority or privilege, physically invades or unlawfully enters the private premises of another whereby

damages directly ensue." *Apel v. Katz*, 83 Ohio St. 3d 11, 19, 697 N.E.2d 600, 607 (citing *Linley v. DeMoss* (1992), 83 Ohio App.3d 594, 598, 615 N.E.2d 631, 633; *Chance v. BP Chemicals, Inc.* (1996), 77 Ohio St.3d 17, 24, 670 N.E.2d 985, 991 ("Trespass is the unlawful entry upon the property of another")). There are two elements to trespass: "(1) an unauthorized intentional act, and (2) entry upon land in the possession of another." *Brown,* 622 N. E.2d at 1161.

Ohio law has recognized that indirect trespass includes chemical invasion of real property by either: (1) aerial dispersion[9]; or (2) groundwater[10]. Plaintiff contends that a trespass occurred because: (1) Plaintiff owns the Wellfield; (2) the Wellfield has been invaded via air;[11] (3) Defendant caused the invasion; (4) the invasion was unauthorized; and (5) the invasion of C8 on the Wellfield interfered with Plaintiff's reasonable and foreseeable use of its groundwater.

Parties dispute the correct legal standard that should be used to analyze whether C8 in the Wellfield actually interfered with Plaintiff's reasonable and foreseeable use of the groundwater. Plaintiff argues that this Court should follow *Chance v. BP Chemicals, Inc*., the Ohio Supreme Court's ruling on subsurface water interference, and find that Plaintiff must show only "some" interference. 77 Ohio St.3d 17. Plaintiff urges the Court not to follow the standard in *Baker v. Chevron U.S.A. Inc.*, which requires substantial damage or interference. 533 F. App'x 509. Plaintiff argues, in addition, that even if the Court follows the *Baker* standard, *Baker* is clear that when a party is actually using the groundwater, any interference with that use gives rise to a cause of action. Defendant retorts that in a case of indirect trespass, where a plaintiff alleges groundwater invasion, a plaintiff must prove substantial interference or substantial damages,

---

[9] *See Brown v. Whirlpool Corp.*, 996 F. Supp. 2d 623, 640-41 (N.D. Ohio 2014); *Williams v. Oeder*, 103 Ohio App.3d 333, 659 N.E.2d 379, 383 (1995); *Brown*, 87 Ohio App.3d 704.

[10] *See Baker*, 533 F. App'x 509; *Leuke*, 2000 WL 1545077; *Chance*, 77 Ohio St.3d 17.

[11] Plaintiff also states that the Defendant invaded the Wellfield via contaminated groundwater, but, since this is disputed, it only depends on undisputed air emissions to state its claim under trespass.

which Plaintiff in this case cannot do. *Baker*, 533 Fed. App'x at 509; *Lueke*, 2000 WL 1545077, at *6-8.

In *Chance*, the Court analyzed whether a lateral migration, thousands of feet below the plaintiffs' properties, of disposed injectate from refining deepwells, constituted trespass. The disposed material did not reach the surface and the Court found it "somewhat speculative" as to whether it reached the subsurface. 77 Ohio St. 3d at 27, 670 N.E.2d at 993. The Court rejected the argument that the presence of the injectate beneath their land, and stigma damages attached, were sufficient to show trespass, and analyzed, instead, to what extent plaintiffs had to show actual damage to their properties. *Id.*

The *Chance* Court held that landowners do not have an absolute right to the subsurface waters beneath their property. *Id.* at 26. Given the "unique" facts of the case, the Court found that the appellants "subsurface rights in their properties include the right to exclude invasions of the subsurface property that actually interfere with appellants' reasonable and foreseeable use of the subsurface." *Id.* Next, the Court rejected Plaintiffs' argument that damages were presumed in every case of trespass. *Id.* at 27. Instead, the Court reasoned that even assuming the ground invasion had reached the subsurface and become an "offending concentration under some of the appellants' properties . . . some type of physical damages or interference with use must have been demonstrated for appellants to recover for a trespass." *Id.* "Stigma damages" were not enough, as they did not indicate actual damage or interference with use. *Id.*

Plaintiff urges that this Court is bound to follow the standard in *Chance*, and hold that it must find only "some" interference with use or damage caused by the indirect air and water invasion in this case. Plaintiff argues that despite the clear holding in *Chance*, the Sixth Circuit in *Baker* incorrectly added a "substantial" damage or interference standard to the holding in

*Chance*. 533 F. App'x at 522-23. (holding that plaintiffs could not show aerial vapors originating in subsurface plume caused substantial damage or interference with use). In so holding that "substantial" damage or interference is required, the *Baker* Court relied on the *Lueke* Court's interpretation and application of *Chance*. *Lueke* involved an indirect trespass claim for damages to a groundwater well that had been invaded by gasoline. The *Lueke* Court held that under *Chance*:

> [i]n cases of indirect trespass, damages are not presumed, and actual damages in the form of physical damages or interference with use must be shown before the person suing for trespass can prevail. Furthermore, the damages must be substantial.

