IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


THE LITTLE HOCKING WATER ASSN.,INC.,

      Plaintiff,


   vs.                        Civil Action 2:09-cv-1081
                                     Judge Marbley
                                     Magistrate Judge King

E.I. DU PONT DE NEMOURS & CO.,

      Defendant.


## OPINION AND ORDER

This matter is before the Court on *Little Hocking's Motion for Sanctions for Lack of Reasonable Inquiry and Discovery Abuses*, ECF 264 ("*Motion for Sanctions*"), and *Little Hocking's Renewed Motion to Broaden Sanctions Discovery*, ECF 296 ("*Motion to Broaden Sanctions Discovery*").  For the reasons that follow, the *Motion for Sanctions* is **GRANTED in part and DENIED in part** and the *Motion to Broaden Sanctions Discovery* is **GRANTED in part and DENIED in part**.

I.    **FACTUAL ALLEGATIONS AND DEFENSES**

Little Hocking is an Ohio non-profit corporation that supplies water to eight townships in Washington County, Ohio, and to two townships in Athens County, Ohio.  *First Amended Complaint*, ECF 23, ¶ 21 ("*Amended Complaint*").  Little Hocking owns wellfields consisting of approximately forty-five (45) acres of land as well as the soil and groundwater beneath the land.  *Id.* at ¶ 26.  The wellfields are located in the State of Ohio, directly across the Ohio River from defendant E.I. du Pont de Nemours and Company's ("DuPont") Washington

1

Works Plant. *Id*. at ¶ 29. The wellfields include four production wells that, Little Hocking alleges, "have been and continue to be contaminated by DuPont's release of [h]azardous [w]astes." *Id*. at ¶ 32. Little Hocking also alleges that the hazardous wastes have contaminated its water distribution system, which consists of pipes, pumps and storage tanks. *Id*. at ¶ 3.

The alleged hazardous wastes consist of "perfluorinated compounds (including perfluorinated acids, sulfonates, phosponates, and telomer alcohols), precursors to perflourinated compounds and/or other toxic and hazardous materials that may be released with these perfluorinated compounds." *Id*. at ¶ 5. The foregoing are collectively referred to as "PFCs." PFCs are synthetic carbon chain compounds that contain fluorine and are used in the manufacture of numerous consumer products. *Id*. at ¶ 42. According to Little Hocking, DuPont uses at least one PFC, ammonium perfluorooctanoate ("APFO") in connection with its Teflon® related products. *Id*. at ¶ 44. APFO is the ammonium salt of "PFOA," the acronym used to identify the chemical Perfluorooctanoic acid commonly referred to as "C8." *Id*. at ¶¶ 45 n.1, 48. Little Hocking alleges that DuPont has used PFOA at its Washington Works plant from at least 1951 to the present. *Id*. at ¶ 46.

According to Little Hocking, DuPont has known of the "bio-persistence and toxicity of PFOA" for some time. *Id*. at ¶ 52. Although Little Hocking concedes that DuPont is under no obligation to cease the production, purchase or use of PFOA, plaintiff alleges that the release of such "hazardous wastes" endangers the safety, health and welfare of the community – in particular, Little Hocking's water

2

users.  *Id.* at ¶¶ 52-53.  Exposure to PFOA has been identified by the United States Environmental Protection Agency ("EPA") as potentially harmful to human health.  *Id.* at ¶¶ 91-96.  Little Hocking alleges that DuPont was aware of the harmful effects of exposure to PFOA on its employees as early as 1981 through, *inter alia*, blood sampling data.  *Id.* at ¶¶ 60-67.  Little Hocking further alleges that DuPont was aware of contamination of plaintiff's wellfields and distribution system as early as 1984.  *Id.* at ¶ 68.  Little Hocking apparently did not become aware of the presence of PFOA in its wellfields, or of the threat to the public at large, until January 2002, during a West Virginia Department of Environmental Protection meeting.  *Id.* at ¶ 81.

Once Little Hocking learned of the presence of PFOA in 2002, its General Manager, Bob Griffin, investigated the scope of the problem "to find short and long-term solutions to the problem, and to advise Little Hocking's water users of what the small organization knew about the scope of the public health threat."  *Id.* at ¶ 149.  Little Hocking alleges that its efforts to address the contamination has resulted in fees and expenses, including consultant fees.  *Id.* at ¶¶ 164-168.

In 2005, DuPont entered into a Memorandum of Understanding with the EPA in order to assess the past and current release of PFOA from the Washington Works Plant.  *Id.* at ¶ 130.  According to Little Hocking, the Final Report was inconclusive because of omissions in the data supplied by defendant.  *Id.*

In November 2007, DuPont, "in consultation with Little Hocking and its consultants[,]" completed construction of a building ("the

Carbon Plant")[1] that attempted to lower PFOA concentrations in the water sent to Little Hocking's water users. *Id*. at ¶ 135.  Little Hocking has spent "hundreds of staff and professional hours planning and reviewing plans for the Carbon Plant that now houses Little Hocking's entire water treatment facilities." *Id*. at ¶ 150. According to Little Hocking, the Carbon Plant was rendered necessary by DuPont's hazardous wastes.  *Id*.

Little Hocking also alleges that the release of hazardous wastes by defendant has affected not only human health and the environment, but also the operations of its business, resulting in various expenses, including costs associated with its participation in the review of the Carbon Plant design plans and its testing of the levels of PFOA and other PFCs in the blood of approximately 25 of its water users.  *Id*. at ¶¶ 148-180.  Little Hocking asserts a number of claims, including claims under the Resource Conservation and Recovery Act of 1976, 42 U.S.C. § 6901, *et seq.* ("RCRA"), public and private nuisance, negligence, trespass, "abnormally dangerous or ultrahazardous activity," conversion, unjust enrichment and declaratory judgment and indemnification.  *Id*. at ¶¶ 181-251. On March 10, 2015, the Court granted in part and denied in part DuPont's motion for summary judgment and granted Little Hocking's motion for summary judgment on its claims for trespass and conversion, leaving for trial Little

---

[1] Little Hocking refers to this building as the "Carbon Plant," *see*, *e.g.*, *Amended Complaint*, ¶ 135, while DuPont refers to it as the Granulated Activated Carbon treatment facility (or "GAC"), *DuPont's Motion to Compel Documents from Little Hocking's Privilege Log*, ECF 96, *Memorandum in Support*, p. 4.  For ease of reference, the Court will refer to this facility as the Carbon Plant.

Hocking's RCRA claims and claims for nuisance and negligence. *Opinion and Order*, ECF 439 ("*3/10/15 Order*").

## II.  PROCEDURAL BACKGROUND RELATED TO DISCOVERY

Both parties have vigorously litigated this action, which has been marked by years of protracted discovery and multiple discovery disputes.  As it relates to the present dispute, Little Hocking previously sought in discovery, *inter alia*, information regarding the migration of C8 contamination from DuPont's Washington Works facility to Little Hocking's wellfields.  *Opinion and Order*, ECF 194 ("*3/25/13 Order*"), p. 6.  Little Hocking specifically sought information regarding DuPont's groundwater flow model as well as information relating to DuPont's production wells, which Little Hocking believed was contained in the files of the Washington Works Power & Services unit ("P&S unit").  *Id.*  On June 28, 2011, DuPont produced to Little Hocking its groundwater flow model which, DuPont represented, captured all relevant project files[2] during the course of another PFOA-related class action.[3]  *Id.* at 8.  When Little Hocking later advised that it could not locate such files, DuPont produced in January 2013 a zip file containing electronic information (in the form of Microsoft Excel spreadsheets) underlying its groundwater flow model, including a sampling of well flow meters from 1957 to 1980, and well flow rates from 1997, 1998, 1999, and 2001.  *Id.* at 9.

---

[2] The groundwater flow model is distinct from the groundwater modeling project files, which apparently contain technical data underlying the model.  *Id.* at 8 n.8.
[3] *Leach v. E.I. du Pont de Nemours and Company*, No. 01-6-608 (Cir. Ct. Wood County W. Va.), filed in August 2001, was a PFOA-related class action filed against DuPont alleging common law tort claims and a claim for medical monitoring.  *See Opinion and Order*, Doc. No. 169, pp. 5-6.

This Court concluded in February and March 2013 that certain information requested by Little Hocking fell within the ambit of discoverable information. *See generally Opinion and Order*, ECF 169 ("*2/19/13 Order*"); *3/25/13 Order*. More specifically and relevant to the parties' present dispute, the Court ordered DuPont, *inter alia*, to:

(1)  Search for and produce certain historic, *i.e.*, pre-2006, well pumping production data (*2/19/13 Order*, pp. 64-66; *3/25/13 Order*, pp. 11, 18-22);

(2)  Search for and produce drain information, including historic and current information about drain maintenance issues and the layout of drains, at the Washington Works facility (*2/19/13 Order*, pp. 68-70; *3/25/13 Order*, pp. 49-50);

(3)  Search for and produce the Groundwater Pollution Source Inventory and Groundwater Protection Plan for the Washington Works facility (*2/19/13 Order*, pp. 61-64; *3/25/13 Order*, pp. 6-9, 13);

(4)  Search for and produce responsive information from the P&S unit at Washington Works (*2/19/13 Order*, pp. 32-39);

(5)  Provide supplemental answers to Interrogatory Nos. 19, 32, 66, 68, 69 (*2/19/13 Order*, pp. 96-97, 99-101).

In addressing the parties' discovery disputes and the scope of DuPont's obligation to produce this information, the Court specifically permitted DuPont to rely on its discovery searches and the documents produced in other PFOA-related action, including *Leach v. E.I. du Pont de Nemours and Company*, No. 01-6-608 (Cir. Ct. Wood County W. Va.) ("the *Leach* action") and two other actions in which the

6

last full collection and review of documents occurred in 2007.
*2/19/13 Order*, pp. 5-21.

After DuPont produced summaries of well pumping data (contained
in a series of Excel spreadsheets) for the years 2006 to 2012 on
January 7, 2013, Little Hocking asked DuPont about production of pre-
2006 well pumping information.  *3/25/13 Order*, p. 10.  In response,
DuPont represented to Little Hocking that, from the early to mid-1980s
to 2006, it "tracked well production information on a computer system
named 'Vantage' that ran on a VAX computer and stored this information
on magnetic tapes."  *3/25/13 Order*, p. 11 (citing *Declaration of John
T. Myers*, ECF 164-10, dated January 24, 2013) ("*Myers 1/24/13
Declaration*").[4]  Several years ago, DuPont transitioned to a new
system, IP-21, for recording well flow data.  *Id*.  Before that
transition, Mr. Myers took steps to retrieve and store "old data":

> 11.   Vantage could only be run on a VAX computer.  VAX
> computers utilize what is now outdated technology, and to
> my knowledge, VAX computers haven't been made since the
> early 1990's.
>
> 12.   The Vantage system was a DuPont internal system, but
> had less data reporting capabilities than IP-21, and stored
> its back-up data on digital tapes (in VAX format).  Limited
> data was also stored on the VAX hard drive itself.
>
> 13.   Before the transition to IP-21, I personally attempted
> to revive some of the old data, but the tapes were so
> degraded that I was unable to retrieve usable information.
> The tapes actually broke my tape reader machine, which
> ended my attempts to revive the data.

---

[4] Mr. Myers was a DuPont employee from 1979 until his retirement on March 31,
2013 and "had an office at the Washington Works facility since 1999." *Myers
1/24/13 Declaration*, ¶ 3; *Deposition of John T. Meyers*, ECF 238-1 ("*Myers
5/10/13 Deposition*"), p. 7.  He is "familiar with DuPont's current and
preexisting systems used to monitor and record well production" and has
"approximately 30 years of experience with monitoring and supporting DuPont
Chemical Processes." *Myers 1/24/13 Declaration*, ¶ 4.

14.   Recognizing the limitations of the tape drive data
backups, in the mid-2000's, I began to store raw VAX data
on my desktop workstation hard drive.  The data retrieved
could only be processed at the time by a VAX machine
running Vantage; in essence, my computer was replacing the
tape backups.

15.   At Washington Works we no longer have a VAX machine.
The unit previously used to run the Vantage system was
dismantled at the time of the transition to IP-21 due to
its age, the fact that it was obsolete technology and the
unavailability of replacement hardware.

16.   Around the time of the transfer to the IP-21 system, I
developed a complicated and labor intensive process to
translate the binary VAX history data into a comma
separated value (".csv") text file, which could be read by
a spreadsheet.  I tested this process on some of the post
2006 data; however because it was extremely time consuming
and data intensive it was impractical to process all the
retained data.

17.   To illustrate the data intensive nature of this
process; to convert VAX binary data into a .csv text file,
it would multiply the file size by a factor of nearly 100,
and thus greatly burden data storage capabilities. Because
historical information of this nature was not required by
the business, the process was not carried out on all the
data.

18.   The process described in paragraphs 16 and 17 above
could only be used on raw data that had been previously
exported in VAX format from a VAX computer running Vantage
to a PC.

*Myers 1/24/13 Declaration*, ¶¶ 11-18.  Based on this information,

DuPont represented to Little Hocking in January 2013 that DuPont was

unable to determine whether these backup tapes, which had degraded and

contained well data, could be located.  *3/25/13 Order*, p. 12.  DuPont

further represented that "'even if the tapes could be located, they

could not be read without a VAX running the Vantage program, both of

which are defunct.'"  *Id.* (internal citations omitted).  Thia Court

permitted Little Hocking to pursue discovery "related to the [alleged]

failure to preserve or the destruction of the pre-2006 pumping records

maintained on back-up tapes as well as the Vantage system and/or VAX computer[.]" *Id.* at 28.  After DuPont discovered additional media that might contain historic well data, the Court later ordered DuPont to provide Rule 30(b)(6) testimony regarding this media as well as the Vantage system and VAX computer. *Opinion and Order*, ECF 208, pp. 8-9 ("*4/26/13 Order*").

On May 10, 2013, Little Hocking deposed Mr. Myers, DuPont's Rule 30(b)(6) designee regarding these issues.  *Myers 5/10/13 Deposition*. According to Little Hocking, this deposition revealed additional information related to the preservation and/or destruction of the well pumping data, including the loss or destruction of at least twenty (20) CDs containing well pumping data.  *Opinion and Order*, ECF 278, p. 2 ("*9/20/13 Order*").

Following a May 20, 2013 status conference, the Court noted that "DuPont expects to produce, on a rolling basis, virtually all remaining well pumping data by June 15, 2013." *Order*, ECF 219, p. 1 ("*5/20/13 Order*").  The Court therefore re-opened non-expert discovery "to permit plaintiff to conduct a Rule 30(b)(6) deposition regarding those documents[.]" *Id.*  On July 10, 2013, DuPont produced two Rule 30(b)(6) corporate designees (Mr. Myers and Mark Eakle) regarding the maintenance, degradation or destruction of pre-2006 well records, the VAX and the Vantage system.  ECF 286, p. 3 ("*DuPont's Final Status Report*").  After Little Hocking represented that DuPont had failed to preserve and had destroyed evidence, this Court denied without prejudice to renewal Little Hocking's motion to broaden sanctions discovery.  *9/20/13 Order*, pp. 9 – 10.

On September 27, 2013, DuPont submitted its final status report regarding its compliance with the *2/19/13 Order* and its response to the *9/20/13 Order*. *DuPont's Final Status Report*.[5]  DuPont located and produced on a rolling basis at least some well pumping data for every year from 1958-1980 and from 1991-2012. *Declaration of Niall A. Paul*, ECF 286-1, ¶¶ 5-10, 14-22, 27-28 ("*Paul 9/27/13 Declaration*"); *Exhibits A* and *B*, attached to *Paul 9/27/13 Declaration* (copies of summaries reflecting months and years for which well pumping data has been produced).  However, "[d]espite having expended hundreds of man hours[6] and hundreds of thousands of dollars in discovery costs and attorneys' fees," DuPont could not locate well pumping data for 1981-1990, nor could it locate data for certain months in 1991, 2002, and 2003. *Paul 9/27/13 Declaration*, ¶ 29.  DuPont produced all well pumping data stored in the Vantage folder. *Id*. at ¶ 34.  DuPont made its final production of well pumping data on September 6, 2013, which included "all well pumping data that DuPont was able to restore and recover from the found storage media." *Id*. at ¶¶ 17, 35.

Little Hocking now moves for sanctions in connection with DuPont's multiple alleged discovery violations and alleged bad faith during the course of the discovery process. *See generally Motion for Sanctions*.  Little Hocking also renews its request to broaden sanctions discovery related to DuPont's alleged failure to preserve and/or alleged destruction of pumping well data and the means to read

[5] DuPont had earlier submitted status reports regarding its compliance with Court orders relating to fact and sanctions discovery in March, May and June 2013.  ECF 180, 187, 195, 212, 215, 217, 233.

[6] DuPont represents that it spent approximately 700 hours locating, restoring, and decoding well pumping data. *Paul 9/27/13 Declaration*, ¶ 20.

that data as well as discovery regarding the destruction of DuPont's electronic database, Nexus.  *See generally Motion to Broaden Sanctions Discovery*.  These motions are now fully briefed and the Court will address each in turn.