*Baker*, 533 F. App'x at 522 (citing *Lueke,* 2000 WL 1545077 at *7). The *Lueke* Court concluded that the interference was not substantial or unreasonable because the defendant quickly remedied it by installing carbon filters to the plaintiff's water system. *Id*. (citing *Lueke*, 2000 WL 1545077, at *8).

The *Baker* Court concluded, accordingly, that under *Chance* and *Lueke* the "plaintiffs have to show something more than the 'mere detection' of soil vapors on their properties to establish the physical damage prong of an indirect trespass claim." *Id*. Instead, they must show that the invasion of their property "has caused either substantial physical damage to the land or substantial interference with their reasonable and foreseeable use of the land." *Id*. at 523.

Like in the case *sub judice*, the Plaintiffs in *Baker* argued that *Lueke* inappropriately implied a "substantial" qualifier to the standard articulated in *Chance*. *Id*. The Court disagreed, and cited to two other Ohio Appellate Court cases on which *Lueke* relied, which also analyzed indirect trespass and found that substantial damages were required in cases of indirect trespass. *Id*. (citing *Oeder,* 103 Ohio App.3d at 659, N.E.2d at 383; *Brown,* 622 N.E.2d at 1161–62).

This Court finds that the analyses in *Brown* and *Oeder,* on which *Lueke* and *Baker* rely*,* assist in resolving the uncertainty of whether "some" or "substantial" damages are required in an indirect trespass claim. Both *Brown* and *Oeder* relied on an Alabama Supreme Court case, *Borland v. Sanders Lead Co., Inc.* (Ala.1979), 369 So.2d 523, 530, to determine the damages standard in indirect trespass claims. *Borland* explained the distinction between nuisance and trespass when it came to an invasion of indirect, particulate matter on one's property:

> For an indirect invasion to amount to an actionable trespass, there must be an interference with plaintiff's exclusive possessory interest; that is, through the defendant's intentional conduct, and with reasonable foreseeability, some substance has entered upon the land itself, affecting its nature and character, and causing substantial actual damage to the res. For example, if the smoke or polluting substance emitting from a defendant's operation causes discomfort and annoyance to the plaintiff in his use and enjoyment of the property, then the plaintiff's remedy is for nuisance; but if, as a result of the defendant's operation, the polluting substance is deposited upon the plaintiff's property, thus interfering with his exclusive possessory interest by causing substantial damage to the res, then the plaintiff may seek his remedy in trespass, though his alternative remedy in nuisance may co-exist.

*Brown*, 87 Ohio App. 3d at 717, 622 N.E.2d at 1161-62 (citing *Borland*, 369 So.2d at 934).

In *Brown*, the Court relied on the *Borland* rationale to determine whether odors that reached plaintiff's property constituted a trespass. *Id*. Relying on the rule in *Borland*, the *Brown* Court held that since there was no evidence that the noxious odors deposited particulate matter on the res or caused any physical damage to it at all, a claim for trespass would not lie. *Id*. Thus, although *Borland* utilizes the phrase "substantial damage," and *Brown* relies upon *Borland*, in *Brown* there was no evidence of damage at all.

Similarly, the Court in *Oeder* adopted the "substantial damage to res" standard set forth from *Borland* because, although "'substantial damage' is not a traditional element of trespass, trespass was not traditionally available as a remedy for airborne particles and pollutants deposited on a plaintiff's land." 103 Ohio App. 3d at 339, 659 N.E.2d at 383. It was, therefore,

necessary to raise the bar on indirect trespass because "'[n]o useful purpose would be served by sanctioning actions in trespass by every landowner within a hundred miles of a manufacturing plant. Manufacturers would be harassed and the litigious few would cause the escalation of costs to the detriment of the many.'" *Id*.