## III. APPLICABLE STANDARDS FOR *MOTION FOR SANCTIONS*

Although the *Motion for Sanctions* is not a model of clarity, the Court understands that Little Hocking seeks sanctions pursuant to Rules 26(g) and 37(b)(2), (c) and (d) of the Federal Rules of Civil Procedure as well as pursuant to this Court's inherent authority.  *See Motion for Sanctions*, pp. 11-12, 24-25, 42 (Clerk's pagination); *Little Hocking's Reply in Support of Its Motion for Sanctions for DuPont's Lack of Reasonable Inquiry and Violations of 2/19 Order (Doc. 264)*, ECF 289, pp. 8, 10, 14, 17-19, 23 (Clerk's pagination) ("*Sanctions Reply*"); *Little Hocking's Response to DuPont's Surreply to Little Hocking's Motion for Sanctions*, ECF 327, p. 6 ("*Response to DuPont's Sur-Reply*") (Clerk's pagination).

Rule 26(g) "requires an attorney or the party personally to certify [after reasonable inquiry] that discovery responses and objections are supported by nonfrivolous argument and are not aimed to harass, cause delay, or drive up litigation costs." *Jones v. Ill. Cent. R.R. Co.*, 617 F.3d 843, 854 (6th Cir. 2010). *See also* Fed. R. Civ. P. 26(g)(1). Rule 26(g) therefore requires "that the attorney make a reasonable inquiry into the factual basis of his response, request, or objection." Fed. R. Civ. P. 26 advisory committee's notes.  A court must impose "an appropriate sanction" should an attorney violate Rule 26(g) without "substantial justification." Fed.

R. Civ. P. 26(g)(3); *Jones*, 617 F.3d at 854.  "The sanction may include an order to pay the reasonable expenses, including attorney's fees, caused by the violation."  Fed. R. Civ. P. 26(g)(3).

Rule 37(b)(2)(A)[7] authorizes sanctions when a party fails "to obey an order to provide or permit discovery."  By this authority, a court may issue such orders as are just.  Rule 37(b)(2)(A)(i)-(vii).  Instead of or in addition to these orders, Rule 37(b)(2)(C) requires a court to "order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure [to comply with an order], unless the failure was substantially justified or other circumstances make an award of expenses unjust."

Sanctions are also available under Rule 37(c) for violations of Rule 26 of the Federal Rules of Civil Procedure.  More specifically, Under Rule 26(a)(2), a party must disclose information relating to an expert witness whose testimony may be offered at trial.  Fed. R. Civ. P. 26(a)(2).  Rule 26(e) requires a party to supplement its disclosures and other discovery responses "in a timely manner."  Fed. R. Civ. P. 26(e).  Failure to comply with Rule 26(a) or (e) may result in the imposition of sanctions pursuant to Rule 37(c)(1) unless the violation was either harmless or substantially justified.  Fed. R. Civ. P. 37(c)(1).

Rule 37(d) authorizes the imposition of sanctions in connection with a party's failure to make Rule 26(a)(1) disclosures, Rule

---

[7] In accordance with Rule 37(a)(1) and S.D. Ohio Civ. R. 37.1, the parties have exhausted all extrajudicial means for resolving their differences. *Declaration of Justin D. Newman*, dated August 21, 2013, ECF 264-1, ¶¶ 6-23 ("*Newman 8/21/13 Declaration*").

37(c)(1), or failure to respond to written discovery requests or
failure to attend one's own deposition.  Fed. R. Civ. P. 37(d)(1)(A).
Sanctions for a violation of Rule 37(d)(1) "may include any of the
orders listed in Rule 37(b)(2)(A)(i)-(vi)."  Fed. R. Civ. P. 37(d)(3).
A court is vested with wide discretion in determining an appropriate
sanction under Rule 37.  *See*, *e.g.*, *Nat'l Hockey League v. Metro.
Hockey Club*, 427 U.S. 639, 642-43 (1976); *Cornette v. Rousselle* Corp.,
647 F.2d 164, 164 (6th Cir. 1981).

Little Hocking also seeks the imposition of sanctions pursuant to
this Court's inherent authority because of DuPont's alleged spoliation
of evidence.  "[A] federal court's inherent powers include broad
discretion to craft proper sanctions for spoliated evidence." *Adkins
v. Wolever*, 554 F.3d 650, 651 (6th Cir. 2009) (*en banc*).  *See also
Metz v. Unizan Bank*, 655 F.3d 485, 490-91 (6th Cir. 2011) (rejecting
the assertion that "inherent power sanctions are improper if Rule 11
also applies"); *Chambers v. NASCO, Inc.*, 501 U.S. 32, 49 (1991)
(stating that inherent powers "can be invoked even if procedural rules
exist which sanction the same conduct); *BDT Prods. v. Lexmark Int'l,
Inc.*, 602 F.3d 742, 754 (6th Cir. 2010) ("Harassing the opposing
party, delaying or disrupting litigation, hampering the enforcement of
a court order, or making improper use of the courts are all examples
of the sorts of conduct that will support a finding of bad faith or
improper purpose[.]").  "Spoliation is defined as the intentional
destruction of evidence that is presumed to be unfavorable to the
party responsible for its destruction." *United States v. Boxley*, 373
F.3d 759, 762 (6th Cir. 2004) (citation omitted).  Unlawful spoliation

may consist of not only the intentional destruction of evidence, but also the removal of evidence "with the 'purpose of rendering it inaccessible or useless to [a party] in preparing its case. . . .'" *Id.* (quoting *Nationwide Mut. Fire Ins. Co. v. Ford Motor Co.*, 174 F.3d 801, 804 (6th Cir. 1999)).  In determining an appropriate sanction for spoliation, a court should craft a sanction that serves "both fairness and punitive functions."  *Adkins*, 554 F.3d at 652.

Little Hocking complains about DuPont's multiple alleged discovery abuses and argues generally that such abuses warrant a variety of sanctions. However, Little Hocking fails to identify and analyze the particular authority governing each alleged abuse.[8] Accordingly, the Court has attempted to organize the alleged abuses into general categories.

## IV.   WELL DATA

The parties' sanctions-related filings focus primarily on DuPont's numerous alleged defaults related to the production of, or failure to produce, its well data.  Little Hocking claims contamination by both groundwater and air emissions.  *See*, *e.g.*, *id.* at 20-21, 23-24, 28, 33.[9]  DuPont argues that the "'revised groundwater modeling by DuPont supports the previous conclusion that no current groundwater migration pathway exists beneath the Ohio River to the Little Hocking Well Field'" and that the only possible pathway of C8

---

[8] For example, Little Hocking scatters different theories throughout its *Motion for Sanctions. See*, *e.g.*, *Motion for Sanctions*, pp. 18-21, 25, 42 (complaining that DuPont's representation that tapes containing well data had degraded was false). As a result, the Court finds itself having to cobble together a coherent articulation of Little Hocking's request for sanctions.
[9] Because the parties dispute Little Hocking's theory of groundwater contamination, Little Hocking's motion for summary judgment addressed only its theory based on air emissions. *3/10/15 Order*, p. 56 n.11.

was transported via air emissions from its stacks by winds.  *Id*. at 5.
*See also Opposition to Motion for Sanctions*, p. 14 (Clerk's
pagination) (explaining that its "strategy" is to rely on widely-
accepted data "to assess the containment of PFOA in the groundwater
surrounding Washington Works"); DuPont's supplemental expert
disclosures dated April 2, 2013, ECF 209-6, pp. 4-5 (Clerk's
pagination) (disclosing that expert Andrew Hartten[10] may testify and
opine regarding, *inter alia*, the following topics:  "the environmental
conditions surrounding the Washington Works facility, including but
not limited to, the science of hydrogeology and the hydrogeology of
the area at and around the Washington Works facility"; "the alleged
leaching of PFOA through the soil to the groundwater"; "that it is
not scientifically reasonable that the PFOA in the Little Hocking
Well Fields arrived there via water migration from emissions of the
Washington Works facility"; "that the majority of any PFOA in the
Little Hocking Well Fields which might have come from the Washington
Works facility would have been transmitted via air dispersion (rather
than through or under the Ohio River)"; "that the migration of any
such PFOA releases would not have occurred through underground water
migration"; "that DuPont followed generally accepted scientific
methods and practices to accurately and fully assess the hydrogeology
around the Washington Works site and fully assess the leaching of

---

[10] Mr. Hartten, employed by DuPont since 1990, is currently DuPont's Principal
Project Manager for the Corporate Remediation Group at its Washington Works
facility.  *Affidavit of Andrew Hartten*, ECF 274-6, ¶ 1 ("*Hartten 9/12/13
Affidavit*").  The Corporate Remediation Group worked on the United States
Environmental Protection Agency's ("EPA") investigation of Washington Works
under the Resources Conservation and Recovery Act that resulted in a
Memorandum of Understanding with the EPA.  *2/19/13 Order*, pp. 20, 35.

chemicals through soil to a reasonable degree of scientific certainty to determine that any PFOA emissions in the Little Hocking Well Fields did not occur via underground water migration").

Little Hocking contends that data from DuPont's wells is necessary to test and refute DuPont's assertion that the pumping of DuPont's wells controls and prevents C8 from traveling to Little Hocking's wellfields. *See, e.g., Motion for Sanctions*, pp. 14, 19, 25. For example, Little Hocking explains that well data records that show that DuPont's wells are not pumping undermine DuPont's assertion that its well pumping efforts prevent off-site contamination. ECF 167, pp. 10-11. Little Hocking also contends that the well data is necessary to undermine DuPont's groundwater model. *Id.* at 11-12. Little Hocking therefore previously sought to compel well data "to test the veracity of DuPont's claims[.]" *See, e.g.*, ECF 264, pp. 35-36 (explaining that well data is necessary to, *inter alia*, "evaluate subsurface pathways of migration from DuPont's Washington Works facility"); ECF 120, p. 35 ("This Court should compel production of the well and drain records, which are necessary to test the veracity of DuPont's claims about how waste moves in the subsurface" and that Little Hocking "seeks production of information regarding DuPont's system of groundwater production wells . . . because DuPont-influenced public reports conclude that these wells help control off-site groundwater contamination").

## A. Relevance and Burden Objections

Little Hocking argues that sanctions are warranted under Rule 26(g) and the Court's inherent authority because DuPont acted in bad

16

faith when it objected to the relevance of the well data and when it
complained that the production of well data was unduly burdensome.
*See*, *e.g.*, *Motion for Sanctions*, pp. 15-17, 23-26 (Clerk's
pagination); *Sanctions Reply*, pp. 14-17 (Clerk's pagination). More
specifically, DuPont formally advanced this objection in 2010 in
response to Little Hocking's request for production:

> DOCUMENT REQUEST NO. 11
>
> All documents relating to groundwater flow at and/or
> near the Washington Works Facility, including all
> groundwater flow models (and drafts of such models)
> produced for the Washington Works Facility; all documents
> generated, reviewed, considered and/or relied on for the
> development of each groundwater flow model for the
> Washington Works Facility; and, all communications
> discussing groundwater flow at the Washington Works
> Facility.
>
> **RESPONSE:**
>
> DuPont objects to this request as being overly broad,
> unduly burdensome and not reasonably calculated to lead to
> the discovery of admissible evidence. Subject to, and
> without waiving, these objections and/or its General
> Objections, DuPont responds as follows:
>
> *See* response to Request No. 5.[11] DuPont will search
> for and produce, as kept in the ordinary course of
> business, non-privileged documents that are responsive to
> this Request and/or relate to environmental sampling on or
> around Washington Works.

*DuPont's Responses and Objections to LHWA's First Set of Requests for
Production of Documents*, ECF 264-9, p. 2 (Clerk's pagination) (dated
September 22, 2010) ("Request No. 11").[12]

According to Little Hocking, "throughout the end of 2011" and
2012, DuPont continued to resist production of the well data on the

---

[11] The response to Request No. 5 is not attached to the *Motion for Sanctions*.
[12] The parties apparently agreed that Request No. 11 encompassed a request for
well data. *See Opinion and Order*, ECF 194, p. 6.

basis of relevance and burden. *Motion for Sanctions*, p. 16 (citing *Declaration of Justin D. Newman*, ECF 205-1, ¶¶ 8-9 ("*Newman 4/24/13 Declaration*"), which in turn cites to *Declaration of Justin D. Newman*, ECF 106-1 ("*Newman 6/19/11 Declaration*")).  Little Hocking insists that DuPont's "strategy" of claiming that DuPont's production wells prevent the migration of C8 contamination further undermines DuPont's relevance objections. *Id.* at 25 (citing to *Exhibit 2*, attached thereto, for the proposition that any adjustment to DuPont's production wells could affect on-site contamination and therefore that the underlying well data is "a key means" to discovering whether the production wells operated as DuPont claimed).  Little Hocking also complains that DuPont failed to make a reasonable inquiry into the burden of producing this information because DuPont's outside counsel did not speak with Mr. Myers about well data until January 2013. *Id.* at 24 (citing *Myers 5/10/13 Deposition*, p. 22 (using deposition pagination)).  According to Little Hocking, this failure is particularly egregious where, in response to a subpoena issued in 2005 by the Department of Justice ("DOJ" and "DOJ subpoena"), DuPont's outside counsel, James P. Denvir, identified Mr. Myers "as the Well custodian" and "his methods of recording Well data were also well known to decision-makers at the Site." *Id.* (citing *Myers 5/10/13 Deposition*, p. 99 (using deposition pagination); letter dated September 12, 2005 from DuPont counsel James P. Denvir addressed to the DOJ, ECF 264-3, p. 5 (Clerk's pagination) ("the Denvir Letter")).

The Denvir Letter states in relevant part:

11.  Well Water Flow and Other Technical Non-C8 Data

18

John Meyers [sic], an employee at Washington Works, monitors and records well water data at the facility.  He does not monitor the well water for chemistry but rather for flow.  He maintains approximately 180,000 electronic files of this data from 1985- present representing an hourly monitoring of the pressure, temperature and flow of all facility wells.  The data from 1996 to present is on CDs.  However, the data from 1985-96 is stored on a "Vax Server".

According to our forensic specialists, it would take approximately 500 hours to convert this Vax Server data into a readable form.  Similarly, the Chambers Works facility keeps several hundred magnetic tapes from its own Vax Servers containing process data from operations on site that come from over 6,000 different instruments.  The instruments monitor conditions from the site's processing areas such as temperatures, volumes, flow rates, and tank levels in 1 minute samples that measure reactions of products that may contain C8 as an ingredient, but which instruments do not make measurements of C8.

Paragraphs 3 and 16 of the Subpoena request documents relating to the "transportation" of C8. Because the well water and instruments contain C8, a broad read of the Subpoena could arguably encompass these records.  We suggest that at this time, DuPont produce the Meyers' CDs, but defer on the production of information from the Vax Server data due to the burden of production and the fact that the materials may not be relevant to your investigation.  Should you determine that this data is relevant after review of the CDs, we can revisit the matter again for discussion at that time.

We appreciate your attention to these matters and would be happy to discuss them with you at your convenience.  If you have any questions or would like to discuss these matters, please do not hesitate to contact either me or Kirsten Gillibrand.

Denvir Letter, p. 5 (Clerk's pagination).

DuPont denies that it violated Rule 26(g) or acted in bad faith when it objected to the relevance of the well data requested by Little Hocking and when it complained that producing 60 years of well data was unduly burdensome.  *See*, *e.g.*, *Defendant E.I. du Pont de Nemours and Company's Combined Table of Contents and Summary of the Argument,*

*and Response in Opposition to Little Hocking's Motion for Sanctions for Lack of Reasonable Inquiry and Discovery Abuses (Dkt. No. 264)*, ECF 274, pp. 18-22, 24-26 (Clerk's pagination) ("*Opposition to Sanctions*").

Rule 26(g) requires that discovery requests be proportionate, *i.e.*, "neither unreasonable nor unduly burdensome or expensive, considering the needs of the case, prior discovery in the case, the amount in controversy, and the importance of the issues at stake in the action." Fed. R. Civ. P. 26(g)(1)(B)(iii). In responding to discovery requests, an attorney or party must personally certify after a "reasonable inquiry" that the discovery responses and objections are supported by nonfrivolous arguments and that they are not interposed for any improper purpose. Fed. R. Civ. P. 26(g)(1)(B)(i), (ii); *Jones*, 617 F.3d at 854. A court applies an objective standard when determining whether or not a party or an attorney has made a reasonable inquiry. Fed. R. Civ. P. 26 advisory committee's notes on 1983 amendments; *Brown v. Tellermate Holdings Ltd.*, No. 2:11-cv-1122, 2014 U.S. Dist. LEXIS 90123, at *47 (S.D. Ohio July 1, 2014). "An attorney has made a 'reasonable inquiry' if the investigation undertaken by the attorney and the conclusions drawn therefrom are reasonable under the circumstances. . . . Ultimately, what is reasonable is a matter for the court to decide on the totality of the circumstances." *Brown*, 2014 U.S. Dist. LEXIS 90123 at *47-48 (quoting *Quinby v. WestLB AG*, No. 04 Civ. 7406, 2005 U.S. Dist. LEXIS 35583, 2005 WL 3453908, *4 (S.D.N.Y. Dec. 15, 2005) (internal quotation marks omitted)).

The Court has previously determined that the well data is relevant to DuPont's theory that its wells prevented off-site migration of C8. *2/19/13 Order*. Prior to that time, however, it was not clear that consideration of relevance and burden obligated DuPont to produce 60 years' worth of well data. *See*, *e.g.*, Fed. R. Civ. P. 26(b). *See Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 305 (6th Cir. 2007)(Holding that the scope of discovery may be properly limited where "the information sought is overly broad or would prove unduly burdensome to produce.") *See also Oppenheimer Fund v. Sanders*, 437 U.S. 340, 351 (1978) (stating that discovery "has ultimate and necessary boundaries") (internal quotation marks and citations omitted).