This Court concludes, therefore, that for indirect particulate matter to constitute trespass, it must actually interfere with a landowner's possessory interest by causing substantial damage to the res. Without such a standard, trespass and nuisance in the case of indirect trespass would constitute identical claims. Thus, as *Chance* explains, the analysis of what constitutes "substantial" or, interchangeably, "actual" damage to the res due to indirect invasion must proceed on a case-by-case basis. For instance, while C8 contamination on one property may not cause substantial damage because it does not interfere with use or cause any appreciable physical harm, this Court must analyze whether the indirect trespass of C8 on Plaintiff's Wellfield caused substantial damage that actually interferes with Plaintiff's possessory interests.[12] The term "substantial" therefore does indicate a difference of degree, but does not necessarily indicate that only interference to some extreme degree is cognizable.

This case is unique because the C8 entered the property as airborne particulates, but caused damage to the groundwater. This case is also unique because Plaintiff's entire business is reliant on use of the groundwater. As *Baker* explained, "[a] property owner has a potential cause of action against anyone who unreasonably interferes with his property right in groundwater," but an Ohio landowner only has a property right in groundwater "to the extent he actually uses that water." *Baker*, 533 F. App'x at 521 (citing *McNamara v. Rittman,* 838 N.E.2d 640, 644 (2005)); *see Wood v. Am. Aggregates Corp.,* 67 Ohio App.3d 41, 585 N.E.2d 970, 972 (1990).

---

[12] Indeed, to permit every household in the Little Hocking area to bring a trespass suit, for example, would open the floodgates to spurious litigation of the type the Court in *Oeder* aimed to avoid.

Unlike in *Chance* and *Baker,* where neither court found the groundwater was either used or polluted, here, Plaintiff's groundwater is undeniably polluted and Plaintiff's business depends on use of the water. Further, unlike in *Lueke,* where nearly immediate remediation prevented any further interference with the landowner's water use, here, the GAC does not alleviated all past and present interference with Plaintiff's water. This Court concludes, therefore, that a reasonable jury could find that the presence of C8 on its Wellfield caused by airborne emissions resulted substantial damage to Plaintiff's Wellfield that actually interferes with reasonable and foreseeable use of the groundwater.

First, the Court rejects Defendant's contention that there was no physical damage to Wellfield because there is no definitive proof that C8 is harmful to humans or has harmed the environment on the Wellfield. As noted *supra*, the EPA has determined that C8 may pose an imminent and substantial danger to human health and the environment. It has also determined that considering the current concentrations of C8 in the Little Hocking Wellfield, Plaintiff's water cannot be consumed safely without treatment. Further, C8 is present in the soil and groundwater, and since it is biopersistent, it will last for hundreds if not thousands of years unless it is removed. Accordingly, the C8, for all intents and purposes, has substantially damaged the Wellfield, as it has rendered the groundwater unusable without remediation.

Second, the Plaintiff states that the following constitutes interference with use of the groundwater: (1) disruption for six years of its mission to provide clean water to its customers ; (2) taking well five off-line from 2002 through 2007 because it had the highest concentration of C8; (3) loss of revenue for two years due to the bottled program; and (4) the presence of the GAC, which interferes with Plaintiff's business, causes it to do biweekly testing for

contamination, forces it to have all maintenance approved by DuPont, and forces it to comply with new regulatory requirements.

Sanson Co. v. Granger Materials, Inc., 2007-Ohio-5852, ¶ 5, is informative in analyzing what amounts to reasonable interference with a business caused by an indirect trespass. In Sanson, the court considered whether dust generated by a nearby plant unreasonably interfered with plaintiff's business and thus constituted a trespass. The Court found that a trespass had occurred because the dust interfered with plaintiff's ability to conduct its food-related businesses, requiring it to clean its premises and equipment much more frequently than before defendants' operations began. Id. In addition, plaintiff had to replace equipment damaged by the dust. Id.

This Court concludes that, like in Sanson, C8 has damaged the Wellfield, and that such damage actually interferes with Plaintiff's ability to conduct its water-related business. The bottled water program is evidence that C8 contamination interfered with Plaintiff's possessory water-related business, even without clear evidence that the program led to a decrease in water sales or revenue. A reasonable jury could find that sales would have been higher but for the bottled water program. Further, Plaintiff has presented a genuine issue of material fact about whether it took Well Five offline because of the C8. This Court disagrees that the presence of the GAC itself is not evidence of actual interference with Plaintiff's possessory interest in the groundwater. Plaintiff presents evidence regarding costs to it arising from the GAC, and other costs and duties arising from dealing responsibly with the contamination. Finally, this Court concludes that being forced to provide contaminated water to its customers is not evidence of interference with Plaintiff's possessory interest in the groundwater or its water-related business, as it does not evidence actual damage or interference.