Prior to the issuance of the *2/19/13 Order*, DuPont had already provided to Little Hocking, *inter alia*, a detailed groundwater model and supporting materials related to the model's development, which described "in detail the hydrology and physical characteristics of the subsurface area around Washington Works and [this information] details the pumping rates for 'all [o]f the 50 process and supply wells located within the model[.]'" *2/19/13 Order*, p. 65. Little Hocking had also created its own groundwater model, which it submitted to the Ohio Environmental Protection Agency ("OEPA"), utilizing much less information than it sought from DuPont. *See Opposition to Sanctions*, pp. 3-5; *Wellhead Protection Plan - Phase I*, ECF 274-5, pp. 1, 7, 9 (dated November 1996) (using plan document's pagination) ("*OEPA WPP*") (explaining that the Wellhead Protection Plan ("WPP"), which utilized, *inter alia*, a groundwater flow model, identified certain "wellhead

protection areas," *i.e.*, "the surface and subsurface area surrounding a water well or well field supplying a public water system through which contaminants are likely to move toward and reach such water or well field" that will be the focus of "wellhead protection efforts[,]" including "groundwater quality monitoring, inventory and control of potential groundwater contamination sources, and public awareness programs") (internal quotation marks omitted)).  More specifically, Little Hocking's OEPA groundwater flow model relied on approximations, assumptions and limited pumping data.  *Hartten 9/12/13 Affidavit*, ¶¶ 8-9.  *See also OEPA WPP*, pp. 7-10.

In addition, prior to the issuance of the *2/19/13 Order*, DuPont and its counsel had investigated and attempted to reach a compromise regarding the demand for well data.  *Stennes 9/13/13 Declaration*, ¶¶ 10-22.  As part of these efforts, DuPont's counsel spoke with at least five current and former DuPont employees "regarding the existence and/or possible location of additional historical well pumping data."  *Id*. at 18.  Sometime during or after the Spring of 2012, DuPont's counsel interviewed Alison Crane, a current member of the Washington Works Environmental Group and a former member of the P&S unit, who "indicated that some historical well pumping data could be on microfiche, but she was not able to locate any records or indices to either confirm this information or identify where such microfiche would be located."  *Id*. at ¶ 11.  DuPont's counsel also spoke with Andrew Hartten, who was later designated as DuPont's Rule 30(b)(6) representative on the issue of well pumping.  *Id*. at ¶ 12.  In 2012 or early 2013, DuPont's counsel interviewed DuPont employees Gary Klesel,

David Altman[13] and Lynwood Ireland.  *Id*. at ¶¶ 12, 14-18.  On January
17, 2013, after Mr. Klesel had identified Mr. Myers "as a potential
source of information regarding historical well pumping data[,]"
DuPont's counsel interviewed Mr. Myers.  *Id*. at ¶¶ 20-21.  DuPont's
counsel had also interviewed two former DuPont employees, neither of
whom could recall what had become of the original paper records of
manually recorded well pumping data dating from 1958 to 1980.  *Id*. at
¶ 22.

Little Hocking complains that neither Ms. Crane nor Mr. Hartten
"had any responsibility for the production wells or pumping records"
and they were therefore "in no position to know the location of that
data."  *Sanctions Reply*, p. 9.  However, Little Hocking's assertion is
not supported by citations to the record and does not, in this Court's
view, undermine DuPont's decision to rely on these individuals when it
investigated the production of well data, particularly in light of the
fact that Mr. Hartten served as DuPont's Rule 30(b)(6) designee on the
issue of well pumping.

Moreover, the Denvir Letter and the timing of DuPont's outside
counsel's interview of Mr. Myers do not establish that DuPont's
investigation and claims of burden were unreasonable.  DuPont's
current outside counsel did not represent DuPont in connection with
the 2005 DOJ subpoena.  *Declaration of Libretta P. Stennes*, ECF 236-5,
¶ 18 ("*Stennes 6/21/13 Declaration*").  "While counsel in this
litigation had general understanding that DuPont's DOJ subpoena
counsel conducted a considerable number of interviews to ascertain the

_____

[13] This David Altman is not Little Hocking's counsel.

location of potentially responsive information to the subpoena,
counsel in this matter did not and does not have exhaustive knowledge
of all the specific information identified [by that other law firm]"
*Id*. The 2005 Denvir Letter was but a single document in a sea of
approximately 4.5 million pages of material produced to Little
Hocking, including documents generated during the course of other
litigation. *Id*. at ¶ 19; *Declaration of Niall A. Paul*, ECF 274-2, ¶
23 ("*Paul 9/13/13 Declaration*"). Moreover, Mr. Myers' name was
spelled incorrectly ("Meyers") in the Denvir Letter, thus reducing the
likelihood that an electronic search utilizing the term "Myers" would
uncover the Denvir Letter.

Under all these circumstances, the Court concludes that DuPont
did not violate Rule 26(g) when it objected to Little Hocking's
request for well data on the basis of relevance and burden. As noted
*supra*, discovery of even relevant information is not unlimited. *See*,
*e.g.*, *Surles ex rel. Johnson*, 474 F.3d at 305; *Oppenheimer Fund*, 437
U.S. at 351. DuPont had previously produced information related to
the well data, *i.e.*, DuPont's groundwater model and supporting
materials, and had conducted a reasonable investigation into the
burden of producing the actual well data. The mere fact that DuPont
did not interview Mr. Myers until January 2013 (when Mr. Klesel
identified Mr. Myers as a potential source of information) does not
vitiate the reasonableness of DuPont's interviews of other current and
former DuPont employees. *See*, *e.g.*, Fed. R. Civ. P. 26(g)(1); *Brown
v. Tellermate Holdings Ltd*., No. 2:11-cv-1122, 2014 U.S. Dist. LEXIS
90123, at *47 (S.D. Ohio July 1, 2014). Similarly, the Court concludes

24

that DuPont did not act in bad faith in advancing objections based on relevance and burden.

**B.    Tape Degradation**

Little Hocking next contends that DuPont's representation that pre-2006 well data could not be produced because the Vantage tapes had degraded was false and was made in bad faith, thus warranting sanctions under the Court's inherent authority. *Motion for Sanctions*, pp. 18-21, 25, 42; *Sanctions Reply*, pp. 11-14. Little Hocking argues that this representation was initially advanced in a letter from DuPont's outside counsel (letter dated January 24, 2013 addressed to Little Hocking's counsel from Libretta P. Stennes, ECF 264-14 ("*Stennes 1/24/13 Letter*")) and in the *Myers 1/24/13 Declaration*.[14] As noted *supra*, in 2010 or 2011, DuPont began transitioning from its Vantage system, which tracked data from well header flow meters using a VAX computer system and which stored the information on magnetic tapes, to a new system, IP-21. *See also Stennes 1/24/13 Letter*, pp. 1-2. After IP-21 began recording data in 2011, "the VAX system was shut down and dismantled approximately one year later." *Id*. at 2. *See also Myers 1/24/13 Declaration*, ¶ 15 ("The [VAX] unit previously used to run the Vantage system was dismantled at the time of the transition to IP-21 due to its age, the fact that it was obsolete technology and the unavailability of replacement hardware."). Mr. Myers averred that, "[b]efore the transition to IP-21, I personally attempted to revive some of the old [well] data, but the tapes were so degraded that I was unable to retrieve usable information. The tapes

---

[14] The *Myers 1/24/13 Declaration* is also the subject of the *Motion to Broaden Sanctions Discovery*, which is addressed *infra*.

actually broke my tape reader machine, which ended my attempts to revive the data." *Myers 1/24/13 Declaration*, ¶ 13.  Mr. Myers began storing raw VAX data on his desktop hard drive, but that data could be processed only by a VAX machine running Vantage. *Id*. at ¶ 14; *Stennes 1/24/13 Letter*, p. 2.

On January 24, 2013, DuPont represented that it had "after a reasonable search, been unable to locate this data, but even if these materials were in existence, it would be impossible to read the data absent either possession of a VAX system running the Vantage program, or an overly burdensome translation process that is both time consuming and data intensive." *Stennes 1/24/13 Letter*, p. 2 (citing *Myers 1/24/13 Declaration*, ¶¶ 14-18). *See also Defendant's Memorandum in Opposition to Plaintiff's Motion to Extend Fact and Expert Discovery Deadlines*, ECF 164, pp. 12-13 (representing same and citing to *Stennes 1/24/13 Letter* and *Myers 1/24/13 Declaration*) (filed 2/7/13).  DuPont went on to describe additional efforts undertaken by it to locate historic well data:

> As part of DuPont's efforts to address Little Hocking's topic on historical well pumping, Mr. Hartten spent a full day at Washington Works in August 2012.  As part of his preparation, he spoke with Allison Crane about what additional historical pumping record documents might exist and where these might be located.  Mr. Hartten and Ms. Crane found a sheet listing certain items and speculated those could have been put on microfilm.  On its face however, this document . . . appears to reference the scroll-like paper records discussed above.  Counsel has inquired further with Washington Works' employees and is unable to locate any information that leads to any well records on microfilm.
>
> While DuPont maintains its previous objections around this data, it has, in good faith produced the reasonably-accessible information in DuPont's possession, custody or control.  DuPont has also made a good faith effort to

respond to all of Little Hocking's concerns regarding any
potential "destruction" of relevant records.

*Stennes 1/24/13 Letter*, p. 2.

On February 7, 2013, in opposing Little Hocking's motion to
extend case deadlines, DuPont represented that "[a]t the time of
migration to IP-21, DuPont attempted to retrieve the historical data
from the back-up tapes but could not do so because the tables had
degraded to the point of no longer being usable."  ECF 164, p. 12
(citing *Myers 1/24/13 Declaration*, ¶ 13).

Little Hocking appears to contend that the representations made
by DuPont on January 24, 2013 and on February 7, 2013 were deceptive
for several reasons.  First, the *Myers 1/24/13 Declaration* refers to
degraded "tapes," but in fact Mr. Myers had attempted to read only one
tape.  *Motion for Sanctions*, pp. 20-21, 25; *Sanctions Reply*, p. 12.
Second, that tape had simply "coated" the heads of the machine when
Mr. Myers tried to read it, *i.e.*, the tape had not actually degraded.
*Motion for Sanctions*, p. 20.  Third, Mr. Myers' attempt to read this
tape occurred in the early 2000s and not as part of the transition to
IP-21.  *Motion for Sanctions*, pp. 20, 25.  Fourth, these tapes, the
TK-50 tapes, did not contain responsive well data.  *Sanctions Reply*,
p. 12.  Finally, Little Hocking contends that DuPont misled Little
Hocking and the Court into believing that historic pre-2006 well data
no longer existed.  More specifically, even though "the existence of
the Myers CDs were, in fact known at the highest levels of the DuPont
hierarchy" in January and February 2013, DuPont failed to advise that
other media, such as CDs created by Mr. Myers and "zip files" on the
P&S portion of a server, contained easily accessible pre-2006 well

27

data.  *Motion for Sanctions*, pp. 18-21, 23, 25, 42; *Sanctions Reply*, pp. 11-13.  Little Hocking argues that DuPont's January and February 2013 representations were made in bad faith and thus warrant sanctions under the Court's inherent authority.  *See, e.g., Motion for Sanctions*, p. 25; *Sanctions Reply*, pp. 11-12.  DuPont denies that its representations were deceptive or otherwise made in bad faith.  *See, e.g., Opposition to Sanctions*, p. 23.

"Harassing the opposing party, delaying or disrupting litigation, hampering the enforcement of a court order, or making improper use of the courts are all examples of the sorts of conduct that will support a finding of bad faith or improper purpose[.]"  *BDT Prods. v. Lexmark Int'l, Inc.*, 602 F.3d 742, 754 (6th Cir. 2010).  For example, courts in this circuit have found bad faith where, *inter alia*, a party has engaged in misrepresentations during the course of litigation. *See, e.g., Galka v. Cooper*, No. 11-13089, 2013 U.S. Dist. LEXIS 51312, at *12 (E.D. Mich. Apr. 10, 2013) (finding bad faith where, *inter alia*, plaintiff fraudulently misrepresenting his financial status on an *in forma pauperis* application); *Laukus v. Rio Brands, Inc.*, 292 F.R.D. 485, 489 (N.D. Ohio 2013) (dismissing complaint and awarding costs where, *inter alia*, plaintiff and his counsel "knowingly offered (or allowed to be offered) arguments before this Court and on appeal that were not supported by—and contrary to—the record" and "failed to correct discovery responses they knew to be inaccurate, misleading or false"); *Robert Bosch LLC v. A.B.S. Power Brake, Inc.*, 2011 U.S. Dist. LEXIS 49713 (E.D. Mich. May 10, 2011) (striking certain affirmative defenses, dismissing certain counterclaims and awarding expenses where

28

defendants submitted a declaration later proven by discovery to be false); *Gordon v. Royal Palm Real Estate Inv. Fund I, LLLP*, No. 09-11770, 2011 U.S. Dist. LEXIS 2110, at *23-26 (E.D. Mich. Jan. 10, 2011).

In arguing that DuPont's prior representations about the tapes were not made in good faith, Little Hocking relies heavily on the deposition of Mr. Myers.  On May 10, 2013, Mr. Myers testified as follows:

> Q:    Your declaration explained that data storage tapes were destroyed when you attempted to retrieve data from them, right?
>
>       MR. PAUL:  Objection and same objection, vague.
>
> A:    Okay.  Yeah.  I was requested to retrieve some data by Gary Kelsel somewhere in the – so many years ago, 2001, 2003, so long ago I can't remember when because normally Gary was a stinker.  He'd call up on the phone and he'd say, hey, I need this.  Can I have it by this afternoon?  And I would tend to go and try to get it for him.
>
>       At any rate, I loaded up the tape to try to read it.  It was an old one.  And to the best of my memory now, because this was a long time ago, I got all kinds of data errors; and in the end, the tape had coated the heads on my reader with iron oxide film.  So that was the last time I tried to pull data off a tape like that.
>
> Q:    Right.
>
> A:    And to the best of my knowledge and recollection –
>
> Q:    What year did you say that happened?
>
> A:    It might be 2002, 2003, somewhere around there, but it's a long time.  And the only reason I remember, the only reason I remember is because it was kind of a traumatic experience.
>
> Q:    Sure.
>
> A:    You don't normally try to recover data and instead you get a mess.

Q:    Maybe you don't –

A:    To the best of my knowledge, what I did then was mark
the tape as bad and put it back –

Q:    What year was that tape from?

A:    To the best of my recollection and again this is all
memory, I'm thinking around '87.

Q:    So it wasn't a 1999 tape.

A:    No, it wasn't one I had ever handled before.

Q:    Yeah.  And where did you go to get that tape?

A:    It would have been in that back room of Building 20.

Q:    Building 20.  Because that's where the tapes were
stored, correct?

A:    Those – that vintage tapes, yes, those of that era.

Q:    The old tapes?

A:    The older ones, yeah.

Q:    Or is this considered a new one?

A:    No, this would not have been considered new.

Q:    How many other times did you attempt to read tapes
where they were destroyed?

A:    Never.  This was the only time I was asked.

      MR. PAUL:  Objection to form and it's not –
mischaracterizing his testimony.

      MR. ALTMAN:  Well, I'm not trying to.

      MR. PAUL:  Okay.

Q:    I'm just asking how many other times if at all did you
read tapes that were either destroyed or harmed your
machine?

A:    Oh, let me think.  That's a good question.  I never
tried to – well, I was never – again, I don't read tapes
for fun.  Somebody has to want some data, and I have to
have a reasonable belief that this particular tape has the
data that they want.

Q:   Certainly.

A:   And that was the only time I did that because I— first of all, no one asked; and second of all, I didn't honestly believe I could recover any data from those tapes.

Q:   But those tapes meaning the old tapes?

A:   Yeah.

Q:   Yeah.  But let me understand, this incident is the sum total of what you're talking about in Paragraph 13 [of the *Myers 1/24/13 Declaration*]?

A:   That's it.

Q:   Yeah.  And that particular tape, that one tape from 1986?

     MR. PAUL:  '87.

A:   My understanding that it was '87 but, you know.

Q:   '87 you say?

A:   That's my memory, but my memory is not perfect.

Q:   Well, anyway, from that particular tape that you were trying to read the data from broke?

A:   Well, it didn't actually break.  It actually ran beautifully destroying the heads of my reader.

Q:   Oh, so it didn't break the tape.

A:   No, but it certainly deposited iron oxide on all the heads.

Q:   It broke the tape reader?

A:   Oh, yeah--

     MR. PAUL:  Which is what Paragraph 13 says.

Q:   But the tape reader could be quickly fixed?

A:   Not that old thing.

Q:   Oh, it could be quickly fixed?

A:   No.

Q:    So was it ever fixed?

A:    I don't believe I ever used that tape reader again.

Q:    That particular tape reader?

A:    That particular tape reader.

Q:    How many tape readers did you have?

A:    Oh, TK-71s, I probably had two or three; but they're not freestanding.  They were installed in VAXs.

*Myers 5/10/13 Deposition*, pp. 160-64.

Q:    Did you have two or three tape readers or two or three others of that particular type of tape reader?

A:    Oh, two or three others of that particular type.

Q:    That's what I thought you said.  I just wanted to be clear.

      Were there any other types of tape readers that could read the kind of tape you were looking at on that --

A:    Nope.  No.

Q:    Is that because of the age of the tape, the age of the tape?

A:    No, that was because of the kind of tape it was.