Accordingly, this Court **GRANTS** Plaintiff's Motion for Summary Judgment on Count IV, Trespass, as all substantive elements of that claim have been met.

### D. Conversion—Count VI

Under Ohio law, conversion is "any exercise of dominion or control wrongfully exerted over the personal property of another in denial of or under a claim inconsistent with his rights." *Cozmyk Enterprises, Inc. v. Hoy*, No. 96APE10-1380, 1997 WL 358816, at *4 (Ohio Ct. App. June 30, 1997) (quotations and citations omitted). "The definition may be broken into three basic elements: (1) defendant's exercise of dominion or control (2) with regard to the [plaintiff's] personal property (3) exercised wrongfully in denial of, or under a claim inconsistent with, the [plaintiff's] rights." *Id*. (quotations and citations omitted).

While "[r]eal property is not the proper subject of a conversion claim…[a] party may, however, assert a claim for conversion of groundwater to the extent that the defendant interferes with the property owner's use of his or her own groundwater." *Baker*, 2009 WL 3698419 at *3 (construing plaintiff's compliant to assert a claim for conversion of groundwater). The Court in *Baker* held that Plaintiffs failed to demonstrate the subsurface plume actually interfered with their use of the subsurface water, and thus their conversion of groundwater claim could not stand. *Id*. The Court found it persuasive that plaintiffs did not use the subsurface water, nor did they show that the presence of the subsurface contaminant caused them to abandon any non-speculative plans which required drilling or excavation under their properties. *Id*. at *5.

Plaintiff argues that it is entitled to summary judgment on its conversion claim because under *Baker*, the C8 contaminated the Wellfield's water, which interfered with Plaintiff's use of that water. Further, Plaintiff argues that the presence of the GAC itself is interference with Plaintiff's use of the well water, as Defendant asserts it control over the water and Plaintiff's

property through the GAC. Plaintiff adds that Defendant has asserted control over its groundwater by testing it without Plaintiff's consent and over its objections on various occasions.

As *Baker* states, the standard for conversion of groundwater is that Plaintiff must show that Defendant's actions—in this case, the C8 contamination—interferes with Plaintiff's reasonable use of the groundwater beneath its property. This standard is different than the standard in trespass, which considers interference with the entire property, including the subsurface. This Court has already found in its analysis of Plaintiff's trespass claim, however, that the record shows uncontroverted interference with Plaintiff's use of the groundwater. In addition, genuine issues of material fact remain about whether C8 contamination interfered with Well Five, and interfered with expansion projects, both of which depend on use of the groundwater. Accordingly, the Court finds that the presence of C8 on the Wellfield and in the groundwater has interfered with Plaintiff's reasonable use of the aquifer.

In addition, Defendant argues that it is entitled to summary judgment on Plaintiff's conversion claim for a different reason. Defendant states that in Mr. Griffin's Fed. R. Civ. P 30(b)(6) deposition, Griffin states that the basis of the conversion claim is Defendant's constructive possession of the "Wellfield," which defendant construes to mean conversion of real property, which is not permissible under the law of conversion. Defendant argues that under the law of Fed. R. Civ. P 30(b)(6), a corporation cannot later proffer new or different allegations than could have been made at the time of the 30(b)(6) deposition, unless it can prove that the information was not known or inaccessible. As a result of Mr. Griffin's statement, Defendant contends, Plaintiff can only move forward on the theory that "Wellfield," real property, was the subject of the conversion, and not the use of the groundwater.

64

Defendant's argument is not well taken. The Wellfield unambiguously includes the groundwater beneath the Wellfield. Further, Plaintiff's Complaint and briefing show that Plaintiff is concerned with interference with use of the aquifer beneath its property.

Accordingly, this Court **GRANTS** Plaintiff's Motion for Summary Judgment on Count VI, Conversion, as all substantive elements of that claim have been met.