Q:    So certain --

A:    It was a TK-50 cartridge and you have to read it in a TK-50 tape reader or a TK-70.  The TK-70 was a newer model which actually had a little higher data capacity.

*Myers 5/10/13 Deposition*, p. 165.

Q:    Fair enough.  So, anyway, there's no other effort you made to read another tape?

A:    Not one of those.

Q:    Right.  And have you ever had problems reading other tapes?

A:    Oh, yeah.  That's one of - the whole point of going to the CDs and FTPing the data across there, that's all based

32

on tape issues.  I had tons of problems with tapes.  I had tons of problems with the 90 millimeter tapes.  I fought them for years.

Q:   Right.  Right.  Right.  But what I'm trying—

A:   I destroyed four of them, tape readers.

Q:   Tape readers?

A:   Oh, yeah.

*Myers 5/10/13 Deposition*, p. 166.

Q:   The tapes in that sentence [paragraph 13 of the *Myers 1/24/13 Declaration*] is plural.  In fact, there was one tape that you're referring to in 13, correct?

A:   I believe so.  It could be, you know, a slip of the tongue or something like that.  I believe at this point and again remember it was a long time ago, my memory was one tape.

*Id.* at 168-69.

A:   Again, it was a long time ago and that's my memory. It was one tape, but that's my memory of it.

Q:   Certainly.  Well, I mean you wrote the declaration, correct?

A:   Exactly and I think I mistyped that or –

Q:   These are your words?

A:   These are my words.

Q:   And then you said [in paragraph 13 of the *Myers 1/24/13 Declaration*] the tapes were so degraded.

A:   Uh-huh.

Q:   Besides that episode and you're talking about 1980s tapes, what is your basis for saying the tapes were degraded?

A:   The one tape.

*Id.* at 170.

> Q:   Now, you — do you mention anywhere in your declaration here about the CDs?  The CDs, when I say CDs, I'm talking about the CDs you testified about earlier today.
>
> A:   No.  [Paragraph] 14 [of the *Myers 1/24/13 Declaration*] is talking about the transfer of the VAX data to my desktop workstation.  The CD burner was located on my desktop workstation.  And so basically all I did was talk about moving it to the workstation; but in actual fact, I would also after doing that burn two CDs and label then and put them in my drawer.

*Id*. at 173.

> Q:   Now, in Paragraph 12 of your declaration . . . you mention two forms of storage format, correct, or do you mention really three because you mention your hard drive?
>
>     \*          \*          \*          \*
>
> A:   The Vantage – see, my stuff was not part of Vantage.  It was extracurricular if you will.  It was not apart [sic] of the Vantage system at all.  It was a PC with a hard drive.

*Id*. at 176.

> Q:   So you weren't trying to exhaustively explain everywhere where you could find Washington Works well pumping data when you wrote your declaration on the Vantage system, correct?
>
>     \*          \*          \*          \*
>
> A:   Right.  No, I didn't say where all of it was probably because I didn't think of it at the time because like you say, when you write a declaration, you have a particular purpose in mind and you're trying to speak to a specific or a particular issue and some of that was extraneous.

*Id*. at 177.

> Q:   Well, what was the particular issue you were trying to address in your declaration?
> A:    My memory of that was that the existing tapes from an earlier era, the '97, '90 through '98, '99 era, I had no confidence in their viability –
>
>     \*          \*          \*          \*
>
> Q:   . . . The purpose of your declaration that you filed that mentioned Vantage and VAX was not to talk about all

34

the places where well pumping data might be found; is that fair?

\*                    \*                    \*                    \*

A:   That would – that would be a fair statement, sir.

*Id*. at 178.

After reviewing this testimony, the Court is not persuaded that the *Myers 1/24/13 Declaration* (or DuPont's representation relying on this declaration) was false or that its averments were made in bad faith when it referred to "tapes" that "broke" the tape reader machine "[b]efore the transition to IP-21[.]"  First, although Mr. Myers' testimony confirms that he attempted to read only one tape, Mr. Myers also testified that the references to "tapes" rather than to "tape" in the *Myers 1/24/13 Declaration* was an innocent error.  *Myers 5/10/13 Deposition*, pp. 168-70.  An inadvertent error does not amount to an intentional misrepresentation that warrants sanctions. The Court is also not persuaded that this testimony establishes that DuPont acted in bad faith when Mr. Myers (and Attorney Stennes) represented that the "tapes" had degraded.  In reaching this conclusion, the Court rejects Little Hocking's contention that the existence of other types of tapes, *i.e.*, DDS backup tapes and reel-to-reel tapes, undermines the representations made by DuPont in January 2013.  *See Sanctions Reply*, p. 12 (arguing that there was no reasonable basis for Mr. Myers and Attorney Stennes to represent that all of the tapes had degraded when it was, at most, only the TK-50 tapes that damaged the reader) (citing *Declaration of James M. Bocchino*, ECF 233-2 ("*Bocchino*

*Declaration*"), ¶ 8).[15]  The *Bocchino Declaration* upon which Little

Hocking relies in this regard is dated June 17, 2013, *i.e.,* months

after DuPont had first interviewed Mr. Myers and after the Court had

issued its *2/19/13 Order.*  In other words, Little Hocking invites this

Court to impute knowledge learned in June 2013 to DuPont as of January

2013.  Little Hocking cites no other evidence that DuPont knew of

these other media in January 2013.  Under these circumstances, and

particularly considering that DuPont disputed the relevance and burden

of producing the well data prior to the *2/19/13 Order*, the Court

cannot conclude that sanctions are warranted merely because DuPont

represented in January 2013 that TK-50 tapes had degraded.

Third, Little Hocking characterizes as misrepresentation any

suggestion that Mr. Myers' attempt to read the TK-50 tape occurred as

part of the transition to IP-21 in 2010 or 2011.  *Motion for*

*Sanctions*, pp. 20, 25.  This Court disagrees.  Mr. Myers testified

that he attempted to read the tape sometime between 2001 and 2003.

*Myers 5/10/13 Deposition*, pp. 160-61.  Mr. Myers and Attorney Stennes

both specifically stated that Mr. Myers' attempt to read the tape was

"[b]efore the transition to IP-21[.]"  The *Myers 1/24/13 Declaration*,

¶ 13; *Stennes 1/24/13 Letter*, p. 2.  These statements are accurate,

*i.e.*, Mr. Myers' attempt in 2001-2003 pre-dated the IP-21 transition

in 2010-2011.  Although a February 2013 filing by DuPont indicated

that it had attempted to retrieve historical data "[a]t the time of

migration to IP-21," *see* ECF 164, p. 12, DuPont specifically cited to

---

[15] Mr. Bocchino is Director of Business Development, Legal Solutions for DTI, a vendor that provides discovery, content/document management and outsourcing services to DuPont.  *Id.* at ¶¶ 1-2.

the *Myers 1/24/13 Declaration*, ¶ 13 as support for this assertion.
Little Hocking has not established that DuPont's assertion was
anything other than an oversight or a careless misstatement of the
*Myers 1/24/13 Declaration*; it does not establish a purposeful attempt
to deceive either Little Hocking or the Court.

Fourth, Little Hocking seeks the imposition of sanctions because
"the entire 'degraded tape' story is even more fanciful in light of
the latest revelation . . . that the TK-50 tapes, the supposed basis
upon which the degraded tape story was based, ***never had any responsive
well data in the first place.***" *Sanctions Reply*, p. 12 (emphasis in
the original).  This argument is not well-taken.  In January 2014 and
thereafter, DuPont reasonably believed that TK-50 tapes might contain
well data.  *See*, *e.g.*, *Myers 1/24/13 Declaration*, ¶¶ 5, 9, 12-13
(explaining that Vantage tracked and monitored well production data
and that back-up data were stored on tapes similar to that which Mr.
Myers attempted to read before the transition to IP-21). *See also*
*Myers 5/10/13 Deposition*, pp. 162, 165-69; *Paul 9/27/13 Declaration*, ¶
31 ("DuPont was able to determine that in 1986-1987, some data was
reportedly maintained on TK-50 tapes."); *Declaration of Vincent M.
Catanzaro, Esq.*, ECF 233-1 ("*Catanzaro Declaration*"), ¶¶ 6, 8
(averring that DuPont "has identified several pieces of media that it
believes may contain well pumping data from a VAX machine that was
operated at the Washington Works Site for nearly three decades[,]"
including backup tapes);[16] *Bocchino Declaration*, ¶¶ 4-5 (averring that
it was believed that three TK-50 tapes, *inter alia*, from DuPont

---

[16] Attorney Catanzaro is counsel for DuPont and is familiar with DuPont's
efforts to comply with the Court's *2/19/13 Order*.  *Id.* at ¶¶ 3-5.

contained data originating from a VAX machine). However, it was only after the completion of a painstaking effort to locate well date, in which DuPont expended hundreds of hours and hundreds of thousands of dollars in expenses and attorney's fees, that DuPont was able to confirm that none of the TK-50 tapes found at Washington Works contained responsive well pumping data. *Paul 9/27/13 Declaration*, ¶¶ 25, 29. In short, Little Hocking asks this Court to sanction DuPont for confirming that no well data was contained on tapes that DuPont had reasonably believed to contain such information.[17] Sanctions under these circumstances are unwarranted.

Finally, Little Hocking contends that DuPont concealed information in January 2013, thereby misleading Little Hocking and the Court into believing that all pre-2006 data were no longer available, even though DuPont knew that Mr. Myers' CDs and zip files on the P&S portion of a server contained easily accessible historic well data. *Motion for Sanctions*, pp. 18-23, 25, 42; *Sanctions Reply*, pp. 11-13. This Court disagrees. As an initial matter, Little Hocking relies in large part on the 2005 Denvir Letter, which responded to a DOJ subpoena that "John Meyers" maintains well data dating from 1996-2005 on CDs. DuPont's current outside counsel avers that "[c]ounsel did not know of the existence of the duplicate CDs at the time of the original investigation" of Mr. Myers in January 2013. *Paul 9/13/13 Declaration*, ¶ 9. *See also id*. at ¶¶ 7-9 (explaining that Mr. Myers had turned over CDs to the P&S administrative assistant, Brenda

---

[17] One wonders if Little Hocking would have sought sanctions had DuPont not attempted to read the TK-50 tapes that DuPont reasonably believed to contain well data.

Scofield, in 2008 and that a search of the P&S central files did not reveals CDs).

The record reflects that DuPont did not locate other media, including CDs, until April 2013, *i.e.,* after the Court ordered DuPont to search for and produce such information. *See*, *e.g.*, *Newman 4/24/13 Declaration*, ¶¶ 28, 32 (averring that DuPont's counsel advised in April 2013 that DuPont had located back-up tapes and CDs); *4/26/13 Order*, pp. 5-6 (recounting DuPont's discovery of additional media, including CDs, in April 2013).

This Court concludes that a delay of three months, *i.e.,* from January to April 2013, in the discovery of these media is unremarkable in this complex case. Moreover, Little Hocking does not explain how a three-month delay in a case spanning more than five years has worked to its prejudice.

Although Mr. Myers, who created the CDs, was obviously aware of their existence in January 2013, he reasonably explained that the *Myers 1/24/13 Declaration* was intended to address only the VAX computer and Vantage system; as a result, he did not think to mention other possible sources of well data. *Myers 5/10/13 Deposition,* pp. 177-78. There is simply no evidence that either Mr. Myers or any agent of DuPont acted intentionally to mislead either Little Hocking or the Court. Particularly is this so when one considers that, at the time Mr. Myers made the statement in his declaration, the Court had not yet ordered the production of all responsive historic well data.

Little Hocking also accuses DuPont of purposely failing to disclose in January 2013 the existence of well data on zip files in

the P&S portion of a server.  However, Little Hocking has pointed to
no evidence establishing that DuPont knew of this source of data in
January 2013, *i.e.*, before it was ordered to search for and produce
well data.  The Court therefore declines to exercise its inherent
authority and sanction DuPont for these claimed defaults.

**C.  Alleged Spoliation of Well Data and VAX computer and *Motion to Broaden Sanctions Discovery***

As discussed *supra*, from the early to mid-1980s to 2006, DuPont
tracked well production information on the Vantage computer system
which ran on a VAX computer and this information was stored on tapes.
*3/25/13 Order*, p. 11.  In 2010 or 2011, DuPont transitioned to a new
system, IP-21, for recording well flow data.  *Id*. at 11.  DuPont
dismantled the VAX computer at Washington Works "at the time of the
transition to IP-21, due to its age, the fact that it was obsolete
technology and the unavailability of replacement hardware." *Myers
1/24/13 Declaration*, ¶ 15.  *See also Myers 5/10/13 Deposition*, p. 205.
However, Mr. Myers began storing well data on CDs for about ten years
before DuPont shut down Vantage.  *Myers 5/10/13 Deposition*, pp. 96-98.
He made two copies of each CD.  *Id*. at 98.  Beginning in 2003 or 2004,
Mr. Myers also saved well data on a .zip file that was saved on a
shared P&S server.  *Id*. at 110-13.

In March 2013, the Court ordered DuPont to produce a Rule
30(b)(6) corporate designee to address "the [alleged] failure to
preserve or the destruction of the pre-2006 pumping records maintained
on back-up tapes as well as the Vantage system and/or VAX computer[.]"
*3/25/13 Order*, p. 28.  After DuPont later located additional media,
the Court ordered DuPont to provide Rule 30(b)(6) testimony regarding

this media.  *4/26/13 Order*, p. 8.  Prior to this Rule 30(b)(6)
deposition, the Court conferred with counsel as to Little Hocking's
desire "to inquire into DuPont's duty to preserve [the pre-2006
pumping records] including the circumstances surrounding holds that
were issued (or should have been issued) in connection with DuPont's
governmental filing obligations or with other litigation involving
DuPont." *Order*, Doc. No. 214.  The Court concluded that these lines
of inquiry went "far beyond" the scope of discovery previously
authorized by the Court and would not be permitted.  *Id.*  On May 10,
2013, Little Hocking conducted the deposition of Mr. Myers, DuPont's
Rule 30(b)(6) designee, regarding the recently discovery media,
Vantage system and VAX computer.  *See generally Myers 5/10/13
Deposition*.  On July 10, 2013, Little Hocking also deposed two Rule
30(b)(6) designees (Mr. Myers and Mark Eakle)[18] regarding the
maintenance, degradation or destruction of pre-2006 well records, the
VAX and Vantage system.  *DuPont's Final Status Report*, p. 3
(explaining that the July 10, 2013 deposition was a continuation of
the *Myers 5/10/13 Deposition*).

     In an earlier motion to broaden sanctions discovery, Little
Hocking represented that Mr. Myers had confirmed that DuPont failed to
preserve, and in fact had destroyed, evidence.  *9/20/13 Order*, p. 2
(internal citations and quotation marks omitted).  DuPont responded
that, *inter alia*, only one tape was damaged when the tape broke and
that well pumping data had been transitioned to CDs for storage

---

[18] Mr. Eakle is employed as DuPont's Information Technology Manager at the
Washington Works facility.  *Declaration of Mark Eakle*, ECF 286-2, ¶ 1 ("*Eakle
9/26/13 Declaration*").  Based on the date of the filing, the Court presumes
that it was signed in September 2013.  *Id.*

because of the problem that Mr. Myers had encountered when that single tape broke. *Id*. at 9. Noting that the record required further development, the Court denied without prejudice to renewal Little Hocking's motion to broaden sanctions discovery:

> The critical issue, which remains unanswered, is whether DuPont can produce primary or secondary well-pumping data for the years 1981-1993 and 2002-2003. The Court has already ruled that this information is discoverable and must be produced. It is only after a determination of what information actually can be produced will this Court ever be in a position to determine whether spoliation occurred. On the present record, the Court declines to broaden sanctions-related discovery.

> Clearly, many hours of effort have been expended on the production of well pumping data; however, more work remains to be done. DuPont must specify whether data exist for the years identified *supra* and, if so, on what media such data are stored. Information and documents that cannot be accounted for must be specifically identified; duplicate files or documents must be identified as such. In addition, DuPont must provide, by affidavit or declaration, a statement of its ability, including an estimate of man-hours required, to translate into a readable format remaining well pumping data not yet produced.

> As for the alleged missing CDs and information that may be stored on zip files, the record awaits further development. At this juncture, Little Hocking's motion is denied without prejudice to renewal pending further production by DuPont in accordance with the foregoing.

*9/20/13 Order*, pp. 9-10.

In its final status report regarding its production of well data, DuPont reported that it had, on a rolling basis since the issuance of the *2/19/13 Order*, located and produced at least some well pumping data for every year from 1958 to 1980 and from 1991 to 2012. *Paul 9/27/13 Declaration*, ¶¶ 5-10, 14-22, 27-28; *Exhibits A* and *B*, attached thereto. Despite the hundreds of hours and hundreds of thousands of dollars expended, DuPont could not locate well pumping data for the

years 1981 to 1990, nor could it locate data for certain months in 1991, 2002, and 2003. *Paul 9/27/13 Declaration*, ¶ 29. Although DuPont could determine that "in 1986-1987, some data was reportedly maintained on TK-50 tapes[,]" none of the three TK-50 tapes found at Washington Works contained responsive well data. *Id.* at ¶¶ 25, 31. DuPont produced all well pumping data stored in the Vantage folder. *Id.* at ¶ 34. DuPont's final production of well pumping data, made on September 6, 2013, included "all well pumping data that DuPont was able to restore and recover from the found storage media." *Id.* at ¶¶ 17, 35.