### E. Abnormally Dangerous or Ultrahazardous Activity—Count V

"A cause of action for the tort of ultra-hazardous activity is analytically identical to that of absolute nuisance." *Chance*, 1995 WL 143827 at *7; *see also Hager,* 2002-Ohio-3466, ¶ 71 (finding absolute nuisance and nuisance per se are based upon either intentional conduct or abnormally dangerous conditions). As noted *supra*, "[a] Facility duly licensed and regulated under state law cannot be subject to absolute common law nuisance." *Hager*, 2002-Ohio-3466, ¶ 128.

This Court has already held that Defendant is not subject to liability for absolute common law nuisance, as its operations and conduct—manufacturing operations, including air emissions, wastewater discharge, and waste disposal—are all subject to a regulatory scheme. Accordingly, Defendant cannot be held liable under a theory of abnormally dangerous or ultrahazardous activity. As explained above, it is Defendant's activity, not the substance C8, which must be shown to be the subject of regulation.

Thus, Summary Judgment is hereby **GRANTED** to Defendant on Count V, Abnormally Dangerous or Ultrahazardous Activity.

### F. Restitution and Unjust Enrichment—Count VII

Plaintiff's claim for unjust enrichment rests upon two theories: (1) that Little Hocking's "expenditure of financial resources," related to maintenance of the GAC Facility, "ha[s]

65

conferred a financial benefit upon DuPont;" and (2) DuPont's use of the Wellfield as a repository

for C8 emissions and disposal have conferred a financial benefit upon Defendant. Under Ohio

law, "[u]njust enrichment occurs when a person has and retains money or benefits which in

justice and equity belong to another, while restitution is the common-law remedy designed to

prevent one from retaining property to which he is not justly entitled." *Johnson v. Microsoft*

*Corp.*, 106 Ohio St. 3d 278, 286, 834 N.E.2d 791, 799 (quotations and citations omitted); *see*

*also Ward v. Geiger*, 2006-Ohio-6853, ¶ 24 ("Unjust enrichment derives from the equitable

principal that no person may retain a benefit that would result in injustice . . . . Accordingly,

unjust enrichment entitles a party to restitution for the reasonable value of a benefit conferred.")

(citations and quotations omitted). Thus, to establish a claim for unjust enrichment and

entitlement to restitution damages, a party must demonstrate: "(1) a benefit conferred by a

plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the

benefit by the defendant under circumstances where it would be unjust to do so without payment

('unjust enrichment')." *Id.*

Defendant argues that Plaintiff cannot recover for damage to the Wellfield caused by C8

contamination under an unjust enrichment theory because "the purpose of such claims is not to

compensate the plaintiff for any loss or damage suffered by him but to compensate him for the

benefit he has conferred on the defendant." *Johnson*, 106 Ohio St. 3d at 286, 834 N.E.2d at 799.

Thus, Defendant contends that Little Hocking is attempting to use an unjust enrichment theory to

recover for losses it has incurred as a result of Defendant's emissions and disposal practices,

which is not permitted.

Plaintiff responds that other courts that have recognized unjust enrichment claims when

another's property is used for waste disposal, and urges this Court to rely on *Cassinos v. Union*

66

*Oil Co.*, 14 Cal. App. 4th 1770, 1788, 18 Cal. Rptr. 2d 574, 584 (1993), and *Branch v. Mobil Oil Corp.,* 778 F. Supp. 35, 35-36 (W.D. Okla. 1991). In *Cassinos*, the defendant injected wastewater into a large oil, gas and mineral field, resulting in damage not just to a particular oil well, but throughout the entire field. 14 Cal. App. 4th at 1787-88. The Court concluded that since the manner of wastewater disposal made it too difficult to trace all injuries caused to the Wellfield, the it could not "resort to more traditional measures of damages such as cost of replacement, cost of restoration, diminution in value or fair rental value cannot be readily used." *Id*. It held, therefore, that because the plaintiff requested restitution damages in the complaint, in trial briefs, and at the damages phase of the trial, it was appropriate to calculate a "reasonable quasi-contractual measure of damages—the fair market cost to dispose of the injected wastewater at available sites in the area during the pertinent period. This is the amount of money Union would have had to pay to others to dispose of the excess water, and therefore the amount of Union's unjust enrichment." *Id*. at 1788.