The Court understands Little Hocking to contend that sanctions are appropriate because DuPont failed to produce well data "from a key period of high C8 disposal (1981 through 1990)" and because DuPont dismantled the VAX at Washington Works "at the same time that a VAX machine at another DuPont location was being preserved due to litigation[.]" *Motion for Sanctions*, pp. 22-23 (Clerk's pagination); *Sanctions Reply*, pp. 3, 9, 12-13, 16, 19-21 (Clerk's pagination); *Response to DuPont's Sur-Reply*, pp. 1-5. In addition to its current request for sanctions, Little Hocking has also filed its *Motion to Broaden Sanctions Discovery*, which alleges spoliation by DuPont and which complains that DuPont failed to preserve and/or destroyed well data from 1981-1991 and, apparently, pre-2006 well data for Washington Works' five West Field wells (also known as the "old Lubeck wells"). Little Hocking further contends that DuPont dismantled the VAX at

Washington Works while this litigation was pending.[19] According to Little Hocking, DuPont's failures in this regard establish a preliminary showing of spoliation, warranting a four-hour deposition of a DuPont corporate designee regarding DuPont's litigation holds, DuPont's handling of well data, and DuPont's duty to preserve and alleged violation of that duty. *Id.* at 3; *Little Hocking's Reply in Support of Renewed Motion to Broaden Sanctions Discovery*, ECF 304 ("*Reply to Motion to Broaden Sanctions Discovery*"). Little Hocking explains that this discovery is "indispensable to a faithful application of the Sixth Circuit spoliation factors, as such information will shed light on when DuPont's duty to preserve the Well Data arose, how the missing Well Data were destroyed, and whether DuPont destroyed it willfully." *Motion to Broaden Sanctions Discovery*, p. 7. DuPont opposes the request for sanctions as well as the request for broadened sanctions discovery. *See generally Opposition to Sanctions; Defendant E.I. du Pont de Nemours and Company's Response to Little Hocking's Renewed Motion for Broader Sanctions Discovery*, ECF 302 ("*Opposition to Broaden Sanctions Discovery*").

### 1. Standard for spoliation

"Spoliation is defined as the intentional destruction of evidence that is presumed to be unfavorable to the party responsible for its destruction." *United States v. Boxley*, 373 F.3d 759, 762 (6th Cir.

---

[19] To the extent that the *Motion to Broaden Sanctions* seeks additional discovery relating to the alleged destruction of records from DuPont's Nexus system, a computer-based system that stores or stored Washington Works maintenance records, including drain information, that request is addressed *infra*.

2004) (citation omitted).  Sanctions are available for spoliation where, "[f]irst, the party with control over the evidence must have had an obligation to preserve it at the time it was destroyed. Second, the accused party must have destroyed the evidence with a culpable state of mind.  And third, the destroyed evidence must be relevant to the other side's claim or defense." *Byrd v. Alpha Alliance Ins. Corp.*, No. 12-5400, 518 F. App'x 380, *383-84 (6th Cir. Mar. 26, 2013).  "The party seeking the sanction bears the burden of proof in establishing these facts."  *Id.*

As to the first requirement, "[a]n obligation to preserve may arise when a party should have known that the evidence may be relevant to future litigation, but, if there was no notice of pending litigation, the destruction of evidence does not point to consciousness of a weak case and intentional destruction." *Beaven v. U.S. Dep't of Justice*, 622 F.3d 540, 554 (6th Cir. 2010). *See also John B. v. Goetz*, 531 F.3d 448, 459 (6th Cir. 2008) ("'As a general matter, it is beyond question that a party to civil litigation has a duty to preserve relevant information, including [electronically stored information], when that party has notice that the evidence is relevant to litigation or . . . should have known that the evidence may be relevant to future litigation.'") (quoting *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001)).  As this Court previously noted, "'the scope of the duty to preserve is a highly fact-bound inquiry that involves considerations of proportionality and reasonableness.'"  *9/20/13 Order*, p. 8 (quoting *Tracy v. NCR, Inc.*, No. 04-cv-6541L, 2012 WL 1067889, 2012 U.S. Dist. LEXIS 44350, at *29

(W.D. N.Y. Mar. 26, 2012)). *See also Pippins v. KPMG LLP*, 279 F.R.D. 245, 255 (S.D.N.Y. 2012) (noting that "[t]he application of the proportionality principle to preservation flows from" Fed. R. Civ. P. 26(b)(2)(C)(iii) and that "proportionality is necessarily a factor in determining a party's preservation obligations").

"[A] federal court's inherent powers include broad discretion to craft proper sanctions for spoliated evidence." *Adkins,* 554 F.3d at 651. Such a sanction should serve "both fairness and punitive functions." *Id.* at 652.  The least severe sanction must be imposed, one that is "commensurate with the degree of prejudice to the nonoffending party." *Lunkenheimer Co. v. Tyco Flow Control Pac. Party Ltd.*, No. 1:11-cv-824, 2015 U.S. Dist. LEXIS 17962, at *38 (S.D. Ohio Feb. 12, 2015) (citing *Pullins v. Klimley*, No. 3:05cv82, 2008 U.S. Dist. LEXIS 3467, at *6, 2008 WL 68945 (S.D. Ohio Jan. 7, 2008)).

### 2.    Well data

This case was filed on November 27, 2009, ECF 2, and DuPont admits that Little Hocking provided notice of its intent to sue on July 23, 2009. *Opposition to Motion to Broaden Sanctions Discovery*, p. 6.  Little Hocking contends, however, that DuPont had such a duty "***by 2002 at the latest***[.]" *Motion to Broaden Sanctions Discovery*, p. 4 n.4 (emphasis in original); *Reply to Motion to Broaden Sanctions Discovery*, p. 5.  In support of this assertion, Little Hocking first relies on an email authored by Mr. Hartten in 1999, which states, *inter alia*:

> I was recently contacted by Bill Packard, who works for
> Dave Harrison in Plant Engineering.  Dave has
> responsibility for the site production well system and has
> provided invaluable assistance to the CRG during the RFI

[RCRA Facility Investigation]. Bill is working for Dave on the production well system with a focus on upgrading capacity.

In case you don't know, our RFI was heavily focused on hydrogeologic characterization, including construction of a sitewide groundwater flow model. Our RFI strategy is to demonstrate sitewide hydraulic control via active pumping of the site's production wells. The modeling we've completed proves this strategy. This is critical since we have ubiquitous C-8 impact to the site aquifer and can claim that no impacted gw leaves the facility. Well planned operation of this system now and in the future is extremely important. This could become a requirement of the site's RCRA permit going forward.

Bill Packard contacted me last week concerning the site's plans to upgrade capacity. He mentioned ideas to shut-off certain wells and upgrade others. Of course, these ideas all could potentially influence our sitwide [sic] containment and must be evaluated fully before implementation. We also have contamination and potential human exposure issues to address which you are familiar with. There was also mention of shutting down the east field wells which supply potable water with no mention of alternative sources[.] Once again, the path DuPont takes on this is highly critical and needs full evaluation.

Needless to say, my request here is that the WW plant folks, CRG, and Legal sit-down and discuss the production well upgrade project, review each others [sic] needs/concerns, and develop a logical path forward.

Email dated May 17, 1999 sent by Andrew Hartten, ECF 296-7 ("1999 Hartten Email"). According to Little Hocking, the 1999 Hartten Email recognized that "proper daily operation of its [DuPont's] wells was essential to controlling contamination migration" so "DuPont should have reasonably anticipated by at least 2002 that its Well Data was and would be relevant to litigation, including with Little Hocking, and taken steps to preserve the Well Data." *Reply in Support of Motion for Broadened Sanctions Discovery*, p. 5.

Little Hocking also argues that DuPont's own privilege log reveals a duty to preserve well data in 2002. More specifically, two

documents, dated January 2002 and February 2002, reflect DuPont's anticipation of litigation with Little Hocking.  *Id*. at 5 (citing ECF 304-2, PAGEID#:9910, entry 008-0135-0004070 ("Information prepared at request of counsel in anticipation of litigation regarding Little Hocking sampling"), and PAGEID#:9913, entry 3994421 ("Email forwarding email to counsel (Reilly) requesting legal advice regarding Draft Ohio River water sampling proposal")).  Little Hocking also refers to an email dated January 12, 2002 from one Bernard J. Reilly, counsel for DuPont.  *Id*. at 5 (citing ECF 304-3).  That email provides in relevant part:

> We learned last week that the water supply in Little Hocking, Ohio, across the river from our Parkersburg plant, has levels of our surfactant 7 times higher than our guideline, so that is bad news. . . . So in addition to all the agencies we have had on our butts, we now have Ohio and another EPA Region, not to mention the 20,000 people who drink the water supplied by Little Hocking with our surfactant in it, likely it has been there for at least the last decade.  The class action lawsuit grows.  Oddly, the source for that water supply may be our plant groundwater, it may flow under the Ohio River, being pulled by those wells, that seems the only theory so far, since levels in the river itself have tended to be just below our guideline.

ECF 304-3.  *See also Reply to Motion to Broaden Sanctions*, p. 5.  Little Hocking therefore contends that these documents establish a duty to preserve well data as of 2002.

The Court agrees that the 1999 Hartten Email adequately establishes DuPont's belief that proper operation of its wells impacted off-site migration of C8.  That belief, combined with DuPont's anticipation in 2002 of litigation with Little Hocking regarding water sampling, *see* ECF 304-2; ECF 304-3, persuades the Court that DuPont's duty to preserve well data arose in 2002.

48

Having so concluded, the Court must next consider the scope of DuPont's duty to preserve.  Little Hocking alleges that DuPont destroyed and/or failed to preserve the following well data:  (1) well data from 1981-1991, which includes, in part, data from 1985-1996 purportedly saved on the VAX; (2) well data from 1996 to 2005 purportedly saved by Mr. Myers on CDs; and (3) pre-2006 well data for Washington Works' five West Field/old Lubeck wells.  *Motion for Sanctions*, pp. 22-23 (Clerk's pagination); *Sanctions Reply*, pp. 3, 9, 12-13, 16, 19-21 (Clerk's pagination); *Response to DuPont's Sur-Reply*, pp. 1-5; *Motion to Broaden Sanctions Discovery*, pp. 4-5 (citing, *inter alia*, the Denvir Letter).

As an initial matter, the present record does not establish whether all of this historical data, *i.e.*, well data dating to 1981, even existed as of 2002.  *See* Denvir Letter, p. 5 (representing that certain data from 1985 to 1996 was stored on a "Vax Server"); *Myers 5/10/13 Deposition*,[20] pp. 90-91 (explaining that the Vantage system "was incapable of keeping online more data than a little over 18, 19, 20 months"), 247 (testifying that he does not know what Mr. Denvir meant by "Vax Server"), 254 (explaining that the term "Vax Server" means nothing). Some of this data existed because DuPont has produced

---

[20] As discussed *supra*, Mr. Myers was a DuPont employee from 1979 until his retirement on March 31, 2013.  He had an office at the Washington Works facility beginning in 1999 and is familiar with DuPont's current and preexisting systems used to monitor and record well production.  Mr. Myers, DuPont's Rule 30(b)(6) witness regarding historical well data and the VAX computer and Vantage system, has "approximately 30 years of experience with monitoring and supporting DuPont Chemical Processes." *Myers 1/24/13 Declaration*, ¶ 4.  In short, Mr. Myers is the person with the best first-hand knowledge of the CDs created by him and of DuPont's Vantage system and VAX computer.

at least some well data for every year from 1958-1980 and from 1991-2012. *Paul 9/27/13 Declaration*, ¶ 28.

The record also reflects that some data from 2002 forward is missing. For example, assuming that Mr. Myers created CDs for the years 1996 to 2005,[21] the present record establishes that DuPont was unable to locate and produce only six months' worth of data from 2002 through most of 2003. *Paul 9/27/13 Declaration*, ¶¶ 4, 22, 29, 33. *See also Exhibits A* and *B*, attached thereto (summaries reflecting the months and years for which DuPont has produced well data). Indeed, Mr. Hartten, one of DuPont's Rule 30(b)(6) witnesses testified in January 2013 that DuPont had destroyed data from prior to 2006. *Deposition of Andrew S. Hartten*, ECF 296-3, pp. 754-56. *See also Opposition to Motion to Broaden Sanctions Discovery*, pp. 4-5 (explaining, *inter alia*, that Mr. Hartten was deposed before the Court's 2/19/13 Order requiring production of well data and before DuPont's investigation into historic well data).

Where it is unclear what well data was reasonably available in 2002, the Court is unable to determine the scope of DuPont's duty to preserve when that duty arose in 2002. As it relates to the request for additional discovery regarding the spoliation of well data, the *Motion for Broadened Sanctions Discovery* is well-taken. Within 30

---

[21] DuPont disagrees that Mr. Myers created CDs for these years, offering varying arguments as to the period covered by the Myers CDs. *See Opposition to Motion to Broaden Sanctions*, p. 5 (arguing that Mr. Myers burned CDs from 1996-2003); *Final Status Report*, p. 8 (stating that Mr. Myers archived data on CDs "from approximately 1994 until the early 2000s"). *Cf. Paul 9/27/13 Declaration*, ¶ 32 (averring that DuPont produced historic well data from CDs for the years 1994, 1995, 1996, 1997, 1998, 1999, 2000, and 2001. It is unclear whether Mr. Myers, who arrived at Washington Works in 1999, created CDs prior to 1999 or instead created CDs that contain data first recorded prior to 1999. *See Myers 1/24/13 Declaration*, ¶ 3; *Myers 5/10/13 Deposition*, pp. 33, 77-78.

days from the date of this *Opinion and Order*, DuPont is **ORDERED** to produce Rule 30(b)(6) witness(es) to address what well data was reasonably available as of 2002 and the scope of DuPont's duty to preserve such data.  This examination is limited to no more than two (2) depositions, each lasting no more than four (4) hours.  Any renewed motion for sanctions based on the spoliation of well data that DuPont had a duty to preserve as of 2002 must be filed within 30 days of the deposition(s).  Any renewed motion, and supporting and opposing memoranda, shall be limited to no more than fifteen (15) pages in length, double-spaced, with one-inch margins, and a font no smaller than 12.

### 3.  VAX computer

Little Hocking also argues that DuPont's dismantling of the VAX during the pendency of this litigation warrants additional sanctions discovery.  *Motion to Broaden Sanctions Discovery*, pp. 3, 6.  DuPont denies that its dismantling of the VAX impacted its ability to locate, read and produce well data, pointing out that the tape reader on the VAX had been broken long before it was dismantled.  *Opposition to Motion to Broaden Sanctions Discovery*, p. 4.  Little Hocking replies that, based on DuPont's prior representations, had DuPont not disassembled the VAX, it could have read Mr. Myers' "older CDs" and that "discovery is needed to determine whether the 'VAX server' discussed in the Denvir letter was part of the VAX machine that was disassembled during the pendency of this case, or part of the other Vantage equipment that was sent to [a different facility] when the VAX

machine was disassembled." *Reply to Motion for Broadened Sanctions Discovery,* p. 8.

As the Court understands this argument, Little Hocking characterizes the now dismantled VAX as critical because it could have been used to read "older CDs" created by Mr. Myers. However, DuPont has represented that it has read all the CDs that it could locate and has produced non-duplicative historic data from some of those CDs. *Paul 9/27/13 Declaration*, ¶¶ 24, 32. In other words, it appears that there is nothing left to read. Moreover, DuPont took steps to preserve all data stored in the VAX computer's memory before dismantling that machine and that information has been produced. *Myers 5/10/13 Deposition*, pp. 110-13, 214-15 (explaining how he saved data from his computer in a .zip file that was saved in wwcs4, P&S's shared file server of the Washington Works server); *Paul 9/27/13 Declaration*, ¶ 15.

To the extent that Little Hocking's argument may be a complaint that the dismantling of the VAX delayed the production of data from CDs, this argument is not well-taken. Such an argument is speculative at best. Moreover, Little Hocking has failed to explain how an undefined period of delay in reading unidentified "older CDs" resulted in prejudice to it; particularly is this so where Little Hocking ultimately received all responsive, non-duplicative data. For all these reasons, Little Hocking has failed to persuade this Court that additional discovery is necessary "to determine whether the 'VAX server' discussed in the Denvir letter was part of the VAX machine that was disassembled during the pendency of this case, or part of the

other Vantage equipment that was sent to Wilmington when the VAX
machine was disassembled."

### D.  Timeliness and Reliability of DuPont's Well Data Production

Little Hocking also appears to seek sanctions pursuant to Rule
37(b)(2)(A), arguing that DuPont's production of well data was
untimely and that the "marinated" and "manipulated" data actually
produced is in any event unreliable.  *See*, *e.g.*, *Motion for Sanctions*,
pp. 23, 32 (Clerk's pagination); *Sanctions Reply*, pp. 11-14, 19-21
(Clerk's pagination); *Response to DuPont's Sur-Reply*, pp. 1-4.  DuPont
denies that its rolling production of well data was improper or
otherwise violated an order of this Court.  *Opposition to Sanctions*,
pp. 26-35 (Clerk's pagination); *Defendant E.I. du Pont de Nemours and
Company's Sur-Reply in Opposition to Little Hocking's Motion for
Sanctions (Dkt. No. 264)*, ECF 326, pp. 1-4 ("*Sur-Reply to Sanctions*").