In the second case to which Plaintiff cites, an Oklahoma Court held that plaintiffs could raise a claim for "negative unjust enrichment" for pollutants that were disposed of on its property, because it could be inferred from the complaint that "Defendants used Plaintiffs' property to dispose of pollutants and saved the expenses of otherwise collecting and disposing of same." *Branch*, 778 F. Supp. at 35-36. Indeed, a number of other courts beyond those on which Plaintiff relies have upheld the recovery of restitution damages for a polluter's disposal of waste on another's property that confers a benefit on the polluter. *See N.C. Corff P'ship, Ltd. v. OXY USA, Inc.,* 929 P.2d 288, 295 (Okla.Ct.App.1996) (Property surface owner was not precluded from making alternative claim for unjust enrichment in its action against oil and gas well operator, arising from alleged pollution of groundwater by operation of oil and gas wells,

alleging common law torts); *Evans v. City of Johnstown,* 96 Misc.2d 755, 410 N.Y.S.2d 199, 205–07 (N.Y.Sup.Ct.1978) (holding that plaintiff could proceed on claim for unjust enrichment against municipalities for money saved by not properly disposing of waste materials); *United States v. Healy Tibbitts Const. Co*., 607 F. Supp. 540, 542-43 (N.D. Cal. 1985) ("The portrait of a polluter indifferently standing idle while its oil spill is neutralized at public expense--and thereafter spiritedly disavowing any responsibility for recompensing the United States--offers as compelling an example of unjust enrichment as has lately been brought before the Court."); *Schwan v. CNH Am. LLC,* No. 4:04CV3384, 2006 WL 1215395, at *34 (D.Neb. May 4, 2006); s*ee also generally* Allan Kanner, *Unjust Enrichment in Environmental Litigation,* 20 J. Envtl. L. & Litig. 111 (2005) ("In pollution cases, the defendant is taking a de facto pollution easement for private gain, and thus is receiving a benefit without compensating anyone."); Allan Kanner & Tibor Nagy, *Measuring Loss of Use Damages in Natural Resource Damage Actions*, 30 Colum. J. Envtl. L. 417, 448 (2005).

Other courts, however, have declined to adopt this rationale. *See Marmo v. Tyson Fresh Meats, Inc.* 457 F.3d 748, 756 (8th Cir. 2006) (citations omitted) (declining to follow other courts, and holding that "Nebraska courts focus on how the pollution injures the plaintiff, and that claim is properly brought under the law of nuisance," and not unjust enrichment).

In the Ohio case, *Developers Three v. Nationwide Ins. Co.,* 64 Ohio App. 3d 794, 801-03, 582 N.E.2d 1130, 1135-36 (1990), the Court found restitution damages were not proper in a tortuous interference case because it would create a windfall for the plaintiff and penalize the defendant, an outcome that is incompatible with a compensatory theory of recovery. The Court in *Developers* acknowledged, however, that an unjust enrichment theory in cases of conversion

might be proper where the property had not been damaged, but a tortfeasor had nonetheless used another's property without permission, and benefitted from that use. *Id.* at 1135-36.

This Court finds that a rule such as the one *Cassinos* and *OXY USA,* fits well within Ohio's jurisprudence as stated in *Developers*. A Plaintiff whose property has been used as a dumping site may plead unjust enrichment as an alternative theory of damages in the chance that the plaintiff is unable to establish actual damages because such a determination may be too difficult. In such a case, it would be unjust to allow Defendant to benefit from disposal of waste on a plaintiff's property without payment of any kind. This Court, however, has already determined that Defendant's contamination of Plaintiff's Wellfield has caused actual and calculable damages to Plaintiff. Accordingly, it would be inappropriate to permit the unjust enrichment claim go forward under the facts of this case. Thus, Summary Judgment is hereby **GRANTED** to Defendant on Count VII, Unjust Enrichment.

### G. Declaratory Judgment for Indemnity—Count VIII

Defendant contends that Plaintiff lacks Article III standing to pursue a declaratory judgment action for indemnity. The Declaratory Judgment Act provides in relevant part:

> [i]n a case of *actual* controversy within its jurisdiction, ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201 (emphasis added). In analyzing the justiciability of a claim under the Declaratory Judgment Act, the Sixth Circuit has held:

> [i]n addition to the 'actual controversy' requirement of this statute, the 'case and controversy' clause of the United States Constitution applies to declaratory judgment actions as well as to other cases of a more conventional nature. The test for determining the 'case or controversy' and 'actual controversy' issues is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of

69

sufficient immediacy and reality to warrant the issuance of a declaratory judgment. Stated differently, a controversy, to be justiciable, must be such that it can presently be litigated and decided and not hypothetical, conjectural, conditional or based upon the possibility of a factual situation that may never develop.