The present record does not support an award of sanctions based
on the alleged untimeliness of DuPont's well data production.  On
February 19, 2013, this Court ordered DuPont to, *inter alia*, search
for and produce well pumping data within 14 days, *i.e.*, by March 5,
2013.  *2/19/13 Order*, pp. 64-66.  On March 5, 2013, DuPont reported on
the status of its compliance with that order, representing that some
well data had been produced and that it would continue to review and
produce responsive data.  ECF 180, p. 13.  DuPont reported again on
March 15 and March 25, 2013, representing that it continued to locate
and produce responsive materials.  ECF 187; ECF 195.  On March 25,
2013, the Court  clarified the scope of the data to be produced in
accordance with the *2/19/13 Order*.  *See 3/25/13 Order*, pp. 18-22

(addressing, *inter alia*, the confusion created by the difference in the terms used in Little Hocking's characterization of its document request for well data and in the actual request).

Thereafter, in April 2013, DuPont located other media, including CDs, that could contain well data. *See*, *e.g.*, *Newman 4/24/13 Declaration*, ¶¶ 28, 32 (averring that DuPont's counsel advised in April 2013 that DuPont had located back-up tapes and CDs); *4/26/13 Order*, pp. 5-6 (recounting DuPont's discovery of additional media, including CDs, in April 2013). On May 17, 2013, DuPont reported on its continued efforts to recover and restore data on the media discovered in April 2013. ECF 215, pp. 5-7. On May 20, 2013, the Court noted after a status conference that "DuPont expects to produce, on a rolling basis, virtually all remaining well pumping data by June 15, 2013." *5/20/13 Order*, p. 1.

On June 17, 2013, DuPont addressed the time-consuming and expensive process of extracting and reading the media believed to contain historic well data. ECF 233. *See also Catanzaro Declaration*, ¶¶ 7-20 (detailing the steps taken to extract and read data and the costs associated with those efforts); *Bocchino Declaration*, ¶¶ 4-26 (same). For example, as of June 2013, DuPont had spent nearly 600 hours on these efforts, at a cost of more than $48,000. *Catanzaro Declaration*, ¶ 19; *Bocchino Declaration*, ¶ 26. DuPont produced yet additional responsive historic well data on August 11, 2013. *Paul 9/27/13 Declaration*, ¶¶ 9-10, 14. On September 6, 2013, DuPont made its final production of well data. *Id*. at ¶ 18. On September 27, 2013, DuPont submitted its final status report regarding its

compliance with the Court's orders, explaining, *inter alia*, that it had made at least 24 separate productions since February 19, 2013, that it had spent over 700 hours locating, restoring and decoding well data and had expended hundreds of thousands of dollars in discovery costs and attorneys' fees. *Final Status Report; Paul 9/27/13 Declaration*, ¶¶ 20-21, 29.

Under these circumstances, the Court declines to award sanctions because DuPont's well data production was not completed by March 5, 2013 or even by June 15, 2013. As an initial matter, Little Hocking's own varying characterizations of its document request for well data, as well as its initial failure to provide the actual text of that request, required the Court to clarify the scope of responsive well data on March 25, 2013, thereby impacting the scope of DuPont's search. Moreover, as the above procedural history makes clear, DuPont did not fail to provide or permit discovery as contemplated in Fed. R. Civ. P. 37(b)(2)(A). Instead, DuPont carefully and regularly detailed its efforts to comply with the Court's orders and produced data as it became available.

The Court is likewise is not persuaded that sanctions are warranted because DuPont "marinated" and "manipulated" certain well data and/or the media upon which DuPont reasonably believed that some data was stored. DuPont responded that TK-50 tapes were "marinated" in an attempt to preserve information contained on the tape ribbon:

> To stabilize the tapes, a necessary process to maximize the possibility of obtaining data, DTI [a third-party vendor that provides discovery, content/document management and outsourcing services] has begun the process of "marinating" them in order to attempt to preserve the information that is magnetically adhered to the tape ribbon. Due to their

> age, the tapes are extremely fragile and require extreme
> caution both in handling and in any attempts to extract the
> decades old information. The additional time needed to
> assure proper handling has resulted in unavoidable delays.
> Several of the tapes are in such bad condition due to their
> age that an additional process is being conducted to ensure
> that the media integrity is preserved.

*Catanzaro Declaration*, ¶ 10.  Failing to follow this acclimatization

process would likely increase the risk of damage to the tapes.

*Bocchino Declaration*, ¶¶ 8-10.

All of the well data at issue was in original VAX code that

required extraction.  *Catanzaro Declaration*, ¶¶ 11-13.  DTI extracted

the data from the storage media and returned the information "to

DuPont for conversion, organization, and production in a readable,

usable format (referred to as 'manipulation.')."  *Opposition to*

*Sanctions*, p. 29 (Clerk's pagination).  "Each piece of media inspected

to date contains anywhere from 4 to 6 million data points for the year

posted."  *Catanzaro Declaration*, ¶ 14.  This data was organized into

many different formats and each required a different method of

decoding the VAX language data.  *Id.* at ¶ 15.  DuPont had to take

additional steps to assure that the retrieved data could then be

produced:

> In order to get the raw data down to manageable size for
> importation into Excel, the extracted data must be divided
> into usable tranches of data points, searched across
> millions of data points for codes that reflect well pumping
> data (approximately 7% of the total amount of data found in
> the archives), copied to excel spreadsheets, organized by
> code, sorted by defined data points and accuracy confirmed.

*Id.* at ¶ 15.

Little Hocking characterizes this process as untrustworthy, *Reply*

*to Motion for Sanctions*, p. 20 (Clerk's pagination), but relies on

only the opinions of its own counsel in making this characterization. *Declaration of Robin A. Burgess*, ECF 289-4, ¶ 8 ("*Burgess Declaration*") (averring that manipulated data from the Ranney Well from a certain time period "purport to show the Ranney Well pumping at over 2,000 gallons per minute (gpm). From my review of the paper Power & Services records pertaining to the Ranney Well, these rates are far in excess of the Ranney Well's pumping capacity"), and *Newman 8/21/13 Declaration*, ¶ 18 (averring that "manipulated" data was "highly suspect" because "there are pumping rates in excess of 20,000 gallons per minute for Well 438 in one of the three files produced in August 11. These rates are, based on my knowledge gained from discovery in this case, far in excess of the pumping capacity of that well"). Little Hocking asks for the metadata underlying DuPont's disclosures in this regard.

It is clear that Little Hocking disagrees with certain of the information produced by DuPont but, without expert opinion that the process followed by DuPont (with the assistance of a third party vendor)is untrustworthy, the Court declines to award sanctions or to require the production of the metadata underlying the information produced by DuPont.

**V. P&S DOCUMENTS**

According to Little Hocking, DuPont's P&S unit operated DuPont's production wells and was "a repository for key information." *Motion for Sanctions*, p. 17. Little Hocking contends that DuPont improperly objected to the relevance of P&S documents and failed to conduct an

adequate search of P&S documents.  *See*, *e.g.*, *Reply to Motion for Sanctions*, pp. 21-23 (Clerk's pagination).

### A.    Relevance Objections

Little Hocking complains that DuPont objected to the production of P&S documents on the basis of relevance at times when DuPont knew that those documents were indeed relevant.  *See*, *e.g.*, *Motion for Sanctions*, pp. 15-17, 23-26 (Clerk's pagination); Request No. 11, ECF 264-9, p. 2.  Little Hocking also contends that, in July 2012, DuPont misrepresented the importance of the P&S unit to this litigation, including its role in the operation of the wells and in maintaining information regarding Washington Works' outfalls.  *Motion for Sanctions*, pp. 17, 25-26 (citing, *inter alia*, ECF 113, pp. 28-32 (Clerk's pagination), which in turn cites to *Declaration of Anthony F. Cavanaugh*, ECF 114, ¶¶ 80, 82 ("*Cavanaugh 7/20/12 Declaration*")).[22] Little Hocking further notes that a DuPont witness "even turned to P&S documents for facts on the Site's [Washington Works] historic C8 disposal practices[,]" underscoring DuPont's knowledge of the importance of P&S.  *Id*. at 17 (citing *Deposition of Robert Zipfel*, ECF 292-1, pp. 119-26 (deposition pagination) ("*Zipfel 8/30/12 Deposition*")).  *See also Sanctions Reply*, pp. 14-19 (Clerk's pagination); *Response to DuPont's Sur-Reply*, pp. 6-8.

---

[22]Attorney Cavanaugh, who is one of DuPont's attorneys in this litigation, has represented DuPont since September 2002 in other PFOA-related litigation, including *Leach* and two other actions.  *Id*. at ¶¶ 1, 3. By virtue of his representation, Attorney Cavanaugh has become familiar with DuPont's document processing and production systems and capabilities.  *Id*. at ¶ 4.  He has overseen DuPont's discovery in this case as well as in other PFOA-related cases, personally interviewing individuals who are conducting each step of the process required to process and produce ESI.  *Id*. at ¶¶ 4-6.

The Court is not persuaded that DuPont's relevance objections and representations regarding the P&S unit violated Rule 26(g).  In advancing its argument for sanctions on this basis, Little Hocking relies heavily on representations contained in the *Cavanaugh 7/20/12 Declaration*.  *See*, *e.g.*, *Motion for Sanctions*, pp. 17, 25-26. Attorney Cavanaugh specifically averred, in pertinent part:

80.  In order to respond to Little Hocking's Motion to Compel, I conducted or directed interviews of DuPont personnel.  The DuPont personnel reported the following:

a.  Information relating to sampling and disposal practices does not reside primarily in the Power and Service Group files.  Rather, it resides in the files of Washington Works' environmental group and its fluoropolymers manufacturing group.  DuPont has collected and produced the responsive files from both of these groups.

b.  The Power and Service group is responsible for operation and maintenance of Washington Works facility areas that are not connected to a manufacturing process. For example, the Power and Service group is responsible for maintenance of the facility's roadways, walkways and open spaces.  It is not responsible for the fluoropolymers manufacturing area where PFOA is used.

c.  The fluoropolymers manufacturing unit maintains the files relating to its unit's operation and any emissions or disposal from that unit.

\*              \*              \*              \*

82.  In order to respond to Little Hocking's Motion to Compel, I conducted or directed interviews of DuPont personnel.  The DuPont personnel reported the following:

a.  The Power and service group is not responsible for environmental issues, and to the extent that they were involved in any sampling or work relating to waste disposal, that information was shared with and retained by the environmental group and/or the fluoropolymers manufacturing unit.

*Cavanaugh 7/20/12 Declaration*, ¶¶ 80, 82. Although Little Hocking is correct that the 2012 depositions of two DuPont witnesses established

59

that the P&S unit operated and maintained certain wells and outfalls, Little Hocking mischaracterizes their testimony as establishing that the P&S unit was a "repository of key information," *Motion for Sanctions*, p. 17, or as inconsistent with the *Cavanaugh 7/20/12 Declaration*. *See Deposition of David Altman*, ECF 264-11, pp. 167, 256-61 (deposition pagination) ("*Altman 8/21/12 Deposition*"); *Deposition of George Woytowich*, ECF 264-12, pp. 46-47 (deposition pagination) ("*Woytowich 11/14/12 Deposition*"). In addition, although it is difficult to follow Mr. Zipfel's testimony regarding a records review without more context and explanation, the *Zipfel 8/30/12 Deposition* "directly contradict[] DuPont's representations that P&S would not have responsive information." *Motion for Sanctions*, p. 17; *Zipfel 8/30/12 Deposition*, pp. 122-23 (deposition pagination) (testifying that he reviewed, *inter alia*, records from multiple sources, including P&S records, when performing a records review apparently related to fluoropolymer waste management activities). Finally, although this Court ultimately ordered DuPont to search the files of the P&S unit for responsive documents, the Court is not persuaded that DuPont violated its obligations under Rule 26(g) or otherwise acted in bad faith when it previously objected to the relevance of P&S documents.

### B.    Violation of Court Orders

Little Hocking next argues that DuPont violated the *2/19/13 Order*, which required DuPont to, *inter alia*, "search, review and produce responsive information from the [P&S] files[,]" including source area and pathway information. *2/19/13 Order*, pp. 38-39; *Motion*

*for Sanctions*, pp. 25-26, 32-33 (Clerk's pagination); *Reply to Motion for Sanctions*, pp. 21-23 (Clerk's pagination).  More specifically, Little Hocking complains that sanctions are warranted because (1) DuPont's "P&S paper production was woefully deficient"; (2) DuPont did not search "a P&S-dedicated portion of a WW computer server – the 'shared5' portion of the wwcs4' server" (3) DuPont did not search the email accounts of P&S employees; and (4) DuPont did not search electronic P&S databases.  *Motion for Sanctions*, pp. 32-33 (Clerk's pagination).

As it relates to Little Hocking's first two complaints, the record reflects that DuPont conducted searches for responsive P&S documents in compliance with the *2/19/13 Order*.  After that order was issued, DuPont interviewed P&S individuals and other Washington Works employees in order to determine the group files to be searched for responsive documents. *Status Report,* ECF 195-1, p. 2.  During that process, DuPont also reviewed twenty filing cabinets and two book shelves of hard copy documents; certain electronic group files from *Leach* and approximately 30 boxes of materials in offsite storage, and produced responsive information.  *Id.; Declaration of Libretta P. Stennes*, ECF 180-1, ¶¶ 13, 15-16 ("*Stennes 3/5/13 Declaration*"); *Paul 9/27/13 Declaration*, ¶ 22.  DuPont also searched wwcs4, the P&S' share of the Washington Works file server, and produced responsive information.  *Myers 5/10/13 Declaration*, pp. 112-13; *Paul Declaration*, ¶ 34.

Little Hocking next complains that DuPont failed to search the email accounts of P&S employees for responsive information.  *Motion*

*for Sanctions*, p. 32 (Clerk's pagination); *Sanctions Reply*, p. 21 (Clerk's pagination); *Newman 8/21/13 Declaration*, ¶ 11 ("DuPont's counsel also informed us [on April 10, 2013] that email from Power & Services employees was not collected and searched in response to the 2/19 Order."). Little Hocking contends that "P&S employees would have relevant email, including the email text reports of Well data from the VAX/Vantage system." *Motion for Sanctions*, p. 32 (Clerk's pagination) (citing *Deposition of John T. Myers*, dated July 10, 2013, ECF 264-18, pp. 305-08) ("*Myers 7/10/13 Deposition*"). DuPont makes no response to Little Hocking's arguments regarding the alleged failure to search the email accounts of P&S employees. It therefore appears to the Court that DuPont did not search these email accounts. *See Opposition to Sanctions*, pp. 25-26 (Clerk's pagination); *Sur-Reply to Sanctions*, pp. 4-5.

In ordering DuPont "to search, review and produce responsive information from the P&S Group's files" for "responsive information, including source area and pathway information," *see 2/19/13 Order*, p. 38, the Court did not limit DuPont's search obligation to paper records. In apparently failing to search for responsive electronic documents, DuPont violated the *2/19/13 Order*.

Having so concluded, the Court must now consider an appropriate sanction for this violation. Rule 37(b)(2)(A) authorizes an array of sanctions, including the following:

> (i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;

(ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;

(iii) striking pleadings in whole or in part;

(iv) staying further proceedings until the order is obeyed; [or]

(vi) rendering a default judgment against the disobedient party[.]

Rule 37(b)(2)(A)(i)-(iv).  Moreover, "the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure [to comply with an order], unless the failure was substantially justified or other circumstances make an award of expenses unjust."  Rule 37(b)(2)(C).  This Court has wide discretion in determining an appropriate sanction under this rule.  *Nat'l Hockey League v. Metro. Hockey Club*, 427 U.S. at 643; *First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 307 F.3d at 510.

Little Hocking does not clearly articulate the particular sanction sought by it in connection with this alleged violation. Little Hocking claims prejudice because DuPont's failure in this regard has, *inter alia*, "prevented LH from having any assurance that it has all responsive information from [this group.]" *Motion for Sanctions*, p. 43 (Clerk's pagination). However, the present record does not establish a wholesale failure or refusal on the part of DuPont to comply with the *2/19/13 Order*.  As noted *supra*, DuPont has searched for and produced thousands of pages of responsive P&S documents.  *See also Paul 9/27/13 Declaration*, ¶ 22 ("DuPont ultimately produced 13,468 pages of [P&S] documents to Little

Hocking[.]").  In considering the range of available sanctions, the Court concludes that a monetary sanction in the amount of $1000.00 will sufficiently enforce the Court's orders, will deter DuPont and other litigants from future violations of the Court's orders, and will help in some measure to defray any expenses suffered by Little Hocking.  In reaching this conclusion, the Court declines to award a greater amount or to require the payment of attorney's fees because Little Hocking has not established actual prejudice to it by reason of DuPont's failure to search the email accounts of P&S employees.

Little Hocking next insists that DuPont's search for responsive P&S information was deficient because DuPont did not update its 2007 electronic searches.  However, as noted *supra*, the *2/19/13 Order* permitted DuPont to begin its current search with the electronic searches conducted in earlier PFOA-related actions; the Court specifically rejected Little Hocking's request that DuPont update its electronic searches of the files of various custodians.  *2/19/13 Order*, pp. 5-21.

## VI.  DOCUMENTS RELATED TO DRAINS AND DRAINAGE SYSTEM

The Court's *2/19/13 Order* required DuPont to search for and produce certain drain information, including historic and current information about drain maintenance issues and the layout of the drains, at the Washington Works facility.  *2/19/13 Order*, pp. 68-70. Little Hocking contends that DuPont violated this order because DuPont "strategically failed to produce essential drain information directly relevant to its discharges of C8 into the Ohio River and groundwater[,]" including drain maps, documents reviewed by Mr. Zipfel

64

prior to his deposition and incident logs since 2007. *Motion for Sanctions*, p. 27 (Clerk's pagination); *Reply to Motion for Sanctions*, pp. 23-26 (Clerk's pagination). Little Hocking also contends that Mr. Zipfel's testimony establishes that DuPont destroyed maintenance records on a certain database, Nexus, which included information related to drains and outfalls, thus warranting additional sanctions discovery. *Motion to Broaden Sanctions Discovery*, pp. 8-10.