*Hillard v. First Fin. Ins.,* 968 F.2d 1214 (6th Cir. 1992).

Plaintiff has not been sued, or threatened by suit or regulatory action, as a result of the presence of C8 on its Wellfield. Instead, Plaintiff has a fear of being sued, because of: (1) a lawsuit filed against the Lubeck Public Service district more than a decade ago; and (2) the belief that C8 is migrating offsite from the Wellfield to adjoining properties. (Doc. 346-21); *see* Doc. 346-29 at 334 ("And so our concern is someone might sue us. We don't know."). Defendant contends that this fear of litigation is not sufficient to confer standing to pursue a declaratory judgment for indemnity of any future litigation. Additionally, Defendant argues that Plaintiff has failed to present any evidence that C8 is actually migrating from the Wellfield to adjoining properties.

Plaintiff responds that it seeks a declaration of its right to be indemnified for future out-of-pocket expenses, such as consultant costs, incurred as a result of the C8 on its Wellfield. It states that such costs are real, not conjectural, as it has already incurred nearly $800,000 dollars in non-litigation consultant costs. Plaintiff argues that such costs are likely to increase in the foreseeable future, and that it is a wise use of judicial resources, especially in the event of a RCRA liability finding, to declare that Little Hocking has a right to indemnity for litigation arising out of C8 contamination. Plaintiff avers that two analogous cases support such a finding: *See Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 263 F. Supp. 2d 796, 866-67 (D.N.J. 2003) *aff'd,* 399 F.3d 248 (3d Cir. 2005), and *Analytical Measurements, Inc. v. Keuffel & Esser Co.*, 843 F. Supp. 920, 930-31 (D.N.J. 1993).

Both cases deal with the New Jersey Spill Act and are inapposite to this case. Under that Act, other persons or dischargers who clean up a hazardous substance have a right of contribution from any other dischargers or persons responsible for such waste. Thus, in both cases, the courts found the defendants responsible for a hazardous waste spill, and then found that the plaintiffs had already incurred clean up costs and were likely to continue incurring costs until the clean up was complete. 263 F. Supp. 2d at 866-67; 843 F. Supp. at 930-31. Accordingly, in both cases, the courts found it appropriate to grant a declaratory judgment holding defendants liable for all future costs associated with cleanup. *Id*.

These two New Jersey cases are not applicable to Plaintiff's request for a declaratory judgment for indemnity. In those cases, the courts granted declaratory judgments finding Defendants liable for future clean up costs because the Court had already found Defendant liable, and it was obvious that the cleanups at the sites were incomplete. In neither case was the declaratory judgment for a grant of indemnity based upon speculative litigation the plaintiffs feared they may face due to defendants' pollution of the properties.

While the Court appreciates that Plaintiff has incurred some costs in anticipation of litigation, it has not adduced sufficient evidence that such litigation is more than hypothetical. This Court finds that Plaintiff's claim conflates an argument for damages made in connection with its tort claims with grounds for future indemnification. Accordingly, this Court hereby **GRANTS** Defendant summary judgment on Count VIII, Declaratory Judgment for Indemnity.

### H. Economic Loss Doctrine

Defendant argues that an essential element of each of Plaintiff's tort-based causes of action is an injury or damage proximately caused by Defendant's tortious conduct. Defendant asserts that for each tort-based cause of action, the economic loss rule bars recovery because

Plaintiff has not put forth evidence showing tangible, physical injury to the Wellfield. Under Ohio law, the economic loss rule "prevents recovery in tort of damages for purely economic losses. The well-established general rule is that a plaintiff who has suffered only economic loss due to another's negligence has not been injured in a manner which is legally cognizable or compensable." *Ashtabula River Corp. Grp. II v. Conrail, Inc.*, 549 F. Supp. 2d 981, 987 (N.D. Ohio 2008) (holding plaintiff's public nuisance claim was barred by the economic loss rule because it wasn't actually a landowner of the site, and thus there was no allegation of harm to any property). In other words, "indirect economic damages that do not arise from tangible physical injury to persons or from tangible property may only be recovered in contract." *Id.*; *accord Paulus v. Citicorp N. Am., Inc.*, No. 2:12-CV-856, 2013 WL 5487053, at *8-9 (S.D. Ohio Sept. 30, 2013). As Defendant has stated repeatedly, it alleges that Plaintiff has failed to identify any damage to the res that has resulted in a depreciation of the value of the res, the Wellfield; thus, any damages it claims to have are purely economic, and barred under the economic loss rule.