This Court disagrees. DuPont represents that it has produced all drain documents that it was able to locate. *Sur-Reply to Sanctions*, p. 6. For example, DuPont produced electronic drain maps on November 19, 2012. *Paul 9/13/13 Declaration*, ¶ 21. Little Hocking's counsel also reviewed oversized drain diagrams and maps taken from the Washington Works facility at DuPont counsel's West Virginia office on December 8, 2012. *Id*. Little Hocking's counsel marked certain documents that it asked to be copied, and DuPont made copies available; Little Hocking did not ask that all drain maps be copied. *Id*. DuPont also represents that, following Mr. Zipfel's deposition, DuPont produced all documents that it was able to locate and which Mr. Zipfel may have reviewed. *Sur-Reply to Sanctions*, p. 6. DuPont also produced incident logs generated since 2007. *Id.*; ECF 326-7 (DuPont's supplemental response to Interrogatory No. 21 and Exhibit D, attached thereto). Little Hocking's insistence, based on its reading of Mr. Zipfel's testimony, *Response to DuPont's Sur-Reply*, pp. 8-9, does not persuade this Court that DuPont's search was defective or that DuPont has otherwise wrongfully withheld documents in this category.

The Court is likewise not persuaded that an alleged failure to preserve records from the Nexus database warrants additional sanctions discovery.  The Nexus database, which is used at Washington Works, is a maintenance cost accounting, requisitioning and equipment tracking system.  *Declaration of Mark Eakle*, ECF 302-8, ¶ 3 ("*Eakle 12/20/13 Declaration*").  "Nexus is an IBM mainframe application hosted in a corporate data center not located at Washington Works."  *Id*. at ¶ 4. Little Hocking contends that Mr. Zipfel, a Rule 30(b)(6) designee,[23] testified that DuPont failed to suspend its policy of destroying Nexus records older than three years old.  *Motion to Broaden Sanctions Discovery*, pp. 8-9 (citing *Deposition of Roger Zipfel*, ECF 296-11 (deposition taken April 18, 2013), pp. 38, 40-44).  According to Little Hocking, these Nexus records purportedly once contained the maintenance records for wood lined trenches, trench inspections, trench fixes, outfall flow rate and equipment inspection and maintenance records for key sub-areas at Washington Works.  *Id*. (citing ECF 296-11, pp. 38, 40-44; ECF 296-12 (interoffice memo dated November 3, 199); ECF 296-13 (email dated March 25, 2002).

DuPont, however, has produced evidence that the Nexus application does not store records of outfall flow rates at Washington Works, but does contain information, including electronic work orders, dating to 1988.  *Eakle 12/20/13 Declaration*, ¶¶ 7-8.  To the extent that Mr. Zipfel's testimony may conflict with this evidence, DuPont explains that DuPont grants varying roles/privileges to people with Nexus accounts, and that Mr. Zipfel was not granted direct access to Nexus.

---

[23] It is not immediately clear upon what topics Mr. Zipfel was designated to testify.

*Id.* at ¶¶ 4, 9. DuPont further explains that the "Nexus application is comprised of data points that are accessed through queries to create reports." *Id.* at ¶ 10. According to DuPont, "[a]ll searches and search results will be electronic in nature. DuPont previously produced search results that are demonstrative of the information that further searches in the Nexus system would provide[,]" but that Little Hocking complained that this information was not helpful. *Opposition to Motion to Broaden Sanctions Discovery*, pp. 9-10.

Considering this record, Little Hocking has failed to establish that additional sanctions discovery in connection with this category of information is warranted. DuPont has conducted searches of the Nexus system and has produced information. Nothing in the present record persuades this Court that additional discovery will reveal additional responsive information or reveal the spoliation of evidence.

**VII.   GROUNDWATER PROTECTION PLAN AND GROUNDWATER FLOW DATA**

The Court previously ordered DuPont to search for and produce information regarding Washington Works' "Source Inventory" and Groundwater Protection Plan. *2/19/13 Order*, p. 64 (requiring responsive information be produced within 14 days). Little Hocking complains that DuPont violated this order because it did not timely produce responsive information. *Motion for Sanctions*, pp. 31-32 (Clerk's pagination) (complaining that DuPont produced only a draft Plan); *Reply to Motion for Sanctions*, pp. 25-26 (Clerk's pagination) (complaining that DuPont did not produce the final (2009) version of

the Plan until September 12, 2013); *Response to DuPont's Sur-Reply*, pp. 9-10.

Little Hocking's arguments are not well-taken. As the procedural history following the Court's *2/19/13 Order* makes clear, DuPont did not fail to provide or permit discovery. Between the original March 5, 2013 deadline for producing responsive information and its final production in September 2013, DuPont reported to Little Hocking and to the Court on its efforts to comply with the *2/19/13 Order* and met with the parties regarding those efforts. Moreover, Little Hocking has failed to show how any delay in the method and timing of production of this information prejudiced it. For example, the different versions of the Plan reflect no apparent material differences, *compare* ECF 326-8, p. (2007 Plan) *with* ECF 326-9 (2009 Plan), although Little Hocking notes that the 2009 Plan "contains 3 key attachments, totaling 22 pages, not included in the 2007 version." *Reply to Motion for Sanctions*, pp. 25-26 (Clerk's pagination). *See Response to DuPont's Sur-Reply*, pp. 9-10 (arguing that the missing attachments "are significant because they purport to be mandatory internal company policies regarding groundwater protection, and therefore are relevant to standards of care as they relate to groundwater contamination issues"). Little Hocking, however, fails to articulate what specific prejudice it suffered by, at most, a six-month delay in the production of these attachments. Under these circumstances, the Court declines to find that DuPont violated the *2/19/13 Order* because the final Groundwater Protection Plan and related documents were not produced by March 5, 2013.

**VIII. DECLARATIONS REGARDING OTHER REQUESTED INFORMATION**

This Court ordered DuPont to search for and produce responsive documents from various DuPont Groups/Teams. *2/19/13 Order*, pp. 45-61. In so ordering, the Court further required DuPont to provide a declaration or affidavit regarding its search and production related to the various Group/Team information. *Id.* Little Hocking complains that DuPont violated this order as to ten teams: The PFOA Communications Team; the WW Audit Team; the WW Environmental Control Group/Environment Group/Environmental Central Group; the AEL (Allowable Exposure Limits) Committee; the WW Domestic Water Team; the Corporate Persistence/Bioaccumulation Team; the Business Regulatory Affairs Team; the Risk Leadership Team; the SHE Excellence Center; and the Fluorine Enterprise Marketing Sub Team. *Motion for Sanctions*, pp. 33-35. The Court shall address each team in turn.

    **A.**    **PFOA Communications Team**

The Court ordered DuPont to produce the following as to the PFOA Communications Team:

> DuPont is **FURTHER ORDERED** to provide a declaration or affidavit (1) as to whether DuPont maintains centralized file(s) for the PFOA Communications Team, identifying the number of and location of such file(s), and (2) confirming and explaining how its search and production of files of team members to date . . . constituted a complete production of all responsive documents relating to the PFOA Communications Team, particularly if DuPont maintains centralized file(s) that were not searched.

*2/19/13 Order*, p. 47.

On March 5, 2013, DuPont produced a declaration addressing its search for documents in connection with the PFOA Communications Team. *Stennes 3/5/13 Declaration*, ¶¶ 30-35. DuPont represented that this

69

team maintained centralized files and that those files had been searched. *Id.* at ¶¶ 31, 35. However, DuPont failed to identify the location of this team's files; failed to confirm that its production was complete; and failed to explain how its search and production constituted a complete production of all responsive documents. *Id.* at ¶¶ 30-35. In opposing Little Hocking's current request for sanctions, DuPont argues generally that its later March 15, 2013 status report "confirmed it [DuPont] had satisfied the 'team' and 'database' requirements of the February Order." *Opposition to Motion for Sanctions*, p. 37 (Clerk's pagination). *See also* ECF 187 ("the *3/15/13 Status Report*")

DuPont's argument is not well-taken. Therefore, although the *Stennes 3/5/13 Declaration* was timely, it failed to address all the areas of information required by the Court. Based on this record, DuPont has technically violated the Court's *2/19/13 Order*. The Court therefore concludes that some sanction is warranted for this technical violation.

Little Hocking complains generally that DuPont's deficient declaration fails to provide "the information needed to determine the scope of outstanding files never searched for this litigation," *Motion for Sanctions*, p. 35 (Clerk's pagination), and, along with other DuPont failures, has "caused LH to expend tens of thousands of dollars and countless hours tracking down what files exist regarding such critical issues[.]" *Reply to Motion for Sanctions*, p. 30 (Clerk's pagination). In considering the range of available sanctions, the Court concludes that a monetary sanction in the amount of $500.00 will

sufficiently enforce the Court's orders, will deter DuPont and other litigants from future technical violations of the Court's orders, and will help in some measure to defray any expenses incurred by Little Hocking. The Court again declines to award a greater amount or to require the payment of attorney's fees because Little Hocking's alleged prejudice is too attenuated from DuPont's technical violation made in its declaration regarding the PFOA Communications Team.

**B. Washington Works Audit Team**

DuPont was also required to produce a declaration or affidavit regarding the following:

> (1) explaining the existence of any DuPont audit teams, including, *inter alia*, what DuPont means when it represents that it has no "standing" audit team in light of, *inter alia*, *Exhibit 21* at document numbered 179-2009-0000930; and (2) identifying the location of responsive audit team related information, particularly in light of *Exhibit 22*, Doc. No. 123-9. In preparing such declaration or affidavit, DuPont is **FURTHER ORDERED** to either confirm under oath that it has produced all responsive audit team related information or, if DuPont discovers upon further review that additional responsive documents exist, produce such additional information.

*2/19/13 Order*, p. 51.

The *Stennes 3/5/13 Declaration* specifically addresses the Washington Works Audit Team. *Stennes 3/5/13 Declaration,* ¶¶ 36-41. However, that declaration fails to explain the existence of any audit teams or what it means by its representation that it has no "standing team." *See id*. The declaration also failed to confirm under oath that all responsive documents have been produced. *Id*. at ¶ 41 (averring that DuPont is in the process of confirming that all responsive audit documents have been produced).

71

The Court again concludes that a monetary sanction in the amount of $500.00 is warranted in connection with this technical violation of the *2/19/13 Order*.

### C.    Washington Works Environmental Control Group/Environment Group/ Environmental Central Group

The Court ordered DuPont to produce a declaration or affidavit addressing the following:

> (1) as to whether DuPont maintains centralized file(s) for the Washington Works Environmental Control Group, identifying the number of and location of such file(s), and (2) confirming and explaining how its search and production of files of the team members to date . . . is a complete production of all responsive documents relating to this group, particularly if DuPont maintains centralized file(s) that were not searched.

*2/19/13 Order*, pp. 52-53. The *Stennes 3/5/13 Declaration* represents that this team maintains centralized files, but does not identify the location of the files. *Id*. at ¶¶ 42-46. DuPont also failed to explain how its search and production of documents constituted a complete production. *Id*. For this technical violation of the *2/19/13 Order*, the Court again concludes that a monetary sanction in the amount of $500.00 is warranted.

### D.    AEL (Allowable Exposure Limits) Committee

DuPont was required to produce a declaration or affidavit addressing the following:

> If DuPont's prior production already incorporated such a search of Mr. [Robert] Graham's files, DuPont is **ORDERED** to provide a declaration or affidavit confirming that its prior search and production included the period dating from the last collection in *Leach* to the present. DuPont is **FURTHER ORDERED** to provide, within fourteen (14) days of the date of this *Opinion and Order*, a declaration or affidavit (1) as to whether DuPont maintains centralized file(s) for the Allowable Exposure Limits Committee, identifying the number of and location of such file(s), and

(2) confirming and explaining how its search and production of files of the team members to date (identified in *Memo. in Opp.*, p. 32) is a complete production of all responsive documents relating to the this group, particularly if DuPont maintains centralized file(s) that were not searched.

*2/19/13 Order*, pp. 54-55. The *Stennes 3/5/13 Declaration* specifically addressed Mr. Graham's files. *Id.* at ¶¶ 47-48. However, that declaration failed to identify the number and location of this team's files, *see id.* at ¶¶ 47-50, failed to confirm that DuPont's production was complete and failed to explain how documents produced to date constituted a complete production. *Id.* at ¶¶ 49-50. For the reasons previously stated, this technical violation warrants a monetary sanction in the amount of $500.00.

### E. Washington Works Domestic Water Team

The Court ordered DuPont to produce a declaration or affidavit addressing the following:

(1) as to whether DuPont maintains centralized file(s) for the Washington Works Domestic Water Team, identifying the number of and location of such file(s), and (2) confirming and explaining how its search and production of Ms. [Alison] Crane's files is a complete production of all responsive documents relating to this group, particularly if DuPont maintains centralized files that were not searched and in light of Little Hocking's representation that Ms. Crane's files do not contain documents referring to this team.

*2/19/13 Order*, p. 56. It appears that the Domestic Water Team has centralized files. *Stennes 3/5/13 Declaration*, ¶ 54 ("DuPont has not identified centralized files of the Domestic Water Team that have not been searched for responsive documents."). However, DuPont has failed to identify the number and location of these files. *See id.* at ¶¶ 51-55. DuPont also failed to confirm that its production of this team's

73

documents was complete.  *Id*.  For the reasons discussed *supra*, the Court again concludes that a monetary sanction in the amount of $500.00 is an adequate sanction.

### F.    Corporate Persistence/Bioaccumulation Team

DuPont was required to search, review and produce responsive information related to the Corporate Persistence/Bioaccumulation Team and to produce a declaration or affidavit

> detailing the nature of this [updated] search, including the sources searched and search terms used.  If DuPont limits the scope of its search because of a perceived burden, DuPont shall explain, with appropriate support, why that limitation is necessary in light of the alleged burden.

*2/19/13 Order*, p. 61.  In response, DuPont averred that this team "developed a modeling tool that could be used to predict scores for persistence and bioaccumulation.  A screen shot of the output for APFO has been produced."  *Stennes 3/5/13 Declaration*, ¶ 55.  No other data was apparently produced and DuPont failed to describe the nature of its search.  *See id*.  Accordingly, DuPont technically violated the *2/19/13 Order* as it relates to this team.  The Court concludes that a monetary sanction in the amount of $500.00 is an appropriate sanction for this technical violation of this Court's order.

### G.    Business Regulatory Affairs Team

DuPont was required to search, review and produce responsive information related to the Business Regulatory Affairs Team and to produce a declaration or affidavit

> detailing the nature of this [updated] search, including the sources searched and search terms used.  If DuPont limits the scope of its search because of a perceived burden, DuPont shall explain, with appropriate support, why

74

that limitation is necessary in light of the alleged
burden.

*2/19/13 Order*, p. 61.  The *Stennes 3/5/13 Declaration* does not
specifically address this team, but avers generally that "DuPont is in
the process of inquiring whether there are any other 'team' files to
be searched for responsive documents.  If such files exist DuPont will
search these files and produce responsive information." *Id*. at ¶ 56.
DuPont did not detail the nature of its search, nor did it identify
the sources searched and search terms used. Accordingly, DuPont's
failure in this regard again violates the *2/19/13 Order*, warranting a
monetary sanction in the amount of $500.00.

### H.    Risk Leadership Team

This Court ordered DuPont to search, review and produce
responsive information related to the Risk Leadership Team and to
produce a declaration or affidavit

> detailing the nature of this [updated] search, including
> the sources searched and search terms used.  If DuPont
> limits the scope of its search because of a perceived
> burden, DuPont shall explain, with appropriate support, why
> that limitation is necessary in light of the alleged
> burden.

*2/19/13 Order*, p. 61.  In response, DuPont avers the following:

> It appears that the Risk Leadership Team with
> responsive documents in this litigation is the PFOA
> Core Team.  DuPont has previously searched and produced
> Core Team files.  Additionally, the PFOA Core Team had
> a business affairs regulatory sub-team that addressed
> PFOA regulatory affairs.  David Boothe led this team
> for a period; Jenny Liu took over for David Boohe.
> DuPont has previously collected and produced the PFOA
> regulatory affairs team as part of the production from
> these custodians.

*Stennes 3/5/13 Declaration*, ¶ 57.  The *Stennes 3/5/13 Declaration*
failed to identify the search terms used.  This Court concludes, for

the reasons previously stated, that a monetary sanction in the amount
of $500.00 is appropriate.

**I.   SHE Excellence Center**

DuPont was required to search, review and produce responsive
information related to the SHE Excellence Center and to produce a
declaration or affidavit

> detailing the nature of this [updated] search, including
> the sources searched and search terms used.  If DuPont
> limits the scope of its search because of a perceived
> burden, DuPont shall explain, with appropriate support, why
> that limitation is necessary in light of the alleged
> burden.

*2/19/13 Order*, p. 61. As to this team, DuPont averred the following:

> 58.   As part of the interview and collection process,
> DuPont has identified the employees of the SHE Excellence
> Center most likely to have responsive documents (e.g.
> Robert Rickard and Barbara Dawson) and conducted interviews
> to collect the responsive files that the SHE Excellence
> center [sic] may possess.  This material has been
> previously produced to Little Hocking.