The Court's analysis in *Paulus v. Citicorp N. Am., Inc.* of the economic loss rule as it relates to nuisance is informative in the case *sub judice*. No. 2:12-CV-856, 2013 WL 5487053, at *8-9 (S.D. Ohio Sept. 30, 2013) (finding economic loss doctrine did not bar recovery in nuisance case based on decreased property value and annoyance from loud generators). As the *Paulus* Court explains, the *Ashtabula River* Court held only that a tort claimant could not recover *indirect* economic damages that do not arise from tangible property damage, but it did not hold that a tort claimant could not recover *direct* economic damages. *Id.* at 8. The *Paulus* Court went on to explain, that "Ohio law classifies indirect economic damages as 'consequential' damages, or those akin to the value of time lost or lost profits," while direct damages are more akin to the

loss attributable to the decreased value of a product. *Id*. (citing *Queen City Terminals,* 73 Ohio St.3d at 614, 653 N.E.2d at 667). According to this distinction between direct and indirect economic damages, the *Paulus* Court held that insofar as the Plaintiffs alleged purely economic damages for the decreased value of their home as a result of the nuisance, such damages are direct, not indirect—they are more akin to decreased value of a product, than loss of profits. *Id*. Thus, they were not barred by the economic loss rule. *Id*.

In addition, the *Paulus* Court held that even if classified as indirect, the Plaintiff's damages were not barred by the economic loss rule because the loss arose from the tangible physical injury to the property. *Id*. at 9; *see also Queen City Terminals*, 73 Ohio St.3d at 615, 653 N.E.2d at 668 ("There must be a direct causal nexus between the tangible damage and the indirect economic losses in order for the economic losses to be recoverable."). The Plaintiffs in *Paulus* had alleged discomfort and annoyance damages, which the Court concluded were "tangible, redressable nuisance-related injuries" under Ohio law. *Id*. Thus, insofar as Plaintiff alleged tangible, redressable tort-related injuries, any economic harms that hinged upon those injuries were not barred by the economic loss doctrine.

This Court found, *supra*, in favor of Plaintiff in its conversion and trespass claims, and found genuine issues of material fact concerning its nuisance claim. Thus, this Court has found redressable-tort related injuries rooted in damage to the Wellfield, which entails such damages are more akin to decreased value of the product than to loss of profits or time. While some of these losses may be economic, there is a direct causal nexus between harm to the Wellfield due to C8 contamination, and other indirect, economic losses. Accordingly, summary judgment is hereby **DENIED** as to Counts II through VI on economic loss doctrine grounds.

**I. Griffin Affidavit**

Defendant argues that evidence upon which Plaintiff relies to support its Partial Summary Judgment Motion is compromised by a declaration submitted by its General Manager, Robert Griffin, which should be stricken. Defendant argues that Griffin was deposed as a Rule 30(b)(6) witness, and that the declaration: (1) omits relevant information given at the deposition; (2) that he provides expert testimony though he is not an expert witness; (3) that he states legal conclusions, which should be stricken; (4) that it contains hearsay, such as statements from the board that C8 was to be his priority. This Court is not persuaded by Defendant's arguments. Griffin's opinions are based on his personal knowledge and do not rise to the level of expert opinion. Further, Plaintiff alleges Griffin provides legal conclusions, but fails to raise this Court's attention to any instances of such statements. Lastly, this Court finds that the one instance of hearsay to which Defendant points—the Little Hocking Board's statement that Griffin was to make C8 contamination his priority—was not offered for the truth of the matter, but to substantiate Griffin's own perception that his duties were to be consumed by C8 related business. Thus, this Court **DENIES** Defendant's request to strike portions of Griffin's Affidavit.

**V. CONCLUSION**

Based on the foregoing, the Court finds Defendant's Motion for Summary Judgment is **GRANTED** on Counts V, VII, and VIII, and **DENIED** on Counts I through IV and VI. Plaintiff's Motion for Partial Summary Judgment is **GRANTED** in full.

**IT IS SO ORDERED.**

*s/Algenon L. Marbley*
**Algenon L. Marbley**
**United States District Court Judge**

**DATE: March 10, 2015**

74