> 59.   The SHE Excellence Center also maintains copies of
> Material Safety Data Sheets ("MSDS") for APFO and PFOA;
> however these MSDS files have been previously produced.

*Stennes 3/5/13 Declaration*, ¶¶ 58-59.  The *Stennes 3/5/13 Declaration*
conformed to the essential requirements of the *2/19/13 Order*. No
sanctions are warranted in this regard.

**J.   Fluorine Enterprise Marketing Sub Team**

This Court ordered DuPont to search, review and produce
responsive information related to the Fluorine Enterprise Marketing
Sub Team and to produce a declaration or affidavit

> detailing the nature of this [updated] search, including
> the sources searched and search terms used.  If DuPont
> limits the scope of its search because of a perceived
> burden, DuPont shall explain, with appropriate support, why

76

that limitation is necessary in light of the alleged
burden.

*2/19/13 Order*, p. 61.  In response, DuPont averred that

[i]t does not appear likely that the Fluorine Enterprise
Marketing Sub Team (referenced in a produced e-mail as a
sub team from the Core Team) had files distinct from the
documents collected and reviewed from Jayne Van Dusen.
Although DuPont has not yet been able to confirm this, it
anticipates to report further no later than March 15, 2013.

*Stennes 3/5/13 Declaration*, ¶ 60.  DuPont has adequately met this

Court's requirement.  Sanctions are therefore not warranted in this

regard.

**IX.  PFC-RELATED DATABASES**

DuPont was ordered to provide a declaration or affidavit

specifying

a list of all databases or other shared areas that contain
PFC-related information[] and whether or not DuPont has
searched these sources for information responsive to Little
Hocking's discovery requests.  If DuPont concludes that
providing such a list is unduly burdensome, it shall
explain, in detail, that conclusion.

*2/19/13 Order*, pp. 25-26. In response, DuPont reported that it "is a

global corporation with multiple shared electronic spaces located on

hundreds of servers around the world.  DuPont is aware of no simple

way to list every shared electronic space."  The *3/5/13 Status Report*,

p. 5.  DuPont went on to explain:

. . . DuPont interviewed employees with job
responsibilities that suggest they would have knowledge of
the location of responsive documents.  As part of the
interview, DuPont collected not only those individual files
each person maintained, but also shared spaces that could
(and did) include databases, shared networks or simply
shared folders.  Accordingly, DuPont feels the shared
spaces searched represent the locations most likely to
contain responsive documents.

*Id.* DuPont later provided a list of file names for databases
identified as PFC-related.  ECF 264-32, pp. 3-4 (Clerk's pagination)
(letter dated May 23, 2013 from Attorney Stennes addressed to Attorney
Altman).

Although DuPont has identified, through the professional
representation of its counsel, a list of PFC-related databases, it
failed to provide this information under penalty of perjury, in
technical violation of the *2/19/13 Order*.  Little Hocking argues
generally that this technical failure warrants "substantive" and
"proportionate sanctions," *Motion for Sanctions*, p. 37 (Clerk's
pagination); *Reply to Motion for Sanctions*, p. 30 (Clerk's
pagination), although Little Hocking fails to clearly articulate how
this technical failure worked to its prejudice.  The Court, in the
exercise of its discretion, concludes that a sanction is unwarranted
under these circumstances.

IX.  **INCOMPLETE INTERROGATORY ANSWERS**

Little Hocking complains that DuPont has failed to provide
complete responses to several interrogatories, in violation of the
*2/19/13 Order*.  *See*, *e.g.*, *Motion for Sanctions*, pp. 37-40 (Clerk's
pagination).  The Court will address each interrogatory in turn.

A.  **Interrogatory No. 19**

Interrogatory No. 19 asks DuPont to identify "each PFC other than
PFOA that is or has been related to any manufacturing process at
DuPont's Washington Works Facility and describe each such
manufacturing process." *2/19/13 Order*, p. 96 (citing ECF 105-42, p.
31).  This Court previously concluded that DuPont's initial answer

78

improperly limited its response to the "use" of any other PFC in the manufacturing of fluoropolymers at Washington Works and ordered DuPont to supplement its answer. *Id*. at 96-97.

DuPont served a supplemental answer, which Little Hocking contends is insufficient. However, neither party has attached this supplemental answer to its filings. *See* ECF 264-35; ECF 274-9. *See also Order*, ECF 277 (granting leave to file response under seal). The Court is therefore unable to evaluate the sufficiency of DuPont's supplemental answer and, for that reason, denies Little Hocking's request for sanctions in connection with Interrogatory No. 19.

### B. Interrogatory No. 32

Interrogatory No. 32 asks, "[i]f DuPont contends that its Washington Works Facility is not the primary source of the PFOA in LHWA's Wellfield, state all material facts supporting that contention." *2/19/13 Order*, p. 99 (citing ECF 105-42, p. 46). DuPont initially responded, *inter alia*, that it was not aware of data sufficient to conclusively determine all sources of PFOA in Little Hocking's wellfield and cited to more than three dozen studies from which Little Hocking may derive the interrogatory answer. *Id*. at 99-100. In finding that conclusive data was unnecessary for DuPont to articulate its own position, the Court ordered DuPont to supplement its answer to this interrogatory. *Id*. at 99-100.

After objecting to this interrogatory, DuPont provided the following supplemental answer:

> DuPont does not deny that emissions from its Washington Works plant have contributed to the PFOA found in LHWA's wellfield. DuPont has produced published reports that address DuPont's scientific conclusion that historical

air emissions from Washington Works have been the primary
source pathway of migration from Washington Works.

DuPont is not aware of data sufficient to conclusively
determine all sources of PFOA in LHWA's wellfield.  The
published literature establishes that PFOA is found in the
environment generally, atmospheric transport takes place
globally, and PFOA may exist in the environment at
background levels at locations in Ohio as a result of many
sources that have nothing to do with DuPont or the
Washington Works plant. DuPont has not identified any
specific sources of PFCs in Little Hocking's well field.

Answering further, DuPont refers LHWA to the following
publicly-available literature and reference materials, from
which LHWA may derive responsive information [listing over
30 articles].

ECF 264-21, pp. 3-7 (Clerk's pagination).

Little Hocking complains that this supplemental answer again

requires Little Hocking to derive DuPont's response from these

articles. *Motion for Sanctions*, p. 39 (Clerk's pagination).  DuPont

disagrees, contending that it answered the question posed by

responding that "historical air emissions from Washington Works have

been the primary source pathway of migration from Washington Works."

*Opposition to Sanctions*, p. 17 (Clerk's pagination).

DuPont's argument is well-taken.  The Court concludes that

DuPont's supplemental answer sufficiently answers Interrogatory No.

32.

### C.  Interrogatory No. 66

Interrogatory No. 66 seeks the following:

Identify all bases (including all material facts) that
DuPont claims support its Twenty-Third Affirmative Defense
that "Plaintiff's claims are barred by virtue of the fact
that there is no reliable scientific, epidemiologic and/or
medical basis to support a claim that exposure to any of
the substances referenced in the Complaint in the
quantities which actually exist or existed in surface
water, groundwater and/or air has proximately caused any

80

negative or harmful impact on Plaintiff's property, human health, and/or the environment, past, present or future."

ECF 264-21, p. 8 (Clerk's pagination). This Court previously ordered DuPont to review and supplement its answer to this interrogatory. *Order*, ECF 82, p. 2; *2/19/13 Order*, p. 101.  DuPont's supplemental answer to Interrogatory No. 66 reads as follows:

> DuPont incorporates its prior responses, general and specific objections, and prior supplemental responses to Interrogatory No. 66 as if stated fully herein.  By way of further response and example, one study by a professor from the University of Pennsylvania, Dr. Emmett, focused on the residents of the Little Hocking community. The PFOA found in the blood of the average Little Hocking resident was higher than the level found in the general population.  The Little Hocking residents with the highest PFOA levels approached those of workers exposed to PFOA at the Plant. The Emmett Study, conducted by Dr. Ted Emmett from the University of Pennsylvania, found no link between PFOA blood levels and a number of potential human health effects. (*See* Emmett, T., et al. "Community Exposure to Perlluorooctanoate: Relationships Between Serum Concentrations and Exposure Sources," J Occup Environ Med. 2006; 48:759-770) (D002177).

> Extensive data taken from Little Hocking's wellfield does not establish ecotoxic impact from PFOA. Although one sample contained 0.6 ppb of PFOA in 1984, subsequent samples taken were non-detect for PFOA.  Based upon the scientific data and information available to DuPont over time, it has been DuPont's understanding that the weight of scientific evidence did not demonstrate that the PFOA in the Little Hocking Water Association wellfield presented any threat of substantial harm to consumers of Little Hocking water or the environment.  Further, Little Hocking has not sustained any damage to real or personal property, and has not been threatened with or subject to a civil or regulatory action as the result of PFOA on Little Hocking's property.

*Id.* at 8-9 (Clerk's pagination).

Little Hocking complains that this supplemental answer is deficient because DuPont does not identify which of Little Hocking's science or studies are flawed and complains that DuPont references

only one study.  *Motion for Sanctions*, p. 37 (Clerk's pagination).
Little Hocking therefore contends that DuPont should be limited to
this study at trial.  *Id.* at 37-38.  DuPont disagrees, arguing, *inter
alia*, that its response to this interrogatory (as well as its
responses to Interrogatory Nos. 68-69) addresses the RCRA claim and
that DuPont supplemented its answer at a time when it did not have the
benefit of full expert discovery.  *Opposition to Sanctions*, pp. 16-17
(Clerk's pagination).

    This Court concludes that the supplemental answer to
Interrogatory No. 66 contains sufficiently specific factual
information to advise Little Hocking of the nature of this defense.
Particularly is this so when one considers that DuPont provided this
supplemental answer at a time before expert discovery and expert
reports were complete, *see*, *e.g.*, *Order*, ECF 311, p. 1 (requiring that
expert discovery be completed by May 22, 2014); *Order*, ECF 315
(requiring that Little Hocking's supplemented expert reports be
produced by March 11, 2014, and that rebuttal expert reports be
produced by April 24, 2014). The Court declines Little Hocking's
invitation to limit DuPont to a single study at trial.[24]

    **D.    Interrogatory No. 68**

    Interrogatory No. 68 asks DuPont to "[i]dentify all bases
(including all material facts) that DuPont claims support its Twenty-
Fifth Affirmative Defense that 'Plaintiff's claim under the Resources
Conservation and Recovery Act is barred because PFCs, specifically

---

[24] Of course, if DuPont concludes that its earlier response in this regard is
now incomplete or incorrect, it must forthwith supplement that response.  *See*
Fed. R. Civ. P. 26(e)(1)(A).

PFOA, are neither hazardous waste nor a solid waste as defined under 42 U.S.C. § 6903.'" ECF 264-21, p. 9 (Clerk's pagination). This Court previously ordered DuPont to review and supplement its answer to this interrogatory. *Order*, ECF 82, p. 2; *2/19/13 Order*, p. 101. DuPont's supplemental answer to Interrogatory No. 68 states:

> DuPont incorporates its prior responses, general and specific objections, and prior supplemental responses to Interrogatory No. 68 as if stated fully herein. By way of further response DuPont states that its Twenty-Fifth Affirmative Defense is primarily based on legal arguments focusing on the definitions of "solid waste" and "hazardous waste" under RCRA and its implementing regulations. DuPont states that Little Hocking has the burden of proving that the alleged PFCs in question, including PFOA, constitute solid or hazardous wastes under 42 U.S.C. Section 6903. If Plaintiff cannot meet this burden, then Plaintiff's claim under RCRA is barred.

> As detailed in the February 15, 2013 Expert Report of Thomas Voltaggio (which has already been produced to Plaintiff), including without limitation Opinion #2 therein, the alleged PFCs in question, including PFOA, are neither listed nor characteristic hazardous wastes as defined by RCRA and its implementing regulations.

> Furthermore, upon DuPont's current available information and belief, some or all of the alleged PFCs in question, including PFOA, constituted uncontained gaseous material and/or solid or dissolved materials in industrial discharges from point sources subject to permits under 33 U.S.C. Section 1342, and therefore are excluded from the definition of "solid waste" under 42 U.S.C. § 6903(27).

> Moreover, upon DuPont's current available information and belief, some or all of the alleged PFCs in question, including PFOA, constituted usable products and/or were not "discarded" as that term is defined under 40 C.F.R. § 261.2(a)(2), and therefore such material cannot constitute "solid waste" or "hazardous waste" under RCRA. For any of the foregoing reasons, Plaintiff's RCRA claim is barred.

ECF 264-21, pp. 9-10 (Clerk's pagination).

Little Hocking contends that this supplemental answer fails to "reveal a single fact to support" DuPont's contentions. *Motion for*

*Sanctions*, p. 38 (Clerk's pagination).  Little Hocking argues that "[t]he only way to level the playing field is to deny DuPont the chance to pursue its last-minute claims by striking the affirmative defense and issuing a finding that DuPont's C8 wastes released at the Site are solid wastes under RCRA."  *Id.*  The Court disagrees with Little Hocking's assertion that this supplemental answer does not reveal a "single fact" to support DuPont's position.  For example, this answer specifically explains that Mr. Voltaggio opines that the alleged PFCs, including PFOA, "are neither listed nor characteristic hazardous wastes as defined by RCRA and its implementing regulations." ECF 264-21, p. 9 (Clerk's pagination).  The Court therefore concludes that this answer sufficiently responds to Interrogatory No. 68.

###### E.    Interrogatory No. 69

Finally, Interrogatory No. 69 asks DuPont to "[i]dentify all bases (including all material facts) that DuPont claims support its Twenty-Sixth Affirmative Defense that 'Plaintiff's claim under the Resource Conservation and Recovery Act is barred because PFCs, specifically PFOA, do not present an imminent and substantial endangerment to health or the environment as required under 42 U.S.C. § 6972(a)(1)(B).'"  ECF 264-21, p. 10 (Clerk's pagination).

DuPont was ordered to review and supplement its answer to this interrogatory.  *Order*, ECF 82, p. 2; *2/19/13 Order*, p. 101.  DuPont's supplemental answer to Interrogatory No. 69 provides:

> DuPont incorporates its prior responses, general and
> specific objections, and prior supplemental responses to
> Interrogatory No. 69 as if stated fully herein.  By way of
> further response, based upon currently available scientific
> studies, the levels of PFOA or other PFCs, if any, in the
> groundwater at or near Little Hocking's well field cannot

84

> constitute "an imminent and substantial endangerment to health or the environment" as that term is used in 42 U.S.C. § 6972(a)(1)(B) and construed by relevant legal precedent. Furthermore, the levels of PFOA or other PFCs, if any, in the finished drinking water produced by Little Hocking cannot possibly constitute "an imminent and substantial endangerment to health or the environment" as that term is used in 42 U.S.C. § 6972(a)(l)(B) and construed by relevant legal precedent due to the operation and maintenance of the Granular Activated Carbon filtration system provided by DuPont.  Consequently, Little Hocking will be unable to meet its burden of establishing a potential "imminent and substantial endangerment to health or the environment" under 42 U.S.C. § 6972(a)(1)(B). DuPont reserves the right to develop and assert additional bases for this defense as discovery and its trial preparation continue.

ECF 264-21, pp. 10-11 (Clerk's pagination).

Little Hocking characterizes this supplemental answer as making merely general references to scientific studies without identifying that information. *Motion for Sanctions*, pp. 37-38 (Clerk's pagination).  Little Hocking therefore asks that "DuPont's case, at trial [] be limited to reflect the limits of its answers." *Id*. at 38.

It is true that the supplemental answer to Interrogatory No. 69 does not identify specific scientific studies; however, the supplemental answer identifies DuPont's bases for asserting that PFCs, specifically PFOA, do not present an imminent and substantial endangerment to health or the environment. *See* ECF 264-21, pp. 10-11 (Clerk's pagination). Moreover, as noted *supra*, DuPont provided its supplemental answer without the benefit of full expert reports and expert discovery.  Under these circumstances, the Court concludes that the supplemental answer to Interrogatory No. 69 is sufficient, subject to DuPont's duty to supplement in accordance with Rule 26(e)(1)(A) of the Federal Rules of Civil Procedure.

**WHEREUPON**, *Little Hocking's Motion for Sanctions for Lack of Reasonable Inquiry and Discovery Abuses*, ECF 264, is **GRANTED in part and DENIED in part** consistent with the foregoing.  Little Hocking is **AWARDED** monetary sanctions in the amounts set forth *supra.*

*Little Hocking's Renewed Motion to Broaden Sanctions Discovery*, ECF 296, is **GRANTED in part and DENIED in part**.  Specifically, Little Hocking's motion is **GRANTED** to the extent that it seeks additional discovery regarding its contention that DuPont failed to preserve well data that, as of 2002, DuPont had a duty to preserve.  Within 30 days from the date of this *Opinion and Order*, DuPont is **ORDERED** to produce Rule 30(b)(6) witness(es) to address these issues in accordance with the limitations established herein.  Any renewed motion for sanctions based on spoliation of well data that DuPont had a duty to preserve as of 2002, subject to the limitations established *supra*, must be filed within 30 days of the conclusion of the deposition(s).

In all other respects, Little Hocking's motions are **DENIED**.


March 24, 2015                       *s/Norah McCann King*
                                Norah M^c Cann King
                          United States Magistrate Judge